ACCEPTED
01-12-00578-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
1/30/2015 2:52:23 PM
CHRISTOPHER PRINI
CLERK

# No. 01-12-00578-CV

IN THE FIRST COURT OF APPEALS
AT HOUSTON, TEXAS

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
1/30/2015 2:52:23 PM
CHRISTOPHER A. PRINE
Clerk

JIM P. BENGE, M.D. AND
KELSEY-SEYBOLD MEDICAL GROUP, PLLC
APPELLANTS

V.

LAUREN WILLIAMS
APPELLEE.

From the 164th District Court of Harris County, Texas
The Honorable Alexandra Smoots-Hogan, presiding
Trial Court Cause No. 2010-52657

## LAUREN WILLIAMS' MOTION FOR REHEARING AND FOR EN BANC RECONSIDERATION

Randall O. Sorrels
State Bar No. 18855350
ABRAHAM, WATKINS, NICHOLS, SORRELS,
AGOSTO & FRIEND
800 Commerce
Houston, Texas 77002
Telephone: (713) 222-7211
Facsimile: (713) 225-0827
rsorrels@abrahamwatkins.com

Lucy H. Forbes
State Bar No. 24007321
THE FORBES FIRM, PLLC
2114 Woodcrest Drive
Houston, Texas 77018
Telephone: (832) 620-3030
Facsimile: (832) 532-3789

lucy@forbesfirm.com

ATTORNEYS FOR APPELLEE LAUREN WILLIAMS

ORAL ARGUMENT REQUESTED

January 30, 2015

# TABLE OF CONTENTS

Table of Contents ........................................................................................... i

Index of Authorities ...................................................................................... iii

Reasons requesting en banc Reconsideration is appropriate ..................................... vi

Statement of Procedural History ...................................................................... ix

Argument ......................................................................................................... 1

I.  Neither the ICS nor Texas common law require this bright line rule
    that invalidated Lauren's judgment based on an unplead informed
    consent claim. ......................................................................................... 4

    A.  ICS just creates a rebuttable presumption. ......................................... 5

    B.  Informed consent is a valid claim based on the disclosure of a
        physician's experience and extent of participation under
        *Felton* and *Wilson* ............................................................................ 6

II. Other States have held disclosure of physicians' or residents'
    experience can support informed consent. ................................................ 12

    A.  Wisconsin: valid informed consent claim where physician
        exaggerated his experience ............................................................. 12

    B.  Maryland: valid informed consent claim where resident cut
        and clamped, patient's informed consent allowed physician to
        use assistants (just as ours), and the resident had no
        experience ..................................................................................... 14

    C.  New Jersey: valid informed consent claim where physician
        exaggerated his experience ............................................................. 15

    D.  Delaware: valid informed consent claim where physician
        failed to disclose he had not performed aneurysm surgery ................. 17

    E.  Virginia: valid informed consent for physician experience
        with expert testimony. .................................................................... 18

i

F.     Connecticut: valid informed claim if surgeon's lack of experience relates to the four factors ....................................................19

III.    Law of the case | Preservation ..................................................................20

IV.    Clarification ..................................................................................................20

Conclusion .................................................................................................................23

Certificate of Service ............................................................................................ xii

Certificate of Compliance .................................................................................... xiii

Lauren Williams' Appendix .................................................................................. xiv

ii

**Cases**

*Avila v. Glangas*,
>   No. 04-95-00106-CV, 1996 Tex.App.LEXIS 564 (Tex. App.—San Antonio
>   Feb. 14, 1996, no writ) (on reh'g) .............................................................10

*Barriocanal v. Gibbs*,
>   697 A.2d 1169 (Del. 1997 ......................................................................17

*Benge v. Williams* (Dissent),
>   Cause No. 01-12-00578-CV, 2014 Tex.App.LEXIS 12445 (Tex. App.—
>   Houston [1st Dist.] Nov. 18, 2014) ...................................viii, ix, 1, 2, 6, 7, 20

*Benge v. Williams* (Majority),
>   Cause No. 01-12-00578-CV, 2014 Tex.App.LEXIS 12445 (Tex. App.—
>   Houston [1st Dist.] Nov. 18, 2014). ........................................ ix, 1, 2, 5, 6, 20

*Dingle v. Belin*,
>   749 A.2d 157 (Md. 2000) ........................................................................14

*Duffy v. Flagg*,
>   905 A.2d 15 (Conn. 2006) .......................................................................19

*Haynes v. Beceiro*,
>   219, S.W.3d 24 (Tex. App.—San Antonio 2006, pet. denied) .....................10

*Howard v. Univ. of Med. & Dentistry of New Jersey*,
>   800 A.2d 73 (N.J. 2002.........................................................................4, 15

*Johnson v. Kokemoor*,
>   545 N.W.2d 495 (Wis. 1996) ...................................................................12

*McGinty v. Hennen*,
>   372 S.W.3d 625 (Tex. 2012) (per curiam....................................................20

*Tajchman v. Giller*,
>   938 S.W.2d 95, 100 (Tex. App.—Dallas 1996, writ denied).......................10

*Tashman v. Gibbs*,
     556 S.E.2d 772 (Va. 2002). ...........................................................................18

*Torres v. Carrese*,
     90 A.3d 256 (Conn.App. 2014). .................................................................19

*Vaughan v. Nielson*,
     274 S.W.3d 732 (Tex. App.—San Antonio 2008, no pet.). ...........................9

**Statutes**

TEX. CIV. PRAC. & REM. CODE §74.101-07 ............................................... i, vi, 1, 4, 5

**Rules**

TEX. R. APP. P. 47.7(b)......................................................................................10

No. 01-12-00578-CV

_____

IN THE FIRST COURT OF APPEALS
AT HOUSTON, TEXAS
_____

JIM P. BENGE, M.D. AND
KELSEY-SEYBOLD MEDICAL GROUP, PLLC
APPELLANTS

V.

LAUREN WILLIAMS
APPELLEE.
_____

From the 164th District Court of Harris County, Texas
The Honorable Alexandra Smoots-Hogan, presiding
Trial Court Cause No. 2010-52657
_____

**LAUREN WILLIAMS' MOTION FOR REHEARING AND
FOR EN BANC RECONSIDERATION**
_____

Lauren Williams files this, her Motion for Rehearing and Motion for *en banc* Reconsideration, and would show this Honorable First Court of Appeals as follows:

## REASONS REQUESTING EN BANC RECONSIDERATION IS APPROPRIATE

Lauren acknowledges this Court's Internal Operating Procedures, which indicate that en banc consideration is not favored. Respectfully, she believes that this rehearing presents the extraordinary circumstances or conflicts that warrant such consideration. Three extraordinary circumstances exist. First, is the marked change in charge practice that an informed consent theory never plead, or submitted to the jury, could form the basis of an invalid claim because the trial court failed to give a charge instruction for the jurors to ignore the evidence that Lauren was not told the resident was wholly inexperienced and performed over 40% of a complicated surgery.

This evidence was properly before the jury on Lauren's medical negligence liability question; she just wasn't supposed to tell the jury (or should have provided an instruction for the jury to not consider it), for any informed consent liability, according to the Majority. This is confusing. This evidence is relevant to negligence, but ignore it for disclosure.

Second, is the holding of first impression that, *as a matter of law*, a physician has no duty to disclose his, any other physician's, or residents', experience or extent of participation in any medical care or surgery, and such disclosure (whether made, exaggerated, or omitted) cannot form the basis of an informed consent claim.

This bright line rule, which this Court rests on the Texas Informed Consent Statute ("ICS")[1] and common law, is actually antithetical to ICS, *Felton*[2], and *Wilson*[3], which would permit a case-by-case analysis, under which Lauren would have met the criteria by her expert's opinion and other evidence, according to the Majority and Dissent.

Third, two unintended consequences result in extraordinary circumstances. First, this Opinion creates a new legal landscape where physicians can make, exaggerate, or omit the experience or extent of participation of their own, or any other physician or resident, with no informed consent legal repercussions. Second, in any case in which a professional's negligence or malpractice is raised, while the experience and participation of the professionals may be sufficient evidence to support negligence, the failure to disclose the experience and participation cannot support informed consent negligence.

The conflicts arise when an analysis is conducted of *Felton* and *Wilson*, and among the other states that have considered the analogous issue, with parallel informed consent laws, but have adopted the approach that disclosure of a physician's, or resident's experience and extent of participation *is* a risk or hazard involved in the medical care or surgical procedure that could influence a

---

[1] TEX.CIV.PRAC.&REM.CODE §74.101-07.

[2] *Felton v. Lovett*, 388 S.W.3d 656, 663 (Tex. 2012).

[3] *Wilson v. Scott*, 412 S.W.2d 299, 302 (Tex. 1967).

reasonable person in making a decision to give or withhold consent and is relevant to an inherent risk in a procedure/surgery.

For these reasons, Lauren respectfully requests *en banc* consideration of her rehearing.

## STATEMENT OF PROCEDURAL HISTORY

*Nature of Case*: Medical malpractice case. Following a laparoscopic-assisted vaginal hysterectomy to remove Lauren's uterus, ovaries, and fallopian tubes, Lauren suffered significant complications leading to a life-long colostomy. Lauren plead medical negligence and submitted one liability question on this basis.

*Trial Court Disposition*: The jury found that Dr. Benge was negligent for the surgery, Dr. Thornton was not negligent for the post-operative care, and Lauren Williams was not negligent, awarding $1,926,069 in damages. With the exception of $10,000 in non-pecuniary damages, the trial court signed a judgment consistent with the jury's verdict, for a total of $1,916,069.14. The judgment is against Dr. Jim Benge and his employer, Kelsey-Seybold Medical Group, PLLC.

*Appellate Court Disposition on three issues* (restated from Appellant's brief):

1.      Did the trial court err when it failed to exclude Williams' negligence expert, even though he was statutorily disqualified from providing expert testimony on that issue?

Majority Disposition: *Affirmed*
Dissent Disposition:  *Affirmed*

2.      Did the trial court err when it allowed the jury to base its verdict on Williams' unsupported informed-consent claim?

Majority Disposition: *Reversed and remanded*
Dissent Disposition: *Affirmed*

3.      Did the trial court err when it refused to allow the Defendants to make periodic payments of the future medical expenses, as the Tecas Civil Practice and Remedies Code expressly allows?

*Did not need to reach*

*Appellate Court Panel and Opinion Citation:*

*Majority panel*:     Justices Jane Bland and Harvey Brown (author)

*Dissent panel*:     Justice Evelyn Keyes

*Opinion citation*:  *Benge v. Williams*, Cause No. 01-12-00578-CV, 2014 Tex.App.LEXIS 12445 (Tex. App.—Houston [1st Dist.] Nov. 18, 2014).

The Majority opinion is cited as:     Op.-*page*

The Dissenting opinion is cited as:     Dissent-*page*

This Opinion leaves Texas citizens as ignorant, and unbeknownst to them, guinea pigs,[4] with no duty, as a matter of law, for a physician to disclose *his* experience, any other physician's, or the residents', and the extent of their participation, in any medical care or surgical procedure. Op.-*52-58. Yet, nothing in the ICS or common law distinguishes Texas from the other states that have held the opposite: Wisconsin, Connecticut, Maryland, New Jersey, Delaware, and Virginia.[5] This Opinion invalidates all informed consent claims on the basis of a disclosure on the physician's or resident's experience or participation. Neither ICS, *Felton*, nor *Wilson* support this bright line holding, under which Lauren's case was reversed under *Casteel*.

If the Court held there is a duty to disclose physician experience and extent of participation, all this does is give Lauren damages for *medical negligence*, she didn't plead or seek any damages for informed consent. By so holding, it doesn't open the floodgates for informed consent claims because of the expert requirement under *Wilson*.

There can be no doubt that Lauren wouldn't be struggling with a lifelong colostomy had Benge not allowed (or properly supervised) this resident to perform

---

[4] Dissent-*93.

[5] *But see* Appendix, States that have similarly held: Washington, Pennsylvania, Wyoming, and Michigan.

1

more than 40% of this complicated surgery, which she had never before done. Just because Lauren shared with the jury Benge's failure to tell her this, and her expert testified it was below the standard of care, she lost her judgment.

So, she wasn't supposed to know *and* wasn't supposed to tell the jury.

If there was a duty, her medical negligence damages wouldn't have been reversed on account of an invalid informed consent claim that she never sought. It would preserve Lauren's judgment and the sanctity of patient expectation that just as with experimental drugs and vaccines, they likewise cannot be used as guinea pigs without their consent.

This medical malpractice case has to be re-tried with only one difference: Lauren must either exclude the disclosure evidence, or instruct the jury that what *Benge told her* about the resident's extensive participation and inexperience cannot be the basis of medical negligence. Dissent-*69,104-05. The resident's participation and inexperience can, however, be the basis of medical negligence. Op.-*62. This is confusing.

The physician can use any physician he wants, competent or not, experienced or not, and to whatever extent he wants, to assist him. He just doesn't have to tell the patient, or be truthful, even though a reasonable person might be *significantly* influenced to give or withhold consent on this basis and even though such inexperience relates to the risk inherent in the procedure. For the retrial, the

elements supporting negligence and damages are exactly the same. Dissent-*104-05.

Under this holding, patients have no choice to request the experience level or extent of participation of any of the physicians; the physician doesn't have to tell his *own* experience or anyone else's, doesn't have to be truthful if it is his, or anyone else's, 1st or 1,000th attempt at the procedure, and doesn't have to honor the patient's request for a particular experience level or surgeon either. Because by this Opinion, any informed consent claim on the basis of this disclosure is an invalid claim *as a matter of law*.

This holding applies equally to the primary physician's disclosure of his own experience because of its reasoning. No matter how egregious the disclosure facts might be, this Opinion sanctifies the physician's disclosure and indemnifies him from any informed consent liability.

The teachings of *Wilson* and *Felton* anticipated that with expert testimony, the disclosure of a physician's experience is relevant to, and can support negligence liability based on informed consent.

While this Opinion makes informed consent claims on this basis simple to summarily dispose, the jurisprudence of Texas charge law and informed consent liability is disserved. Under this holding, a patient has no right to know these facts and must submit completely as a guinea pig, or else risk having to choose a

3

different physician, who likewise, is under no legal duty to disclose the experience of any of the physicians and to what extent they'll participate. This holding takes a basic medical negligence case and makes charge error simple to inject by recasting a plaintiff's case. Dissent-*67-70,103-04.

Under *Felton* and *Wilson*, a more case-specific approach, that follows what most patients believe (that their physician *would be* legally obligated to accurately and fully disclose the experience of the physicians and honor their request for a particular experience level) is to permit informed consent claims on this basis, with expert testimony, such as what Lauren provided.

This Court should affirm.

## I.     Neither the ICS nor Texas common law require this bright line rule that invalidated Lauren's judgment based on an unplead informed consent claim.

Although Lauren did not plead or seek damages for informed consent, as the Majority acknowledged, she would have met the criteria if there was a duty to disclose; and there would be no invalid claim.

The doctrine of informed consent was tied initially to the tort of battery, but its evolution has firmly established it as negligence. *Howard v. Univ. of Med. & Dentistry*, 800 A.2d 73, 77-78 (N.J.2002).

Our supreme court has likewise so held, making inapplicable the battery line of cases, such as *Haynes*. *See Felton*, 388 S.W.3d at 663 ("Failures to disclose

4

what a reasonable patient should know, and what a reasonable care provider would disclose, are both *negligence*."); *see Wilson*, 412 S.W.2d at 302 ("*The traditional elements of assault and battery, unlawful use of violence upon another and intent to injure, are absent* in most malpractice cases based upon a physician's failure to make sufficient disclosure.").

### A. ICS just creates a rebuttable presumption.

Nothing in the legislature's enactment of the ICS would support this result. If experience and participation can be a basis of negligence liability, it should not be an invalid theory if the disclosure of the experience of the physician, other physicians, or residents, and their extent of participation, is introduced as evidence.

The Texas Medical Disclosure Panel List A disclosures just create a rebuttable presumption that the requirements have been complied with. Op.-*52-54.

This court could affirm, require expert testimony to support informed consent based on what a reasonable patient would be influenced by regarding the risks and hazards, including the physician's experience, the resident's experience and extent of participation, tied to the applicable standard of care. Lauren met this criteria, if she had intended to pursue an informed consent claim, such that there wouldn't be an invalid claim.

This Opinion is irreconcilable under the Legislature's expressed intent,

which created a rebuttable presumption, not an exclusive list.

**B.**      **Informed consent is a valid claim based on the disclosure of a physician's experience and extent of participation under *Felton* and *Wilson*.**

The common law doesn't dictate this result either. Op.-*54-58.

Lauren's "informed consent theory" (which she never pled) would have been valid under Patsner's uncontroverted expert testimony. Dissent-*95-96. "Williams's expert, Dr. Patsner, testified that Dr. Benge's failure to disclose Dr. Giacobbe's involvement to Williams fell below the standard of care. Under this theory, the question of what a gynecological surgeon of ordinary prudence would do was not addressed to either doctor's surgical techniques but, instead, whether the hired surgeon (Dr. Benge) should have disclosed to the patient that another surgeon with limited experience would perform a substantial portion of the operation. To complete the necessary elements for a finding of negligence under this theory, Williams presented evidence on causation and damages with Williams's testimony that she would not have consented to Dr. Giacobbe's substantial involvement had she known and with Dr. Patsner's testimony that, in his opinion, Williams's substantial injuries were caused by Dr. Giacobbe perforating her bowel." Op.-*35-36

Lauren presented unrebutted expert testimony that the experience and participation of a co-surgeon is material, would influence a reasonable person's

6

decision to consent, and is inherent to the medical procedure undertaken. Dissent-*91-98.

The experience and participation of physicians goes to the heart of an inherent risk with a procedure/surgery, which can support a breach of the standard of care for negligence and informed consent. Dissent-*92-94. Benge's "failure to disclose a risk inherent in 'the care itself,' namely, the greatly increased risk that an inexperienced, unqualified surgeon performing [LAVH] for the first time, by herself, with only instructions and example of her co-surgeon on the other side … will make a mistake that a qualified surgeon who had performed an LAVH in the past would not make, causing harm to the patient. This is exactly the type of risk that must be disclosed under *Felton*." Dissent-*93

"In sum, a reasonable health care provider must disclose the risks that would influence a reasonable patient in deciding whether to undergo treatment but not those that would be unduly disturbing to an unreasonable patient." *Felton*, 388 S.W.3d at 661. "The risk that surgery may result in injury, even if properly performed, is inherent in the procedure itself." *Id.* The supreme court's rationale shows it never intended for a bright line rule, but one that would cater to the specific facts of a case.

The *Felton* court quoted extensively from *Wilson*, which this Court cited also. 388 S.W.3d at 660-63 n.11, n.16, n.19, n.36. In *Wilson*, plaintiff alleged

doctor failed to make reasonable disclosure of risk for a stapedectomy operation and he wasn't told, *although the doctor had performed related operations, his former experience with this procedure had been confined to experimental operations upon cadavers while being supervised*. 412 S.W.2d at 301. No expert testified as to the standard for disclosure about the surgeon's experience with an operation. *Id.* at 303. The trial court granted judgment for the doctor on a motion for instructed verdict, but the appellate court reversed. *Id.* at 300. The supreme court held there was evidence of the medical standard for informed consent and affirmed the appellate court, thereby remanding the cause for trial. *Id.* at 304.

Our supreme court held "plaintiff had the burden to prove by expert medical evidence what a reasonable medical practitioner of the same school and same or similar community under the same or similar circumstances would have disclosed to his patient about the risks incident to a proposed diagnosis or treatment, that the physician departed from that standard, causation, and damage." *Id*. at 302.

In *Wilson*, the disclosure of the physician's experience was a factor alleged in the informed consent allegation, and our supreme court remanded that claim for trial.

Thus, *Felton* and *Wilson* actually support affirming an informed consent claim on the basis of the disclosure of a physician's or resident's experience and extent of participation, with expert testimony, as Lauren did here.

8

In *Vaughan*, the court reversed a summary judgment, permitting plaintiff to pursue his informed consent claim on the basis of a physician who secured his consent through a misrepresentation of grossly misrepresenting the likelihood of success and understating the risk of certain side effects. *See Vaughan v. Nielson*, 274 S.W.3d 732, 734-41 (Tex.App.—San Antonio 2008, no pet.). There is no difference between misrepresenting the likelihood of success of a procedure and the likelihood of success based on a physician's inexperience and extensive participation. Yet, under this Opinion, the latter misrepresentation cannot be raised as a matter of law, but the former can under *Vaughan*. Both disclosures reflect a risk inherent in the procedure from any reasonable patient's perspective.

"It is one thing for a reasonable patient to consent to a procedure that he believes has a 90% chance of success; it is another thing altogether to consent to the same procedure knowing it actually has only a 33% chance of success. Similarly, consent to a procedure where the risk of a particular  side effect is, in reality, 80-100% and 25% of patients will be 'debilitated' by that side effect, is far different than consent after the patient is told that only 50% of patients will experience that side effect and 'most patients' regard it as 'a minor inconvenience.'" *Id.* at 740-41.

Thus, any representation that affects a risk inherent in a procedure, including physician experience, can form the basis of informed consent.

9

*Tajchman v. Giller* is distinguishable because the court rejected the plaintiff's argument that it was a *DTPA violation* to not disclose who would be placing the electrodes during the procedure, because the statute barred the characterization of medical negligence as DTPA claims. 938 S.W.2d 95, 100 (Tex.App.—Dallas 1996, writ denied). Lauren didn't allege a DTPA violation. This discrete holding goes to how the claim was raised.

*Haynes v. Beceiro* is distinguishable because plaintiff *plead battery* and *fraud* on the basis she that wasn't told who would be performing the surgery and lost on summary judgment. 219, S.W.3d 24, 25-28 (Tex.App.—San Antonio 2006, pet. denied). In contrast, Lauren never plead battery, fraud, or informed consent as a cause of action and this appeal arose following a jury trial with proper expert testimony. Moreover, as *Felton* has held, the battery line of cases are inapplicable to the negligence grounded informed consent claim.

This Court also cites to *Avila*, *an unpublished opinion* with *no precedential value*. *See Avila v. Glangas*, No. 04-95-00106-CV, 1996 Tex.App.LEXIS 564, at *5-6 (Tex.App.—San Antonio Feb. 14, 1996, no writ) (on reh'g); Tᴇx. R. Aᴘᴘ. P. 47.7(b). Avila alleged lack of informed consent on the basis of nondisclosure of the surgical team's inexperience, the intention to use a particular approach, and the ability to have the surgery performed elsewhere. *Id.* She lost on summary judgment. *Id.* The appellate court affirmed, explaining that none of these three

10

factors exist in, or are inseparable from, the procedure; they instead related to Avila's claims involving "negligent human intervention." *Id.* at *6.

*Wilson* and *Felton* make for much better authorities to frame our jurisprudence than this unpublished disposition. Nothing there requires the wholesale disregard for patient choice in the physicians' level of experience and extent of participation. By holding there is no duty to disclose experience, it necessarily follows that there is no reason to honor any preference.

And it makes for a more complicated charge because experience is a factor in negligence, but you can't tell the jury you weren't told, without an instruction for them to ignore that evidence in finding for negligence. This is confusing.

But, physicians can't train as many residents if they disclose a resident who has never done a sophisticated surgery before will perform more than half of it. The FDA could approve a lot more drugs, medical devices, and vaccines too if informed consent wasn't required for clinical trials/research/studies. Imagine the progress in medical advances if physicians could experiment and train on us with drugs, devices, vaccines, and procedures/surgeries if they didn't have to accurately disclose that we're guinea pigs. An informed consent form that says: "we may use *new methods*" should suffice, which is analogous to the notice Lauren received from the form she signed.

Well, they're doctors, they know what's best for us, and we signed

11

something saying they can use "assistants and residents." That should put anyone on notice that a physician with no experience will perform more than half of a complicated surgery. Our consolation is we have a medical negligence claim if it all goes wrong.

We have no choice to know, or select, the physician experience and extent of participation beforehand though. That's what this Opinion holds: physicians never have to disclose any physicians' experience or participation.

This holding is not congruent with other areas of medical experimentation.

## II. Other States have held disclosure of physicians' or residents' experience can support informed consent.

### A. Wisconsin: valid informed consent claim where physician exaggerated his experience.

Wisconsin's informed consent law is similar, requiring the disclosure of what a reasonable patient would want to know about significant potential risks to consent to a treatment/surgery. *Johnson v. Kokemoor*, 545 N.W.2d 495, 504 (Wis.1996). *The doctor wanted a bright line rule that only what is inherent in the procedure should have to be disclosed*, which their supreme court rejected. *Id.* At issue was the admission of evidence regarding the doctor's limited experience in operating on aneurysms, and no experience comparable to the complexity of plaintiff's large basilar bifurcation aneurysm. *Id.* at 505-06.

"[A] patient cannot make an informed, intelligent decision to consent to a

physician's suggested treatment unless the physician discloses what is material to the patient's decision, *i.e.*, all of the viable alternatives and risks of the treatment proposed. *In this case information regarding a physician's experience in performing a particular procedure, a physician's risk statistics as compared with those of other physicians who perform that procedure*, and the availability of other centers and physicians better able to perform that procedure would have facilitated the plaintiff's awareness of 'all of the viable alternatives' available to her and thereby aided her exercise of informed consent." *Id.* at 498. Thus, the circuit court didn't erroneously admit the evidence.

Plaintiff introduced evidence that had a reasonable person been aware of the defendant's lack of experience in performing basilar bifurcation aneurysm surgery, that person would not have consented, and this was among the most difficult surgeries in all of neurosurgery. *Id.*

The court concluded that a reasonable person in the plaintiff's position would have considered the defendant's lack of experience material in making an intelligent and informed decision about the surgery. *Id.*

Here, permitting a case-by-case analysis, with the requirement of expert testimony, is the jurisprudent outcome for Texas, and would permit an affirmance.

**B.** **Maryland: valid informed consent claim where resident cut and clamped, patient's informed consent allowed physician to use assistants (just as ours), and the resident had no experience.**

Maryland has a similar informed consent law, focusing on the adequacy of the explanation given by physician in obtaining patient's consent. *Dingle v. Belin*, 749 A.2d 157, 158-63, 165-70 (Md.2000). "In the context of this case, it will suffice to say that *a doctor who partially abandons his or her patient by improperly delegating to others professional tasks that the doctor was engaged personally to do and agreed personally to do may be liable* for traditional professional negligence, *lack of informed consent*, and breach of contract, depending in part on the nature of the consequences that flow from that abandonment." *Id.* at 170.

The facts are remarkably analogous. Physician delegated the cutting and clamping to a resident in a laparoscopic cholecystectomy (removal of gall bladder through small incision in abdomen), which resulted in the cutting of a common bile duct and drainage of bile into the abdomen. *Id.* at 158-63, 165-70. *The court noted that it was unaware of any case precisely like this one, where the dispute is over an alleged allocation of specific functions between or among surgeons, all of whom were expressly authorized to participate and perform some role in the procedure.* *Id.* Plaintiff lost at trial on her negligence and informed consent claims. *Id.*

The court granted certiorari to consider whether a physician who, as part of

his contractual undertaking with a patient, agrees to an allocation of tasks among physicians, may be liable for breach of contract if that agreement is violated. *Id.* The court held that it can.[6] *Id.*

Here, although the informed consent forms allow the physician to use other physicians and residents, the physician should still be subject to informed consent liability if he fails to disclose what a reasonable patient would want to know in giving consent.

## C. New Jersey: valid informed consent claim where physician exaggerated his experience.

New Jersey's informed consent laws are similar, patient must prove that doctor withheld pertinent medical information concerning the risks of the procedure/treatment, alternatives, or potential results if the procedure/treatment were not undertaken under a "reasonably prudent patient" standard. *Howard*, 800 A.2d at 75-81. There, patient alleged that doctor overstated his experience with the surgery and that he was board certified in neurosurgery (he was not at the time). *Id.*

"Although personal credentials and experience may not be a required part of an informed consent disclosure under the current standard of care required of doctors, the question raised in this appeal is *whether significant misrepresentations concerning a physician's qualifications can affect the validity of consent obtained.*

---

[6] Plaintiff lost on the facts because the evidence regarding what doctor told patient on the allocation of functions was sharply disputed and the jury's finding on informed consent in doctor's favor precluded a breach of contract finding. *Dingle*, 749 A.2d at 170.

*The answer obviously is that they can.*" *Id.* at 83.

The allegation was the defendant's misrepresentations concerning his credentials and experience were instrumental in overcoming plaintiff's reluctance to proceed with the surgery. *Id.* at 75-81, 83-85.

The court held if an objectively reasonable person could find that physician experience was material in *determining the medical risk* of the corpectomy procedure to which plaintiff consented, and if a reasonably prudent person in plaintiff's position informed of the defendant's misrepresentations about his experience would not have consented, then a claim based on lack of informed consent may be maintained. *Id.*

"We recognize that a misrepresentation about a physician's experience is not a perfect fit with the familiar construct of a claim based on lack of informed consent. *The difficulty arises because physician experience is not information that directly relates to the procedure itself or one of the other areas of required medical disclosure concerning the procedure*, its substantial risks, and alternatives that must be disclosed to avoid a claim based on lack of informed consent. But the possibility of materiality is present. *If defendant's true level of experience had the capacity to enhance substantially the risk of paralysis from undergoing a corpectomy, a jury could find that a reasonably prudent patient would not have consented to that procedure had the misrepresentation been revealed.*" *Id.* at 84.

16

Here, a bright line rule doesn't serve the jurisprudence of Texas when Lauren would have met the standard for a valid informed consent claim, thereby precluding the *Casteel* reversal.

### D.    Delaware: valid informed consent claim where physician failed to disclose he had not performed aneurysm surgery.

Delaware has a similar informed consent law, which by statute requires disclosure of "the risks and alternatives to treatment or diagnosis which a reasonable patient would consider material to the decision whether or not to undergo the treatment or diagnosis." *Barriocanal v. Gibbs*, 697 A.2d 1169, 1172 (Del.1997).

Plaintiff argued Dr. Gibbs failed to disclose he had not performed aneurysm surgery recently, that Christiana Hospital would be thinly staffed the day of surgery, and there were hospitals nearby that specialized in this surgery. *Id.* at 1170-173. The trial court excluded this evidence because it believed the expert report had not unequivocally stated that this type of information is customarily given to patients for informed consent. *Id.*

The Delaware Supreme Court reversed, holding the exclusion of evidence was reversible error, the expert's report did comply, and this is the type of information customarily given in an informed consent case. *Id.* The court held the type of "qualification" information was relevant to informed consent. *Id.* Because the excluded evidence went to "the very heart" of plaintiffs' case and "might well

17

have affected the outcome" of the trial, the exclusion of this evidence warranted a new trial. *Id.*

Here, Lauren had expert testimony that could support informed consent under *Wilson*, such that a *Casteel* reversal is not required.

**E.    Virginia: valid informed consent for physician experience with expert testimony.**

Virginia's informed consent law parallels Texas', physician has a duty in the exercise of ordinary care to inform patient of the dangers of, possible negative consequences of, and alternatives to a proposed medical treatment or procedure. *Tashman v. Gibbs*, 556 S.E.2d 772, 774-79 (Va.2002).

Gibbs alleged Dr. Tashman failed to obtain her informed consent because he didn't tell her he had never performed a sacrospinous procedure as a "lead surgeon," and she wouldn't have consented had she known.

"On the issue of Dr. Tashman's experience, we conclude that Gibbs failed to establish by expert testimony that the appropriate standard of care in 1996 for an obstetrician and gynecologist in Virginia required Dr. Tashman to disclose to Gibbs the extent of his experience in performing sacrospinous procedures. Because Gibbs' evidence regarding all three components of her "informed consent" claim was insufficient as a matter of law to raise a jury issue, we conclude that the trial court erred in submitting that part of her malpractice action to the jury." *Id.* at 778.

This plaintiff lost on the facts, but could have made the informed consent

claim with expert testimony, such as what Lauren provided here.

### F. Connecticut: valid informed claim if surgeon's lack of experience relates to the four factors.

Connecticut has a similar objective informed consent law, the "gravaman of informed consent is a discussion of the material risks of the procedure itself." *Torres v. Carrese*, 90 A.3d 256, 273-77 (Conn.App.2014). The court acknowledged a "surgeon's complete lack of experience" could form the basis of an informed consent claim. *Id.* at 273-77. The physician's disclosure must include four factors, the: (1) nature of the procedure; (2) risks and hazards of the procedure; (3) alternatives to the procedure; and (4) anticipated benefits of the procedure. *Id.* at 271.

"We do not foreclose the possibility that, in other circumstances, analogous factors may appropriately be regarded to be material risks subject to consideration by a jury. *For example, we do not necessarily rule out a surgeon's complete lack of experience … as a material risk attendant to the procedure.*" *Id.* at 277 n.36; *see Duffy v. Flagg*, 905 A.2d 15, 19-23 (Conn.2006) (informed consent valid if plaintiff shows physician's experience goes to one of the four prongs of informed consent).

Here, telling the jury the physician never disclosed the resident's lack of experience and extensive participation should not have caused a reversal when these facts support negligence.

## III. Law of the case | Preservation

The court measures the evidence of liability and damages based on the unobjected to charge given to the jury. *McGinty v. Hennen*, 372 S.W.3d 625, 628 (Tex. 2012) (per curiam). Benge did *not* object to the charge on the basis that the resident's participation and experience could not support negligence. Dissent-*82-91. There was expert testimony the risks of using an unqualified co-surgeon is below the standard of care and Benge never objected to the charge on this basis. Dissent-*96-97. Thus, the charge should have been measured against the unobjected to portion, which would have permitted an affirmance.

## IV. Clarification

The Opinion states that Lauren didn't complain "about the substance of the proposed instruction in the trial court or on appeal." Op.-*47,*59n.9. Williams argued in her Response, filed on 4/25/13, the instruction was aimed at nudging or tilting the jury, which would have been a comment on that evidence. (Resp.-13,56). No magic words are required, it would have been confusing.

in refusing to submit this instruction for at least three reasons.

First, the requested instruction did nothing to assist the jury in deciding Benge's negligence. *See Perez*, 339 S.W.3d at 698 (citing Tex.R.Civ.P. 277) (a valid instruction assists the jury). The jury was instructed with a proper question and instructions on negligence. The limiting instruction would not have assisted the jury.

Second, it was not necessary to "limit the jury" to a valid theory. The only theory was negligence. There was also discussion about medical residency programs, what it means for a person to "assist" during surgery, Lauren's care post-surgery, and other topics. Does Benge think any mention of any topic related to what happened to Lauren is grounds for reversible error because it mixed a valid theory with an "invalid" one? That is the jury's province to resolve conflicts in the evidence and a limiting instruction is not necessary for every piece of evidence.

Third, Benge's instruction was aimed to nudge or tilt the jury to ignore the overwhelming evidence of negligence based on an issue that would never appear in the negligence question. *See id.* The court's charge instructed the jury on negligence. Had the court submitted the instruction, it would have been a comment on a small piece of evidence and an abuse of discretion.

The trial court correctly refused to submit the instruction. As this Court has recognized, it can be error for a trial court to give the jury an instruction even when

56

**3. There was only one liability question submitted to the jury on negligence, this is a negligence case, and the trial court did not abuse its discretion in refusing the limiting instruction.**

Second, the court's charge asked only one liability question: negligence. Thus, the focus of the trial was on evidence related to Benge's negligence in performing the surgery and Thornton's negligence in her post-surgery care of Lauren. The jury was conservative with its negligence finding and award. It found only Benge was negligent.

There is no *Casteel* issue when there is only one liability question. The trial court has wide discretion in giving limiting instructions. It did not abuse its discretion in refusing to instruct the jury that it could not consider what Benge told Lauren about the "resident being involved with the surgery." Granulated submission of each fact or piece of evidence is not required in broad form negligence. Nor is the court required to submit a limiting instruction as to each piece of evidence. Yet, that is what Benge requested, he wanted a limiting instruction as to a small piece of evidence. The court properly refused it, as that would actually have been a nudge or tilt to the jury and a comment on the weight of the evidence.

The jury does not need to agree on every detail of what occurred so long as they agree on the legally relevant result of negligence. The jurors could have found Benge was liable under one of Zepeda's, Benge's, Patsner's, or Thornton's

13

## CONCLUSION

Lauren Williams respectfully requests this Court grant this rehearing, affirm the judgment, and for all other relief to which she is entitled.

Respectfully submitted,

_____
Randall O. Sorrels
State Bar No. 18855350
ABRAHAM, WATKINS, NICHOLS,
SORRELS, AGOSTO & FRIEND
800 Commerce
Houston, Texas 77002
Telephone: (713) 222-7211
Facsimile: (713) 225-0827
rsorrels@abrahamwatkins.com

Lucy H. Forbes
Texas State Bar No. 24007321
THE FORBES FIRM, PLLC
2114 Woodcrest Drive
Houston, Texas 77018
Telephone: (832) 620-3030
Facsimile: (832) 532-3789
E-mail: lucy@forbesfirm.com

ATTORNEYS FOR APPELLEE LAUREN
WILLIAMS

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the above Lauren Williams' Motion for Rehearing and for *en banc* Reconsideration has been served electronically through the electronic filing manager; in the alternative, it has been served by fax, or by email, as permitted under TEX. R. APP. P. 9.5(b) (1) – (2)  to the following persons on this the  day of 30th January, 2015:

| | |
|---|---|
| David George<br>Earnest W. Wotring \| Amy Nilsen<br>Connelly Baker Wotring LLP<br>700 JPMorgan Chase Tower<br>600 Travis Street<br>Houston, Texas 77002<br>Facsimile: (713) 980-1701<br>dgeorge@connellybaker.com | |
| Amicus:<br>R. Brent Cooper<br>Diana L. Faust<br>Cooper & Scully, PC<br>900 Jackson St., Suite 100<br>Dallas, Texas 75202<br>Facsimile: (214) 712-9540<br>diana.faust@cooperscully.com | Amicus:<br>Jeffrey B. McClure<br>Andrews Kurth, LLP<br>600 Travis St., Suite 4200<br>Houston, Texas 77002<br>Facsimile: (713) 220-4285<br>jmcclure@andrewskurth.com |
| Amicus:<br>Ann Seymore<br>929 Gessner, 25th Fl<br>Houston, Texas 77024<br>Facsimile: (713) 242-2424<br>ann.seymore@memorialhermann.org | |

_____
Lucy Forbes

## CERTIFICATE OF COMPLIANCE

As required by Texas Rule of Appellate Procedure 9.4(i)(2), (3), I certify that this computer generated brief has <u>4,497</u> words in the document, having relied on Microsoft Word 2007.

_____
Lucy H. Forbes

## No. 01-12-00578-CV

---

IN THE FIRST COURT OF APPEALS
AT HOUSTON, TEXAS

_____

JIM P. BENGE, M.D. AND
KELSEY-SEYBOLD MEDICAL GROUP, PLLC
APPELLANTS

v.

LAUREN WILLIAMS
APPELLEE.

_____

From the 164th District Court of Harris County, Texas
The Honorable Alexandra Smoots-Hogan, presiding
Trial Court Cause No. 2010-52657

_____

**LAUREN WILLIAMS' APPENDIX**

_____

| Tab | Description | Record Cite |
|-----|-------------|-------------|
| 1. | Panel Majority Opinion and Dissenting Opinion, November 18, 2014 | 1 |
| 2. | Charge of the Court, January 20, 2012 | 2 |
| 3. | Defendant's Requested Jury Instruction 3 | 3 |
| 4. | Formal Charge Conference | 4 |
| 5. | Informal Charge Conference | 5 |
| 6. | Final Judgment, March 23, 2012 | 6 |

7.   *Felton v. Lovett*, 388 S.W.3d 656 (Tex. 2012)..............................................7

8.   *Wilson v. Scott*, 412 S.W.2d 299 (Tex. 1967). ............................................8

9.   *Johnson v. Kokemoor*, 545 N.W.2d 495 (Wis. 1996). ...............................9

10.  *Dingle v. Belin*, 749 A.2d 157 (Md. 2000 ..................................................10

11.  *Howard v. Univ. of Med. & Dentistry of New Jersey*, 800 A.2d 73 (N.J. 2002). ..........................................................................11

12.  *Barriocanal v. Gibbs*, 697 A.2d 1169 (Del. 1997)...................................12

13.  *Tashman v. Gibbs*, 556 S.E.2d 772 (Va. 2002)........................................13

14.  *Torres v. Carrese*, 90 A.3d 256 (Conn.App. 2014, pet. denied). ......................................................................................14

15.  *Duffy v. Flagg*, 905 A.2d 15 (Conn. 2006) .............................................15

16.  *Wlosinski v. Cohn*, 713 N.W.2d 16 (Mich. 2005). ...................................16

17.  *Curran v. Buser*, 711 N.W.2d 562 (Neb. 2006) .......................................17

18.  *Whiteside v. Lukson*, 947 P.2d 1263 (Wash.Ct.App. 1997). .....................18

19.  *Willis v. Benger*, 596 F.3d 1244 (10th Cir. 2010) ...................................19



**JIM P. BENGE, M.D., AND KELSEY-SEYBOLD MEDICAL GROUP, PLLC, Appellants v. LAUREN WILLIAMS, Appellee**

**NO. 01-12-00578-CV**

**COURT OF APPEALS OF TEXAS, FIRST DISTRICT, HOUSTON**

**2014 Tex. App. LEXIS 12445**

**November 18, 2014, Opinion Issued**

**PRIOR HISTORY:**     [*1] On Appeal from the 164th District Court, Harris County, Texas. Trial Court Case No. 2010-52657.

**COUNSEL:** For Appellant: David George, Earnest W. Wotring, Amy Nilsen, CONNELLY\*BAKER\*WOTRING LLP, Houston, TX.

For Appellee: Randall O. Sorrels, Chelsie King Garza, ABRAHAM, WATKINS, NICHOLS, SORRELS, AGOSTO & FRIEND, Houston, TX; Lucy H. Forbes, THE FORBES FIRM, PLLC, Houston, TX.

**JUDGES:** Panel consists of Justices Keyes, Bland, and Brown. Justice Keyes, dissenting.

**OPINION BY:** Harvey Brown

**OPINION**

Dr. Jim Benge and his employer, Kelsey-Seybold Medical Group, PLLC, appeal from an adverse jury verdict finding that Dr. Benge's medical negligence caused a perforation of Lauren Williams's bowel during a hysterectomy. Dr. Benge and Kelsey-Seybold (collectively Dr. Benge) raise three issues challenging the judgment against them. First, Dr. Benge contends that Williams's expert on the applicable medical standard of care was statutorily disqualified. Second, Dr. Benge argues that the jury charge commingled in one broad-form submission two theories of negligence--negligent surgical technique and negligent failure to obtain the patient's informed consent--over his objection, resulting in harmful error. Third,

Dr. Benge asserts that the trial court erred in refusing to allow periodic payment of future medical expenses.

We first consider whether the trial court abused its discretion in allowing Williams's expert on the standard of care to testify; we hold that it did not. We next consider whether the jury charge **[*2]** impermissibly combined valid and invalid theories of liability into a single liability question. Because we conclude that it did and that Dr. Benge preserved the error for appeal, we reverse and remand the cause for a new trial. As a result, we do not reach the issue of periodic payments.

## Background

Williams brought this health care liability case following a hysterectomy. The hysterectomy was performed by Dr. Benge, a board-certified obstetrician and gynecologist who has practiced with Kelsey-Seybold since 2000. Dr. Benge was assisted by Dr. Lauren Giacobbe, a third-year obstetrical/gynecological resident in Methodist Willowbrook Hospital's four-year residency program. It is undisputed that Williams's bowel was perforated as a result of the hysterectomy.

## A. Williams's hysterectomy, complications, and subsequent surgeries

Dr. Benge first saw Williams, then age 39, in June 2008, two months before her surgery. Williams discussed her symptoms, including chronic and "excruciating" pain during her menstrual period. Dr. Benge diagnosed Williams with uterine fibroids, dysfunctional uterine bleeding, and pelvic pain. After consulting with Dr. Benge, Williams elected to undergo a laparoscopic-assisted **[*3]** vaginal hysterectomy (LAVH) to remove her uterus, ovaries, and fallopian tubes.

Dr. Benge next met with Williams one week before the LAVH surgery. Dr. Benge discussed the procedure and presented her with written disclosure and consent forms that they reviewed together. The consent forms--which tracked the requirements imposed by the Texas Legislature--set forth surgical risks associated with the LAVH procedure, including, among other things, damage to the bowel, the injury that formed the basis for Williams's claim. The consent forms also stated that Dr. Benge could use such "associates, technical assistants and other health care providers as [he] may deem necessary" during the surgery and that those assisting Dr. Benge may include "residents" who could "perform important tasks" during the surgery "under the supervision of a responsible physician." Dr. Benge testified that during this visit he told Williams that he "would be doing the surgery with an assistant." Williams disputes that contention. She testified that he did not tell her there would be an assistant. Although it is disputed whether Dr. Benge mentioned using an assistant in the procedure, the parties agree that Dr. Benge did **[*4]** not tell Williams that he would be assisted by someone with no prior experience assisting on an LAVH procedure.

Williams signed the consent forms and agreed in writing to proceed with the planned LAVH surgery. Dr. Benge performed the LAVH procedure on the morning of August 26,

2008, with Dr. Giacobbe assisting. While Dr. Giacobbe had significant experience with hysterectomies and laparoscopic surgeries, she had not previously assisted an LAVH surgery. Dr. Giacobbe testified that she explained to Dr. Benge her experience level before the surgery began and that he determined the tasks she would perform. She also testified that she introduced herself to Williams on the morning of the surgery and told Williams that she was a resident and was going to be "assisting" Dr. Benge with the surgery. Dr. Giacobbe did not identify the surgical tasks she would perform; she testified that she did not know those details until after the surgery began. Williams disputed Dr. Giacobbe's testimony. She testified that she did not speak with Dr. Giacobbe on the morning of her surgery. Williams further testified that she would not have undergone the surgery if she had been informed that it was Dr. Giacobbe's **[*5]** first time assisting an LAVH surgery.

The amount of assistance provided by Dr. Giacobbe was disputed. An LAVH operation is divided into two parts: the laparoscopic part, followed by the vaginal part. The post-operative report does not indicate which physician performed which portion of the procedure. Dr. Giacobbe testified that Dr. Benge remained at all times "in control of the patient's care and directing" the surgery. She estimated that she performed approximately 40% of the surgery and did so under Dr. Benge's direction and supervision. In a document she signed after the surgery that was maintained to monitor the resident's experiences, however, she reported that she was "the surgeon," which required her to perform 50% or more of the surgery. Dr. Benge estimated that Dr. Giacobbe performed 40% or less of the surgery. He testified that the standard of care is "for the attending physician to decide, based on [the resident's] skill-set, what is appropriate for her to do."

During the laparoscopic part of the LAVH, Dr. Benge stood on the right side of Williams while Dr. Giacobbe stood on the left. Dr. Benge demonstrated each step of the operation to Dr. Giacobbe and showed her "how to **[*6]** use the instruments and what to do." Dr. Giacobbe would then repeat the same thing on the left side--the side where Williams was determined to have a perforation--while Dr. Benge observed.

Upon completion of the procedure, Dr. Benge examined the surgical area but saw no signs that Williams's bowel had been perforated. He noted no complications in the post-operative report. Within hours of the surgery, Williams began to complain of severe pain, abdominal tenderness, and nausea. Later that day, rectal bleeding was discovered. By the time Dr. Benge saw Williams on the morning following the LAVH procedure, she had a fever and was anemic, tachycardic, and in constant pain. According to Dr. Benge, nothing about Williams's condition at that time indicated that she had a perforated bowel. He started her on intravenous antibiotics and ordered an x-ray of her chest to ensure that she did not have pneumonia. He did not see her again that day because he went home ill; instead, Dr. Carmen Thornton took over Williams's care.

Williams's post-operative condition continued to deteriorate: her hemoglobin and hematocrit levels fell significantly, she required a multi-unit blood transfusion, and she experienced **[*7]** constant pain. Three days post-surgery, Dr. Thornton ordered a consultation from a gastroenterologist, who performed an emergency exploratory surgery that night and de-

termined that Williams had an undiagnosed bowel perforation that was allowing feces from Williams's intestines to leak into her abdomen. The doctors repaired the perforation, but a colostomy was required.

Afterwards, she was moved to ICU and placed in a chemically-induced coma. Williams subsequently developed sepsis and underwent a tracheotomy. A mechanical ventilator was required. Williams remained comatose at the hospital for three weeks. She was discharged on October 1, 2008, and transferred to Kindred Rehabilitation Hospital. When she left Kindred the next month, she required home health assistance and was unable to work.

Williams had a second surgery in May 2009 in an effort to reverse the colostomy. This procedure could not be completed successfully; therefore, the colostomy was replaced with an ileostomy. Three months later, Williams had her third post-LAVH surgery to replace the ileostomy with another colostomy; the surgery was successful, but the colostomy became permanent. Williams has had two additional surgeries **[*8]** since then to address complications related to the colostomy.

## B. Possible causes of Williams's perforated bowel

One week after Williams's LAVH, Dr. Benge wrote an e-mail to Dr. Giacobbe stating his theory of how the bowel injury occurred. Specifically, he stated that the injury likely resulted from "an electrical arc from the BOVIE,[1] not a sponge stick or the weighted speculum."[2] According to Dr. Benge, during the vaginal portion of the surgery, the weighted speculum was touching the area where the bowel perforated. Dr. Benge opined that an arc of electricity went from the BOVIE through the weighted speculum, causing a "thermal injury" to Williams's bowel tissue below. Even though no immediate damage to the bowel tissue was visible at the time of the surgery, Dr. Benge theorized at trial that an electrical arc from the BOVIE could have caused the inflammation, tissue breakdown, and bowel perforation Williams experienced. While neither Dr. Benge nor Dr. Giacobbe saw an electrical arc during the surgery, Dr. Benge testified that it is possible for an arc to pass from the BOVIE without being seen.

> 1    The "BOVIE" is an electrical cauterizing instrument that uses energy to cut the tissue or to **[*9]** fuse it together to stop bleeding.
> 2    A weighted speculum is a surgical tool used to hold tissue in an optimal location to allow the surgeon better access to the surgical area.

Dr. Bruce Patsner, a board-certified obstetrician/gynecologist, testified as Williams's medical liability expert. In his opinion, the perforation of Williams's bowel occurred during the vaginal portion of the LAVH procedure and was caused by a surgical cut, not a thermal injury resulting from an electrical arc as Dr. Benge opined. Dr. Patsner testified that, based on reasonable medical probability, it was more likely that the less-experienced resident made the surgical error, not Dr. Benge.

He opined that the "red flags" presented to Dr. Benge after the hysterectomy suggested operative complications that needed to be addressed. In Dr. Patsner's opinion, Dr. Benge

should have suspected a bowel injury and requested an immediate general surgical consultation not later than the day after the surgery. Dr. Patsner opined that, had Dr. Benge done so, Williams "wouldn't have ended up in the operating room with . . . [a] septic shock catastrophe." Based on his opinion that Dr. Benge failed to thoroughly or timely investigate **[*10]** and evaluate the source of Williams's post-LAVH complications, Dr. Patsner concluded that Dr. Benge deviated from the standard of care and proximately caused Williams's injuries.

The jury found in Williams's favor and awarded damages.

## Dr. Patsner Met Statutory Qualifications

In his first issue, Dr. Benge contends that the trial court erred by denying his motion to strike Dr. Patsner as an expert witness. During both the pre-trial and trial phases of this litigation, Dr. Benge challenged Dr. Patsner's qualifications under Chapter 74 of the Civil Practice and Remedies Code. TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.401-.403 (West 2011). Dr. Benge did not assert a substantive challenge to Dr. Patsner's qualifications; rather, he focused on the temporal requirements of the statute. Dr. Benge argued that Dr. Patsner was not "practicing medicine" at the requisite points in time during the litigation, as required by section 74.401(a)(1). TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(a)(1) (providing that witness may qualify as expert in health care liability suit if witness "is a physician who . . . is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose."). His argument is based on Dr. Patsner's **[*11]** departure from the United States and subsequent work as a law professor and professor of medicine in Korea at the time of his testimony.

### A. Standards of review regarding statutory qualifications

Each party has the burden to prove that her own expert is qualified to offer expert testimony at trial. *Rittger v. Danos*, 332 S.W.3d 550, 558-59 (Tex. App.--Houston [1st Dist.] 2009, no pet.). The determination of whether a witness is qualified to testify as an expert is left largely to the trial court's discretion. *See Broders v. Heise*, 924 S.W.2d 148, 151 (Tex. 1996). We will not disturb the trial court's determination that an expert is qualified unless the trial court abuses its discretion. *See id*. A trial court abuses its discretion when it acts "'without reference to any guiding rules or principles.'" *Id*. (quoting *E.I. du Pont de Nemours and Co., Inc. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995)); *see Larson v. Downing*, 197 S.W.3d 303, 304-05 (Tex. 2006). In close cases, we defer to the trial court's resolution of expert qualifications and will not reverse its judgment. *See Larson*, 197 S.W.3d at 304.

A challenge to an expert's qualifications that raises an issue of statutory construction involves a question of law that we review de novo. *Group v. Vicento*, 164 S.W.3d 724, 730 (Tex. App.--Houston [14th Dist.] 2005, pet. denied). We strive to ascertain and give effect to legislative intent when interpreting statutes. *See id*. We look to the plain and common meaning of the language in the statute, reading the statute as a whole and not in isolation. *Id*. If the meaning is **[*12]** unambiguous, we interpret it according to its terms, giving it a meaning that is consistent with other provisions in the statute. *Id*. Courts read every word as if it was

deliberately chosen and presume that omitted words were excluded purposefully. *Id*. We may also consider the legislative objective as well as the consequences of any particular construction. *Id*.

Dr. Benge contends that Williams's expert, Dr. Patsner, does not meet the statutory qualifications to be a medical liability expert witness. We, therefore, review de novo the section 74.401 requirements applicable to expert medical testimony. *See* TEX. CIV. PRAC.& REM. CODE ANN. § 74.401.

## B. Section 74.401(a) requires that Dr. Patsner was "practicing medicine"

Section 74.401(a) establishes a threefold hurdle that a witness must overcome to qualify as an expert with respect to medical standards of care. TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(a). The expert must: (1) be "practicing medicine" at the time the claim arose or at the time the testimony is given; (2) have knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and (3) be qualified on the basis of training or experience to offer an expert opinion **[*13]** regarding those accepted standards of medical care. *Id*. Dr. Benge challenges the first requirement, arguing that Dr. Patsner was not "practicing medicine" at the specified points in the litigation. Williams concedes that Dr. Patsner was not practicing medicine at the time her claim arose: he was a professor at the University of Houston Law Center. Williams argues, instead, that Dr. Patsner's work at the time of his testimony meets the statutory requirements for "practicing medicine."

"Practicing medicine" is defined as follows:

> For the purposes of this section, "practicing medicine" or "medical practice" includes, but is not limited to, training residents or students at an accredited school of medicine or osteopathy or serving as a consulting physician to other physicians who provide direct patient care, upon the request of such other physicians.

TEX. CIV. PRAC.& REM. CODE ANN. § 74.401(b).

Dr. Benge offers three arguments why Dr. Patsner's work at the time he testified does not meet the statutory requirement that he be "practicing medicine." First, he argues that Williams failed to establish that the Korean school of medicine with which Dr. Patsner was affiliated was "an accredited school of medicine" **[*14]** under section 74.401(b). Second, he argues that Williams offered no evidence that any of the Korean physicians with whom Dr. Patsner was consulting at the time of his testimony meets the statutory definition of a "physician" under section 74.401(g), which requires that the individual be licensed to practice medicine in a state within the United States or have graduated from a medical school with particular accreditations. *See* § 74.401(g).[3] Third, he argues that, to the extent the phrase "practicing medicine" is not limited to the two specifically enumerated definitions listed in section 74.401(b), the phrase nevertheless requires Dr. Patsner to have actually "examined [or] ad-

mitted" patients, and Williams offered no evidence that Dr. Patsner was examining or admitting patients in Korea or elsewhere at the relevant time.

     3   In this subchapter, "physician" means a person who is:

        (1) licensed to practice medicine in one or more states in the United States; or

        (2) a graduate of a medical school accredited by the Liaison Committee on Medical Education or the American Osteopathic Association only if testifying as a defendant and that testimony relates to that defendant's standard of care, the alleged departure from that standard of care, or the causal relationship **[\*15]**  between the alleged departure from that standard of care and the injury, harm, or damages claimed.

     TEX. CIV. PRAC. &REM. CODE ANN. § 74.401(g) (West 2011).

We conclude that the statutory definition of "practicing medicine" provides a nonexclusive list of activities that qualify an expert to testify and further conclude that Dr. Patsner's work at the time of his testimony qualifies as "practicing medicine." To assist in explaining our holding, we turn first to Dr. Patsner's medical background.

## 1. Dr. Patsner's medical background

Dr. Patsner's professional background includes private medical practice, teaching positions at medical schools and affiliated hospitals, government service, and teaching positions at law schools. He has worked both in the United States and abroad.

Dr. Patsner is licensed to practice medicine in three states and is board-certified in obstetrics/gynecology with a sub-specialty certification in gynecological oncology. He graduated from Baylor College of Medicine in 1979. He completed his residency in obstetrics and gynecology at the Beth Israel Medical Center at Harvard Medical School. He also completed a fellowship in gynecological oncology in 1985 at the Roswell Park Memorial **[\*16]**  Institute.

After numerous years teaching at medical schools and working in private practice, Dr. Patsner attended law school. Afterwards, he was a senior medical officer at the Food and Drug Administration in Washington, D.C., for several years and served as the FDA's representative to the Gynecology Practice Committee of the American College of Obstetricians and Gynecologists.

In 2007, Dr. Patsner returned to Houston to teach at the University of Houston Law Center. He also began working as an Associate Professor and Director of Colposcopy and Preinvasive Disease in the Department of Obstetrics and Gynecology at Houston's Baylor College of Medicine. In connection with this position, he received a Temporary Faculty Li-

cense which permitted him to practice at a limited location even though he did not have a state-wide Texas medical license. He saw patients at Baylor for approximately one and one-half years while also teaching medicine-related law classes at the University of Houston Law Center. At Baylor, he also taught medical students and residents in obstetrics and gynecology and was directly involved in resident teaching conferences to discuss the best methods for performing gynecologic **[*17]** surgery. His affiliation with Baylor ended July 1, 2011.

Though the exact timing is unclear, Dr. Patsner testified that he also was the Assistant Director of Gynecology Oncology Service at Ben Taub Hospital and Harris County Hospital District until he "left Houston" in 2011 for Korea. In this position, he was responsible for teaching medical students and residents in obstetrics/gynecology and fellows in oncology at Ben Taub. He was one of three board-certified gynecological cancer surgeons; he selected and scheduled which of the three would perform various procedures, based on their comparative abilities. He also was one of four attending physicians running gynecological oncology clinics at Ben Taub, where he oversaw Ben Taub's "inpatient pre- and post-operative care of surgical patients on gynecological oncology . . . on an every-other-week basis." He ran four clinics a week, seeing patients with preinvasive disease, benign gynecological issues, and gynecological oncology problems.

Dr. Patsner has over 120 peer-reviewed publications. For the majority of those publications, he is the primary author. Additionally, he was on the editorial board for two medical journals and a reviewer for **[*18]** other journals.

In June 2011--six months before the trial of this case--Dr. Patsner ended his academic appointment at Baylor 2011 and began working in Seoul, South Korea, on a three-year contract. He held two positions in Seoul: (1) Adjunct Clinical Professor of Obstetrics and Gynecology at Severance Hospital, Yonsei College of Medicine, and (2) full-time tenure-track Professor of Law and Director of Health Law and Policy at Yonsei Law School, Yonsei University. As an adjunct professor at Yonsei College of Medicine, he trained medical students, residents, and fellows in gynecology and gynecologic oncology and was "heavily involved" in their instruction. Furthermore, he would "directly teach medical students, residents in Obstetrics-Gynecology, and fellows in Gynecologic Oncology and Minimally Invasive Surgery at Yonsei Medical School/Severance University Hospital." He testified that his work at the Yonsei medical school was "the same stuff I've been doing since 1983."

Additionally, while in Korea, Dr. Patsner "regularly lecture[d] on benign gynecology and gynecological oncology topics at University Hospital teaching conferences, and [was] an active participant in the Gynecological Oncology Tumor **[*19]** Board at Yonsei Medical School." Dr. Patsner attended gynecology and gynecological oncology patient-care conferences, during which pre-operative patients were discussed, and was "an active participant" at monthly surgical morbidity and mortality conferences at the medical school. He stated that "[a]t all of these conferences" he and other faculty members would "make patient care recommendations, which include[d] surgical and overall treatment recommendations." According to Dr. Patsner, these discussions focused on the "selection of surgical procedures,

route of surgery (open, laparoscopic, vaginal), as well as intense and focused discussions on anticipation of operative complications, proper techniques for recognition of surgical complications, and management of same."

At the time of trial, Dr. Patsner also had an ongoing affiliation with Baylor College of Medicine and the National Institutes of Health. He explained, "[W]e're still doing research. I still have my name on NIH grants at Baylor in their genetics and ovarian cancer laboratory. In fact, I'm meeting with them tomorrow, unless I'm here . . . ."

Though in Korea, Dr. Patsner continued to maintain his medical licenses in several states in the United [*20] States, allowing him to be an attending physician, order tests, and write prescriptions. He did not, however, have staff privileges at any hospital at the time he testified; therefore, he could not admit a patient to a hospital.

He characterized his work at the time of trial as follows: "I'm still very active in obstetrics and gynecology even though I also am a law professor" in Korea. "I've worked with residents in clinic and in the operating room my entire career, which I guess now is--it's 32 years." Regarding hysterectomies specifically, Dr. Patsner testified in his deposition--which the trial court had before it--that he had performed and taught LAVH-related techniques "continuously since the early 1990s, and [has] lectured at the medical student, resident, fellow, and attending level on this subject and related subjects (care of the surgical patient, management of complications) since that time as well." He testified that he was the first person in the United States to incorporate the use of a new stapler design in a cervical cancer hysterectomy. In his expert report--which was also before the trial court--Dr. Patsner estimated that he had directly performed or first-assisted 450 laparoscopic [*21] hysterectomies and more than 6,000 abdominal or vaginal hysterectomies during his career.

Dr. Patsner testified at trial that he was leaving in one week to take a surgical team to Honduras for a two-week visit, focused on women's cancer, during which he would be teaching medical students, residents, and surgical fellows; it would be "hands-on." Although Dr. Patsner agreed at trial that he had not performed an LAVH since 1999, he testified that he had worked in operating rooms as recently as two months before trial in Taiwan.

The question, then, is whether Dr. Patsner's work at the time of his testimony was "practicing medicine" within the meaning of section 74.401, such that Dr. Patsner could qualify as a medical expert and opine whether Dr. Benge was negligent in the medical care of Williams. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.401-.403 (concerning qualifications of expert in medical liability case).

## 2. What it means to "practice medicine"

The qualifications required to testify as an expert in a health care liability suit are found in Chapter 74 of the Civil Practice and Remedies Code. TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.401-.403. Whether an individual is qualified to provide expert testimony is a question of law to the [*22] extent that it involves a question of statutory construction. *Vicento*, 164 S.W.3d at 729-30.

Dr. Benge argues that Dr. Patsner's work in Korea does not qualify as "practicing medicine" because he neither examined nor admitted patients to hospitals there. Williams responds that Dr. Patsner's work, viewed in its entirety, meets the general, commonly accepted understanding of the term "practicing medicine" sufficient to meet the statutory requirement that he be practicing medicine at the time of his testimony. We agree.

### 3. Giving meaning to phrase "includes, but is not limited to"

"Practicing medicine" is statutorily defined. TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(b). It "includes, but is not limited to," training residents and medical students and serving as a consulting physician to other physicians. *Id*. The term "includes" is not defined in Chapter 74; however, the Government Code defines "includes" as a term "of enlargement and not of limitation or exclusive enumeration, and use of [includes] does not create a presumption that components not expressed are excluded." TEX. GOV'T CODE ANN. § 311.005(13) (West 2013); *see Vicento*, 164 S.W.3d at 731 (applying Government Code's definition of "includes" when analyzing section 74.402 of Texas Civil Practice and Remedies Code defining "practicing health care"). Likewise, it **[*23]** has been stated that "[t]he verb *to include* introduces examples, not an exhaustive list." ANTONIN SCALIA & BRYAN GARNER, READING LAW 132 (2012). Thus, a statutory definition that specifies that it "includes but is not limited to" certain activities will be read to allow within it other, non-enumerated activities as well. *Cf. Benavides v. Garcia*, 278 S.W.3d 794, 797 (Tex. App.--San Antonio 2009, pet. denied) (interpreting same provision--section 74.401--and holding that witness who was practicing medicine as *locum tenens* physician--defined as physician who substitutes for another temporarily--qualified as "practicing medicine" and as expert witness). Accordingly, we conclude that section 74.401's use of phrase "includes, but is not limited to" requires that the activities that qualify as "practicing medicine" not be restricted to training at an accredited medical school and serving as a consultant to physicians as detailed in section 74.401(g).

### 4. Definitions of "practicing" and "medicine"

Dr. Benge argues that, even if the phrase "practicing medicine" includes more than the two examples listed in the statute--i.e., training and consulting--it must be limited to physicians who actively are examining or admitting patients into hospitals. Again we disagree.

To ascertain legislative intent, we first look to the plain meaning **[*24]** and common usage of the words chosen by the Legislature. TEX. GOV'T CODE ANN. § 311.011 (West 2013); *see St. Luke's Episcopal Hosp. v. Agbor*, 952 S.W.2d 503, 505 (Tex. 1997) ("The Legislature's intent is determined from the plain and common meaning of the words used."). The word "practice" means "to be professionally engaged in" a subject. MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 974 (11th ed. 2003). The word "medicine" is defined as "the science and art dealing with the maintenance of health and the prevention, alleviation, or cure of disease." *Id*. at 771. The phrase "practice of medicine" has been given its own definition: "the learned profession that is mastered by graduate training in a medical school and that is devoted to preventing or alleviating or curing diseases and injuries."[4]

4    "Practice of medicine," http://www.webster-dictionary.org (last visited Oct. 23, 2014); "Practice of medicine," http://www.thefreedictionary.com (same); "Practice of medicine," http://www.definitions.net (same).

Accordingly, we conclude that the phrase "practicing medicine" in section 74.401(a)(1) includes a variety of tasks performed by licensed physicians, professionally engaged in preventing, alleviating, and curing diseases and injuries. A physician may be devoted to preventing, alleviating, or curing diseases and injuries through tasks other than "treating" or "admitting" patients. *Cf. Schneider v. Fried*, 320 F.3d 396, 407 (3d Cir. 2003) (holding **[*25]** that trial court erred by excluding cardiologist expert who had stopped performing angioplasties but continued to advise interventional cardiologists who performed angioplasties).

Further, because the statute uses the phrase "includes, but is not limited to," we conclude that the "practicing medicine" requirement for medical liability experts allows for geographical movement so long as the physician continues to professionally engage in and actively use his medical knowledge as the statute requires. *Cf. Peterson v. Shields*, 652 S.W.2d 929, 930-31 (Tex. 1983) (rejecting locality rule); *TTHR, L.P. v. Guyden*, 326 S.W.3d 316, 321 (Tex. App.--Houston [1st Dist.] 2010, no pet.) (stating that the term physician "does not impose any geographical limits"); *accord N.H. Ins. Co. v. Allison*, 414 S.W.3d 266, 274 (Tex. App.--Houston [1st Dist.] 2013, no pet.). Dr. Patsner received his training and board certification in the United States and practiced and taught medicine in Houston the majority of his career. This case does not concern the qualification of a physician who trained, practiced, and taught in another country and then came to Texas to testify.

In conclusion, we construe "practicing medicine," within the context of section 74.401, to include a physician who is licensed to practice in the United States, has actively practiced medicine by consulting with other physicians and teaching medical residents in Texas, and then moved to another **[*26]**   country where he continues to consult with that country's physicians and teach its medical residents, all the while maintaining his affiliation with a Texas medical school, working on NIH grants, and teaching--with hands-on involvement--surgical procedures abroad through volunteer service. *See* TEX. CIV. PRAC. & REM. CODE ANN. §74.401; *Larson*, 197 S.W.3d at 304-05 (stating that "expert qualifications should not be too narrowly drawn").

## C. Trial court did not err in concluding that Dr. Patsner was practicing medicine

Once we interpret the applicable statute as a matter of law, the issue of whether a particular witness qualifies as an expert under that statute is left to the trial court's discretion. *See Broders*, 924 S.W.2d at 151; *Daniels*, 175 S.W.3d at 893. We will not find that the trial court abused its discretion in finding Dr. Patsner was qualified unless it acted without reference to any guiding rules or principles. *Daniels*, 175 S.W.3d at 893-94; *Larson*, 197 S.W.3d at 304-05.

The following evidence supports the trial court's ruling:

o Dr. Patsner's substantive (versus temporal) qualifications are unchallenged. Dr. Patsner is a board-certified gynecologist and has maintained his certification at all times relevant to this suit. He has years of experience practicing and teaching in the area of gynecology.

o Dr. Patsner has expertise **[*27]** in the very issue presented in this case; he estimates that he has directly performed or first-assisted 450 laparoscopic hysterectomies and more than 6,000 abdominal or vaginal hysterectomies during his career.

o Dr. Patsner continued to participate "hands-on" in gynecological cancer surgeries up to and after the date of his testimony through international aid work.

o Dr. Patsner's work in Korea, where he had begun working by the time the case went to trial, was substantially similar to the work he performed at Baylor and Ben Taub.

o The time period between Dr. Patsner's last teaching assignment at Baylor and his teaching assignment in Korea was relatively short.

o Dr. Patsner's expertise in gynecology was recognized by Ben Taub, where he was appointed the Assistant Director of Gynecological Oncology and ran four clinics weekly.

o Dr. Patsner performed similar teaching tasks in Korea as he had at Baylor College of Medicine, a research and teaching hospital in Houston. While the record is silent on whether the Yonsei medical school--as opposed to the affiliated teaching hospital--is accredited, his professional work was functionally equivalent to the teaching he had been doing at Baylor several **[*28]** months before his trial testimony.

o Dr. Patsner maintained, through the date of trial, an affiliation with Baylor in Texas: "[W]e're still doing research. I still have my name on NIH grants at Baylor in their genetics and ovarian cancer laboratory."

We conclude that the trial court did not abuse its discretion in admitting Dr. Patsner's testimony. *See Broders*, 924 S.W.2d at 151. We therefore overrule Dr. Benge's first issue.

### *Casteel* **Challenge to Broad-form Negligence Question**

In his second issue, Dr. Benge argues that the "trial court erred when it mixed valid and invalid legal theories in a broad-form jury question over Defendants' objection." According to Dr. Benge, the broad-form question mixed a valid theory (negligence) with an invalid theory (lack of consent). Dr. Benge contends that the mixing of these two theories violated *Crown Life Insurance Company v. Casteel*, 22 S.W.3d 378 (Tex. 2000).

The standard of review for claims of charge error is abuse of discretion. *Tex. Dep't of Human Servs. v. E. B*., 802 S.W.2d 647, 649 (Tex. 1990); *Powell Elec. Sys., Inc. v. Hewlett Packard Co*., 356 S.W.3d 113, 122 (Tex. App.--Houston [1st Dist.] 2011, no pet.). Therefore, we review a trial court's decision to deny a requested instruction under that standard of review. *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012). An instruction that might aid the jury in answering the jury questions is proper. *Id*. When a trial court refuses to submit a requested instruction, "the question on appeal is whether the request was reasonably **[*29]** necessary to enable the jury to render a proper verdict." *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006). If the jury charge was erroneous, we must then consider whether the error requires reversal. *Powell*, 356 S.W.3d at 122.

## A. What constitutes a *Casteel* problem

*Casteel* and its progeny teach that a jury charge is erroneous when a jury answers a single broad-form liability question affirmatively, the single liability question incorporates multiple legal theories, and at least one of those legal theories does not support liability as a matter of law and therefore is invalid.[5] *Casteel*, 22 S.W.3d at 387-89. The "erroneous commingling of valid and invalid question" makes it impossible for an appellate court to "determine whether the jury based its verdict on an improperly submitted theory." *Burbage v. Burbage*, No. 12-0563, 2014 Tex. LEXIS 753, 2014 WL 4252274, at *4 (Tex. Aug. 29, 2014).

> 5    Mixing valid and invalid damages elements also creates a *Casteel* problem. *Harris Cnty. v. Smith*, 96 S.W.3d 230, 234 (Tex. 2002).26 theories of liability in a broad-form liability

A theory may be invalid for a variety of reasons, including lack of standing (*Casteel*, 22 S.W.3d at 387-89), lack of supporting evidence (*Romero v. KPH Consolidation, Inc. d/b/a Columbia Kingwood Medical Center*, 166 S.W.3d 212, 225, 227-28 (Tex. 2005)), or a failure to plead it (*Texas Commission on Human Rights v. Morrison*, 381 S.W.3d 533, 537 (Tex. 2012) (plaintiff did not claim denial of promotion, only wrongful termination and retaliation, and could not do so because she did not pursue that claim before EEOC)). "A trial court errs by submitting to the jury theories of liability that are **[*30]** not legally viable--e.g., liability theories that [1] have not been pled, [2] are not supported by the legally sufficient evidence, or [3] are not supported by operative law." *Powell*, 356 S.W.3d at 123. Thus, the inquiry is not limited to whether an invalid theory was pleaded. If one of the plaintiff's legal theories does not support liability as a matter of law and the plaintiff presented evidence to the jury on that theory that may have led the jury to answer affirmatively the broad-form liability question incorporating the invalid theory, there is a *Casteel*-type charge error. *See Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 863-65 (Tex. 2009) (broad-form negligence question included instruction that hospital acts through its employees, agents, nurses, and servants but did not inform jury that hospital is not legally liable for acts of independent contractor-physician and, as result, appellate court could not tell if jury impermissibly found hospital liable for acts of doctor where evidence raised that possibility).

In *Casteel*, the theory was invalid due to an issue of standing. 22 S.W.3d at 387-89. The plaintiff asserted that the defendant engaged in a number of unfair or deceptive practices that violated the Insurance Code and DTPA. *Id*. at 381-82. In response to a single broad-form question, the jury **[*31]** found the defendant liable. *Id*. at 387. Because the liability theories were combined in a single question, it was unclear if the jury had assigned liability based on a finding of an Insurance Code violation or DTPA violation. *See id*. The plaintiff could not recover on four DTPA claims because he was not a consumer. *Id*. at 387-88. The Texas Supreme Court held that when a jury question mixes valid and invalid liability theories and it cannot be determined on which theory the jury based its liability finding, appellate courts will presume harm, reverse, and remand the cause for a new trial using a legally correct jury charge. *See id*. at 387-90. To avoid this risk, "when the trial court is unsure whether it should submit a particular theory of liability, separating liability theories best serves the policy of judicial economy underlying Rule 277 . . . ." *Id*. at 390; *see also Powell*, 356 S.W.3d at 123 (stating that "judicial economy may favor separate submission of liability theories to prevent the need to re-try the cause of action if the trial court reaches an incorrect decision with regard to which theories of liability should be submitted to the jury.").

In this case, the jury was asked a single liability question, phrased as "negligence." We first consider **[*32]** whether the question effectively presented the theory of informed consent in addition to surgical and post-surgical negligence, taking into consideration Williams's evidence and arguments as well as the overlapping nature of the negligence and informed consent theories. We conclude that, as a result of the combination of these circumstances, the single question here effectively included two distinct liability inquiries.

## B. Williams's theories of liability

Williams argues that the charge does not violate *Casteel* because Dr. Benge's disclosures, or lack thereof, "are simply facts, not theories of liability." While evidence of Dr. Giacobbe's experience was a relevant fact, and not a pleaded theory of liability, the evidence regarding the disclosures went far beyond simply the facts. Evidence regarding the disclosure issue was a major theme of Williams's case and was explicitly incorporated into liability questions asked of her expert, Dr. Patsner.

The jury was asked only one liability question: "Did the negligence, if any, of any of those named below proximately cause Lauren Williams' injuries in question?" Blanks were provided to allow the jury to assign liability to Dr. Benge, Dr. Thornton, **[*33]** and Williams. Negligence, with respect to Dr. Benge, was defined for the jury to mean "failure to use ordinary care that is, failing to do that which an obstetrician/gynecologist of ordinary prudence would have done under the same or similar circumstances or doing that which an obstetrician/gynecologist of ordinary prudence would not have done under the same or similar circumstances."

Throughout trial, Williams presented evidence on and argument about the standard of care, meaning what an obstetrician/gynecologist of ordinary prudence would have done during or after her hysterectomy. Under one of Williams's theories, either Dr. Benge or the

resident perforated Williams's bowel, causing feces to enter her abdominal cavity, which ultimately resulted in sepsis, multiple operations, a lengthy coma, and an irreversible colostomy. Williams contended that an ordinarily prudent gynecological surgeon would not have made such an error and, therefore, Dr. Benge was negligent.

She further contended that an ordinarily prudent gynecological surgeon would not have allowed such an inexperienced resident to perform a large portion of the surgery, as Dr. Benge did. Dr. Giacobbe's level of experience and **[*34]** Dr. Benge's knowledge of that information were both relevant to that claim. Relatedly, and to the extent it was Dr. Giacobbe who erred, the parties do not dispute that Dr. Benge, as Williams's surgeon with a supervising role over the resident, was legally liable for both his own surgical errors and those of the resident he was supervising.

The surgical error claim, in its many iterations--i.e., that Dr. Benge was liable if he (1) negligently perforated Williams's bowel, (2) negligently allowed Dr. Giacobbe to actively participate in the surgery resulting in Dr. Giacobbe perforating the bowel, or (3) reasonably allowed Dr. Giacobbe to operate but then was legally liable when she perforated Williams's bowel--was not the only theory Williams presented to the jury.

Under her unpleaded informed consent theory, Dr. Benge knew an inexperienced resident was going to perform a substantial portion of the surgery under his supervision and he negligently failed to provide that information to Williams before the operation. Williams testified that she had no idea that a resident was going to do a substantial portion of her LAVH or that her surgery would be that resident's first experience performing **[*35]** such a procedure. Further, Williams testified that, had she known that information, she would not have agreed to the operation and, as such, would not have suffered any of her injuries. Williams testified that she was never orally informed that Dr. Benge would be assisted by a resident (as opposed to the written consent forms informing her that he might be assisted by a resident) or that the resident might or would perform a large portion of the surgery. Williams's expert, Dr. Patsner, testified that Dr. Benge's failure to disclose Dr. Giacobbe's involvement to Williams fell below the standard of care. Under this theory, the question of what a gynecological surgeon of ordinary prudence would do was not addressed to either doctor's surgical techniques but, instead, whether the hired surgeon (Dr. Benge) should have disclosed to the patient that another surgeon with limited experience would perform a substantial portion of the operation. To complete the necessary elements for a finding of negligence under this theory, Williams presented evidence on causation and damages with Williams's testimony that she would not have consented to Dr. Giacobbe's substantial involvement had she known **[*36]** and with Dr. Patsner's testimony that, in his opinion, Williams's substantial injuries were caused by Dr. Giacobbe perforating her bowel. This second theory asserted that Dr. Benge was negligent and caused her injures simply by not telling Williams about Dr. Giacobbe.

Williams insists that the failure-to-disclose theme was a "small piece of evidence" supporting a finding of medical negligence. She correctly observes that jurors do not have to agree on the basis for the negligence and that even if jurors believed Dr. Benge "was wrong not to tell [Williams] about the resident's involvement," they still could have found that Benge

used "poor surgical technique." She contends that the poor surgical technique claim was "the focus of the trial." Further, Williams asserts that evidence regarding these non-disclosures was offered to demonstrate that Benge was "deceitful," committed a "betrayal," and "broke a promise." Thus, the evidence, she urges, was presented "for the jury's credibility determination," not as a basis for finding liability. Dr. Benge does not dispute that evidence regarding Dr. Giacobbe's experience was relevant to the claim that Dr. Benge was negligent during the surgery. **[*37]** A reasonable jury could have determined that the amount of supervision required over an assistant and the tasks delegated to the assistant vary according to the resident's experience. However, he disagrees that the evidence was presented as just a "small piece" of the trial.

A review of the record reveals that Williams went beyond offering admissible facts regarding Dr. Giacobbe's background and Dr. Benge's knowledge of her limitations. Most significantly, Williams's medical liability expert testified that the failure to disclose was a violation of the standard of care:

> Q: Would you say that [Dr. Benge] violated the standard of care if he did not explain that the third-year resident--doing this, her first-time procedure--was going to be performing a part of the surgery?
>
> A: Well, yes. . . . You can't have ghost surgeons.
>
> Q: Period? End of story?
>
> A: Period.

Dr. Patsner further testified:
> [Y]ou have to get consent from your patients that a resident is going to be do--is going to be with you in the operating room. . . . And do patients occasionally say no? Yes, they do. I mean, sometimes people don't want to be operated on by people who haven't finished their training. Sometimes they want people with **[*38]** more experience. So the circumstances can vary. The--the standard of care is to get permission from the patient for everybody who's going to be operating on them.

Again Dr. Patsner testified:
> Q: Do you believe that Dr. Benge fell below the standard of care when he allowed someone without the express consent to operate on Lauren Williams?
>
> A: Yes.

Finally, Dr. Patsner testified:

Q: The area of betrayal, the failure--the failure of Dr. Benge to explain who was doing the surgery on Ms. Williams--was that below the standard of care?

A: Yes. It was outside the standard.

Q: In your opinion, was that a breach of the standard of care? Was that negligent?

A: Yes.[6]

6    That testimony was disputed. Dr. Toy, a board certified physician who served as the residency program director where Dr. Giacobbe was a resident, testified that express permission by the patient for the resident to "perform a surgery" is not required because the resident is in an assistant role, always under the supervision of the attending physician and that the "standard of care does not require disclosure that the resident is putting hands on the patient." Dr. Zepeda, a defense expert witness, also discussed the standard of care. He testified **[*39]** that the standard consent form used by Dr. Benge granted permission for the use of a resident when completing the procedure. Finally, Dr. Benge testified that his practice with regard to disclosing resident participation in surgical procedures was consistent with standard practices and was reasonable. He further testified that his disclosure complied with American Medical Association guidelines for the use of residents during surgery when "the usual form of consent" is used and the named surgeon has "participatory supervision" over the resident's work. The AMA guidelines provide that, when the "usual form of consent to operation" is used, it is permissible for "the operating surgeon to delegate the performance of certain aspects of the operation to the assistant provided this is done under the surgeon's participatory supervision, ie, the surgeon must scrub." On the other hand, "[i]f a resident or other physician is to perform the operation under non-participatory supervision, it is necessary to make a full disclosure of this fact to the patient."

Williams presented a repeated trial theme seeking liability based on the failure-to-disclose theory, which culminated in the final moments of **[*40]** jury argument with her request that the jury "send . . . a message" to the medical community that it can no longer rely on a "vaguely worded" disclosure forms to permit active participation by residents in the operating room. Williams asked for a finding of liability for failing to disclose more information about the participation of the resident, whom she described as a "secret surgeon."

This theme was established from the beginning of trial. Williams opened the trial by informing the jury: "We're suing Kelsey-Seybold for six reasons. First reason: betrayal by the Kelsey-Seybold doctor to bring in a surgeon who had no permission, who had no consent to put her hands on Lauren." Williams then told the jury that there were three "steps to betrayal":

trust, vulnerability, and betrayal itself, which she described as letting a "secret surgeon, a first-time resident, do a significant part of this procedure."

During closing, Williams explained that she hired "his hands, his experience; but under anesthesia, she got another set of hands working on her . . . a set of hands she did not know, who had never done the job before, had no experience. You can't do this in our community." She then sought **[*41]** a jury verdict based on her "betrayal" theory:

> The best thing they can say is "We're good people. We didn't mean it. We're sorry. . . . The fact that we didn't tell them who was doing the surgery is--it should be of no concern to you because that's the way we want to do business." . . . [E]ach one of you--take it upon yourselves to make them change the way they do business.
>
> . . . .
>
> If you want this fiction to continue or to grow throughout the country, find for them. You are the conscience of the community. If that's what you want the standard to be, I'm telling you right now your job will be very quick. Go back and find for them. That will give them the approval. It'll give them the consent, and it will be publicized throughout the industry, "This is how you do it. Don't tell the patient. It makes things a whole lot easier. We can get a whole lot more training. You just don't tell the patient."

Williams told the jury that it could impact the practice within the medical community concerning "secret" surgeons:

> If you approve that standard today, that will become the standard. You disapprove that standard today, you send them a message, the standard changes. Our community is a safer place to live. **[*42]** That's why I say you are the caretakers of our community. You set the standard. You make it safer for everyone in this courtroom, all of their family, all of their friends, or you can sit silently by and let it continue. Your choice.

Given a one-minute warning at the conclusion of her closing argument, Williams asked the jury "to enforce the safety rules" through its verdict:

> If you choose to do so, if you think these rules are important and need to be enforced, say so by your verdict. You are the conscience of the community. If you don't think they're important, put zero, put zero, because your verdict will be heard. It will be heard by this organization, this group. . . . They are going to go back doing the same thing they've been doing, not telling people about who's doing the operation.

The disclosure theory was a primary theme of the case.

If the jury, as Williams suggested, agreed that using a "secret surgeon" was not what they "want[ed] the standard to be," and further decided that the ordinarily-prudent-physician standard required disclosure of the resident's role, then this theory could have led the jury to conclude that Dr. Benge breached his general duty of ordinary care to Williams--completely **[\*43]** independent of whether he or Dr. Giacobbe negligently perforated Williams's bowel. And it could have found causation because Williams testified that she would not have undergone the surgery if Dr. Giacobbe's role had been disclosed. This trial theme and the evidence presented to the jury created the possibility of a liability finding based on either of the two negligence theories: negligence during and after the surgery and negligence before the surgery in failing to disclose Dr. Giacobbe's participation or level of experience.

## C. The broad form negligence question effectively included an informed consent issue and therefore violated *Casteel*

Williams responds that the broad-form jury question did not include this second theory; it asked only a general negligence question, thus precluding a *Casteel* error. We therefore next examine whether a reasonable jury could have concluded that the general negligence question subsumed the informed consent issue. Based on the evidence and arguments presented, we conclude that the jury could have, and therefore the broad-form charge violated *Casteel*.

An informed consent claim is a subspecies of a negligence claim. In such a claim, "the only theory on **[\*44]** which recovery may be obtained is that of *negligence* in failing to disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent." TEX. CIV. PRAC. & REM. CODE ANN. § 74.101 (West 2011) (emphasis added); *see also Schaub v. Sanchez*, 229 S.W.3d 322, 323 (Tex. 2007) (stating that a plaintiff "can prevail on her informed consent claim only if she shows that the doctors negligently failed to disclose the procedure's risks or hazards. . . . [U]nder [the statute], lack of informed consent is a particular subspecies of negligence based on a failure to disclose the risks or hazards of a procedure."). And whether a physician was negligent in his treatment of a patient is a distinct legal question from whether the physician was negligent in failing to disclose to the patient the risks inherent in the treatment. *Felton v. Lovett*, 388 S.W.3d 656, 663 (Tex. 2012). A jury, therefore, should be asked separate questions for the two theories. *See Hawley*, 284 S.W.3d at 863-65.

Medical non-disclosure negligence claims are not the only negligence claims governed by specific principles of duty. For example, premises liability claims and negligent undertaking claims are negligence claims that have defined duty standards. For these claims, a broad-form negligence question is erroneous **[\*45]** and cannot support a judgment. *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837-38 (Tex. 2000) (concluding that negligent undertaking claim requires three additional predicate instructions to determine if there is a duty to exercise ordinary care); *Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 529 (Tex. 1997)

(holding that broad-form negligence question that omitted elements of premises liability claim was insufficient); *see also Torrington*, 46 S.W.3d at 838 ("In premises liability cases, like undertaking cases, a possessor of land may be held liable only if certain conditions are met."); *Custom Transit, L.P. v. Flatrolled Steel, Inc*., 375 S.W.3d 337, 362 (Tex. App.--Houston [14th Dist.] 2012, pet. denied) (noting that both premises liability and negligent undertaking claims involve different duties than basic negligence claims and holding that broad-form negligence submission was error for negligent undertaking claim); *Price Drilling Co. v. Zertuche*, 147 S.W.3d 483, 488 (Tex. App.--San Antonio 2004, no pet.) (when plaintiff's claim could "only be characterized as a premises liability claim," submission of ordinary negligence questions and instructions resulted in waiver of premises defect claim).

Williams contends that *Casteel* does not govern alternative factual assertions, only different liability theories. We agree, but do not find this distinction applicable in this case. In *Columbia Medical Center of Las Colinas v. Bush ex rel. Bush*, 122 S.W.3d 835 (Tex. App.--Fort Worth 2003, pet. denied), a defendant hospital requested limiting instructions that the jury could not consider specific acts in its evaluation of negligence. *Id*. at 857-58. The trial court refused, **[*46]** and the hospital appealed. *Id*. The appellate court concluded that the case involved alternative factual allegations in support of a single legally grounded theory, not multiple liability theories, one of which was defective. *Id*. at 858-59.

The difference is critical. For example, in *Hawley*, a broad-form negligence question included an instruction that a hospital acts through its employees, agents, nurses and servants. 284 S.W.3d at 863. Yet the charge said nothing about the hospital's undisputed lack of liability for the conduct of a physician who acted as an independent contractor. *Id*. at 862-63. Although the charge's statement that a hospital acts through these four categories of individuals was not improper, the Court held that it was error to refuse an additional requested instruction clarifying this issue because the jury "could have considered" the physician as an agent of the hospital. *Id*. at 863. "The hospital's request was designed to prevent that from happening" by providing a proper limiting definition and instruction that would have assisted the jury. *Id*. at 863-64. Moreover, the plaintiffs did "not complain that the instruction would have 'tilted' the jury against them in some manner;" on the contrary, they asserted that the failure **[*47]** to give the instruction was not error because the issue was undisputed. *Id*. at 864.

Similarly, Dr. Benge submitted an instruction that would have clarified that Williams could not recover on an informed consent negligence theory: "You are instructed that in deciding whether any defendant was negligent, you cannot consider what the defendant told, or did not tell, the plaintiff about the resident physician being involved with the surgery." Dr. Benge's proposed instruction, which the trial court refused, would have properly limited the jury to the issue that Williams states was her only claim: negligent medical treatment during and after the surgery. And like the plaintiff in *Hawley*, Williams did not make any complaint about the substance of the proposed instruction in the trial court or on appeal. The instruction here did not tilt the jury insofar as the physicians' surgical technique and level of experience was at issue. Nor did it prevent the jury from considering Dr. Giacobbe's level of experience

and Dr. Benge's knowledge of that information when he permitted Dr. Giacobbe to perform a large portion of the surgery. The proposed instruction would not have prevented the jury from considering **[*48]** that information to determine whether Dr. Benge or Dr. Giacobbe were negligent in their medical treatment of Williams; it only would have limited the jury from considering what Dr. Benge told Williams regarding that information--beyond the signed consent forms[7]--in deciding if he acted negligently.[8]

> 7    The consent form states, "I [    ] voluntarily request Dr. [    ] as my physician and such associates, technical assistants and other health care providers as they may deem necessary, to treat my condition which has been explained to me (us) as [    ]." It continues, "I (we) understand that the physician may require other physicians including residents to perform important tasks based on their skill set and, in the case of residents, under the supervision of the responsible physician. (Residents are doctors who have finished medical school but are getting more training.)."
>
> 8    An alternative instruction would have been that the jury could only consider whether the doctors' acts or omissions during or after the surgery constituted negligence. That would have prevented a finding of negligence based solely on the failure to disclose to Williams more information about the participating resident.

Likewise, **[*49]** this case is similar to *Hawley* because although there was only a single jury question, the jury was presented with multiple theories in that one question and that error could have been easily resolved with a simple instruction. The instruction in *Hawley* asking whether the employees, agents, nurses or servants were negligent "effectively submitted four negligence questions." *Hawley*, 284 S.W.3d at 864. Here the single question also "effectively submitted" two different negligence questions.

The Texas Supreme Court in a second case also concluded that a single broad-form question violated *Casteel* even though the accompanying definitions and instructions did not explicitly contain multiple theories because the broad form subsumed within it an improper theory and evidence had been submitted in support of that theory. *Morrison*, 381 S.W.3d at 537. In that wrongful termination lawsuit, the jury was asked whether the defendant took "adverse personnel actions" against the plaintiff because of her opposition to an unlawful discriminatory practice. *Id*. at 536. The plaintiff presented evidence relevant to her wrongful termination claim that she was denied a promotion, but she did not raise such a claim (and could not do so because it was not part of her **[*50]** underlying EEOC complaint). *Id*. at 537. The Court concluded that the charge violated *Casteel*. "Because the jury question allowed liability for 'adverse personnel actions,' the jury could have improperly found liability based upon the denied promotion." *Id*.

Williams repeatedly stressed to the jury that Dr. Benge did not inform her of Dr. Giacobbe's role or experience. Importantly, she also presented expert testimony that the failure to do so violated the standard of care. She disclaims that theory on appeal, stating "this is a surgical neglect case" and "the only question before the jury that's at issue in this appeal was on Benge's surgical negligence," and disclaiming that she "sought [any] recovery" on an

informed consent claim. The jury, however, was unaware of this limitation, and the rejected instruction would have made this point clear for it.

The introduction of evidence admissible for multiple purposes does not in itself create a *Casteel* problem. But the broad-form negligence question here necessarily included a non-disclosure legal theory because the evidence explicitly included standard-of-care questions on informed consent. Much like a limiting instruction is appropriate when evidence **[*51]** is admissible for one purpose but inadmissible for another purpose, the requested instruction would have focused the jury properly on the issues of negligence during and after the surgery and away from the theory of non-disclosure. Without the requested instruction, a jury in this situation "could have improperly found liability based upon" the unpleaded informed consent issues. *Morrison*, 381 S.W.3d at 537; *see also Hawley*, 284 S.W.3d at 863 (charge violated *Casteel* because jury "could have considered" physician as agent of hospital).

Finally, Williams asserts that a holding that the trial court abused its discretion in refusing to include the requested instruction is contrary to the preference for broad-form submission "whenever feasible." *See* TEX. R. CIV. P. 277; *Thota*, 366 S.W.3d at 688-89. But our system of justice likewise requires the jury to be properly instructed in the law and that broad form is appropriate only when it is feasible. *Casteel*, 22 S.W.3d at 388. We conclude that the broad-form medical negligence question here effectively subsumed an informed consent issue.

We next address whether Williams's second theory--a failure-to-disclose theory--was an invalid theory.

## D. Whether Williams's "secret surgeon" theory of liability was valid as a stand-alone negligence claim

### 1. Duty is a [*52] question of law

Because an informed consent claim is a subspecies of negligence, it includes the traditional elements of that claim: breach, causation, and damages. But like negligence claims, the threshold issue is whether there is a duty because, if there is no duty, there is no liability. *See Greater Hous. Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990); *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987) (superseded by statute on other grounds); *Graff v. Beard*, 858 S.W.2d 918, 919 (Tex. 1993).

A jury cannot decide whether an individual has a duty; duty is a question of law left to the court's determination. *See Phillips*, 801 S.W.2d at 525; *see also Torrington*, 46 S.W.3d at 837-38. A jury finding that a defendant failed to use reasonable care cannot result in a negligence finding unless the plaintiff first establishes that the defendant had a legal duty to act. *See El Chico Corp.*, 732 S.W.2d at 311. We consider whether the law imposes a legal duty on a physician to disclose information about the level of a resident's participation beyond the standard disclosure form language used in this case that a "resident" may "assist" the surgeon, including performing "important tasks" during the surgery.

## 2. No duty under TMLA

"Health care must be based on a patient's informed consent." *Felton*, 388 S.W.3d at 658. The Texas Medical Liability Act, which governs causes of action based on health care liability claims, sets forth the elements of a claim for failure to **[*53]** obtain informed consent. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.101. Under section 74.101, informed-consent claims are "based on the failure of the physician or health care provider to disclose or adequately disclose the risks and hazards involved in the medical care or surgical procedure rendered by the physician or health care provider." *Id*.

Section 74.102 implements the long-established rule that medical treatment requires a patient's informed consent, *see Binur v. Jacobo*, 135 S.W.3d 646, 654-55 (Tex. 2004), by creating a Texas Medical Disclosure Panel "to determine which risks and hazards related to medical care and surgical procedures must be disclosed by health care providers or physicians to their patients or persons authorized to consent for their patients and to establish the general form and substance of such disclosure." TEX. CIV. PRAC. & REM. CODE ANN. § 74.102 (West 2011). The Panel evaluates all medical and surgical procedures, determines if disclosure of risks is required, and if so, determines how much disclosure is required. *Bryan v. Watumull*, 230 S.W.3d 503, 508 (Tex. App.--Dallas 2007, pet. denied). The Panel creates two lists reflecting its conclusions, Lists A and B. "If the procedure requires some disclosure of the risks involved in the treatment, it is placed on List A. However, if the Panel determines that no disclosure is required, **[*54]** the procedure is placed on List B." *Id*. at 508-09 (citations omitted).

List A identifies the disclosures required for the medical procedures involved in this case: vaginal hysterectomy, fallopian tube and ovarian removal surgery, and abdominal laparoscopic procedures. *See* 25 TEX. ADMIN. CODE §§ 601.2(g)(2), g(3), & (s) (West 2014). It does not require any disclosure of the experience or role of a resident surgeon. When a procedure is included on List A, conformity with its requirements creates a rebuttable presumption that the physician was not negligent. *Bryan*, 230 S.W.3d at 509; TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.104, 74.106(a)(1).

Because the presumption is rebuttable, we will examine whether there is any other source of a duty for Dr. Benge to disclose Dr. Giacobbe's level of participation or experience. *See Felton*, 388 S.W.3d at 660 (stating that if section 74.401 does not apply, the common law does); *Cf*. TEX. CIV. PRAC. & REM. CODE ANN. § 74.106(b) (when procedure is not covered by List A or B, issue is whether there is duty "otherwise imposed by law.").

## 3. No duty under the common law

The common law imposes on "'[p]hysicians and surgeons [the] duty to make a reasonable disclosure to a patient.'" *Felton*, 388 S.W.3d at 660 (quoting *Wilson v. Scott*, 412 S.W.2d 299, 301 (Tex. 1967)). A reasonable disclosure will include "the risks that would influence a reasonable patient in deciding whether **[*55]** to undergo treatment but not those that would

be unduly disturbing to an unreasonable patient." *Id*. at 661. The risks that must be disclosed are those "inherent" in treatment, meaning a risk "that 'exists in and is inseparable from the procedure itself.'" *Id*. (citation omitted). "Inherent risks of treatment are those which are directly related to the treatment and occur without negligence." *Id*. at 662. An informed consent claim concerns "inherent risks" of the procedure--meaning negative results that can occur as a consequence of a properly performed procedure. It is the possibility of a negative consequence from a properly performed operation that is the operation's inherent risk. *Tajchman v. Giller*, 938 S.W.2d 95, 98-99 (Tex. App.--Dallas 1996, writ denied).

By contrast, a physician has no duty to disclose the risks that the surgery "may be based on an erroneous diagnosis or prognosis, or that it is negligently performed." *Felton*, 388 S.W.3d at 662. "Malpractice . . . is an extraneous risk, one that inheres in the practice of health care, not in the care itself." *Id*. "[O]nly inherent risks of a procedure--risks that arise from the procedure itself and not from any defect in the procedure or negligent human intervention--need be disclosed." *Tajchman*, 938 S.W.2d at 99. The common law does not, therefore, recognize a duty to disclose **[*56]** such non-inherent risks and failure to disclose them cannot support a liability finding.

Williams's resident-disclosure theory does not concern a risk or hazard inherent to her hysterectomy surgery; this theory concerns the possibility that an inexperienced resident assisting in the surgery might negligently perform the operation and that Dr. Benge might negligently supervise her performance by not catching her error or by allowing her to do more of the surgery or too complex an aspect of the surgery given her limited experience. These are extraneous risks.

No Texas authority has recognized a duty to disclose the level of participation by the resident or that resident's experience level. *See Haynes v. Beceiro*, 219 S.W.3d 24, 27 (Tex. App.--San Antonio 2006, pet. denied) (medical battery case; signature on standard consent and disclosure form permitted active participation in surgery by another doctor because patient consented to her chosen doctor and other "such associates" he deemed necessary to perform surgery); *cf. Avila v. Flangas*, No. 04-95-00106-CV, 1996 Tex. App. LEXIS 564, 1996 WL 63036, at *2 (Tex. App.--San Antonio Feb. 14, 1996, no writ) (mem. op., not designated for publication) (holding that claim that defendant physicians failed to disclose their inexperience was not inherent risk and therefore did not need to be disclosed; claim **[*57]** concerned negligent human intervention).

While Williams did not sue under a medical battery theory, that cause of action raises issues similar to those underlying Williams's informed consent theory. Medical battery is defined as performing a medical act or treatment on a patient without consent. *See Haynes*, 219 S.W.3d at 26. In *Haynes*, the plaintiff could not prevail on a medical battery claim against an assisting surgeon who participated in her surgery, even though she explicitly informed the surgeon's staff, before her procedure, that "[s]he does not want to see anyone else--or have anyone else do surgery" besides the surgeon she selected. *Id*. at 25. The Disclosure and Consent Form she signed stated that she was "voluntarily request[ing]" her chosen surgeon "and such associates, technical assistants and other health care providers as they may deem

necessary to treat my condition . . . ." *Id.* The court held that consent, therefore, was given for the second surgeon to participate in her procedure. *Id.; cf. Lane v. Anderson*, 345 Ill. App. 3d 256, 802 N.E.2d 1278, 1282-84, 280 Ill. Dec. 757 (Ct. App. Ill. 2004) (holding, in medical battery case addressing level of participation by resident, that plaintiff does not have medical battery claim, as matter of law, against resident who "performed a majority of the surgery" because, by signing **[*58]** consent form, plaintiff consented to selected surgeon and his assisting resident, "regardless of the degree to which [the resident] participated").

### 4. Conclusion on duty

The Legislature has created a comprehensive statutory scheme concerning disclosure and informed consent law, and it is the Legislature's prerogative to expand the level of disclosure required, should it see fit. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.101-.107. Mindful of the statutory framework and following the analysis in *Haynes*, we conclude that Texas law does not impose a legal duty to disclose to a patient specific information about a consented-to assisting surgeon's anticipated level of participation or experience. We further conclude that an assertion of medical negligence that characterizes the failure to disclose this information as a breach of duty presents an invalid legal theory.

We address next whether Dr. Benge preserved error on his *Casteel* challenge.

### E. Whether Dr. Benge preserved *Casteel* error

Any complaint to a jury charge, including "complaints of error in broad-form submission," is waived unless a party "make[s] the trial court aware of the complaint, timely and plainly, and obtain[s] a ruling." *In re B.L.D.*, 113 S.W.3d 340, 349 (Tex. 2003). Objections must both "clearly **[*59]** designate the error" and "explain the grounds for complaint." *Burbage*, 2014 Tex. LEXIS 753, 2014 WL 4252274, at *6. An objection must "explain the nature of the error" so the trial court may correct it. 2014 Tex. LEXIS 753, [WL] at *7.

Williams contends that Dr. Benge waived any error in the jury charge by failing to object during trial to questions asked of him on cross-examination about his non-disclosure of Dr. Giacobbe's level of experience and surgical participation.[9] However, the issue Dr. Benge raises on appeal is a legal one related to jury-charge error, not an evidentiary issue. Mid-trial evidentiary objections were not necessary to preserve this complaint. *See Felton*, 388 S.W.3d at 660 & n.9 (noting that purely legal issues, which do not affect jury's role as fact-finder, will preserve error even if raised for first time in post-verdict motions). Moreover, Dr. Benge asserted during the presentation of the evidence that Williams was improperly injecting a consent theory into the case.

> 9   Williams does not contend that the charge objection did not advise the trial court of the *Casteel* problem or that the proposed instruction was incorrect or confusing.

After the parties rested, the court held an informal charge conference. During the informal conference, Dr. Benge asked for the following **[*60]** instruction:

> You are instructed that in deciding whether any defendant was negligent, you cannot consider what the defendant told, or did not tell, the plaintiff about the resident physician being involved with the surgery.

Williams responded, "It's not an informed-consent case. It's whether or not Dr. Benge acted properly when he didn't do part of the surgery and let someone else do it. That's what the case is about . . . It's not an informed-consent case. It's a negligence case." In reply, Dr. Benge asserted that Williams therefore should have no objection to the instruction. When the court asked why the instruction was necessary, Dr. Benge responded that evidence had been presented on the consent issue. He further stated, "But the problem is the jury very well could focus on [informed consent] and could decide, 'Boy, I wish they would have given Ms. Williams more information. She might not have allowed Dr. Giacobbe to be involved.' That is informed consent, which isn't in the case." The trial judge stated that she would not give the instruction.

During the formal charge conference, Dr. Benge objected to the broad-form liability question as follows: "[D]efendants object to Question Number 1, negligence, **[*61]** because the broad-form submission allows the jury to base its finding on a violation of informed consent . . . ." The objection was overruled. In an effort to reduce the possibility that the jury would assign liability for failing to disclose the resident's involvement, Dr. Benge requested the same instruction that he had requested during the informal charge conference. The requested instruction was refused.

Dr. Benge specifically objected to the broad-form nature of the liability question and advised the trial court that a liability finding could be based on the informed consent theory that Williams presented. Subsequently, Dr. Benge offered an instruction that would have prevented the jury from finding negligence based on a failure to inform. While he did not cite *Casteel*, it was unnecessary for him to do so. *Morrison*, 381 S.W.3d at 536 ("*Casteel* error may be preserved without specifically mentioning *Casteel*."); *Thota*, 366 S.W.3d at 691 ("[Appellant] did not have to cite or reference *Casteel* specifically to preserve the right for the appellate court to apply the presumed harm analysis . . . ."). His objection informed the trial court that the broad-form negligence question mixed general negligence and informed consent issues. His **[*62]** proposed instruction attempted to carve out the informed consent issue from the broad-form negligence question. Dr. Benge, therefore, apprised the trial court of the error "such that the court [had] the opportunity to correct the problem." *Burbage*, 2014 Tex. LEXIS 753, 2014 WL 4252274, at *7; *see also Thota*, 366 S.W.3d at 690-91 (holding the charge error was sufficiently preserved). And the instruction did so while allowing the jury to consider the evidence of Dr. Giacobbe's inexperience: it only precluded a negligence finding based on what Williams was told about that experience. Thus, the jury could have relied on her experience not only in evaluating her conduct during the surgery, but also Dr. Benge's supervision of her during the surgery. In short, Dr. Benge's proposed instruction did not detract the jury from focusing on the claimed acts of negligence during and after the surgery.

We conclude that Dr. Benge's complaints were sufficient to alert the trial court to the potential deficiency in the jury charge that set up a *Casteel* problem, merging valid and invalid theories of liability into a single, broad-form liability question. *See Morrison*, 381 S.W.3d at 536 (holding in wrongful termination lawsuit that complaint that charge improperly lumped different employment actions together **[*63]** was sufficiently identified to preserve error even though employer did not state during charge conference that question mixed legally valid and invalid theories or, as phrased by intermediate appellate court, in *Texas Commission on Human Rights v. Morrison*, 346 S.W.3d 838, 847-48 (Tex. App.--Austin 2011), *rev'd*, 381 S.W.3d 533 (Tex. 2012), "that it was concerned about legally invalid theories"). As the Texas Supreme Court has explained,

> There should be but one test for determining if a party has preserved error in the jury charge, and that is *whether the party made the trial court aware of the complaint*, timely and plainly, and obtained a ruling. The more specific requirements of the rules should be applied . . . to serve rather than defeat this principle.

*State Dep't of Highways & Public Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992) (emphasis added); *see also Thota*, 366 S.W.3d at 690. We conclude that Dr. Benge preserved error in the jury charge.

Having concluded that Dr. Benge preserved error, we turn next to whether the commingling of the valid and invalid theories was harmful error.

### F. *Casteel* error requires reversal

Williams contends that there was sufficient evidence for the jury to find that Dr. Benge or Dr. Giacobbe operated below the standard of care when one or the other perforated Williams's bowel during surgery. Thus, she concludes, any error is harmless.

When an invalid legal theory is mixed **[*64]** with one or more valid theories at trial and the jury is given only a broad-form liability question to which a proper objection is made, an appellate court will presume error because it cannot be determined if liability was based on a valid theory or solely on one of the invalid theories. *See Casteel*, 22 S.W.3d at 378-79; Tex. R. App. P. 44.1(a)(2). The appellant is left unable to demonstrate the consequence of the trial court's jury charge error because it is unclear on what the jury based its decision. *Casteel*, 22 S.W.3d at 388.

Similar to the argument presented by Williams, the plaintiffs in *Hawley* argued that any jury charge error (which resulted because the jury could have reasonably--but erroneously--interpreted the charge to allow vicarious liability on the hospital for a physician who was not its agent) was harmless because the jury could have found negligence based on the nurses' acts or omissions. 284 S.W.3d at 864. But the Court held that the error was harmful, nevertheless, because it was impossible to determine whether the jury held the defendant hospital negligent based solely on the conduct of the physician or based on the conduct of the other

individuals for whom the hospital had vicarious liability. *Id*. at 864-65. Thus, the Texas Supreme Court could not tell **[\*65]** whether the jury thought the hospital was liable under a valid theory (negligence based on negligent acts by its nurses) or an invalid theory (negligence based on the negligent acts of the independent contractor physician). *Id*. At all times, the only "liability theory" was negligence; however, one of the two bases for a liability finding had no support under Texas law. *See id*. The Court presumed that the jury charge caused harm. *Id*. at 865.

Similarly, the mixing of an invalid theory with a valid theory was harmful and required reversal in *Romero*. 166 S.W.3d at 227-28. There, the plaintiff sued a hospital for malicious credentialing of a surgeon who was a known drug abuser. *Id*. at 217-19. The plaintiff also claimed the hospital was negligent in delaying a blood transfusion during surgery. *Id*. The charge included a single, broad-form, apportionment-of-liability question. *Id*. at 215. The jury found the hospital liable under both theories and assigned it a percentage of responsibility. *Id*. at 214-15. The Texas Supreme Court concluded, however, that there was no evidence of malicious credentialing. *Id*. at 224. It further found that the broad-form apportionment question made it impossible to determine how much of the hospital's assigned responsibility was due to **[\*66]** the impermissible malicious credentialing theory versus the allowed negligent delivery-of-blood theory. *Id*. at 226. Citing *Casteel*, the Supreme Court explained, "Even if the jury *could* still have made the same apportionment of fault, the error in the question is nevertheless reversible because it effectively prevents Columbia from complaining on appeal that they *would not* have done so." *Id*. The plaintiff could not avoid reversal by arguing that the jury might have reached the same apportionment of responsibility. *Id*.

Likewise, the Court in *Morrison* rejected the plaintiff's argument that, when an invalid theory is not directly submitted to the jury but is merely subsumed within broad language, "the mere possibility the jury may find liability based on an invalid theory does not constitute harm." *Morrison*, 381 S.W.3d at 537. The Court explained: "The harm to [the Appellant] is not that the jury reached the wrong verdict, but rather that [the Appellant] has been prohibited from demonstrating on appeal that the jury's verdict was based upon the invalid legal theory." *Id*.

Here, Williams argued two alternative legal bases for finding Dr. Benge negligent: (1) either Dr. Benge or the resident physician for whom he was responsible **[\*67]** were negligent during or after the surgery or, alternatively, (2) Dr. Benge failed to disclose Dr. Giacobbe's role or experience beyond the statements contained in the signed disclosure forms and such failure was below the standard of care and, therefore, negligent. The first is a valid theory of liability, but the second is not. Williams repeatedly urged the jury to answer the liability question affirmatively on the basis of this invalid legal theory.

From this record, we cannot say that the jury was not significantly influenced by the disclosure issue. We therefore sustain Dr. Benge's second issue and must reverse.

**Conclusion**

Having sustained Dr. Benge's second issue, we reverse and remand the case for a new trial. In doing so, we do not reach Dr. Benge's third issue challenging the denial of periodic payments.

All pending motions are denied as moot.

Harvey Brown

Justice

Panel consists of Justices Keyes, Bland, and Brown.

Justice Keyes, dissenting.

**DISSENT BY:** Evelyn V. Keyes

**DISSENT**

**DISSENTING OPINION**

I respectfully dissent. This is a simple medical negligence case in which a patient recovered damages for physical pain and suffering, mental anguish, and lost earnings against her gynecological surgeon for professional **[*68]** negligence in performing her laparoscopic-assisted vaginal hysterectomy ("LAVH"). Yet the majority takes an element of the proof of professional negligence--the defendant-surgeon's failure to tell the patient that he was turning over half of her surgery to an unqualified co-surgeon he was supervising--and turns this fact into an unpled and invalid theory of recovery, not submitted to the jury, but on which the majority presumes damages to have been awarded anyway.

The majority concludes that the unpled theory of recovery arose from the Texas Supreme Court's decision in *Felton v. Lovett*,[1] which defines the scope of a physician's duty to disclose the risks of medical procedures under the Medical Liability Act ("MLA"), and it reforms the plaintiff's general negligence case to include it. It further concludes that this theory of recovery is entirely separate from professional negligence, that evidence of failure to disclose the use of an unqualified co-surgeon is not evidence of professional negligence, and that this evidence cannot be used to show that a physician committed professional negligence. Finally, it determines that the trial court's *failure* to submit this invalid theory of recovery **[*69]** to the jury, and its failure to instruct the jury to disregard the evidence of what the defendant physician told the patient, is reversible error because it allowed the jury to award damages based solely or primarily on the invalid theory of recovery of damages in violation of *Crown Life Insurance Co v. Casteel*.[2] Therefore, it orders that the case be remanded to be retried *without the invalid theory that was neither pled nor submitted* to the jury. It also orders that the case be retried (1) without evidence that the defendant surgeon failed to tell his patient that he would be turning over the surgery on one side of her body to an unqualified resident physician he was supervising who had never done an LAVH and (2) without expert testimony that failure to disclose the use of an unqualified co-surgeon is a breach of a surgeon's standard of care.

1    388 S.W.3d 656 (Tex. 2012).

2    22 S.W.3d 378, 389 (Tex. 2000) (holding that when single broad-form liability question erroneously commingles valid and invalid liability theories and appellant's objection is timely and specific, error is harmful when appellate court cannot determine whether improperly submitted theories formed sole basis for jury's finding).

In my view, the majority finds jury charge error **[\*70]** where there was none; finds that the alleged error was preserved when it was not; mistakenly confuses *evidence* of medical negligence with a *separate cause of action*; misapprehends and misconstrues the plaintiff's case; misapplies the Texas Supreme Court's holding in *Felton*, creating and injecting into the case a new theory of liability which it acknowledges is both invalid and unpled; greatly expands the concept of jury charge error requiring reversal of a judgment for an invalid element of damages under *Casteel*; and, ultimately, denies the plaintiff her right to submit material evidence going to proof of her claim that the defendant-physician breached the professional standard of care of a gynecological surgeon performing her operation. Because I believe the majority opinion lays the groundwork for dangerous judicial overreach in overturning properly decided cases, I must dissent.

**The Parties' Arguments**

Appellee Lauren Williams sued appellants Jim P. Benge, M.D., and Kelsey-Seybold Medical Group, PLLC, for medical malpractice, alleging breach of the standard of professional care of a physician performing an LAVH. Williams argued that Dr. Benge committed professional negligence in performing **[\*71]** her LAVH by turning over half the surgery to a resident physician, Dr. Giacobbe, who had never done an LAVH operation, greatly increasing the risk of the operation, without telling Williams that his co-surgeon was inexperienced and unqualified, with the foreseeable result that the resident pierced Williams' bowel, causing severe life-long injuries.

During the trial, Dr. Benge's counsel insisted that Williams was *really* arguing not only that Dr. Benge had breached the standard of care of a physician performing LAVH surgery--which she had pled--but also that he had breached a non-existent statutory duty of a physician to disclose that he was using an assistant--a liability theory Williams had *not* pled and with which she did not agree. Instead, Williams argued and produced evidence that Dr. Benge had used Dr. Giacobbe not as an assistant but as a co-surgeon, that he did not tell Williams he was using Dr. Giacobbe, and that his actions violated the professional standard of care. Thus, in my view, Williams created questions for the jury as to whether Dr. Benge used Dr. Giacobbe as an undisclosed and unqualified co-surgeon and whether, if he did, his use of Dr. Giacobbe as co-surgeon and his **[\*72]** failure to disclose to Williams his intended use of an unqualified co-surgeon were acts of professional negligence.

Nevertheless, at the charge conference, Dr. Benge objected to the jury charge on the ground that the single broad-form jury question on professional negligence submitted to the jury allowed it to find liability based on breach of the statutory duty to disclose and obtain the

patient's informed consent and that "that theory was unsupported by the pleadings or the evidence." The trial court overruled the objection. Dr. Benge also requested, in writing, an instruction to the jury that they were not to consider "what the defendant told, or did not tell, the plaintiff about the resident physician's being involved with the surgery." The court refused the instruction.

The case was submitted to the jury on a single broad-form negligence question of liability. The jury found that Dr. Benge was negligent and awarded Williams damages for mental pain and anguish, lost earning capacity, physical impairment, and medical expenses.

On appeal, Dr. Benge argues that the jury's award of damages to Williams for his medical negligence was based, solely or primarily, on the invalid theory that **[*73]** he had a statutory duty to disclose the use of a resident assistant, which he did not have. And he argues that the trial court's error in allowing the jury to consider evidence relating to this invalid theory of recovery as evidence of his medical negligence so contaminated the jury's damage award that the case must be reversed and retried.

The majority accepts all of Dr. Benge's arguments and reverses and remands the case. I do not accept them. I find them to be internally self-contradictory and also contradictory to the pleadings, the record, the charge, and the law. I do not agree with Dr. Benge that he has successfully injected an invalid theory of recovery into the case, preserved error as to its omission from the charge, succeeded in having the theory considered by the jury despite its omission from the charge, and is entitled to a new trial without the omitted theory--and without the evidence of malpractice it actually constitutes--because it was invalid and should not have been considered by the jury.

I find no error in the charge and ample evidence to support the jury's verdict holding Dr. Benge liable to Williams for malpractice and awarding her damages for his breach of the **[*74]** duty of care of an ordinarily prudent physician performing an LAVH operation. I agree with the majority that Williams' expert, Dr. Patsner, was eminently qualified to testify and that the trial court did not err in admitting his testimony on the standard of care of a physician performing a hysterectomy. Therefore, I would affirm the judgment of the trial court.

## Background

### A. *The Trial*

This is a case in which a patient, Williams, went to the hospital because of painful menstrual problems to have an elective LAVH performed by a surgeon she trusted and had used before, Dr. Benge, and left the operating table with severe, lifelong medical injuries. Dr. Benge's own expert testified that he had "not personally" ever seen a patient have an outcome as bad as Williams' from an LAVH. Williams' expert, Dr. Patsner, testified, "She is actually the worst outcome I've ever seen after this operation in 30 years of taking care of patients with this, short of--short of dying."

The undisputed evidence shows that Dr. Benge allowed a resident physician, Dr. Giacobbe, to perform all of the surgery on the left side of Williams' body, even though he knew that she had never performed surgery of this type before. **[*75]** Both Dr. Benge and Dr. Giacobbe testified that Dr. Giacobbe performed 40% of the surgery, but the medical form signed by Dr. Giacobbe after the procedure stated that she was the "surgeon," which meant that she performed 50% or more. There was conflicting evidence as to whether Dr. Benge told Williams that he would be using a medical resident to "assist" him--a disclosure Dr. Benge and Dr. Giacobbe testified they made and Williams denies they made. However, the evidence is undisputed that Dr. Benge did not tell Williams that he would be turning over all the surgery on one side of Williams' body to Dr. Giacobbe. Rather, Dr. Giacobbe testified that Dr. Benge did not even tell *her* what part of the surgery she would be performing until after the surgery began. And the evidence is undisputed that neither Dr. Benge nor Dr. Giacobbe told Williams that this would be Dr. Giacobbe's first LAVH procedure. The operation left Williams with a life-threatening perforated bowel on the left side of her body--the side on which Dr. Giacobbe had performed the operation.

Immediately following the LAVH, Williams developed severe pain, abdominal tenderness, nausea, and a fever due to a perforated bowel. Dr. **[*76]** Benge checked her the next day, but failed to diagnose the perforated bowel. Instead, he went home sick and turned over Williams' care to Dr. Carmen Thornton. Three days after the surgery, Dr. Thornton ordered a consultation with a gastroenterologist. The gastroenterologist performed emergency exploratory surgery that same night and determined that Williams had an undiagnosed bowel perforation that was allowing feces from her intestines to leak into her abdomen. A colostomy was required and performed. Williams developed sepsis, underwent a tracheotomy, and was placed in a medically induced coma. She suffered months of rehabilitation, including having to learn to breathe, walk, and talk again.

Williams was left with her vagina, bladder, and rectum fused together, and they had to be separated when doctors attempted to reverse the colostomy. However, the colostomy could not be reversed because there was not enough of Williams' rectum and intestines left to stretch for the repair. Multiple surgeries followed, but the colostomy remained permanent, requiring the use of a colostomy bag. Williams is unable to have normal sexual relations, and she has ongoing depression, anxiety, and post-traumatic **[*77]** stress disorder, as well as physical symptoms.

Dr. Zepeda, Dr. Benge's own medical liability expert, agreed that all of Williams' injuries were a direct result of the LAVH performed by Dr. Benge. Dr. Patsner, Williams' expert, likewise testified that all of Williams' surgeries and complications were a result of the LAVH.

There was conflicting evidence at trial from which the jury could have concluded either that Williams' bowel perforation was caused by an electrical arc from a medical instrument, a Bovie, used during the LAVH, as Dr. Benge theorized, or from a slit in Williams' bowel on the side on which the resident, Dr. Giacobbe, performed the operation, as Williams' expert testified. Either way, both Dr. Benge and his expert, Dr. Zepeda, agreed that Dr. Benge was responsible for any acts of negligence committed by Dr. Giacobbe. Dr. Zepeda agreed "ab-

solutely" with the proposition that doctors are always responsible for the acts of the residents they supervise.

With respect to Dr. Benge's failure to disclose to Williams that he intended to use Dr. Giacobbe as a co-surgeon, the record reflects the following exchange between Dr. Benge's counsel and Williams's expert, Dr. Patsner:

> Q: Well, **[*78]** let's talk a little bit about some of the claims we've made in this case. . . . Would you say that [Dr. Benge] violated the standard of care if he did not explain that the third-year resident--doing this, her first-time procedure--was going to be performing a part of the surgery?
>
> A: Well, yes. There's a--I mean, there's a difference between being just an assistant and being a co-surgeon.
>
> . . .
>
> So in this particular instance there were two surgeons.
>
> . . .
>
> The--the standard of care is to get permission from the patient for everybody who's going to be operating on them. You can't have ghost surgeons.
>
> Q: Period? End of story?
>
> A: Period.

### B. The Jury Charge

At the charge conference, Dr. Benge objected to submission of Williams' case to the jury on a single broad-form negligence question as to liability, objecting to "Question No. 1, negligence, because the broad-form submission allows the jury to base its finding on a violation of informed consent and that that theory is not supported by the pleadings or the evidence." The trial court overruled the objection.

Dr. Benge did not seek a legal ruling on his argument that his alleged failure to disclose his intended use of either "an assistant" or an unqualified **[*79]** co-surgeon constituted an invalid separate and independent theory of liability for Williams' injuries that should be separately submitted to the jury as the proximate cause of some or all of her damages.

Dr. Benge did request, in writing, an instruction to the jury that "in deciding whether any defendant was negligent, you cannot consider what the defendant told, or did not tell, the plaintiff about the resident physician being involved with the surgery." He did not state any reason for requesting this instruction, and the trial court refused it.

The case was presented to the jury on a single-broad form negligence question as to liability: "Did the negligence, if any, of any of those named below proximately cause Lauren Williams' injuries in question?" Those named were Dr. Benge, Dr. Thornton, and Williams. An instruction defined negligence with respect to the physicians as "failure to use ordinary care that is, failing to do that which an obstetrician/gynecologist of ordinary prudence would have done under the same or similar circumstances or doing that which an obstetrician/gynecologist of ordinary prudence would not have done under the same or similar circumstances."

The jury found **[*80]**  that Dr. Benge was negligent and that Dr. Thornton and Williams were not. It awarded Williams $240,000 in damages for past and future pain and mental anguish; $302,609 for past and future lost earning capacity, zero damages for disfigurement, $20,000 for past and future physical impairment, and $1,332,960.14 for past and future medical expenses. It was not asked to find, and did not find, any separate damages for breach of a duty to disclose.

**Analysis**

Dr. Benge argues and the majority concludes that (1) Dr. Benge preserved his complaint by his objection to broad-form submission of Williams' negligence claim on the ground that the question "allows the jury to base its finding on a violation of informed consent and . . . that theory is not supported by the pleadings or the evidence"; (2) as a matter of law, a physician has no duty to disclose to a patient that he intends to turn over laparoscopic-assisted surgery on half of a patient's body to a co-surgeon who has never performed the operation; (3) the failure to make such a disclosure is a separate theory of liability that cannot, as a matter of law, constitute an act of professional negligence; (4) it was harmful error for the trial **[*81]** court to refuse to include this separate theory of liability in the charge and, likewise, to refuse to include an instruction to the jury to disregard all evidence relating to the theory of failure to disclose; (5) under the Texas Supreme Court's ruling in *Felton*, a physician has no statutory duty to disclose the intended use of an unqualified co-surgeon to perform half of a patient's laparoscopic-assisted surgery, so that this unpled theory of liability is invalid; (6) the trial court erred in failing to submit this unpled and invalid theory of liability to the jury as a separate question while allowing it to consider evidence of the physician's use of an unqualified and inexperienced resident as an undisclosed co-surgeon as professional negligence; and (7) this error caused the jury to award damages based on the unsubmitted, unpled, and invalid theory of liability and was so harmful that (8) the appellate court is required by *Casteel* to reverse the judgment of the trial court and remand the case for retrial--without submission of the invalid, unpled, unsubmitted theory, *and* without evidence relating to it. I disagree with

each of these arguments and conclusions and believe that they **[\*82]** are contrary to established legal authority.

### A. Preservation of Error

Dr. Benge made the following objection to the jury charge: "Question No. 1, negligence, because the broad-form submission allows the jury to base its finding on a violation of informed consent and that that theory is not supported by the pleadings or the evidence." I would hold that this objection did not preserve Dr. Benge's complaint.

Texas Rule of Civil Procedure 274, governing preservation of alleged error in the jury charge, requires that an objecting party "must point out distinctly the objectionable matter and the grounds of the objection," stating that "[a]ny complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections." TEX. R. CIV. P. 274. Likewise, Texas Rule of Appellate Procedure 33.1 requires a complaining party (1) to make a timely objection to the trial court that "state[s] the grounds for the ruling that the complaining party [seeks] from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context" and (2) to obtain a ruling on his objection. *See* TEX. R. APP. P. 33.1(a); *State Dep't of Highways & Public Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992). Under the preservation **[\*83]** rules as articulated by the Texas Supreme Court, "A timely objection, plainly informing the court that a specific element . . . should not be included in a broad-form question because there *is no evidence to support its submission*, . . . preserves the error for appellate review." *Thota v. Young*, 366 S.W.3d 678, 691 (Tex. 2012) (emphasis in original) (quoting *Harris Cnty. v. Smith*, 96 S.W.3d 230, 236 (Tex. 2002)).

Here, Dr. Benge did just the opposite of what the preservation rules require. His sole argument regarding his objection to the charge was that the jury *might* have considered his "violation of informed consent" *as an element of malpractice*, implying that it was not an element of malpractice, and not proof of malpractice, but a separate theory of liability. He then asked that the jury be instructed to disregard all evidence of anything he had said to Williams about Dr. Giacobbe's qualifications. He did *not* object that the broad-form negligence question on which the case was submitted to the jury contained a specific element as to which there was *no evidence*. He objected that the single broad-form liability question on negligence permitted the jury to consider *evidence* in the record of what he argued was an *unpled theory* of breach of the duty to disclose that was "*not supported* **[\*84]** *by the pleadings or the evidence*." At the same time, he, inconsistently, requested an instruction that the jury could not consider the *evidence* of "what [Dr. Benge] told, or did not tell, [Williams] about the resident physician being involved with the surgery" that was present in the record. An objection to a broad-form question that it includes a theory as to which there *is* evidence a party does not want the jury to consider does not preserve error. *See Thota*, 366 S.W.3d at 691. Moreover, Dr. Benge did not satisfy Rule 274, requiring that an objecting party "must point out distinctly the objectionable matter and the grounds of the objection." *See* TEX. R. CIV. P. 274; *Thota*, 366 S.W.3d at 690-91. I would hold that the objection Dr. Benge made to

the charge was insufficient to preserve his complaint on this point because it contradicted Rule 274 and *Thota*.

I would also hold that Dr. Benge's objection was insufficient to preserve error because the link between the objection and the argument on appeal that the charge violated *Casteel* was not specifically stated and because the objection and argument on appeal are inconsistent both with each other and with *Casteel. Casteel* holds that the trial court's submission of the case to the jury on a single broad-form **[*85]** negligence question is harmful error requiring reversal when it permits the jury to find damages on an invalid theory that was *pled* along with a valid one. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 387-88 (Tex. 2000); *see also Payne*, 838 S.W.2d at 241 (stating that test for determining preservation of error in charge is "whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling"). Dr. Benge argues, and the majority agrees, that the theory he claimed Williams had *not* pled was not supported by the professional negligence pleadings or the evidence. I do not see how this objection can satisfy Rule 33.1's and *Payne'*s requirement that an objection "state[] the grounds for the ruling that the complaining party [seeks] from the trial court with sufficient specificity to make the trial court aware of the complaint." TEX. R. APP. P. 33.1(a)(1)(A); *Payne*, 838 S.W.2d at 241.

But even if I could agree that Dr. Benge preserved his complaint, I could not agree that the trial court erred or that the objection on which this appeal is based is valid.

### B. Charge Error

Texas Rule of Civil Procedure 277 mandates broad-form submission "whenever feasible." TEX. R. CIV. P. 277; *see also Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990) (interpreting "whenever feasible" as mandating broad-form submission "in any or every instance in which it is capable of being accomplished"); **[*86]** Comm. on Pattern Jury Charges, State Bar of Tex., *Tex. Pattern Jury Charges: General Negligence & Intentional Personal Torts* PJC 4.1 cmt. (2012). Rule 278 provides that the trial court must "submit the questions, instructions and definitions in the form provided by Rule 277, which are *raised by the written pleadings and the evidence*." TEX. R. CIV. P. 278 (emphasis added); *Smith*, 96 S.W.3d at 236 ("Whether a granulated or broad-form charge is submitted, the trial court's duty is to submit only those questions, instructions, and definitions raised by the pleadings and the evidence.").

Except in certain "special proceedings in which the pleadings are specially defined by statutes or procedural rules, *a party shall not be entitled to any submission of any question* raised only by a general denial and *not raised by affirmative written pleading by that party*." TEX. R. CIV. P. 278 (emphasis added). And failure to submit a question, definition, or instruction "shall not be deemed a ground for reversal of the judgment unless its submission, in substantially correct wording, has been requested in writing and tendered by the party complaining of the judgment." *Id*. "Upon appeal all independent grounds of recovery or of defense not conclusively **[*87]** established under the evidence and no element of which is submitted or requested are waived." TEX. R. CIV. P. 279. Moreover, "if the trial court has 'to resolve a

legal issue before the jury could properly perform its fact-finding role[,] . . . a party must lodge an objection in time for the trial court to make an appropriate ruling without having to order a new trial." *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (quoting *Holland v. Wal-Mart Stores, Inc.*, 1 S.W.3d 91, 94 (Tex. 1999) (per curiam)).

The trial court has considerable discretion in determining proper jury instructions. *Thota*, 366 S.W.3d at 687. "An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence." *Id.* (quoting *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 855-56 (Tex. 2009)). An appellate court does not reverse a judgment for charge error unless the error was harmful "because it 'probably caused the rendition of an improper judgment' or 'probably prevented the petitioner from properly presenting the case to the appellate courts.'" *Id.* (quoting TEX. R. APP. P. 44.1, 61.1).

In my view, every rule governing proper jury questions and instructions set out above would have been violated had the trial court submitted questions or instructions, at Dr. Benge's request, based on the theory that Dr. Benge's failure to disclose his intended use of an unqualified **[*88]** physician as a co-surgeon constituted a separate unpled and invalid cause of action of "failure to disclose" that did not constitute medical malpractice but as to which there was evidence and for which damages are separately recoverable so that it was required to be separately submitted to the jury. Thus, in my view, the majority opinion, which adopts each of these premises, erroneously construes the mandates of Rules of Civil Procedure 277, 278, and 279 and Rule of Appellate Procedure 44.1.

Only one liability theory was pled by Williams: breach of the standard of care of an ordinarily prudent surgeon performing an LAVH operation. Neither party pled breach of a statutory or separate common law duty to disclose. Rather, Williams alleged only that Dr. Benge violated the standard of care of an ordinarily prudent gynecological surgeon by failing to disclose that Dr. Giacobbe, for whom he had supervisory responsibility, would be performing half of Williams' LAVH operation by herself and that she had never done such an operation before and then by using her to perform 50% of the surgery and negligently supervising her work so that she pierced Williams' bowel, causing severe injuries. There was evidence from which the jury could have found all of these facts, **[*89]** and there was expert testimony that each of these acts was an act of malpractice.

The allegedly invalid theory of failure to disclose was not raised by the written pleadings, and Dr. Benge argued that it also was not raised by the evidence before arguing that it was raised by the evidence. Therefore, he cannot argue on appeal that the charge was improper under Rules 277 and 278. *See* TEX. R. CIV. P. 278 (requiring that trial court submit only questions and instructions "raised by the written pleadings and the evidence"). Dr. Benge did not ask the trial court to determine whether Williams had actually pled failure to disclose as a separate cause of action or to rule that the issue had been tried by consent, as required by *Osterberg. See* 12 S.W.3d at 55 (requiring that party lodge objection in time for trial court to make appropriate ruling if required "to resolve a legal issue before the jury could properly perform its fact-finding role"). He made no proper request for an instruction going to whether Williams was entitled to recover damages on the independent theory of recovery for failure to

disclose that he now asserts on appeal, nor did he submit such an instruction in substantially correct form, as required by **[*90]** Rule 278. *See* TEX. R. CIV. P. 278. Thus, he waived the complaints of jury charge error upon which he relies on appeal. *See* TEX. R. CIV. P. 279 ("Upon appeal all independent grounds of recovery or of defense not conclusively established under the evidence and no element of which is submitted or requested are waived.").

There is absolutely nothing to show error in the charge in this case. Rather, review of the pleadings, the record, the evidence, and the rules of procedure confirms that submission of this case to the jury on a broad form negligence question was not only within the trial court's discretion but the *only* proper form for submission. *See* TEX. R. CIV. P. 277 (requiring that "the court shall, whenever feasible, submit the cause upon broad-form questions"); *E.B.*, 802 S.W.2d at 649 (interpreting "whenever feasible" as mandating broad-form submission "in any or every instance in which it is capable of being accomplished"); *Tex. Pattern Jury Charges: General Negligence & Intentional Personal Torts* PJC 4.1 cmt.

The majority, however, concludes that Dr. Benge not only preserved error but showed reversible error in the jury charge. I turn, therefore, to the merits of Dr. Benge's argument on appeal that Williams' case included **[*91]** an invalid theory of liability that should have been submitted to the jury separately from her malpractice claim.

## *C*. Felton *and Breach of the Duty to Disclose*

The majority characterizes the evidence relating to Dr. Benge's failure to disclose that he was using an unqualified and inexperienced co-surgeon not as part of the evidence showing his breaches of the duty of care of a surgeon but as evidence that Williams' pleadings included as an invalid theory of liability separate from medical negligence. In my view, this re-characterization of the theory of liability pled by Williams and tried to the jury has no valid basis either in Williams' pleadings or in the law. Yet the majority's holding depends entirely upon this re-characterization of the case at Dr. Benge's invitation and its interpretation of the law governing the physician's duty to disclose the use of an assistant.

As the majority states, the common law--the law that encompasses medical negligence--requires that a reasonable health care provider must disclose "the risks that would influence a reasonable patient in deciding whether to undergo treatment." Slip Op. at 46 (quoting *Felton v. Lovett*, 388 S.W.3d 656, 661 (Tex. 2012)). The common law risks that must be disclosed under **[*92]** *Felton* are those "inherent" in treatment, i.e., risks "that 'exist[] in and [are] inseparable from the procedure itself.'" *Felton*, 388 S.W.3d at 661. "Inherent risks of treatment are those which are directly related to the treatment and occur without negligence." *Id*. at 662.

*Felton* distinguished the common law duties of physicians from the statutory duty to disclose set out in Civil Practice and Remedies Code section 74.106, even as the court recognized that, "probably in all cases, the common-law and statutory duties are congruent." *Id*. at 661. "Malpractice, for example," the court pointed out, "is an extraneous risk, one that inheres

in the *practice* of health care, not in the care itself," and thus is *itself* not an inherent risk of surgery that must be disclosed. *Id.* at 662 (emphasis in original).

Williams, however, made no claim that Dr. Benge failed to comply with the disclosure statute, Civil Practice and Remedies Code section 74.101. And her claim was not that Dr. Benge was liable to her for her injuries because he failed to disclose the use of a resident as an assistant.

Williams claimed that Dr. Benge did not use the standard of care of an ordinarily prudent gynecological surgeon in performing her LAVH; and she included, among Dr. Benge's acts of malpractice as a supervising surgeon responsible for the work of Dr. Giacobbe, **[*93]** his failure to disclose a *risk inherent in* in "the care itself," namely, the greatly increased risk that an inexperienced, unqualified surgeon performing laparoscopic-assisted vaginal surgery for the first time, by herself, with only the instructions and example of her co-surgeon on the other side of the patient's body as guidance, will make a mistake that a qualified surgeon who had performed an LAVH in the past would not make, causing harm to the patient. This is exactly the type of risk that must be disclosed under *Felton. See id*. at 661 (requiring that "a reasonable health care provider must disclose the risks that would influence a reasonable patient in deciding whether to undergo treatment"). The law does not permit physicians to use patients as guinea pigs without their consent. And doing so is exactly the type of act that is probative of breach of the professional standard of care.

Here, Williams paid for Dr. Benge's mistakes with her health and almost with her life. She did so not because Dr. Benge failed to disclose that he would be using an assistant but because, as Williams' gynecological surgeon, he had a duty to perform the surgery at a professional level. And the evidence--including **[*94]** expert testimony of the standard of care of a gynecological surgeon performing an LAVH procedure--shows that he used an unqualified physician to perform half the surgery; that he failed to disclose either to Williams or to his co-surgeon the extent of the surgery he expected his co-surgeon to perform; that it was risky to turn over half of this sophisticated surgery to someone who had never done this type of surgery; that both his use of the physician he was supervising in this way and his failure to disclose his use of an unqualified co-surgeon to perform half of Williams' surgery were breaches of his professional standard of care; that the unqualified physician he was supervising perforated Williams' bowel; and that Williams almost died and suffered life-long injuries from this wound. A jury's consideration of *evidence* of duty, breach, causation, and injury in determining a physician's liability for breach of the standard of professional care and damages for a professional negligence claim is *not* consideration of commingled valid and invalid *theories* of liability.

Dr. Giacobbe testified that Dr. Benge did not disclose *even to her* the extent of the surgery she would be performing. The **[*95]** evidence is undisputed that he did not disclose this fact to Williams. Nor did Dr. Benge disclose that Dr. Giacobbe had never performed an LAVH. And Dr. Zepeda, Dr. Benge's own medical liablity expert, agreed that "[a]bsolutely," doctors are always responsible for the acts of the residents they supervise, as did Williams' expert, Dr. Patsner. This is all critical evidence of breach of Dr. Benge's duties as a surgeon, and it is

evidence that Dr. Benge wanted withheld from the jury in this malpractice case. To my mind, the jury was clearly entitled to consider this evidence, along with all the other evidence of Dr. Benge's breaches of the standard of professional care of an ordinarily prudent gynecological physician performing an LAVH, in making its decision whether Dr. Benge was medically negligent and thereby foreseeably caused Williams' injuries.

The majority does not point to any evidence in the record to rebut Dr. Patsner's expert testimony that the standard of care of a physician performing a hysterectomy includes a duty "to get permission from the patient for everybody who's going to be operating on them" or to rebut Dr. Patsner's, Dr. Zepeda's, and Dr. Benge's testimony that Dr. Benge was **[*96]** responsible for any acts of negligence committed by Dr. Giacobbe, whom he was supervising and to whom he turned over half of Williams' surgery.

Instead, the majority assumes, contrary to the testimony and the pleadings, that there is *no* difference between "being just an assistant and being a co-surgeon"; that Dr. Giacobbe was only an assistant (which was a question for the jury); that there is no duty to disclose the intended use of an unqualified co-surgeon under the section of the MLA that deals with the risks of surgery; that this failure to disclose the risks of using an unqualified co-surgeon is *not* below the standard of care of a gynecological surgeon (despite expert testimony to the contrary); that, therefore, Dr. Benge could not have been committing malpractice when he handed over half the surgery to an unqualified co-surgeon and failed to disclose to Williams how he intended to perform the operation; that the claim that Dr. Benge violated the duty to disclose was, instead of evidence, a disguised separate and invalid theory of liability; that it was harmful error for the trial court to refuse to submit this unpled theory of liability to the jury separately from Williams' negligence **[*97]** theory; that it was also harmful error for the trial court to refuse to instruct the jury not to consider any evidence of what Dr. Benge told Williams about Dr. Giacobbe; and, because this invalid theory was not separately submitted and the evidence of failure to disclose was before the jury, that the jury probably found damages--or most or all of the damages--it attributed to Dr. Benge's malpractice only on the unpled and invalid theory of recovery for a violation of the MLA's disclosure requirement. All of these assumptions flow from the majority's initial mischaracterization of Dr. Benge's failure to disclose Dr. Giacobbe's lack of qualification as a separate theory of liability from malpractice, rather than as one of a number acts from which the jury could have reasonably concluded that Dr. Benge breached the standard of professional care of a gynecological surgeon performing an LAVH, and from its conclusion that Dr. Benge preserved genuine errors in the charge.

Notably, although the majority's holding depends on its conclusions that it is *not* a breach of the professional standard of care for a surgeon to fail to disclose that an unqualified and inexperienced co-surgeon will be performing **[*98]** half of an operation and that this act is not a breach of any other duty, the majority does not make an argument from authority for these conclusions other than its construction of *Felton*, the argument that no other court has recognized the duty the majority introduces into the case and finds invalid, and an argument by analogy to medical battery. *See* Slip Op. at 43-50.

I cannot agree with the majority that this case shows any error in the charge. This conclusion becomes even more compelling when the majority's holding that the trial court's jury charge error was so harmful that the judgment must be reversed and the case remanded for retrial under Casteel is considered.

### D. Casteel *and the Commingling of Valid and Invalid Theories of Liability*

When a charge issue is properly preserved and contested on appeal, the appellate court reviews the basis of the complaint and reverses only if the alleged charge error was harmful. TEX. R. APP. P. 44.1(a) (stating standard for reversible error); *Thota*, 366 S.W.3d at 691.

In *Casteel*, the supreme court found harmful error because the single broad-form question submitted to the jury for violation of Insurance Code article 21.21 included not only the plaintiff's claims of liability for violations of the DTPA incorporated **[\*99]** into the Insurance Code, for which he had standing, but also the plaintiff's claims for DTPA violations for which he did not have standing because he was not a consumer within the definition contained in the DTPA. *See* 22 S.W.3d at 386-87. Under *Casteel*, "when a trial court submits a single broad-form liability question incorporating multiple theories of liability, the error is harmful and a new trial is required when the appellate court cannot determine whether the jury based its verdict on an improperly submitted invalid theory." *Id.* at 388; *see also* TEX. R. APP. P. 44.1(a) (providing, "No judgment may be reversed on appeal . . . unless the court of appeals concludes that the error complained of . . . probably prevented the appellant from properly presenting the case to the court of appeals").

In *Harris County v. Smith*, the supreme court extended the *Casteel* holding to broad-form liability questions that commingle damage elements when an element is unsupported by legally sufficient evidence. 96 S.W.3d at 234. Under *Casteel* and *Smith*, the appellate courts "presume that the error was harmful and reversible and a new trial required when [they] *cannot determine whether the jury based its verdict solely on the improperly submitted invalid* **[\*100]** *theory or damage element*." *Bed, Bath & Beyond, Inc. v. Urista*, 211 S.W.3d 753, 756 (Tex. 2006) (emphasis added).

*Casteel* and *Smith* both require that a plaintiff have actually *pled* an invalid theory of recovery and have then sought damages from the jury under a single broad-form liability question that permitted the recovery of damages on the invalid theory as well as on a valid theory. Here, the contention that the broad-form negligence question on liability submitted to the jury permitted the jury to award damages on an invalid theory of breach of a non-existent *unpled* and *unsubmitted* duty to disclose is entirely a *defensive* argument raised by *Dr. Benge*. What *Williams* asked the jury to find was whether Dr. Benge's act of using an undisclosed, unqualified co-surgeon to perform half of her LAVH surgery, among other acts, breached the standard of care of a gynecological surgeon and proximately caused her injuries. And she rested her case on her ability to prove that Dr. Benge's acts breached the standard of care of a gynecological surgeon performing an LAVH, causing her injuries and justifying the damages awarded her.

Nevertheless, Dr. Benge argues, and the majority concludes, that the single broad-form liability question on negligence submitted to the **[*101]** jury improperly sought damages on the unpled invalid theory Dr. Benge proposes. And Dr. Benge argues, and the majority concludes, that the unpled and unsubmitted invalid theory formed the primary or even "the sole basis of the jury's finding" that Dr. Benge committed malpractice, entitling Williams to damages. And Dr. Benge argues, and the majority concludes, that this separate, unpled, invalid cause of action on which the trial court submitted no question and no instruction to the jury so infected the damages award that the judgment must be reversed and the case tried again without it.

In my view, even assuming that Dr. Benge preserved a claim of error in the submission of the charge, what the majority views as an infectious unpled and unsubmitted--but considered--*theory of liability* is only *evidence* from which the jury could reasonably have concluded that Dr. Giacobbe did act as a co-surgeon; that she was not qualified; that her mistake caused Williams' injuries; and that Dr. Benge's performance as the sole disclosed surgeon and as Dr. Giacobbe's supervising physician fell below the standard of care of a surgeon performing an LAVH because he knew of Dr. Giacobbe's lack of experience, **[*102]** used her as a co-surgeon anyway, failed to adequately instruct and supervise her, and failed to disclose either to Williams or to Dr. Giacobbe herself how he intended to use Dr. Giacobbe in performing the operation. I believe this evidence was properly submitted to the jury and is both legally and factually sufficient to support the jury's finding that Dr. Benge breached the standard of care of a reasonably prudent physician performing an LAVH, entitling Williams to damages for her injuries caused by the breach.

**Conclusion**

The majority separates the failure to disclose the use of an unqualified resident as a co-surgeon from the professional duties of a supervising surgeon, declares it not to be an element of professional negligence, despite unrebutted expert testimony to the contrary, and requires that failure to disclose be pled separately as a statutory violation with its own damages. Thus, in my view, it dramatically broadens the scope of *Felton*. Likewise, it dramatically broadens the concept of reversibility on *Casteel* grounds by concluding that it was harmful error for the trial court *not* to submit this unpled and invalid theory of liability to the jury, improperly allowing the **[*103]** jury to award damages to Williams based, in part, on unrebutted expert testimony that Dr. Benge breached the professional standard of care of a gynecological surgeon performing an LAVH by, among other acts, failing to disclose his intention to use an unqualified co-surgeon to perform half of the surgery by herself. And it draws both of these conclusions despite Dr. Benge's failure to comply with any of the rules that would permit this Court to find that he preserved the charge error of which he complains on appeal.

The foreseeable result of the majority's holding is that its opinion will cause future litigants to attempt to do the same thing Dr. Benge has successfully done here: to re-characterize a properly pled, tried, and decided negligence case submitted to the jury on a broad-form

liability question as one in which the pleadings did not mean what they said; one in which, as a matter of law, it is *not* an act of malpractice for a surgeon to fail to disclose that he is using a co-surgeon for an LAVH who has never performed the operation, has no qualifications to perform it, and nevertheless will be performing the entire operation on one-half of the patient's body; one in which evidence **[*104]** that a supervising physician failed to disclose his intended use of an unqualified and inexperienced co-surgeon may not even be submitted to the jury and is harmful error unless excluded; one in which a jury may be presumed to have awarded damages on a theory of recovery that is invalid, that was not pled, and that was not submitted to it in the charge either by questions or by instructions; one in which a carefully articulated damages question listing only elements of damages validly recoverable for medical negligence nevertheless conceals a finding of damages on an unpled and unsubmitted theory of breach of the statutory duty to disclose; and one in which the failure to separate out this unpled and unsubmitted theory of liability and exclude it from consideration is deemed to be harmful error by the trial court that requires reversal of the trial court's judgment by the appellate court and retrial *without* the same unsubmitted theory of recovery *and* also without material evidence of professional negligence related to duty, breach, and causation of the plaintiff's injuries.

The result of the majority's analysis is that this case is remanded to be *retried* on the *same* theory and *same* **[*105]** facts on which it was tried the first time, and to seek the *same* elements of damages under the *same* charge--but with an instruction that evidence that Dr. Benge used an unqualified and inexperienced resident physician he was supervising as an undisclosed co-surgeon is not evidence of breach of the standard of professional care and must not be considered. Indeed, the majority effectively declares such evidence inadmissible.

For the foregoing reasons, I cannot join the majority opinion. I therefore respectfully dissent. Finding no error, I would affirm the judgment of the trial court.

Evelyn V. Keyes

Justice

Panel consists of Justices Keyes, Bland, and Brown.

Justice Keyes, dissenting.

OFFICIAL COURT COPY

*P10*

CAUSE NO. 2010-52657

FILED
Chris Daniel
District Clerk

JAN 20 2012

Time _____
By _____ Deputy

LAUREN WILLIAMS

VS

JIM P. BENGE, M.D., CARMEN
THORNTON, M.D., and KELSEY-
SEYBOLD MEDICAL GROUP,
P.L.L.C.

§
§
§
§
§
§
§
§
§
§

IN THE DISTRICT COURT

OF HARRIS COUNTY, TEXAS

164TH JUDICIAL DISTRICT

## CHARGE OF THE COURT

LADIES AND GENTLEMEN OF THE JURY:

This case is submitted to you by asking questions about the facts, which you must decide from the evidence you have heard in this trial. You are the sole judges of the credibility of the witnesses and the weight to be given their testimony, but in matters of law, you must be governed by the instructions in this charge. In discharging your responsibility on this jury, you will observe all the instructions which have previously been given you. I shall now give you additional instructions which you should carefully and strictly follow during your deliberations.

1. Do not let bias, prejudice or sympathy play any part in your deliberations.

2. In arriving at your answers, consider only the evidence introduced here under oath and such exhibits, if any, as have been introduced for your consideration under the rulings of the court, that is, what you have seen and heard in this courtroom, together with the law as given you by the court. In your deliberations, you will not consider or discuss anything that is not represented by the evidence in this case.

3. Since every answer that is required by the charge is important, no juror should state or consider that any required answer is not important.

4. You must not decide who you think should win, and then try to answer the questions accordingly. Simply answer the questions, and do not discuss nor concern yourselves with the effect of your answers.

5. You will not decide the answer to a question by lot or by drawing straws, or by any other method of chance. Do not return a quotient verdict. A quotient verdict means that the jurors agree to abide by the result to be reached by adding together each juror's figures and dividing by the number of jurors to get an average. Do not do any trading on your answers; that is, one juror should not agree to answer a certain question one way if others will agree to answer another question another way.

: 00980

6.      Unless otherwise instructed, you may answer a question upon the vote of ten or more jurors. If you answer more than one question upon the vote of ten or more jurors, the same group of at least ten of you must agree upon the answers to each of those questions.

These instructions are given you because your conduct is subject to review the same as that of the witnesses, parties, attorneys and the judge. If it should be found that you have disregarded any of these instructions, it will be jury misconduct and it may require another trial by another jury; then all of our time will have been wasted.

The presiding juror or any other who observes a violation of the court's instructions shall immediately warn the one who is violating the same and caution the juror not to do so again.

When words are used in this charge in a sense that varies from the meaning commonly understood, you are given a proper legal definition, which you are bound to accept in place of any other meaning.

Answer "Yes" or "No" to all questions unless otherwise instructed. A "Yes" answer must be based on a preponderance of the evidence unless you are otherwise instructed. If you do not find that a preponderance of the evidence supports a "Yes" answer, then answer "No." The term "preponderance of the evidence" means the greater weight of credible evidence admitted in this case. A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true. Whenever a question requires an answer other than "Yes" or "No," your answer must be based on a preponderance of the evidence unless you are otherwise instructed.

## SPECIAL INSTRUCTIONS

1.      A fact may be established by direct evidence or circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

2.      Deposition testimony consists of the sworn testimony of witnesses taken by a court reporter in the presence of attorneys for the parties. Deposition testimony read into evidence during the trial or presented by videotape is to be considered by you in the same manner as though the witness had personally appeared before you and testified from the witness stand.

3.      You are further instructed that Kelsey-Seybold Medical Group, P.L.L.C. is a legal entity that acts through its employees. Therefore, the actions of Kelsey-Seybold Medical Group, P.L.L.C.'s employees while they are working for the group are the actions of Kelsey-Seybold Medical Group, P.L.L.C. You are further instructed that Jim Benge, M.D. and Carmen Thornton, M.D. are employees of Kelsey-Seybold Medical Group,

2

: 00981

P.L.L.C. and were employees of Kelsey-Seybold Medical Group P.L.L.C. at all times relevant herein.

4. A finding of negligence may not be based solely on evidence of a bad result to the claimant in question, but a bad result may be considered by you, along with other evidence, in determining the issue of negligence. You are the sole judges of the weight, if any, to be given to this kind of evidence.

5. Do not include any amount for any condition resulting from the failure, if any, of Lauren Williams to have acted as a person of ordinary prudence would have done under the same or similar circumstances in caring for and treating her injuries, if any, that resulted from the occurrence in question.

## DEFINITIONS

"Ordinary Care," when used with respect to the conduct of **Jim Benge, M.D.**, means that degree of care that an obstetrician/gynecologist of ordinary prudence would use under the same or similar circumstances.

"Ordinary Care," when used with respect to the conduct of **Carmen Thornton, M.D.**, means that degree of care that an obstetrician/gynecologist of ordinary prudence would use under the same or similar circumstances.

"Negligence," when used with respect to the conduct of **Jim P. Benge, M.D.**, means failure to use ordinary care that is, failing to do that which an obstetrician/gynecologist of ordinary prudence would have done under the same or similar circumstances or doing that which an obstetrician/gynecologist of ordinary prudence would not have done under the same or similar circumstances.

"Negligence," when used with respect to the conduct of **Carmen Thornton, M.D.**, means failure to use ordinary care that is, failing to do that which an obstetrician/gynecologist of ordinary prudence would have done under the same or similar circumstances or doing that which an obstetrician/gynecologist of ordinary prudence would not have done under the same or similar circumstances.

"Proximate Cause," when used with respect to the conduct of **Jim Benge, M.D.**, means that cause that was a substantial factor in bringing about an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that an obstetrician/gynecologist using ordinary care would have foreseen that event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

"Proximate Cause," when used with respect to the conduct of **Carmen Thornton, M.D.**, means that cause that was a substantial factor in bringing about an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that an obstetrician/gynecologist using ordinary care would have foreseen that event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

3

: 00982

**"Negligence,"** when used with respect to the conduct of Lauren Williams means failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person would not have done under the same or similar circumstances.

**"Ordinary care,"** when used with respect to the conduct of Lauren Williams means that degree of care that a person of ordinary prudence would use under the same or similar circumstances.

**"Proximate cause,"** when used with respect to the conduct of Lauren Williams means that cause which, in a natural and continuous sequence, produces an injury, and without which cause such injury would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the injury, or some similar injury, might reasonably result therefrom. There may be more than one proximate cause of an injury.

4

: 00983

## QUESTION NO. 1

Did the negligence, if any, of any of those named below proximately cause Lauren Williams' injuries in question?

Answer "Yes" or "No" for each of the following:

Jim Benge, M.D. _Yes_

Carmen Thornton, M.D. _No_

Lauren Williams _No_

5

: 00984

If you answered "Yes" to Question No. 1 for more than one of those named in Question No. 1, then answer the following question, Question No. 2. Otherwise, do not answer Question No. 2.

Assign percentages of responsibility only to those for which you answered "Yes" to in Question No. 1.

The percentages you find must total 100 percent. The percentages must be expressed in whole numbers. The percentage of responsibility attributable to any one is not necessarily measured by the number of acts or omissions found.

## QUESTION NO. 2

**For each of those named below for which you answered "Yes" in Question No. 1, find the percentage of responsibility attributable to each:**

| | |
|---|---|
| **Jim Benge, M.D.** | _____ % |
| **Carmen Thornton, M.D.** | _____ % |
| **Lauren Williams** | _____ % |
| **TOTAL RESPONSIBILITY** | ____100%____ |

Not applicable

6

: 00985

Answer Question No. 3 if you answered "Yes" Question No. 1.   Otherwise, do not answer Question No. 3.

## QUESTION NO. 3

**What sum of money would have fairly and reasonably compensated Lauren Williams for her injuries, if any, that resulted from the occurrence in question?**

Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.

You are instructed that damages awarded, if any, are not subject to federal income taxation. Answer separately, in dollars and cents, for damages, if any.

a.  **Physical pain and mental anguish sustained in the past.**

Answer: __125,000__

b.  **Physical pain and mental anguish that, in reasonable probability, Lauren Williams will sustain in the future.**

Answer: __115,000__

c.  **Loss of earning capacity sustained in the past.**

Answer: __168,609__

d.  **Loss of earning capacity that, in reasonable probability, Lauren Williams will sustain in the future.**

Answer: __134,500__

e.  **Disfigurement sustained in the past.**

Answer: __O__

f.  **Disfigurement that, in reasonable probability, Lauren Williams will sustain in the future.**

Answer: __O__

g.  **Physical impairment sustained in the past.**

Answer: __15,000__

h.  **Physical impairment that, in reasonable probability, Lauren Williams will sustain in**

7

: 00986

the future.

Answer: ___5,000___

i. **Medical care expenses incurred in the past.**

Answer: ___475,460.14___

j. **Medical care expenses that, in reasonable probability, Lauren Williams will sustain in the future.**

Answer: ___887,500___

8

00987

After you retire to the jury room, you will select your own presiding juror. The first thing the presiding juror will do is to have this complete charge read aloud and then you will deliberate upon your answers to the questions asked.

It is the duty of the presiding juror—

1.    to preside during your deliberations.

2.    to see that your deliberations are conducted in an orderly manner and in accordance with the instructions in this charge.

3.    to write out and hand to the bailiff any communications concerning the case that you desire to have delivered to the judge.

4.    to vote on the questions.

5.    to write your answers to the questions in the spaces provided, and

6.    to certify to your verdict in the space provided for the presiding juror's signature or to obtain the signatures of all the jurors who agree with the verdict if your verdict is less than unanimous.

You should not discuss the case with anyone, not even with other members of the jury, unless all of you are present and assembled in the jury room. Should anyone attempt to talk to you about the case before the verdict is returned, whether at the courthouse, at your home, or elsewhere, please inform the judge of this fact.

When you have answered all the questions you are required to answer under the instructions of the judge and your presiding juror has placed your answers in the spaces provided and signed the verdict as presiding juror or obtained the signatures, you will inform the bailiff at the door of the jury room that you have reached a verdict, and then you will return into court with your verdict.

_____
JUDGE PRESIDING

9

: 00988

**Verdict Certificate**

Check one:

_____ Our verdict is unanimous. All 12 of us have agreed to each and every answer. The presiding juror has signed the certificate for all 12 of us.

_____     _____
Signature of Presiding Juror                    Printed name of Presiding Juror

✓ Our verdict is not unanimous. Eleven of us have agreed to each and every answer and have signed the certificate below.

_____ Our verdict is not unanimous. Ten of us have agreed to each and every answer and have signed the certificate below.

| SIGNATURE | NAME PRINTED |
|---|---|
| 1. | Jennifer K Heller |
| 2. | Paula J. Collier |
| 3. | Scott Shannon |
| 4. | Janet Bruner |
| 5. | Alicia Minor |
| 6. | Alyza Gordon |
| 7. | Keith Dilling |
| 8. | Randi Russian |
| 9. | Joan-Paul Minor |
| 10. | Steven F Figley |
| 11. | Angela Smitherman |

10

: 00989

CAUSE NO. 2010-52657

| LAUREN WILLIAMS | § | IN THE DISTRICT COURT OF |
|---|---|---|
| | § | |
| vs. | § | HARRIS COUNTY, TEXAS |
| | § | |
| JIM P. BENGE, M.D. AND KELSEY-SEYBOLD MEDICAL GROUP, P.A. | § § | 164TH JUDICIAL DISTRICT |

## DEFENDANTS' REQUESTED JURY INSTRUCTION 3

You are instructed that in deciding whether any defendant was negligent, you cannot consider what the defendant told, or did not tell, the plaintiff about the resident physician being involved with the surgery.

Granted _____

Refused _____

Modified as Follows: _____

3

: 00972

*MR. GEORGE:* Mr. Sorrels -- (Tendering document.) I think I'll start with the objections.

*THE COURT:* Okay.

*MR. GEORGE:* And, Your Honor, I'll note that we've been provided with a Court's charge, and we're here after the close of all the evidence and on the record in front of the Court and in front of counsel for the plaintiff.

We make the following objections to the jury charge. First, the defendants object to the submission of Question Number 1, negligence regarding Dr. Benge, because the evidence is legally insufficient to support a finding that he was negligent regarding Ms. Williams' treatment.

*THE COURT:* Overruled. Next.

*MR. GEORGE:* We -- Defendants object to the submission of Question Number 1, negligence regarding Dr. Benge, because the evidence is legally insufficient to support a finding the negligence on his part was a proximate cause of Ms. Williams' injuries in question.

*THE COURT:* Overruled. Next.

*MR. GEORGE:* Defendants object to the submission of Question Number 1, negligence regarding Dr. Thornton, because the evidence is legally

insufficient to support a finding that she was negligent regarding Ms. Williams' treatment.

THE COURT: Overruled. Next.

MR. GEORGE: Defendants object to the submission of Question Number 1, negligence regarding Dr. Thornton, because the evidence is legally insufficient to support a finding that any negligence on her part was a proximate cause of Ms. Williams' injuries in question.

THE COURT: Overruled. Next.

MR. GEORGE: Defendants object to Question Number 1, negligence, because the broad-form submission allows the jury to base its finding on a violation of informed consent and that that theory is not supported by the pleadings or the evidence.

THE COURT: Overruled. Next.

MR. GEORGE: Defendants object to the submission of Question Number 2, percentage of responsibility regarding Dr. Benge, because the evidence is legally insufficient to support a finding that he was negligent regarding Ms. Williams' treatment.

THE COURT: Overruled. Next.

MR. GEORGE: Defendants object to the submission of Question Number 2, percentage of

responsibility regarding Dr. Benge, because the evidence is legally insufficient to support a finding that any negligence on his part was a proximate cause of Ms. Williams' injuries in question.

THE COURT: Overruled. Next.

MR. GEORGE: Defendants object to the submission of Question Number 2, percentage of responsibility regarding Dr. -- regarding Dr. Thornton, because the evidence is legally insufficient to support a finding that she was negligent regarding Ms. Williams' treatment.

THE COURT: Overruled. Next.

MR. GEORGE: The defendants object to the submission of Question Number 2, percentage of responsibility regarding Dr. Thornton, because the evidence is legally insufficient to support a finding that any negligence on her part was a proximate cause of any of Ms. Williams' injuries in question.

THE COURT: Overruled. Next.

MR. GEORGE: The defendants object to the question of -- to submission of Question 3(d), which is the earning capacity in the future, because the evidence is legally insufficient to support a finding of the amount of any loss of earning capacity in the future.

THE COURT: Overruled. Next.

MR. GEORGE: And Defendants object to the submission of -- of Question Number 3(j), medical expenses in the future, because the evidence is legally insufficient to support a finding of the amount of any medical expenses in the future.

THE COURT: Overruled. Next.

MR. GEORGE: Turn now to the requested jury instructions in the packet.

THE COURT: Okay.

MR. GEORGE: The first is the requested Instruction Number 1, which asks -- that -- that instructs the jury "can't be found negligent based on the -- surmise, conjecture, speculation."

Request the Court to grant it, or if does not grant, to mark it "Refused."

THE COURT: I will mark it "Refused."

MR. GEORGE: Next Defendant offers Defendants' requested Instruction Number 2, which -- regarding expert testimony needed to prove negligence, and Defendants request the Court grant it, but if not granting it, would mark it "Refused."

THE COURT: Refused.

MR. GEORGE: Defendants request Jury Instruction 3, which instructs the jury that they

can't consider what was told regarding the resident physician in deciding negligence, and Defense asks the Court grant it, if not, to mark it "Refused."

THE COURT: Refused.

MR. GEORGE: Defendant requests Instruction -- Definition Number 1, which is for new and independent cause.

THE COURT: Refused.

MR. GEORGE: Okay.

THE COURT: Refused.

MR. GEORGE: I'm sorry. Next Defendants request Jury Question 1, which -- this gets to the Volunteer Protection Act, that Dr. Benge was acting in scope -- responsibilities of volunteer regarding the resident. Ask to be granted.

THE COURT: Refused.

MR. GEORGE: Defendants request Jury Question 2, again on the Volunteer Protection Act, which asks whether Dr. Benge's -- willful or criminal misconduct, gross negligence was the cause of any injury. Ask to be granted.

THE COURT: Refused.

MR. GEORGE: And Defendants request Jury Definition 2, which is a definition of "gross negligence" which relates to the Volunteer Protection

Act. I ask that it be granted.

THE COURT: Refused.

MR. GEORGE: And, Your Honor, now that these requested instructions, definitions, and questions -- the Court has marked all "Refused," I'd request that they be included in the papers of this case.

THE COURT: And they shall be.

MR. GEORGE: At that time the plaintiffs -- defendants -- the defendants conclude their objections and requests to the charge.

THE COURT: All righty. Well, if there's nothing further, then the charge is now complete, and so is this charge conference.

All right. Charge has been printed. We'll put that in the seats in just a minute. But how long do you want for closing?

MR. SORRELS: We talked about agreeing. We agreed upon, if the Court would agree with us, an hour and fifteen minutes each.

THE COURT: You -- that -- that even hurt when you said it.

MR. WOTRING: Judge, I'll be happy with an hour, or less.

MR. SORRELS: I'm sure he would be. I

it up.

THE COURT: Uh-huh. Okay.

MR. WOTRING: CPRC. Will you hand me those --

(Sotto voce discussion off the record.)

MR. GEORGE: And the next one'd be informed consent cannot be considered. This is not PJC, but it's particular to this case --

THE COURT: Uh-huh.

MR. GEORGE: -- that -- the jury should be instructed because -- we think there should be -- as -- given we moved for a directed verdict on the informed consent, that the jury can't dec -- in -- in deciding whether any defendant was negligent, jury cannot consider whether that defendant told or did not tell the plaintiff about the resident physician being involved with the surgery. Takes informed consent out of the case.

MR. SORRELS: As we spoke previously, it's not an informed-consent case. It's whether or not Dr. Benge acted properly when he didn't do part of the surgery and let someone else do it. That's what the case is about.

MR. GEORGE: Then we probably can agree to put the instruction in then.

MR. SORRELS: It's -- it's -- no. It's not an informed-consent case. It's a negligence case.

MR. GEORGE: I think Mr. Sorrels and I -- we agree on that point, but that's why we think the instruction's here.

THE COURT: Well, if it's not an informed-consent case, then why are we putting an informed-consent instruction in the charge?

MR. GEORGE: Because there's been testimony and discussion at various times about what -- I mean, the consent has been brought up. "What did you tell Ms. -- Ms. -- Ms. Williams? What did -- what did Dr. -- what was she told about Dr. Giacobbe's involvement?"

THE COURT: Sounds like excellent points for closing arguments, but --

MR. GEORGE: No. I think it's -- well, it is. But the problem is the jury very well could focus on that and could decide, "Boy, I wish they would have given Ms. Williams more information. She might not have allowed Dr. Giacobbe to be involved." That is informed consent, which isn't in the case.

MR. SORRELS: There's another reason against --

THE COURT: Aah, there it is. I just found it. Sorry. I was still looking for the instruction before. I did find it in the PJC.

MR. GEORGE: Okay. The one on liability?

THE COURT: Yep.

MR. GEORGE: Okay.

THE COURT: It is actually PJC 880.10.

MR. SORRELS: Okay. That's good. Liability limits?

MR. WOTRING: "Do not" -- "Do not discuss" --

MR. GEORGE: Which probably has the effect of informing the jury --

(Simultaneous discussion off the record.)

THE COURT: Do you want it in or not?

MR. GEORGE: I think it has to be, by the statute, doesn't it?

MR. WOTRING: Doesn't have to be, but I don't want it either.

THE COURT: Are you offering it or not?

MR. WOTRING: I am declining the instruction, Your Honor.

THE COURT: Okay. There we go. So

now, we're still back on --

MR. WOTRING: Sorry for taking the Court's time up on that.

THE COURT: Well, you made me sit here and flip through this dad gone book for it. I'm a little hot under the collar, but --

MR. WOTRING: Well, we should've had that at our fingertips.

THE COURT: Yeah. You should have. That's what you have that appellate lawyer for.

Paula --

(Discussion off the record.)

THE COURT: Okay. Yeah. I am not putting the "informed consent cannot be considered" instruction in there. That does not foreclose your ability to squawk the entire time during your closing argument about it, but I'm not going to put it in the charge.

MR. GEORGE: I think we have one more -- I have one about taxes, but that wasn't put in there already, so we don't have to look at that.

Failure to mitigate. This would be from a -- P -- PJC 80.9.

THE COURT: Uh-huh.

MR. GEORGE: "Do not include any

CAUSE NO. 2010-52657

| | | |
|---|---|---|
| LAUREN WILLIAMS | § | IN THE DISTRICT COURT |
| | § | |
| VS | § | |
| | § | |
| JIM P. BENGE, M.D., CARMEN | § | OF HARRIS COUNTY, TEXAS |
| THORNTON, M.D., and KELSEY- | § | |
| SEYBOLD MEDICAL GROUP, | § | 164TH JUDICIAL DISTRICT |
| P.L.L.C. | § | |

**FILED**
Chris Daniel
District Clerk

MAR 23 2012

Time: _____ 3:02 pm

By _____
Harris County, Texas
Deputy

### FINAL JUDGMENT

**I.**

On January 9, 2012, during a regular term of this Court, the above entitled and numbered cause came to be heard in due order and came the Plaintiff, Lauren Williams, and came the Defendants, Jim P. Benge, M.D., Carmen Thornton, M.D. and Kelsey-Seybold Medical Group, P.L.L.C. The parties announced ready for trial, and the Court entered and ruled upon such matters preliminary to trial as were before the Court. The parties proceeded with voir dire examination and a jury of twelve lawful jurors was impaneled and sworn as the jury in this case. The case then proceeded to trial with opening statements, introduction of evidence, stipulations of the parties, and final argument.

**II.**

At the close of all the evidence, the Court submitted a charge to the jury with questions of fact, definitions, and instructions to the jury. The Court heard and ruled upon the exceptions and objections presented by the parties to the charge; thereafter, the charge was read to the jury by the Court and the case was submitted to the jury. The jury retired, elected their presiding juror, and deliberated. After deliberation, the jury announced in open court on January 20, 2012 that it had reached a verdict. The Court received the jury's verdict, and filed and entered the findings as a part of the permanent record of the case. The Court's charge, including the questions submitted to the jury, and the jury's verdict thereto, being on file among the papers of this cause, are incorporated herein for all purposes by reference.

**RECORDER'S MEMORANDUM**
This instrument is of poor quality
at the time of imaging

## III.

Plaintiff Lauren Williams is entitled to judgment in her favor against Jim P. Benge, M.D. and Kelsey-Seybold Medical Group, P.L.L.C. (hereinafter "Kelsey-Seybold") based on the jury's liability, causation, and damages findings. In Question 1, the jury found the negligence of Jim Benge, M.D., proximately caused Lauren Williams' injuries. In Question 3, the jury awarded the sum of money that would fairly and reasonably compensate Lauren Williams for her injuries that resulted from the occurrence in question. Pursuant to the Court's Special Instruction 3, Kelsey-Seybold is vicariously liable for the acts of Jim P. Benge, M.D. because he was an employee of Kelsey-Seybold and was acting in the course and scope of his employment for Kelsey-Seybold at the time of the occurrence in question. Jim P. Benge, M.D. is liable for the acts of Lauren Giacobbe, M.D., the resident that he was supervising, at the time of Lauren Williams' procedure at issue in this case. However, Plaintiff is not entitled to judgment against Defendant Carmen Thornton, M.D. because in Question 2, the jury did not find that Dr. Thornton was negligent and/or the proximate cause of Lauren Williams' injuries. Also, in Question 2, the jury did not find any percentage of responsibility is attributable to Plaintiff Lauren Williams.

## IV.

As to the liability of Defendant Jim P. Benge, M.D., and vicariously Kelsey-Seybold, the jury found in Questions 1 and 3 that Lauren Williams is entitled to $168,609.00 in past lost earning capacity and $475,460.14 in past medical care expenses. The jury further found that Lauren Williams individually will suffer in reasonable probability $134,500.00 in future lost earning capacity and $887,500.00 in future medical expenses. The jury awarded a total of $1,666,069.14 for Ms. Williams' pecuniary losses. The jury also found that Lauren Williams suffered non-economic damages to the extent of $125,000.00 in past physical pain and mental anguish and in reasonable probability $115,000.00 in future physical pain and mental anguish. The jury also awarded Ms. Williams $15,000 for the physical impairment she suffered in the past

2

: 01266

and in reasonable probability $5,000 for physical impairment she will sustain in the future as a result of the negligence the jury found in Question 1. The jury awarded a total of $260,000.00 in non-economic damages.

**Original Jury Award**

|  | Lauren |
|---|---|
| Past Economic | $644,069.14 |
| Future Economic | $1,022,000.00 |
| Past Non-Economic | $140,000.00 |
| Future Non-Economic | $120,000.00 |
| Total | $1,926,069.14 |

Thus, the jury awarded Plaintiff a total of $1,926,069.14 in damages; however, that award amount is subject to a statutory limitation on non-economic damages. Section 74.301(a) of the Civil Practices and Remedies Code limits the total non-economic damages rendered against a physician for a health care liability claim to $250,000 for each claimant. A claimant includes all persons who sustained damages as the result of the death of a single person. Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(2). Therefore, the Court should limit the award of non-economic damages to $250,000, which reduces Plaintiff's total award to $1,916,069.14, $1,666,069.14 of which is economic damages and $250,000 of which is non-economic damages.

**Jury Award with Non-Economic Cap**

|  | Lauren |
|---|---|
| Past Economic | $644,069.14 |
| Future Economic | $1,022,000.00 |
| Past Non-Economic | $134,615.38 |
| Future Non-Economic | $115,384.62 |
| Total | $1,916,069.14 |

Plaintiff is also entitled to pre-judgment interest under the Texas Finance Code for all past damages awarded by the jury. Tex. Fin. Code Ann. § 304.103. The jury awarded Plaintiff a total of $784,069.14 in past actual damages; however, Plaintiff is only entitled to $778,684.52 after application of the non-economic damages limitation described above. The rate of interest

3

: 01267

posted on the OCCC website is 5 percent, simple interest. *See* Tex. Fin. Code. Ann. § 304.140. Plaintiff accrued pre-judgment interest of $61,654.75 beginning on August 23, 2010, the date the suit was filed, through March 23, 2012, the date of the signing of the final judgment. Thus, the total judgment due to Ms. Williams on March 23, 2012, assuming the judgment is signed that day, is $1,977,723.89. In the event that the judgment is not signed on March 23, 2012, the per diem amount of interest, to be added daily to that total judgment, is $106.67 per day.

### Total Judgment on March 23, 2012

|  | Lauren |
|---|---|
| **Past Economic** | $644,069.14 |
| **Future Economic** | $1,022,000.00 |
| **Past Non-Economic** | $134,615.38 |
| **Future Non-Economic** | $115,384.62 |
| **Pre-Judgment Interest** | $61,654.75 + $106.67/day after Mar. 23 until judgment signed |
| **Total** | $1,977,723.89 + $106.67/day after Mar. 23 until judgment signed |

### V.

Plaintiff is also entitled to recover post-judgment interest on the entire amount awarded in the judgment, at the legal rate of five percent, compounded annually. *See* Tex. Fin. Code Ann. § 304.002, *et seq.*

ACCORDINGLY, IT IS HEREBY ADJUDGED, ORDERED AND DECREED:

1.     Lauren Williams shall have and recover judgment against Jim P. Benge, M.D. for the sum of $778,684.52 in past damages;

2.     Lauren Williams shall have and recover judgment against Jim P. Benge, M.D. for the sum of $1,137,384.62 in future damages;

3.     Lauren Williams shall have and recover judgment against Jim P. Benge, M.D. for the sum of $61,654.75 in pre-judgment interest, calculated in the manner prescribed in paragraph number IV above, plus $106.67 pre-judgment interest to be added daily for each day after March 23, 2012 until the day the judgment is signed.

4

: 01268

4.    Lauren Williams shall have and recover from Jim P. Benge, M.D. post-judgment interest at the rate of five percent compounded annually until paid on the sum of $1,977,723.89, plus $106.67 per day after March 23, 2012 until the day the judgment is signed, plus court costs.

5.    Defendants Kelsey and Dr. Benge shall make separate payment to Medicare to account for the amount of Medicare's interest under the Medicare secondary payment statute for past medical expenses as negotiated by plaintiff and the amount of this separate payment shall be deducted from any payment made to plaintiff for past medical expenses.

6.    Plaintiff shall recover from Jim P. Benge, M.D. all costs of court expended or incurred by Plaintiffs as a prevailing party.

7.    Kelsey-Seybold Medical Clinic, P.L.L.C. is vicariously liable for the judgment against Jim P. Benge, M.D., as he was acting in course and scope of his employment with Kelsey-Seybold at the time of liability, causation, and damages against him.

8.    Plaintiff shall take nothing against Defendant Carmen Thornton, M.D. who shall recover all costs of court incurred or expended by her.

All relief not expressly granted herein is denied. This Final Judgment disposes of all claims, defenses, and all parties, and this is a final judgment.

SIGNED THIS THE 23rd DAY OF _March_, 2012, in Houston, Texas.

MAR 2 3 2012

_____
JUDGE PRESIDING

5

: 01269



**AARON FELTON, PETITIONER, v. BROCK LOVETT, D.C.,
RESPONDENT**

**NO. 11-0252**

**SUPREME COURT OF TEXAS**

**388 S.W.3d 656; 2012 Tex. LEXIS 1012; 56 Tex. Sup. J. 122**

**September 13, 2012, Argued
November 30, 2012, Opinion Delivered**

**SUBSEQUENT HISTORY:**     Released for Publication January 18, 2013.
On remand at, Appeal dismissed by Lovett v. Felton, 2013 Tex. App. LEXIS 1767 (Tex. App.
Amarillo, Feb. 21, 2013)

**PRIOR HISTORY:   [\*\*1]**
    ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE SEV-
ENTH DISTRICT OF TEXAS.
Lovett v. Felton, 333 S.W.3d 389, 2011 Tex. App. LEXIS 596 (Tex. App. Amarillo, 2011)


**COUNSEL:** For Baptist St. Anthony's Hospital, Intervenor: Ronald D. Nickum, Amarillo
TX.

For Aaron Felton, Petitioner: Charles Dunn, Law Office of Charles Dunn, Lubbock TX;
Cynthia Hollingsworth, Nona Bowles Walker, Hollingsworth Walker LLP, Dallas TX.

For D.C. Brock Lovett, Respondent: Barry D. Peterson, Peterson Farris & Parker, P.C.,
Amarillo TX; Liberty Dawn Lay, Peterson Farris Pruitt & Parker, P.C., Amarillo TX; Scott P.
Stolley, Thompson & Knight LLP, Dallas TX.

**JUDGES:** JUSTICE HECHT delivered the opinion of the Court. JUSTICE JOHNSON did
not participate in the decision.

**OPINION BY:** Nathan L. Hecht

**OPINION**

[*658]  Health care must be based on a patient's informed consent. A health care provider may be liable for failing to disclose to a patient the risks inherent in proposed treatment. The issue in this case is whether the possibility that a patient, due to an undetectable physical condition, will suffer a severe, negative reaction to a procedure is a risk that is inherent in the procedure. We hold that it is and therefore reverse the court of appeals' judgment[1] for respondent and remand the case to the court of appeals.

1    333 S.W.3d 389 (Tex. App.--Amarillo 2011).

Aaron  [**2] Felton sought treatment for neck pain from Brock Lovett, a doctor of chiropractic. Lovett obtained a history, x-rayed Felton's cervical spine, and on two occasions, manipulated his neck. When the treatments did not provide relief, Lovett performed a more forceful manipulation on Felton's third visit. Felton immediately began experiencing blurred vision, nausea, and dizziness. Lovett called an ambulance, which took Felton to the hospital, where doctors determined that he had suffered a stroke resulting from a vertebral artery dissection.

Lovett was well aware of the risk of stroke from chiropractic neck manipulation. Just that morning, he had been reading an article on the subject. And, he previously had a patient who suffered a vertebral dissection.

[*659]  Felton sued, alleging that Lovett had failed to disclose the risks associated with the neck manipulations and was negligent in treating him.

At trial, Felton offered expert testimony that:

o vertebral artery dissection is a known risk of neck adjustments but occurs only if the patient's artery is unhealthy or if the adjustment is performed improperly;

o chiropractors have been aware of the risk for a long time;

o there are safer alternatives  [**3] to manual adjustment that do not run the risk of stroke;

o about 10 to 20% of vertebral dissections are preceded by chiropractic manipulation of the spine;

o it was "much more likely than not" that Felton's vertebral dissection resulted from Lovett's chiropractic treatment;

o the standard of care calls for a chiropractor to inform a patient of the risks associated with neck adjustments; and

o Lovett breached this standard of care by not disclosing to Felton the risk of vertebral artery dissection.

Lovett's expert testimony was to the contrary.

The jury failed to find that Lovett's "negligence . . . proximately cause[d] the injury in question", but found, in answer to three other questions, that:

> o "Lovett fail[ed] to disclose to [Felton] such risks and hazards inherent in the chiropractic treatment that could have influenced a reasonable person in making a decision to give or withhold consent to such treatment";

> o "a reasonable person [would] have refused such treatment if those risks and hazards had been disclosed"; and

> o "Felton [was] injured by the occurrence of the risk or hazard of which he was not informed."

Based on the verdict, the trial court rendered judgment awarding Felton $742,701.90 **[\*\*4]** -- the damages found by the jury, less offsets, plus prejudgment interest.

Lovett appealed. For the law governing Felton's claim for lack of informed consent, the court of appeals looked to Section 74.101 of the Medical Liability Act ("MLA"),[2] which states:

> *In a suit against a physician or health care provider* involving a health care liability claim that is *based on the failure* of the physician or health care provider *to disclose* or adequately disclose *the risks and hazards involved in the medical care or surgical procedure rendered by the physician or health care provider*, the only theory on which recovery may be obtained is that of negligence in failing to disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent.[3]

This is the theory the trial court submitted to the jury at Felton's request and without objection.[4] But as Lovett argues, under the MLA, while a chiropractor is a "health care provider",[5] he is not a physician,[6] and "medical care" can be provided only by **[\*660]** physicians.[7] Also, Lovett did not (and legally could not[8]) perform surgery. Thus, Felton's suit was not based on a failure to disclose the risks of "medical **[\*\*5]** care or surgical procedure" and was not covered by Section 74.101.[9]

2   *Id.* at 390-391.
3   TEX. CIV. PRAC. & REM. CODE § 74.101 (emphasis added).
4   *See* COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES PJC 51.10 (2008).

5    TEX. CIV. PRAC. & REM. CODE § 74.001(a)(12)(A) (defining "health care provider"
to include a chiropractor but not a physician).

6    *Id.* § 74.001(a)(23) ("'Physician' means . . . an individual licensed to practice
medicine in this state [and certain entities].").

7    *Id.* § 74.001(a)(19) ("'Medical care' means any act defined as practicing medicine
under Section 151.002, Occupations Code, performed or furnished, or which should
have been performed, by one licensed to practice medicine in this state . . . ."); *see* TEX.
OCC. CODE § 151.002(a)(13) ("'Practicing medicine' means the diagnosis, treatment, or
offer to treat a mental or physical disease or disorder or a physical deformity or injury
by any system or method, or the attempt to effect cures of those conditions, by a person
who: (A) publicly professes to be a physician or surgeon; or (B) directly or indirectly
charges money or other compensation for those services.").

8    *Id.* § 201.002(b) ("A person practices chiropractic  **[**6]** . . . if the person . . . (2)
performs nonsurgical, nonincisive procedures, including adjustment and manipulation .
. . .").

9    The court of appeals refused to consider Lovett's argument because "he did not raise
this theory prior to trial." 333 S.W.3d 389, 390 n.1 (Tex. App.--Amarillo 2011). But a
purely legal issue which does not affect the jury's role as fact-finder, raised for the first
time post-verdict, may preserve error. *Waffle House, Inc. v. Williams*, 313 S.W.3d 796,
802 (Tex. 2010); *Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 450 (Tex.
2004); *Holland v. Wal-Mart Stores, Inc.*, 1 S.W.3d 91, 94 (Tex. 1999).

But when Section 74.101 does not apply, the common law does.[10] It imposes on
"[p]hysicians and surgeons [the] duty to make a reasonable disclosure to a patient of risks that
are incident to medical diagnosis and treatment."[11] Chiropractors in Texas have long been held
to a standard of ordinary care -- that of a reasonable chiropractor[12] -- including the duty to
reasonably disclose risks of treatment.[13] Lovett argues that the common law's focus on what a
reasonable health care provider would disclose is materially different from the statute's focus
on what a reasonable  **[**7]** patient would want to know,[14] and that this difference makes the
jury's findings that the statutory duty was breached immaterial to whether the common-law
duty was breached. We agree that "the common law focus[es] on the physician, rather than
**[*661]**  the patient",[15] as the statute does, but we disagree that this difference is material in
assessing liability.

10    Whether a statute modifies or abrogates the common law depends on legislative
intent. *Energy Serv. Co. v. Superior Snubbing Servs., Inc.*, 236 S.W.3d 190, 194 (Tex.
2007). Section 74.101 does not purport to affect the common law in cases other than
those the statute covers, and nothing in the MLA suggests a different intent.

11    *Wilson v. Scott*, 412 S.W.2d 299, 301 (Tex. 1967).

12    *See Nicodeme v. Bailey*, 243 S.W.2d 397, 401 (Tex. Civ. App.--El Paso 1951, writ
ref'd n.r.e.); TEX. CIV. PRAC. & REM. CODE § 74.402(b) ("In a suit involving a health
care liability claim against a health care provider, a person may qualify as an expert
witness on the issue of whether the health care provider departed from accepted stand-

ards of care only if the person: (1) is practicing health care in a field of practice that involves the same type of care or treatment **[**8]** as that delivered by the defendant health care provider . . . ; (2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.").

13    *See Hartfiel v. Owen*, 618 S.W.2d 902, 905 (Tex. Civ. App.--El Paso 1981, writ ref'd n.r.e.). This appears to be the majority, though not universal, rule in the country. *See Annotation, Liability of Chiropractors and Other Drugless Practitioners for Medical Malpractice*, 77 A.L.R. 4th 273 § 14 (1989).

14    *Compare* COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES PJC 51.09 (2008) (common-law claim) *with id*. PJC 51.10 (statutory claim).

15    *Peterson v. Shields*, 652 S.W.2d 929, 930 (Tex. 1983).

The common-law duty

   is based upon the patient's right to information adequate for him to exercise an informed consent to or refusal of the procedure. The nature and extent of the disclosure depends upon the medical problem as well as the patient. In some medical procedures the dangers are great; in others they **[**9]** are minimal. It has been suggested that some disclosures may so disturb the patient that they serve as hindrances to needed treatment. Certain disclosures in some instances may even be bad medical practice.[16]

In sum, a reasonable health care provider must disclose the risks that would influence a reasonable patient in deciding whether to undergo treatment but not those that would be unduly disturbing to an unreasonable patient. The common-law duty was defined not only for a school of practice but for a community, and the statutory duty abandons the latter factor -- the "locality rule".[17] The abandonment is not based on principle as much as the recognition that standards of health care have ceased to be a matter of local practice, and for the same reason, it is doubtful whether the "locality rule" survives for the common law. In any event, no one argues in this case that the standard of care for Lovett, practicing in Amarillo, was different from that for chiropractors in other parts of the state. In this case, certainly, and probably in all cases, the common-law and statutory duties are congruent.[18]

16    *Wilson*, 412 S.W.2d at 301 (internal citations omitted).

17    *Peterson*, 652 S.W.2d at 931 **[**10]** (construing the MLA's predecessor, Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 6.02, 1977 Tex. Gen. Laws 2039, 2050, formerly TEX. REV. CIV. STAT. ANN. art. 4590i, § 6.02 (Vernon 1977)).

18    Of course, the jury charge for a statutory claim should track the statutory language. *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994).

Both require disclosure of risks "inherent" in treatment.[19] An inherent risk, as the court of appeals in this case noted, is one that "exists in and is inseparable from the procedure itself".[20] Pointing to the testimony of Felton's own expert that Lovett's manipulation could not have caused a vertebral artery dissection unless Felton's artery was unhealthy or the manipulation was done improperly, the court reasoned that the risk arose "only when some other factor or condition was present" and "did not exist in the procedure itself[,] nor was it inseparable from the procedure."[21] "Simply put," the court concluded, the risk of a vertebral artery dissection was not inherent in the procedure Lovett performed.[22] Accordingly, the court reversed judgment for Felton and rendered judgment for Lovett.[23]

19   *Compare Wilson*, 412 S.W.2d at 306 (common-law  **[**11]** duty) *with Barclay v. Campbell*, 704 S.W.2d 8, 9 (Tex. 1986) (statutory duty).
20   333 S.W.3d 389, 391 (Tex. App.--Amarillo 2011) (citing *Barclay*, 704 S.W.2d at 10).
21   333 S.W.3d at 391-392.
22   *Id*. at 392.
23   *Id*.

We granted Felton's petition for review.[24]

24   Tex. Sup. Ct. J. (Feb. 17, 2012).

Health care gives few guarantees; usually there is a risk -- commonly **[*662]**  defined as a "chance of injury"[25] -- even if treatment is proper and properly administered. Such a risk is inherent in health care. Other risks are extraneous. Malpractice, for example, is an extraneous risk, one that inheres in the *practice* of health care, not in the care itself.[26] Thus, the inherent risks of surgery do not include the possibility that it may be based on an erroneous diagnosis or prognosis,[27] or that it is negligently performed.[28] Another example is the risk that a drug used in treatment may be defective; that risk inheres in the drug's manufacture, not in its use in treatment.[29] On the other hand, the risk that surgery may result in injury, even if properly performed, is inherent in the procedure itself. An example is cutting or traumatizing a nerve adherent to a lymph gland being biopsied.[30] Inherent risks of treatment are  **[**12]** those which are directly related to the treatment and occur without negligence.[31] They do not include eventualities or non-treatment-specific injuries, such as the possibility of hospital infections, or complications which occur without particular regard to the treatment the patient receives. They do include side effects and reactions, whether likely or only possible, that are directly related to the treatment provided. The MLA charges the Texas Medical Disclosure Panel with the responsibility "to determine which . . . treatments and procedures do and do not require disclosure of the risks and hazards".[32] The Panel's lengthy lists of procedures for which disclosure either must or need not be made, and of the risks that must be disclosed,[33] largely define the scope of the statutory duty to disclose and inform the scope of the common-law duty.

25   BLACK'S LAW DICTIONARY 1442 (9th ed. 2009); *accord* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1961 (3d ed. 2002) ("the possibility of loss, injury").

26    *Binur v. Jacobo*, 135 S.W.3d 646, 655 (Tex. 2004).

27    *Id.*

28    *See Tajchman v. Giller*, 938 S.W.2d 95, 99-100 (Tex. App.--Dallas 1996, writ denied) (negligently cutting a vein is not an inherent risk of **[**13]** depth electrode placement procedure); *Jones v. Papp*, 782 S.W.2d 236, 240 (Tex. App.--Houston [14th Dist.] 1989, writ denied) (surgical intervention is not an inherent risk of the diagnostic procedure of a coronary angiography).

29    *Barclay v. Campbell*, 704 S.W.2d 8, 10 (Tex. 1986).

30    *Peterson v. Shields*, 652 S.W.2d 929, 931 (Tex. 1983).

31    *Cf. Scientifc Image Ctr. Mgmt., Inc. v. Brewer*, 282 S.W.3d 233, 239 (Tex. App.--Dallas 2009, no pet.) (poor healing is an inherent risk of reconstructive surgery); *Knoll v. Neblett*, 966 S.W.2d 622, 628-629 (Tex. App.--Houston [14th Dist.] 1998, pet. denied) (post-operative worsening pain, numbness, weakness, bladder and bowel problems, paralysis, spinal fluid leak and infection, and hematoma are inherent risks of laser lumbar laminectomy); *Beal v. Hamilton*, 712 S.W.2d 873, 877 (Tex. App.--Houston [1st Dist.] 1986, no writ) (thrombophlebitis is an inherent risk of taking the estrogen drug Premarin).

32    TEX. CIV. PRAC. & REM. CODE § 74.103.

33    25 Tex. Admin. Code § 601.1-.3. When a procedure has not been addressed by the Panel, as is the case with the chiropractic treatment performed by Lovett, the provider must still comply with the common-law duty to inform patients **[**14]** of risks "inherent" in the procedure to be performed. TEX. CIV. PRAC. & REM. CODE § 74.106(b); *see Binur v. Jacobo*, 135 S.W.3d 646, 654 (Tex. 2004).

The court of appeals concluded that because, by the undisputed evidence, Felton's injury would not have occurred but for his own physical condition -- an unhealthy vertebral artery -- the risk could not have been inherent in Lovett's treatment. **[*663]** ³⁴ But this ignores the evidence that Felton's injury also would not have occurred but for Lovett's treatment, that chiropractic neck manipulation can result in vertebral artery dissection and does so in a significant number of cases, and that dissection and stroke are known risks of chiropractic treatment that should be disclosed. Felton's injury occurred during treatment, as a direct result of treatment. The same kind of injury may occur in other patients undergoing the same kind of treatment. The risk that a patient will not respond well to treatment is clearly one that inheres in the treatment. And as the evidence indicated, and the jury found, the possibility of vertebral artery dissection and stroke is precisely the kind of information a reasonable patient would be expected to want to know before **[**15]** deciding whether to risk such severe consequences in order to alleviate neck pain.

34    333 S.W.3d 389, 391-392 (Tex. App.--Amarillo 2011).

Lovett argues that the jury's failure to find that his negligence caused Felton's injury precludes liability for nondisclosure of the risks of treatment, or at least conflicts with the jury's finding of nondisclosure. But as we have explained, the jury's nondisclosure finding -- that "Lovett fail[ed] to disclose . . . such risks and hazards inherent in the chiropractic treatment

that could have influenced a reasonable person in making a decision to give or withhold consent to such treatment" -- amounted to a finding of nondisclosure, the statutory and common-law causes of action being essentially the same. Failures to disclose what a reasonable patient should know, and what a reasonable care provider would disclose, are both negligence. As for any conflict in the jury's answers, it must be reconciled "if reasonably possible in light of the pleadings and evidence, the manner of submission, and the other findings considered as a whole."[35] Whether Lovett was negligent in his treatment of Felton is a distinct legal question from whether Lovett was negligent [**16] in failing to disclose the risks of treatment to Felton.[36] We think it sufficiently clear from the charge that the jury was to consider the specific questions on disclosure separately from the more general question on negligence.

35   *Bender v. S. Transp. Co.*, 600 S.W.2d. 257, 260 (Tex. 1980).

36   *Compare* TEX. CIV. PRAC. & REM. CODE § 74.001 (negligence in treatment) *with Wilson v. Scott*, 412 S.W.2d 299, 301 (Tex. 1967) (nondisclosure).

We therefore reverse the judgment of the court of appeals. Issues remain for that court to address, and we remand the case for it to do so.

Nathan L. Hecht

Justice

Opinion delivered: November 30, 2012



**Anthony Wilson, Petitioner, v. Frank E. Scott, Respondent**

**No. A-11180**

**Supreme Court of Texas**

**412 S.W.2d 299; 1967 Tex. LEXIS 293; 10 Tex. Sup. J. 187**


**February 1, 1967**

**PRIOR HISTORY:** [**1] From Bexar County, Fourth District


**JUDGES:** Jack Pope, Associate Justice. Associate Justices Griffin, Smith and Hamilton dissenting.

**OPINION BY:** POPE

**OPINION**

[*300] ON MOTION FOR REHEARING

The opinion handed down on November 16, 1966 is withdrawn and the following is substituted.

Plaintiff, Frank E. Scott, sued Dr. Anthony Wilson for failure to make reasonable disclosure of risks incident to a stapedectomy operation. He alleged that his right to refuse the operation upon his left ear was violated because the preoperative warning was not sufficiently full for him to exercise an informed consent, and the operation was unsuccessful. The trial court rendered judgment for Dr. Wilson after sustaining his motion for instructed verdict, but the Court of Civil Appeals reversed that judgment. 396 S.W.2d 532 (1965). Dr. Wilson's points of error in this Court urge that Scott had the burden of proving by expert medical evidence the medically accepted standard for cautioning a patient about risks inherent in the operation, and that the record is devoid of such medically proved standard. We sustain the first point but hold that there was evidence of the medical [**2] standard. We affirm the judgment of the Court of Civil Appeals.

Plaintiff has had a hearing defect in his left ear for more than twenty years. He first noticed the problem while a student in high school. For short periods of time he tried to use hearing aids, but he testified that he was not happy with them. Without an aid he could hear conversations, but he said he was sure he missed a part of them. He said that many people who knew him were not aware that he had a hearing loss. The Navy rejected him during World War II by reason of his defective hearing, but the Merchant Marines accepted him.

In 1962 Scott consulted Dr. Wilson who correctly diagnosed the cause of the hearing defect as a bony growth on the stapes bone which inhibited its vibration and dulled Scott's hearing. He recommended a stapedectomy with a vein graft. The operation is relatively new and is regarded as a delicate and complex one. It is performed inside the middle ear through a speculum in an area about the size of a thimble and is done with a special microscope and special instruments. Dr. Wilson is highly trained and has received special instruction in the performance of stapedectomy surgery. He had **[\*\*3]** performed similar ear operations, but Scott's operation was his first stapedectomy with vein graft. Dr. Wilson performed the operation on February 8, 1962, and a few days later Scott lost all hearing in his left ear.

Scott did not allege or prove that Dr. Wilson improperly, negligently or unskillfully performed the operation. He contends **[\*301]** that the operation was elective and not done in an emergency. He says that he made direct inquiry about the risks involved in this operation, but Dr. Wilson did not fully inform him of all of them. Scott acknowledges that Dr. Wilson advised him that ninety per cent of such operations were successful, there was a ten per cent possibility that his hearing would be no better or could be worse after the operation, and he might sustain an altered sense of taste. Dr. Wilson also told Scott there was a risk associated with the anesthetic from which people sometimes die. Dr. Wilson testified that he specifically warned Scott that one per cent of the patients suffered a total loss of hearing as a result of the operation. Scott alleged and testified that since the operation, he has experienced vertigo, instability, tinnitus, or a roaring **[\*\*4]** in the ear, and total loss of hearing in his left ear. He said that he was warned of none of those hazards.

Scott testified that Dr. Wilson, in discussing the probable results, told him about statistical experiences in terms of "we," from which he inferred that Dr. Wilson had performed this specific operation previously. Although he had performed related operations, Dr. Wilson's former experience with this specific procedure had been confined to experimental operations upon cadavers under the instruction of the originators of the procedure and the best available instructors.

Physicians and surgeons have a duty to make a reasonable disclosure to a patient of risks that are incident to medical diagnosis and treatment. This duty is based upon the patient's right to information adequate for him to exercise an informed consent to or refusal of the procedure. Salgo v. Leland Stanford Jr. Univ. Bd. of Trustees, 154 Cal. App.2d 560, 317 P.2d 170 (Ct. App. 1957); Bowers v. Talmage, 159 So.2d 888 (Fla. App. 1963); Natanson v. Kline, 186 Kan. 393, 350 P.2d 1093, on rehearing, 187 Kan. 186, 354 P.2d 670 (1960); 60 Colum. L. Rev. 1193 (1960); Annot. 99 A.L.R.2d 599 (1965). The nature and extent **[\*\*5]** of the disclosure depends upon the medical problem as well as the patient. In some medical pro-

cedures the dangers are great; in others they are minimal. See Atkins v. Humes, 110 So.2d 663, 81 A.L.R.2d 590 (Fla. 1959). It has been suggested that some disclosures may so disturb the patient that they serve as hindrances to needed treatment.  Patrick v. Sedwick, 391 P.2d 453 (Alaska 1964); Di Filippo v. Preston, 53 Del. 539, 173 A.2d 333 (Sup. Ct. 1961); Natanson v. Kline, supra; Lund, The Doctor, The Patient, and The Truth, 19 Tenn. L. Rev. 344 (1946); Smith, Therapeutic Privilege to Withhold Specific Diagnosis from Patient Sick with Serious or Fatal Illness, 19 Tenn. L. Rev. 349 (1946). Certain disclosures in some instances may even be bad medical practice. Aiken v. Clary, 396 S.W.2d 668, 674 (Mo. 1965).

Dr. Wilson recognizes that he owed a duty of some kind, but insists that a part of Scott's burden of proof was the establishment of a standard against which a physician's conduct may be tested, and that the standard is a medical one which must be proved by expert medical evidence of what a reasonable practitioner of the same school and the same or similar locality would have **[**6]**  advised a patient under similar circumstances. The standard, says Dr. Wilson, is a medical judgment which includes discretion and an evaluation of scientific and medical data as well as the patient himself. Scott argues that expert medical evidence is unnecessary to the jury's determination that Dr. Wilson departed from the duty standard. Furthermore, Scott contends he actually proved a standard by Dr. Wilson's own expert medical opinion.

A number of cases in other jurisdictions hold that the plaintiff, in an action against a physician for failure to disclose hazards, must prove a medical standard by expert medical evidence. Di Filippo v. Preston, supra; Bowers v. Talmage, supra; Visingardi v. Tirone, 178 So.2d 135 (Fla. App. 1965); Hunt v. Bradshaw, 242 N.C. 517, 88 S.E.2d 762 (1955); Govin v. Hunter,  **[*302]**  374 P.2d 421 (Wyo. 1962); McCoid, A Reappraisal of Liability for Unauthorized Medical Treatment, 41 Minn. L. Rev. 381 (1957); Comment, 18 Baylor L. Rev. 137 (1966); Contra, 75 Harv. L. Rev. 1445 (1962). Williams v. Menehan, 191 Kan. 6, 379 P.2d 292, 295 (1963) affirmed a judgment for a doctor upon demurrer to the evidence because "The record is devoid of any standard of **[**7]**  care required of the defendant doctors." The Supreme Court of Missouri in Aiken v. Clary, supra   396 S.W.2d at 674, recently reexamined and overruled its former decision in Mitchell v. Robinson, 334 S.W.2d 11 79 A.L.R.2d 1017 (Mo. 1960). *Mitchell* had inferred that lay testimony was sufficient to establish the standard for medical practitioners in warning about risks. After first holding that the plaintiff has the burden to prove the standard, the Court wrote:

> "We have reexamined this question and have concluded that the question of what disclosure of risks incident to proposed treatment should be made in a particular situation involves medical judgment and that expert testimony thereon should be required in malpractice cases involving that issue. The question to be determined by the jury is whether defendant doctor in that particular situation failed to adhere to a standard of reasonable care. These are not matters of common knowledge or within the experience of laymen. Expert medical evidence thereon is just as necessary as is such testimony on the correctness of the handling in cases involving surgery or treatment. In Fisher v. Wilkinson, Mo., 382 S.W.2d **[**8]**

627, 632, we held: 'Without the aid of expert medical testimony in this case a jury could not, without resorting to conjecture and surmise or by setting up an arbitrary standard of their own, determine that defendants failed to exercise their skill and use the care exercised by the ordinarily skillful, careful and prudent physician acting under the same or similar circumstances.' And, as we said in Pedigo v. Roseberry, 340 Mo. 724, 736, 102 S.W.2d 600, 607: 'Juries should not be thus turned loose and privileged to say, perchance, the method of treating an injury * * * [or an illness] was negligent notwithstanding, for instance, the uncontradicted competent testimony [establishing] that the uniformly adopted practice of the most skillful surgeons [or physicians] had been followed.' The question is not what, regarding the risks involved, the juror would relate to the patient under the same or similar circumstances, or even what a reasonable *man* would relate, but what a reasonable *medical practitioner* would do. Such practitioner would consider the state of the patient's health, the condition of his heart and nervous system, his mental state, and **[\*\*9]** would take into account, among other things, whether the risks involved were mere remote possibilities or something which occurred with some sort of frequency or regularity. This determination involves medical judgment as to whether disclosure of possible risks may have such an adverse effect on the patient as to jeopardize success of the proposed therapy, no matter how expertly performed. * * * "

We conclude therefore that the plaintiff had the burden to prove by expert medical evidence what a reasonable medical practitioner of the same school and same or similar community under the same or similar circumstances would have disclosed to his patient about the risks incident to a proposed diagnosis or treatment, that the physician departed from that standard, causation, and damages. The action is one of malpractice for a physician's failure to conform to medical standards in obtaining the patient's consent. Regardless of what some earlier informed consent cases suggest, such an action need not be pleaded as one for assault and battery. The traditional elements of assault and battery, unlawful use of violence upon another and intent to injure, are **[\*\*10]** absent in most malpractice cases based upon a physician's failure to make sufficient disclosure. McCoid, A Reappraisal **[\*303]** of Liability for Unauthorized Medical Treatment, 41 Minn. L. Rev. 381, 422 (1957); Comment, 18 Baylor L. Rev. 137 (1966); Note, 44 Tex. L. Rev. 799.

There remains the question of whether Scott proved a medical standard for disclosure in stapedectomy operations. Scott contended that Dr. Wilson should have advised him more fully about such additional risks as vertigo, instability, tinnitus, loss of taste, a one per cent chance of total loss of hearing, and that he had not previously performed this operation. The Court of Civil Appeals held that Scott proved a medical standard for disclosure because Dr. Wilson agreed with a statement contained in a medical textbook written by Dr. Philip E. Meltzer. Dr. Meltzer wrote, concerning stapedectomy operations, "The public has been educated to believe that modern science and ingenuity have solved their ills, and without risk.

They need not be discouraged from assuming this risk, but they certainly should be aware of it." Since this is a case in which the patient urges that the physician gave some significant warnings **[\*\*11]** but failed to mention other risks, Dr. Wilson's agreement with Dr. Meltzer's general statement of the abstract rule did not establish a medical standard.

Dr. Wilson was called as an adverse witness, and by his own testimony he established the medical standard. He denied that it was standard medical practice to advise a stapedectomy patient about such effects as vertigo, instability, and tinnitus. His position about those effects was that they are only temporary results which normally follow the operation. Neither Dr. Wilson nor any other witness testified about a medical standard for disclosure to a patient about the surgeon's experience with a specific operation. Dr. Wilson, however, was asked whether he advised Scott about the chances of a total loss of hearing in the ear. This was the testimony:

"Q. But you are sure you told him it might result in complete loss of the hearing in the ear?

A. Yes. This is a very standard thing that is told to all patients.

Q. How did you tell him that? What words did you use?

A. Well, it is explained to the patients who are very good candidates for this surgery that they have a 90 percent chance of achieving good hearing in **[\*\*12]** the ear following surgery; there is a 10 percent, approximately 10 percent chance of no increase in the hearing; and a 1 percent chance of loss, the way that I would explain it, loss of the hearing in the ear. This is for good candidates.

A. Good candidates.

\* \* \*

Q. And you are saying that you are sure you told him that because you always tell people that or do you remember telling him that?

A. This is what I was taught, and I remember telling him that. \* \* \* This is a standard procedure."

Dr. Wilson testified that standard medical practice would have included advice about the chance of Scott's total loss of hearing. Dr. Wilson said that he so advised Scott, but Scott denied that he was so informed. There was direct evidence of the vital fact that Dr. Wilson failed to conform to the standard medical practice which his own testimony established. Humphreys v. Roberson, 125 Tex. 558, 83 S.W.2d 311 (1935); McDermott v. Manhattan Eye, Ear & Throat Hospital, 15 N.Y.2d 20, 203 N.E.2d 469, 255 N.Y.S.2d 65 (1964); State use of Miles v. Brainin, 224 Md. 156, 167 A.2d 117, 88 A.L.R.2d 1178 (1961).

Scott, by cross-assignment, says the trial court erred in **[\*\*13]** excluding the testimony of Dr. Meredith Mallory his expert witness. Dr. Mallory was no longer a practicing physician but was engaged in business. He **[\*304]** had no special knowledge of the diseases and treatment of the eye, ear, nose and throat and was unfamiliar with stapedectomy operations or medically accepted standards for caution of the hazards in such an operation. The trial court did not abuse its discretion in excluding his testimony. 2 McCormick & Ray, Texas Law of Evidence, § 1401, (2d ed. 1956).

We affirm the judgment of the Court of Civil Appeals which reversed the judgment of the trial court and remanded the cause for trial. Both motions for rehearing are overruled. The parties may file a second motion for rehearing within fifteen days.

Associate Justices Griffin, Smith and Hamilton dissenting.

**DISSENT BY:** SMITH

**DISSENT**

Clyde E. Smith, Associate Justice

I respectfully dissent. The trial court's action in granting Wilson's motion for instructed verdict should be sustained because there is no evidence that Wilson failed to give that *warning* to Scott that would have been given by medical doctors of ordinary **[\*\*14]** knowledge and skill in the San Antonio area and vicinity or in a similar vicinity in 1962 under the same or similar circumstances.

In the beginning, I call attention to the cause of action stated by the plaintiff, Scott, in his pleadings. Scott sought recovery upon three alternative theories. Scott alleged 21 different acts of negligence on the part of the doctor and that "as a proximate result of the operation or as a proximate result of one or more of the foregoing acts of negligence, Scott suffered damages."

Scott alleged that the doctor was guilty of fraud in representing that he was thoroughly experienced in performing a stapedectomy and that a "stapedectomy with vein graft and polyethylene prosthesis was a safe and proven operation when in fact it was an experimental operation condemned by some of the most prominent experts and authorities. Had Scott been informed of this fact, he would not have submitted to the operation." Scott's third theory of recovery was that "[although] Scott had specifically inquired of Dr. Wilson prior to the operation whether there was danger of disability, Dr. Wilson stated that there was none other than the normal risk of taking anesthetics and **[\*\*15]** possibly some slight loss of taste. In truth and in fact the risk of nerve deafness, tinnitus, vertigo, dizziness and other nervous disorders were well-known to Dr. Wilson, and the operation was still in the experimental stage. Dr. Wilson's failure or refusal to advise and inform Scott of such facts made it impossible for Scott to know and understand the nature of the operation or to give a knowledgeable consent to such operation. Had Scott been informed of such facts, he would not have consented to said operation. *Such operation* constituted an *assault and battery*." Emphasis added.

Thus, liability was predicated upon three basic theories: (1) misrepresentation or fraud, (2) assault and battery and (3) negligence.

The trial court granted the doctor's motion for instructed verdict. On appeal to the Court of Civil Appeals, Scott presented the following basic points:

"The trial court erred in instructing the jury because there was sufficient evidence to support a jury verdict for plaintiff based on fraud."

"Second Point of error: The trial court erred in instructing the jury because there was sufficient evidence to support a jury verdict for plaintiff based **[**16]** on *assault and battery*." Emphasis added.

Scott did not complain in the Court of Civil Appeals of the action of the trial court in sustaining the doctor's motion for instructed verdict on the ground no evidence was introduced showing negligence. Therefore, the negligence theory as to the manner **[*305]** in which the doctor performed the operation is not before this Court. The Court of Civil Appeals, in effect, held this was not a fraud case. Therefore, the fraud theory is not before this Court, since Scott did not complain of such action. This leaves Scott with only his self styled "assault and battery" theory.

The Court of Civil Appeals in recognizing such a theory said:

> "The consent which Scott gave to have the operation performed is of no effect unless it was an informed and knowledgeable consent. There is no question here as to Scott's being injured and suffering damages as a result of the operation."

> "If Dr. Wilson did not have Scott's informed consent to operate upon him he would be guilty of assault and battery on Scott, and liable for the damages caused by the operation. Moss v. Rishworth, Tex.Comm'n.App., 222 S.W. 225."

The Moss case **[**17]** was one where the operation was performed upon an eleven year old child without her consent and the consent of her parents. The Court held that "as the child, on account of her minority, could not, and the parents did not, give consent, had she survived the operation, she would have had a cause of action as for a technical assault and battery, and that therefore the parents, in virtue of Article 4695, R.S. 1911 , have a cause of action." Ours is not an assault and battery case. Here written consent was given the only contention being that Scott did not give his informed consent. Scott admits that the doctor warned him in four different ways there could be an imperfect result. Scott testified, contrary to his pleadings, that the doctor told him (1) "we have had 90% success with this operation with a person of your qualifications; (2) that there was a 10% possibility that his hearing would be no better or could be worse; that he would have an altered sense of taste and (3) that there was a risk associated with the anesthetic and that people had died from it. There is no showing by lay or medical testimony that these warnings were untrue. The warnings given cannot be **[**18]** classified

as misrepresentations. They are representations and warnings made by the doctor to his patient prior to surgery. This is a case of first impression in Texas, but I find no case decided in other jurisdictions that holds a doctor is under a duty to state in precise words that there probably would be 1% who would sustain a complete loss of hearing as a result of the stapedectomy. Nor do I find any cases which sustain Scott's apparent theory that to be an informed consent that the doctor is required to relate all of the dangers associated with the operation, such as 1% of patients sustain a complete loss of hearing, or that tinnitus, vertigo, dizziness and other nervous disorders probably would follow the operation.

Whether or not a physician or surgeon is under a duty to warn a patient of the possibility of a *specific* adverse result of a proposed treatment or operation depends upon *the circumstances of the particular case, and of the general practice with respect to such cases followed by the medical profession in the locality*. The custom of the medical profession to warn must be established by expert medical testimony.

It is not the duty of a physician in this type **[\*\*19]** of case to relate specific adverse results that might obtain after surgery. The physician's duty to disclose is limited to those disclosures which a reasonable medical practitioner would make under the same or similar circumstances.

The Court is here holding that since Dr. Wilson testified that it was a standard procedure to tell a patient, and that he was sure he told Scott that there was "a 1% chance of loss, . . . of the hearing in the ear," the doctor was under a duty to relate specific adverse results. This is not in harmony with the decided cases. In so holding, the Court is relieving Scott of the burden of proof which stays with him throughout the trial. The Court, merely because Dr. Wilson thinks he told Scott **[\*306]** about the 1% total loss of hearing, and Scott says the doctor did not mention the 1%, has relieved Scott of the burden of establishing by expert testimony of medical witnesses that the disclosures which were admittedly made were not in accordance with those which a reasonable medical practitioner would make under the same or similar circumstances. See Natanson v. Kline, 186 Kan. 393, 350 P.2d 1093, rehearing denied, 187 Kan. 186, 354 P.2d 670 (1960); **[\*\*20]** Williams v. Menehan, 191 Kan. 6, 379 P.2d 292 (1963). *Kline* was a case where the physician failed in his legal duty to make any disclosure whatever to the patient of the dangers and hazards inherent in the proposed treatment. The Court held:

> "Whether or not a physician has advised his patient of the inherent risks and hazards in a proposed form of treatment is a question of fact concerning which *lay witnesses* are competent to testify, and the establishment of such fact is *not dependent upon expert medical testimony*. It is only when the facts concerning the actual disclosures made to the patient are ascertained, or ascertainable by the trier of the facts, that the expert testimony of medical witnesses is required to establish whether such disclosures are in accordance with those which a reasonable medical practitioner would make under the same or similar circumstances."

In *Williams*, the Kansas Supreme Court said:

"At the outset it may be stated that all of the parties rely on our recent case of Natanson v. Kline, 186 Kan. 393, 350 P.2d 1093, rehearing denied 187 Kan. 186, 354 P.2d 670, the parties seeking to place a different construction **[\*\*21]** on what was said with reference to informed consent. We said in the Natanson case at page 406 it is the duty of a doctor to make a reasonable disclosure to his patient of the nature and probable consequences of the suggested or recommended treatment, and to make a reasonable disclosure of the dangers within his knowledge which are incident or possible in the treatment he proposes to administer. But this does not mean that a doctor is under an obligation to describe in detail all of the possible consequences of treatment. To make a complete disclosure of all facts, diagnoses and alternatives or possibilities which might occur to the doctor could so alarm the patient that it would, in fact, constitute bad medical practice."

The cases from other jurisdictions draw a distinction as to the type of proof required where the doctor gave *no* warning and where the doctor gave *some* warning. It is my position that Dr. Wilson has made no admission in this case which would forego the necessity of proof by Scott that where there is testimony regarding the type or extent of warning given the patient (Scott in this instance), then the expert testimony of medical witnesses is required to **[\*\*22]** establish whether such disclosures are in accordance with those which a reasonable medical practitioner would make under the same or similar circumstances. By his testimony, the doctor has not waived this requirement. The question of whether or not a surgeon is under a duty to warn a patient of the possibility of a specific adverse result of a stapedectomy depends upon the general practice followed by the medical profession and not upon the personal opinion of a layman. See Govin v. Hunter, 374 P.2d 421 (Sup.Ct. Wyoming, 1962). The question of whether or not Dr. Wilson mentioned the 1% total loss possibility is not an ultimate issue in this case.

I would reverse the judgment of the Court of Civil Appeals and affirm that of the trial court.

Associate Justices Griffin and Hamilton join in this dissent.

Page 1

199 Wis. 2d 615, *; 545 N.W.2d 495, **;
1996 Wisc. LEXIS 23, ***



**Donna L. Johnson, by her Guardian ad Litem, Timothy J. Adler, Plaintiff-Respondent-Petitioner, v. Dr. Richard Kokemoor, Physicians Insurance Company of Wisconsin, and Wisconsin Patients Compensation Fund, Defendants-Appellants-Cross Petitioners, Scared Heart Hospital, Wisconsin Healthcare Liability Plan, Wisconsin Department of Health and Social Services, and Healthcare Financing Administration, Defendants.**

**No. 93-3099**

**SUPREME COURT OF WISCONSIN**

**199 Wis. 2d 615; 545 N.W.2d 495; 1996 Wisc. LEXIS 23**

**November 1, 1995, Oral Argument**
**March 20, 1996, FILED**

**PRIOR HISTORY:** [***1] REVIEW of a decision of the Court of Appeals. COURT: Circuit. COUNTY: Chippewa. JUDGE: RICHARD STAFFORD. Reported at: 188 Wis. 2d 202, 525 N.W.2d 71 (Ct. App. 1994) PUBLISHED.

**DISPOSITION:** Reversed and cause remanded.

**COUNSEL:** For the plaintiff-respondent-petitioner there were briefs by D. Charles Jordan, Dana J. Wachs, Heidi L. Atkins and Jordan & Wachs, Eau Claire and oral argument by D. Charles Jordan.

For the defendants-appellants-cross petitioners there were briefs by Douglas J. Klingberg, James F. Harrington and Ruder, Ware & Michler, S.C., Wausau and oral argument by Douglas J. Klingberg.

Amicus curiae brief was filed by Nancy M. Rottier, counsel, Madison and Dean P. Laing and O'Neil, Cannon & Hollman, S.C., Milwaukee for the Wisconsin Academy of Trial Lawyers.

**JUDGES:** SHIRLEY S. ABRAHAMSON, J. Justice Ann Walsh Bradley did not participate.

Page 2

199 Wis. 2d 615, *; 545 N.W.2d 495, **;
1996 Wisc. LEXIS 23, ***

**OPINION BY:** SHIRLEY S. ABRAHAMSON

**OPINION**

[*620]    [**497]    SHIRLEY S. ABRAHAMSON, J. This is a review of a published decision of the court of appeals, Johnson v. Kokemoor, 188 Wis. 2d 202, 525 N.W.2d 71 (Ct. App. 1994), reversing an order of the circuit court for Chippewa County, Richard H. Stafford, judge. We reverse **[***2]** the decision of the court of appeals and remand the cause to the circuit court for further proceedings on the question of damages. [1]

> 1    The trial was bifurcated at the circuit court. The jury decided only the liability issue; the issue of damages has not been tried.

Donna Johnson (the plaintiff) brought an action against Dr. Richard Kokemoor (the defendant) [2] alleging his failure to obtain her informed consent to surgery as required by Wis. Stat. § 448.30 (1993-94). [3] The jury found that the defendant failed to adequately inform the plaintiff regarding the risks associated with her surgery. The jury also found that a reasonable person in the plaintiff's position would have refused to **[*621]** consent to surgery by the defendant if she had been fully informed of its attendant risks and advantages. [4]

> 2    While there are other defendants in this case, in the interest of clarity we refer only to Dr. Kokemoor as the defendant.

**[***3]**
> 3    All future statutory references are to the 1993-94 volume of the Wisconsin Statutes.
>
> 4    The parties agreed to a special verdict form requiring the jury to answer the following two questions:
>
> (1) Did Dr. Richard Kokemoor fail to adequately inform Donna Johnson of the risks and advantages of her surgery?
>
> (2) If you have answered Question 1 "yes", then and then only answer this question: Would a reasonable person in Donna Johnson's position have refused to consent to the surgery by Dr. Richard Kokemoor had she been informed of the risks and advantages of the surgery?

The jury answered "yes" to both questions.

The circuit court denied the defendant's motions to change the answers in the special verdict and, in the alternative, to order a new trial. In a split decision, the court of appeals reversed the circuit court's order.

This case presents the issue of whether the circuit court erred in admitting evidence that the defendant, in undertaking his duty to obtain the plaintiff's informed consent before operating to clip an aneurysm, failed (1) to divulge the extent **[***4]** of his experience in per-

Page 3

199 Wis. 2d 615, *; 545 N.W.2d 495, **;
1996 Wisc. LEXIS 23, ***

forming this type of operation; (2) to compare the morbidity and mortality rates [5] for this type of surgery among experienced surgeons and inexperienced surgeons like himself; and (3) to refer the plaintiff to a tertiary care center staffed by physicians more experienced in performing the same surgery. [6] **[**498]** The **[*622]** admissibility of such physician-specific evidence in a case involving the doctrine of informed consent raises an issue of first impression in this court and is an issue with which appellate courts have had little experience.

> 5    As used by the parties and in this opinion, morbidity and mortality rates refer to the prospect that surgery may result in serious impairment or death.
>
> 6    In a motion brought prior to trial, the defendant attempted to bar testimony and argument relating to his personal experience with aneurysm surgery and to the relative experience of other surgeons available to perform such surgery. The defendant argued that such disclosures are not material to the issue of informed consent. The circuit court denied the defendant's motion and also ruled that the plaintiff could present expert testimony that the defendant should have advised her of and referred her to more experienced neurosurgeons.

**[***5]** The court of appeals concluded that the first two evidentiary matters were admissible but that the third was not. The court of appeals determined that evidence about the defendant's failure to refer the plaintiff to more experienced physicians was not relevant to a claim of failure to obtain the plaintiff's informed consent. Johnson, 188 Wis. 2d at 223. Furthermore, the court of appeals held that the circuit court committed prejudicial error in admitting evidence of the defendant's failure to refer, because such evidence allowed the jury to conclude that the defendant performed negligently simply because he was less experienced than other physicians, even though the defendant's negligence was not at issue in this case. Johnson, 188 Wis. 2d at 224. [7] The court of appeals therefore remanded the cause to the circuit court for a new trial. [8]

> 7    Prior to trial, the plaintiff had voluntarily dismissed a cause of action alleging that the defendant was negligent in performing the surgery.
>
> 8    Given the "overwhelming" evidence "that Kokemoor did not adequately inform Johnson," Johnson v. Kokemoor, 188 Wis. 2d 202, 227, 525 N.W.2d 71 (Ct. App. 1994), the court of appeals left to the circuit court's discretion whether it need retry the issue of the defendant's alleged failure to obtain the plaintiff's informed consent or whether it need retry only the causation issue.

**[***6]** The plaintiff's position is that the court of appeals erred in directing a new trial. The defendant's position **[*623]** in his cross-petition is that the circuit court and the court of appeals both erred in approving the admission of evidence referring to his experience with this type of surgery and to his and other physicians' morbidity and mortality statistics in performing this type of surgery.

We conclude that all three items of evidence were material to the issue of informed consent in this case. As we stated in Martin v. Richards, 192 Wis. 2d 156, 174, 531 N.W.2d 70

Page 4

199 Wis. 2d 615, *; 545 N.W.2d 495, **;
1996 Wisc. LEXIS 23, ***

(1995), "a patient cannot make an informed, intelligent decision to consent to a physician's suggested treatment unless the physician discloses what is material to the patient's decision, i.e., all of the viable alternatives and risks of the treatment proposed." In this case information regarding a physician's experience in performing a particular procedure, a physician's risk statistics as compared with those of other physicians who perform that procedure, and the availability of other centers and physicians better able to perform that procedure would have facilitated the plaintiff's awareness of "all of the viable **[***7]** alternatives" available to her and thereby aided her exercise of informed consent. We therefore conclude that under the circumstances of this case, the circuit court did not erroneously exercise its discretion in admitting the evidence.

I.

We first summarize the facts giving rise to this review, recognizing that the parties dispute whether several events occurred, as well as what inferences should be drawn from both the disputed and the undisputed historical facts.

On the advice of her family physician, the plaintiff underwent a CT scan to determine the cause of her headaches. Following the scan, the family physician **[*624]** referred the plaintiff to the defendant, a neurosurgeon in the Chippewa Falls area. The defendant diagnosed an enlarging aneurysm at the rear of the plaintiff's brain and recommended surgery to clip the aneurysm. [9] The defendant performed the surgery in October of 1990.

> 9    The defendant acknowledged at trial that the aneurysm was not the cause of the plaintiff's headaches.

**[**499]** The defendant clipped **[***8]** the aneurysm, rendering the surgery a technical success. But as a consequence of the surgery, the plaintiff, who had no neurological impairments prior to surgery, was rendered an incomplete quadriplegic. She remains unable to walk or to control her bowel and bladder movements. Furthermore, her vision, speech and upper body coordination are partially impaired.

At trial, the plaintiff introduced evidence that the defendant overstated the urgency of her need for surgery and overstated his experience with performing the particular type of aneurysm surgery which she required. According to testimony introduced during the plaintiff's case in chief, when the plaintiff questioned the defendant regarding his experience, he replied that he had performed the surgery she required "several" times; asked what he meant by "several," the defendant said "dozens" and "lots of times.

In fact, however, the defendant had relatively limited experience with aneurysm surgery. He had performed thirty aneurysm surgeries during residency, but all of them involved anterior circulation aneurysms. According to the plaintiff's experts, operations performed to clip anterior circulation aneurysms are significantly **[***9]** less complex than those necessary to clip posterior circulation aneurysms such as the plaintiff's. [10] **[*625]** Following residency, the defendant had performed aneurysm surgery on six patients with a total of nine aneurysms.

Page 5

199 Wis. 2d 615, *; 545 N.W.2d 495, **;
1996 Wisc. LEXIS 23, ***

He had operated on basilar bifurcation aneurysms only twice and had never operated on a large basilar bifurcation aneurysm such as the plaintiff's aneurysm. [11]

> 10    The plaintiff's aneurysm was located at the bifurcation of the basilar artery. According to the plaintiff's experts, surgery on basilar bifurcation aneurysms is more difficult than any other type of aneurysm surgery.
>
> 11    The defendant testified that he had failed to inform the plaintiff that he was not and never had been board certified in neurosurgery and that he was not a subspecialist in aneurysm surgery.

The plaintiff also presented evidence that the defendant understated the morbidity and mortality rate associated with basilar bifurcation aneurysm surgery. According to the plaintiff's witnesses, the defendant had told the [***10] plaintiff that her surgery carried a two percent risk of death or serious impairment and that it was less risky than the angiogram procedure she would have to undergo in preparation for surgery. The plaintiff's witnesses also testified that the defendant had compared the risks associated with the plaintiff's surgery to those associated with routine procedures such as tonsillectomies, appendectomies and gall bladder surgeries. [12]

> 12    The defendant testified at trial that he had informed the plaintiff that should she decide to forego surgery, the risk that her unclipped aneurysm might rupture was two percent per annum, cumulative. Since he informed the plaintiff that the risk accompanying surgery was two percent, a reasonable person in the plaintiff's position might have concluded that proceeding with surgery was less risky than non-operative management.

[*626] The plaintiff's neurosurgical experts testified that even the physician considered to be one of the world's best aneurysm surgeons, who had performed hundreds [***11] of posterior circulation aneurysm surgeries, had reported a morbidity and mortality rate of ten-and-seven-tenths percent when operating upon basilar bifurcation aneurysms comparable in size to the plaintiff's aneurysm. Furthermore, information in treatises and articles which the defendant reviewed in preparation for the plaintiff's surgery set the morbidity and mortality rate at approximately fifteen percent for a basilar bifurcation aneurysm. The plaintiff also introduced expert testimony that the morbidity and mortality rate for basilar bifurcation aneurysm operations performed by one with the defendant's relatively limited experience would be between twenty and thirty percent, and "closer to the thirty percent range." [13]

> 13    The plaintiff introduced into evidence as exhibits articles from the medical literature stating that there are few areas in neurosurgery where the difference in results between surgeons is as evident as it is with aneurysms. One of the plaintiff's neurosurgical experts testified that experience and skill with the operator is more important when performing basilar tip aneurysm surgery than with any other neurosurgical procedure.

[***12] Finally, the plaintiff introduced into evidence testimony and exhibits stating that a [**500] reasonable physician in the defendant's position would have advised the

Page 6

199 Wis. 2d 615, *; 545 N.W.2d 495, **;
1996 Wisc. LEXIS 23, ***

plaintiff of the availability of more experienced surgeons and would have referred her to them. The plaintiff also introduced evidence stating that patients with basilar aneurysms should be referred to tertiary care centers--such as the Mayo Clinic, only 90 miles away--which contain the proper neurological intensive care unit and microsurgical facilities and **[*627]** which are staffed by neurosurgeons with the requisite training and experience to perform basilar bifurcation aneurysm surgeries.

In his testimony at trial, the defendant denied having suggested to the plaintiff that her condition was urgent and required immediate care. He also denied having stated that her risk was comparable to that associated with an angiogram or minor surgical procedures such as a tonsillectomy or appendectomy. While he acknowledged telling the plaintiff that the risk of death or serious impairment associated with clipping an aneurysm was two percent, he also claims to have told her that because of the location of her aneurysm, the risks attending her **[***13]** surgery would be greater, although he was unable to tell her precisely how much greater. [14] In short, the defendant testified that his disclosure to the plaintiff adequately informed her regarding the risks that she faced.

> 14   The defendant maintained that characterizing the risk as two percent was accurate because the aggregate morbidity and mortality rate for all aneurysms, anterior and posterior, is approximately two percent. At the same time, however, the defendant conceded that in operating upon aneurysms comparable to the plaintiff's aneurysm, he could not achieve morbidity and mortality rates as low as the ten-and-seven-tenths percent rate reported by a physician reputed to be one of the world's best aneurysm surgeons.

The defendant's expert witnesses testified that the defendant's recommendation of surgery was appropriate, that this type of surgery is regularly undertaken in a community hospital setting, and that the risks attending anterior and posterior circulation aneurysm surgeries are comparable. **[***14]** They placed the risk accompanying the plaintiff's surgery at between five and ten percent, although one of the defendant's experts also **[*628]** testified that such statistics can be misleading. The defendant's expert witnesses also testified that when queried by a patient regarding their experience, they would divulge the extent of that experience and its relation to the experience of other physicians performing similar operations. [15]

> 15   The defendant's expert witness Dr. Patrick R. Walsh testified:
>
> > In my personal practice, I typically outline my understanding of the natural history of aneurysms, my understanding of the experience of the neurosurgical community in dealing with aneurysms and then respond to specific questions raised by the patient. If a patient asks specifically what my experience is, I believe it is mandatory that I outline that to him as carefully as possible.

Page 7

199 Wis. 2d 615, *; 545 N.W.2d 495, **;
1996 Wisc. LEXIS 23, ***

Dr. Walsh also stated that "it certainly is reasonable for [the defendant] to explain to [the plaintiff] that other surgeons are available.

Dr. Douglas E. Anderson, who also testified for the defense, stated that "if the patient is asking issues about prior experience, it is reasonable . . . to proceed with a discussion of your prior experience." Dr. Anderson also stated that "if the patient asks a surgeon if there is someone who has performed more surgeries than he, it is reasonable to tell the truth."

**[\*\*\*15]** II.

We now turn to a review of Wisconsin's law of informed consent. The common-law doctrine of informed consent arises from and reflects the fundamental notion of the right to bodily integrity. Originally, an action alleging that a physician had failed to obtain a patient's informed consent was pled as the intentional tort of assault and battery. In the typical situation giving rise to an informed consent action, a patient-plaintiff consented to a certain type of operation but, in the course of that operation, was subjected **[\*629]** to other, unauthorized operative procedures. See, e.g., Paulsen v. Gundersen, 218 Wis. 578, 584, 260 N.W. 448 (1935) (when a patient agrees to a simple operation and a physician performs a more extensive operation, the physician is "guilty of an assault and would be responsible for damages resulting therefrom"); Throne v. Wandell, 176 Wis. 97, 186 N.W. 146 (1922) (dentist extracting six of the plaintiff's teeth without her consent has committed a technical assault).

The court further developed the doctrine of informed consent in Trogun v. **[\*\*501]** Fruchtman, 58 Wis. 2d 596, 207 N.W.2d 297 (1972), stating for the first time that a plaintiff-patient could bring **[\*\*\*16]** an informed consent action based on negligence rather than as an intentional tort. [16] The court clarified Wisconsin's modern doctrine of informed consent in Scaria v. St. Paul Fire & Marine Ins. Co., 68 Wis. 2d 1, 227 N.W.2d 647 (1975). Wis. Stat. § 448.30 codifies the common law set forth in **[\*630]** Scaria. [17] This statute has recently been interpreted and applied in Martin, 192 Wis. 2d 156. [18], 531 N.W.2d 70

16    Although an action alleging a physician's failure to adequately inform is grounded in negligence, it is distinct from the negligence triggered by a physician's failure to provide treatment meeting the standard of reasonable care. The doctrine of informed consent focuses upon the reasonableness of a physician's disclosures to a patient rather than the reasonableness of a physician's treatment of that patient.

17    See Martin v. Richards, 192 Wis. 2d 156, 174, 531 N.W.2d 70 (1995) (discussing the legislative history of Wis. Stat. § 448.30).

Wisconsin Stat. § 448.30 requires that a physician inform a patient about the availability of all alternate, viable medical modes of treatment and about the benefits and risks attending these treatments. The informed consent statute reads as follows:

**448.30 Information on alternate modes of treatment.**

Page 8

199 Wis. 2d 615, *; 545 N.W.2d 495, **;
1996 Wisc. LEXIS 23, ***

Any physician who treats a patient shall inform the patient about the availability of all alternate, viable medical modes of treatment and about the benefits and risks of these treatments. The physician's duty to inform the patient under this section does not require disclosure of:

(1) Information beyond what a reasonably well-qualified physician in a similar medical classification would know.

(2) Detailed technical information that in all probability a patient would not understand.

(3) Risks apparent or known to the patient.

(4) Extremely remote possibilities that might falsely or detrimentally alarm the patient.

(5) Information in emergencies where failure to provide treatment would be more harmful to the patient than treatment.

(6) Information in cases where the patient is incapable of consenting.

**[\*\*\*17]**
18    See also Platta v. Flatley, 68 Wis. 2d 47, 227 N.W.2d 898 (1975).

The concept of informed consent is based on the tenet that in order to make a rational and informed decision about undertaking a particular treatment or undergoing a particular surgical procedure, a patient has the right to know about significant potential risks involved in the proposed treatment or surgery. Scaria, **[\*631]**   68 Wis. 2d at 11. In order to insure that a patient can give an informed consent, a "physician or surgeon is under the duty to provide the patient with such information as may be necessary under the circumstances then existing" to assess the significant potential risks which the patient confronts. Id.

The information that must be disclosed is that information which would be "material" to a patient's decision.   Martin, 192 Wis. 2d at 174. In the first of three seminal informed consent decisions relied upon by both the Trogun and Scaria courts, [19] the federal court of appeals for the District of Columbia stated that information regarding risk is material when "a reasonable person, in what **[\*\*\*18]**   the physician knows or should know to be the patient's position, would be likely to attach significance to the risk or cluster of risks in deciding whether or not to forego the proposed therapy. " Canterbury v. Spence, 150 U.S. App. D.C. 263, 464 F.2d 772, 787 (D.C. Cir. 1972), cert. denied, 409 U.S. 1064, 34 L. Ed. 2d 518, 93 S. Ct. 560 (1972). The Canterbury court defined as material and therefore "demanding a communication" from a physician to a patient all information regarding "the inherent and potential hazards of the proposed treatment, the alternatives to that treatment, if any, and the results likely if the patient remains untreated." Id. at 787-88. [20]

19 Canterbury v. Spence, 150 U.S. App. D.C. 263, 464 F.2d 772 (D.C. Cir. 1972), cert. denied, 409 U.S. 1064, 34 L. Ed. 2d 518, 93 S. Ct. 560 (1972); Cobbs v. Grant, 8 Cal. 3d 229, 502 P.2d 1, 104 Cal. Rptr. 505 (Cal. 1972); Wilkinson v. Vesey, 110 R.I. 606, 295 A.2d 676 (R.I. 1972).

20 See also Miles J. Zaremski & Louis S. Goldstein, 1 Medical and Hospital Negligence § 15.05 at 17 (1988-90) (stating that "materiality is the touchstone for determining the adequacy of the disclosure . . . the crux of the issue is the effect of the nondisclosure on the patient's ability to make an intelligent choice").

[***19]   [*632]   According to both the Scaria and Martin courts, a physician's reasonable disclosure requires that a patient be informed   [**502]   regarding available options. A "reasonable disclosure" of "significant risks," stated the Scaria court, requires an assessment of and communication regarding "the gravity of the patient's condition, the probabilities of success, and any alternative treatment or procedures if such are reasonably appropriate so that the patient has the information reasonably necessary to form the basis of an intelligent and informed consent to the proposed treatment or procedure." Scaria, 68 Wis. 2d at 11. [21] The Martin court, explicitly recognizing that the statutory doctrine of informed consent in Wisconsin is "based upon the standard expounded in Canterbury," Martin, 192 Wis. 2d at 173, explained that a patient cannot make an informed decision to consent to the suggested treatment "unless the physician discloses what is material to the patient's decision, *i.e.,* all of the viable alternatives and risks of the treatment proposed." Martin, 192 Wis. 2d at 174.

21 For a discussion of informed consent from the legal and medical perspectives, see also Paul S. Applebaum, Charles W. Lidz, & Alan Meisel, Informed Consent: Legal Theory and Clinical Practice (1987).

[***20]

What constitutes informed consent in a given case emanates from what a reasonable person in the patient's position would want to know.   Scaria, 68 Wis. 2d at 13; Martin, 192 Wis. 2d at 174. This standard regarding what a physician must disclose is described as the prudent patient standard; it has been embraced   [*633]   by a growing number of jurisdictions since the Canterbury decision. [22]

22 Wisconsin's adoption of this standard in Scaria is discussed in Medical Malpractice: Concepts and Wisconsin Cases, Staff Paper #2 of the Medical Malpractice Committee, Wisconsin Legislative Council Reports 1, 2 (1976); John S. Schliesmann, Torts, 59 Marq. L. Rev. 417, 417-19 (1976). For a more general overview of the history of and distinctions between the traditional professional physician standard and the prudent patient standard, see Applebaum, supra, 41-49; David W. Louisell & Harold Williams, 2 Medical Malpractice § 22.05 (2d ed. 1987) (pointing out that the professional physician standard has been criticized for being vague and thereby conferring almost unlimited discretion on the treating physician); Zaremski & Goldstein, supra, § 15.03 & nn.18-20 (collecting cases).

Page 10

199 Wis. 2d 615, *; 545 N.W.2d 495, **;
1996 Wisc. LEXIS 23, ***

**[\*\*\*21]** The Scaria court emphasized that those "disclosures which would be made by doctors of good standing, under the same or similar circumstances, are certainly relevant and material" in assessing what constitutes adequate disclosure, adding that physician disclosures conforming to such a standard "would be adequate to fulfill the doctor's duty of disclosure in most instances." Scaria, 68 Wis. 2d at 12. But the evidentiary value of what physicians of good standing consider adequate disclosure is not dispositive, for ultimately "the extent of the physician's disclosures is driven . . . by what a reasonable person under the circumstances then existing would want to know." Martin, 192 Wis. 2d at 174; see also Scaria, 68 Wis. 2d at 13. [23]

> 23 We recognize, as did the Scaria court, that there must be some limitation upon the doctor's duty to disclose risks involved. In Scaria, we cautioned:
>
> > A doctor should not be required to give a detailed technical medical explanation that in all probability the patient would not understand. He should not be required to discuss risks that are apparent or known to the patient. Nor should he be required to disclose extremely remote possibilities that at least in some instances might only serve to falsely or detrimentally alarm the particular patient. Likewise, a doctor's duty to inform is further limited in cases of emergency or where the patient is a child, mentally incompetent or a person is emotionally distraught or susceptible to unreasonable fears.
>
> Scaria, 68 Wis. 2d at 12-13 (note omitted). Similar limitations on a physician's duty to disclose were subsequently incorporated into Wis. Stat. § 448.30.

**[\*\*\*22]**    **[\*634]**   "The information that is reasonably necessary for a patient to make an informed decision regarding treatment will vary from case to case." Martin, 192 Wis. 2d at 175. [24] The standard to which a physician is held is determined not by what the particular patient being treated would want to know, but rather by what a reasonable person in the patient's position would   **[\*\*503]**   want to know.   Scaria, 68 Wis. 2d at 13.

> 24 See also Zaremski & Goldstein, supra, § 15.01 at 3 ("the scope of the disclosure is to be viewed in conjunction with the circumstances of each individual case").

III.

Before addressing the substantive issues raised by the parties, we briefly outline the standards of review which we apply to the circuit court's evidentiary ruling admitting the three items of evidence in dispute in this case.

The defendant argues that the circuit court erred in admitting the evidence. He asks the court to declare that the three pieces of evidence at issue are not admissible as a matter of law in informed **[\*\*\*23]**   consent cases. [25]

Page 11

199 Wis. 2d 615, *; 545 N.W.2d 495, **;
1996 Wisc. LEXIS 23, ***

25    Under Wisconsin's doctrine of informed consent, whenever the determination of what a reasonable person in the patient's position would want to know is open to debate by reasonable people, the issue of informed consent is a question for the jury.   Martin, 192 Wis. 2d at 172-73; Platta, 68 Wis. 2d at 60; see also Canterbury, 464 F.2d at 788.

In Martin, we upheld that part of a court of appeals decision reversing the circuit court's exclusion as a matter of law of certain evidence relating to the physician's failure to disclose a one-to-three-percent chance that the plaintiff might suffer intracranial bleeding following a serious head injury. The circuit court had determined that the disputed information involved "extremely remote possibilities" and was therefore not subject to disclosure under Wis. Stat. § 448.30(4) as a matter of law. Instead, we noted that while the undisclosed risk may have been small, "such risk may be significant to a patient's decision in light of the potentially severe consequences" and therefore should have been admitted.   Martin, 192 Wis. 2d at 168.

[***24]

[*635]   The general rule is that a circuit court's decision with regard to the relevance of proffered evidence is a discretionary decision.   State v. Pittman, 174 Wis. 2d 255, 267, 496 N.W.2d 74 (1993). Evidence is relevant when it "tends 'to make the existence of [a material fact] more probable or less probable than it would be without the evidence.'" In Interest of Michael R.B., 175 Wis. 2d 713, 724, 499 N.W.2d 641 (1993) (quoting State v. Denny, 120 Wis. 2d 614, 623, 357 N.W.2d 12 (Ct. App. 1984)); Wis. Stat. § 904.01. [26] Material facts are those that are of consequence to the merits of the litigation. In Interest of Michael R.B., 175 Wis. 2d at 724.

26    Wis. Stat. § 904.01 provides as follows:

**Definition of "relevant evidence."** "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Evidence which is relevant may [***25]   nevertheless be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of [*636]   the issues, or misleading the jury.   State v. Patricia A.M., 176 Wis. 2d 542, 554, 500 N.W.2d 289 (1993); Wis. Stat. § 904.03. [27] It is not enough that the evidence will be prejudicial; "exclusion is required only if the evidence is unfairly prejudicial." Patricia A.M., 176 Wis. 2d at 554.

27    Wis. Stat. § 904.03 provides as follows:

Page 12

199 Wis. 2d 615, *; 545 N.W.2d 495, **;
1996 Wisc. LEXIS 23, ***

**Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The question of whether otherwise admissible evidence is nevertheless unfairly prejudicial rests with the discretion of the circuit court. Featherly v. Continental **[***26]** Ins. Co., 73 Wis. 2d 273, 243 N.W.2d 806 (1976). This court will not conclude that a circuit court erroneously exercised its discretion when there is a reasonable basis for the circuit court's determination.

Finally, if the circuit court erred in admitting the evidence, reversal or a new trial is required only if the improper admission of evidence has affected the substantial rights of the party seeking relief. Wis. Stat. § 805.18(2). [28]

28    Wis. Stat. § 805.18(2) provides as follows:

No judgment shall be reversed or set aside or new trial granted in any action or proceeding on the ground of drawing, selection or misdirection of jury, or the improper admission of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court to which the application is made, after an examination of the entire action or proceeding, it shall appear that the error complained of has affected the substantial rights of the party seeking to reverse or set aside the judgment, or to secure a new trial.

**[***27]    [*637]    [**504]** IV.

The defendant contends that the circuit court erred in allowing the plaintiff to introduce evidence regarding the defendant's limited experience in operating upon aneurysms comparable to the plaintiff's aneurysm. Wisconsin's law of informed consent, the defendant continues, requires a physician to reveal only those risks inherent in the treatment. Everyone agrees, argues the defendant, that he advised the plaintiff regarding those risks: the potential perils of death, a stroke or blindness associated with her surgery.

The defendant argues that the circuit court's decision to admit evidence pertaining to his surgical experience confused relevant information relating to treatment risks with irrelevant and prejudicial information that the defendant did not possess the skill and experience of the very experienced aneurysm surgeons. Therefore, according to the defendant, the jury's at-

Page 13

199 Wis. 2d 615, *; 545 N.W.2d 495, **;
1996 Wisc. LEXIS 23, ***

tention was diverted from a consideration of whether the defendant made required disclosures regarding treatment to the question of who was performing the plaintiff's operation. Thus, the defendant contends, the circuit court transformed a duty to reasonably inform into a duty to reasonably perform **[\*\*\*28]** the surgery, even though the plaintiff was not alleging negligent treatment.

The doctrine of informed consent should not, argues the defendant, be construed as a general right to information regarding possible alternative procedures, health care facilities and physicians. Instead, urges the defendant, the doctrine of informed consent **[\*638]** should be viewed as creating a "bright line" rule requiring physicians to disclose only significant complications intrinsic to the contemplated procedure. The defendant interprets Wis. Stat. § 448.30 as an embodiment of this more modest definition of informed consent. In sum, the defendant urges that the statutory provisions require disclosure of risks associated with particular "treatments" rather than the risks associated with particular physicians. [29]

> 29    The defendant also argues that the plaintiff is trying to disguise what is actually a negligent misrepresentation claim as an informed consent claim so that she might bring before the jury otherwise inadmissible evidence regarding the defendant's experience and relative competence.
>
> The tort of negligent misrepresentation occurs when one person negligently gives false information to another who acts in reasonable reliance on the information and suffers physical harm as a consequence of the reliance. Restatement (Second) of Torts, § 311(1) (1965). An overlap exists between a claim pleading this tort and one alleging a failure to provide informed consent. As the commentary to § 311 of the Restatement points out:
>
>> The rule stated in this Section finds particular application where it is a part of the actor's business or profession to give information upon which the safety of the recipient or a third person depends. Thus it is as much a part of the professional duty of a physician to give correct information as to the character of the disease from which his plaintiff is suffering, where such knowledge is necessary to the safety of the patient or others, as it is to make a correct diagnosis or to prescribe the appropriate medicine.
>
> Restatement (Second) of Torts, § 311(1) cmt. b (1965).
>
> Because of this overlap between negligent misrepresentation and informed consent, it is not surprising that allegations made and evidence introduced by the plaintiff might have fit comfortably under either theory. But this overlap does not preclude the plaintiff from making allegations and introducing evidence in an informed consent case which might also have been pled in a negligent misrepresentation case. This case was pled and proved under the tort of failure to procure informed consent.

Page 14

199 Wis. 2d 615, *; 545 N.W.2d 495, **;
1996 Wisc. LEXIS 23, ***

[***29]    [*639]   We reject the defendant's proposed bright line rule that it is error as a matter of law to admit evidence in an informed consent case that the physician failed to inform the patient regarding the physician's experience with the surgery or treatment at issue. The prudent patient standard adopted by Wisconsin in Scaria is incompatible with such a bright line rule.

As Scaria states and as Martin confirms, what a physician must disclose is contingent upon what, under the circumstances of a given case, a reasonable person in the patient's position would need to know in order to make an intelligent and informed decision.   Scaria, 68 Wis. 2d at 13; Martin, 192 Wis. 2d at 174. The question of whether certain information   [**505] is material to a patient's decision and therefore requires disclosure is rooted in the facts and circumstances of the particular case in which it arises.   Martin, 192 Wis. 2d at 175.

The cases upon which the Trogun and Scaria courts relied in fashioning Wisconsin's current doctrine of informed consent rejected the concept of bright line rules. The "scope of the disclosure required of physicians," stated the California Supreme Court, "defies [***30] simple definition" and must therefore "be measured by the patient's need, and that need is whatever information is material to the decision." Cobbs v. Grant, 8 Cal. 3d 229, 502 P.2d 1, 10, 11, 104 Cal. Rptr. 505 (Cal. 1972). "The amount of disclosure can vary from one patient to another," stated the Rhode Island Supreme Court, because "what is reasonable disclosure in one instance may not be reasonable in another." Wilkinson v. Vesey, 110 R.I. 606, 295 A.2d 676, 687-88 (R.I.   [*640]   1972). Finally, the Canterbury court's decision--which, as the Martin court underscored last term, provides the basis for Wisconsin's doctrine of informed consent, Martin, 192 Wis. 2d at 173--states explicitly that under the doctrine of informed consent, "there is no bright line separating the significant from the insignificant." Canterbury, 464 F.2d at 788.

Wisconsin Stat. § 448.30 explicitly requires disclosure of more than just treatment complications associated with a particular procedure. Physicians must, the statute declares, disclose "the availability of all alternate, viable medical modes of treatment" in addition to "the benefits and risks of these treatments."

The Martin court rejected the argument that Wis. Stat. § 448.30 [***31]   was limited by its plain language to disclosures intrinsic to a proposed treatment regimen. The Martin court stated that Wis. Stat. § 448.30 "should not be construed so as to unduly limit the physician's duty to provide information which is reasonably necessary under the circumstances." Martin, 192 Wis. 2d at 175. [30] "There can be no dispute," the [*641]   Martin court declared, "that the language in Scaria . . . requires that a physician disclose information necessary for a reasonable person to make an intelligent decision." Id.

30    Ruling before the publication of Martin on the admissibility of evidence pertaining to the defendant's experience, the circuit court made a similar point:

I've also looked at the informed consent instruction, 1023.2, and it says that the doctor or physician is under a duty to make such disclosures that

Page 15

199 Wis. 2d 615, *; 545 N.W.2d 495, **;
1996 Wisc. LEXIS 23, ***

will enable a reasonable person under the circumstances confronting the patient to exercise the patient's right to make a proper consent, so I don't think that--that we're limited to the references made in the statute. I think that anything that's necessary to a reasonable person to arrive at an informed and reasonable consent is allowable evidence, so clearly the six times [i.e. the six post-residency aneurysm operations which the defendant had performed] is allowable evidence and the fact that he made a statement that he had done this lots of time, there's nothing wrong with that [being admitted].

[***32]   In this case, the plaintiff introduced ample evidence that had a reasonable person in her position been aware of the defendant's relative lack of experience in performing basilar bifurcation aneurysm surgery, that person would not have undergone surgery with him. According to the record the plaintiff had made inquiry of the defendant's experience with surgery like hers. In response to her direct question about his experience he said that he had operated on aneurysms comparable to her aneurysm "dozens" of times. The plaintiff also introduced evidence that surgery on basilar bifurcation aneurysms is more difficult than any other type of aneurysm surgery and among the most difficult in all of neurosurgery. We conclude that the circuit court did not erroneously exercise its discretion in admitting evidence regarding the defendant's lack of experience and the difficulty of the proposed procedure. A reasonable person in the plaintiff's position would have considered such information material in making an intelligent and informed decision about the surgery.

We also reject the defendant's claim that even if this information was material, it should have been excluded because its prejudicial [***33]   effect outweighed its probative value. The defendant contends that the admission of such evidence allowed the jury to infer that the plaintiff's partial paralysis was a product   [**506]   of the defendant's lack of experience and skill rather than a consequence of his alleged failure to inform.

[*642]   We disagree with the defendant's claim that evidence pertaining to the defendant's experience was unduly and unfairly prejudicial. While a jury might confuse negligent failure to disclose with negligent treatment, [31] the likelihood of confusion is nonexistent or de minimis in this case. The plaintiff dismissed her negligent treatment claim before trial. It is thus unlikely that the jury would confuse an issue not even before it with the issue that was actually being tried. We therefore conclude that the defendant was not unduly or unfairly prejudiced by the admission of evidence reflecting his failure to disclose his limited prior experience in operating on basilar bifurcation aneurysms.

31    See Marjorie Maguire Schultz, From Informed Consent to Patient Choice: A New Protected Interest, 95 Yale L.J. 219, 228-29 (1985). One could only completely eliminate the potential that such confusion might arise by categorically prohibiting all actions predicated on an alleged failure to procure informed consent.

Page 16

199 Wis. 2d 615, *; 545 N.W.2d 495, **;
1996 Wisc. LEXIS 23, ***

**[\*\*\*34]**  V.

The defendant next argues that the circuit court erred in allowing the plaintiff to introduce evidence of morbidity and mortality rates associated with the surgery at issue. The defendant particularly objects to comparative risk statistics purporting to estimate and compare the morbidity and mortality rates when the surgery at issue is performed, respectively, by a physician of limited experience such as the defendant and by the acknowledged masters in the field. Expert testimony introduced by the plaintiff indicated that the morbidity and mortality rate expected when a surgeon with the defendant's experience performed the surgery **[\*643]** would be significantly higher than the rate expected when a more experienced physician performed the same surgery.

The defendant asserts that admission of these morbidity and mortality rates would lead the jury to find him liable for failing to perform at the level of the masters rather than for failing to adequately inform the plaintiff regarding the risks associated with her surgery. Furthermore, contends the defendant, statistics are notoriously inaccurate and misleading.

As with evidence pertaining to the defendant's prior experience with similar **[\*\*\*35]** surgery, the defendant requests that the court fashion a bright line rule as a matter of law that comparative risk evidence should not be admitted in an informed consent case. For many of the same reasons which led us to conclude that such a bright line rule of exclusion would be inappropriate for evidence of a physician's prior experience, we also reject a bright line rule excluding evidence of comparative risk relating to the provider.

The medical literature identifies basilar bifurcation aneurysm surgery as among the most difficult in neurosurgery. As the plaintiff's evidence indicates, however, the defendant had told her that the risks associated with her surgery were comparable to the risks attending a tonsillectomy, appendectomy or gall bladder operation. The plaintiff also introduced evidence that the defendant estimated the risk of death or serious impairment associated with her surgery at two percent. At trial, however, the defendant conceded that because of his relative lack of experience, he could not hope to match the ten-and-seven-tenths percent morbidity and mortality rate reported for large basilar bifurcation aneurysm surgery by very experienced surgeons.

 **[\*644]**  The defendant **[\*\*\*36]**  also admitted at trial that he had not shared with the plaintiff information from articles he reviewed prior to surgery. These articles established that even the most accomplished posterior circulation aneurysm surgeons reported morbidity and mortality rates of fifteen percent for basilar bifurcation aneurysms. Furthermore, the plaintiff introduced expert testimony indicating that the estimated morbidity and mortality rate one might expect when a physician with the defendant's relatively limited experience performed the surgery would be close to thirty percent.

Had a reasonable person in the plaintiff's position been made aware that being operated upon by the defendant significantly increased   **[\*\*507]**   the risk one would have faced in the hands of another surgeon performing the same operation, that person might well have elected to forego surgery with the defendant. Had a reasonable person in the plaintiff's position been

Page 17

199 Wis. 2d 615, *; 545 N.W.2d 495, **;
1996 Wisc. LEXIS 23, ***

made aware that the risks associated with surgery were significantly greater than the risks that an unclipped aneurysm would rupture, that person might well have elected to forego surgery altogether. In short, had a reasonable person in the plaintiff's position possessed such **[***37]** information before consenting to surgery, that person would have been better able to make an informed and intelligent decision.

The defendant concedes that the duty to procure a patient's informed consent requires a physician to reveal the general risks associated with a particular surgery. The defendant does not explain why the duty to inform about this general risk data should be interpreted to categorically exclude evidence relating to provider-specific risk information, even when that provider-specific data is geared to a clearly delineated surgical procedure and identifies a particular provider **[*645]** as an independent risk factor. When different physicians have substantially different success rates, whether surgery is performed by one rather than another represents a choice between "alternate, viable medical modes of treatment" under § 448.30.

For example, while there may be a general risk of ten percent that a particular surgical procedure will result in paralysis or death, that risk may climb to forty percent when the particular procedure is performed by a relatively inexperienced surgeon. It defies logic to interpret this statute as requiring that the first, almost meaningless **[***38]** statistic be divulged to a patient while the second, far more relevant statistic should not be. Under Scaria and its progeny as well as the codification of Scaria as Wis. Stat. § 448.30, the second statistic would be material to the patient's exercise of an intelligent and informed consent regarding treatment options. A circuit court may in its discretion conclude that the second statistic is admissible.

The doctrine of informed consent requires disclosure of "all of the viable alternatives and risks of the treatment proposed" which would be material to a patient's decision. Martin, 192 Wis. 2d at 174. We therefore conclude that when different physicians have substantially different success rates with the same procedure and a reasonable person in the patient's position would consider such information material, the circuit court may admit this statistical evidence. [32]

32    See Aaron D. Twerski & Neil B. Cohen, Comparing Medical Providers: A First Look at the New Era of Medical Statistics, 58 Brook. L. Rev. 5 (1992). Professors Twerski and Cohen note that the development of sophisticated data regarding risks of various procedures and statistical models comparing the success rates of medical providers signal changes in informed consent law. Specifically, they state:

**[***39]**

The duty to provide information may require more than a simple sharing of visceral concerns about the wisdom of undertaking a given therapeutic procedure. Physicians may have a responsibility to identify and correlate risk factors and to communicate the results to patients as a predicate to fulfilling their obligation to inform.

Page 18

199 Wis. 2d 615, *; 545 N.W.2d 495, **;
1996 Wisc. LEXIS 23, ***

Id. at 6.

See also Douglas Sharrott, Provider-Specific Quality-of-Care Data: A Proposal for Limited Mandatory Disclosure, 58 Brook L. Rev. 85 (1992) (stating that it is difficult to refute the argument that provider-specific data, once disclosed to the public by the government, should also be disclosed to patients because the doctrine of informed consent requires a physician to inform a patient of both material risks and alternatives to a proposed course of treatment).

**[\*646]** We caution, as did the court of appeals, that our decision will not always require physicians to give patients comparative risk evidence in statistical terms to obtain informed consent. [33] Rather, we hold that evidence of the morbidity and mortality outcomes of different physicians was admissible under the circumstances of this case.

> 33    For criticisms of medical performance statistics and cautions that provider-specific outcome statistics must be carefully evaluated to insure their reliability and validity when used as evidence, see, e.g., Jesse Green, Problems in the Use of Outcome Statistics to Compare Health Care Providers, 58 Brook. L. Rev. 55 (1992); Paul D. Rheingold, The Admissibility of Evidence in Malpractice Cases: The Performance Records of Practitioners, 58 Brook. L. Rev. 75, 78-79 (1992); Sharrott, supra, at 92-94, 120; Twerski & Cohen, supra, at 8-9.

**[\*\*\*40] [\*647] [\*\*508]** In keeping with the fact-driven and context-specific application of informed consent doctrine, questions regarding whether statistics are sufficiently material to a patient's decision to be admissible and sufficiently reliable to be nonprejudicial are best resolved on a case-by-case basis. The fundamental issue in an informed consent case is less a question of how a physician chooses to explain the panoply of treatment options and risks necessary to a patient's informed consent than a question of assessing whether a patient has been advised that such options and risks exist.

As the court of appeals observed, in this case it was the defendant himself who elected to explain the risks confronting the plaintiff in statistical terms. He did this because, as he stated at trial, "numbers give some perspective to the framework of the very real, immediate, human threat that is involved with this condition." Because the defendant elected to explain the risks confronting the plaintiff in statistical terms, it stands to reason that in her effort to demonstrate how the defendant's numbers dramatically understated the risks of her surgery, the plaintiff would seek to introduce other statistical **[\*\*\*41]** evidence. Such evidence was integral to her claim that the defendant's nondisclosure denied her the ability to exercise informed consent.

VI.

The defendant also asserts that the circuit court erred as a matter of law in allowing the plaintiff to introduce expert testimony that because of the difficulties associated with operating on the plaintiff's aneurysm, the defendant should have referred her to a **[\*648]** tertiary care center containing a proper neurological intensive care unit, more extensive microsurgical

Page 19

199 Wis. 2d 615, *; 545 N.W.2d 495, **;
1996 Wisc. LEXIS 23, ***

facilities and more experienced surgeons. While evidence that a physician should have referred a patient elsewhere may support an action alleging negligent treatment, argues the defendant, it has no place in an informed consent action.

The court of appeals agreed with the defendant that this evidence should have been excluded, and it further concluded that admission of this evidence created "a serious danger [that] the jury may confuse a duty to provide average quality care with a duty to adequately inform of medical risks." Johnson, 188 Wis. 2d at 224.

We share the concern expressed by the court of appeals and underscored by the defendant, but their concern is misplaced in **[***42]** this case. Here, the plaintiff was not asserting a claim for negligent performance. Just because expert testimony is relevant to one claim does not mean that it is not relevant to another.

When faced with an allegation that a physician breached a duty of informed consent, the pertinent inquiry concerns what information a reasonable person in the patient's position would have considered material to an exercise of intelligent and informed consent. Scaria, 68 Wis. 2d at 13; Martin, 192 Wis. 2d at 174. Under the facts and circumstances presented by this case, the circuit court could declare, in the exercise of its discretion, that evidence of referral would have been material to the ability of a reasonable person in the plaintiff's position to render informed consent.

The plaintiff's medical experts testified that given the nature and difficulty of the surgery at issue, the plaintiff could not make an intelligent decision or give an informed consent without being made aware that **[*649]** surgery in a tertiary facility would have decreased the risk she faced. One of the plaintiff's experts, Dr. Haring J.W. Nauta, stated that "it's not fair not to bring up the subject of referral to another **[***43]** center when the problem is as difficult to treat" as the plaintiff's aneurysm was. Another of the plaintiff's experts, Dr. Robert Narotzky, testified that the defendant's "very limited" experience with aneurysm surgery rendered reasonable a referral to "someone with a lot more experience in dealing with this kind of problem." Dr. Fredric Somach, also testifying for the plaintiff, stated as follows:

> She should have been told that this was an extremely difficult, formidable lesion and that there are people in the immediate geographic vicinity that are very experienced and that have had a great deal of contact with this type of aneurysm and **[**509]** that she should consider having at least a second opinion, if not going directly to one of these other [physicians].

Articles from the medical literature introduced by the plaintiff also stated categorically that the surgery at issue should be performed at a tertiary care center while being "excluded" from the community setting because of "the limited surgical experience" and lack of proper equipment and facilities available in such hospitals.

Page 20

199 Wis. 2d 615, *; 545 N.W.2d 495, **;
1996 Wisc. LEXIS 23, ***

Scaria instructs us that "the disclosures which would be made by doctors of good standing, **[\*\*\*44]** under the same or similar circumstances, are certainly relevant and material" to a patient's exercise of informed consent. Scaria, 68 Wis. 2d at 12. Testimony by the plaintiff's medical experts indicated that "doctors of good standing" would have referred her to a tertiary **[\*650]** care center housing better equipment and staffed by more experienced physicians. Hence under the materiality standard announced in Scaria, we conclude that the circuit court properly exercised its discretion in admitting evidence that the defendant should have advised the plaintiff of the possibility of undergoing surgery at a tertiary care facility.

The defendant asserts that the plaintiff knew she could go elsewhere. This claim is both true and beside the point. Credible evidence in this case demonstrates that the plaintiff chose not to go elsewhere because the defendant gave her the impression that her surgery was routine and that it therefore made no difference who performed it. The pertinent inquiry, then, is not whether a reasonable person in the plaintiff's position would have known generally that she might have surgery elsewhere, but rather whether such a person would have chosen to have surgery **[\*\*\*45]** elsewhere had the defendant adequately disclosed the comparable risks attending surgery performed by him and surgery performed at a tertiary care facility such as the Mayo Clinic, only 90 miles away.

The defendant also argues that evidence of referral is prejudicial because it might have affected the jury's determination of causation. The court of appeals reasoned that if a complainant could introduce evidence that a physician should have referred her elsewhere, "a patient so informed would almost certainly forego the procedure with that doctor." Johnson, 188 Wis. 2d at 224. [34]

> 34   The court of appeals expressed concern that the plaintiff's evidence regarding the defendant's failure to refer might cause the jury to confuse a physician's duty to procure a patient's informed consent with a separate and distinct tort establishing a physician's duty to refer. While acknowledging that other jurisdictions had recognized a distinct duty to refer, the court of appeals observed that Wisconsin has never done so. Nor does the court do so today. We merely hold that a physician's failure to refer may, under some circumstances, be material to a patient's exercise of an intelligent and informed consent.

**[\*\*\*46]** **[\*651]** The court of appeals concluded that admitting evidence regarding a physician's failure to refer was prejudicial error because it probably affected the jury's decision about causation in favor of the plaintiff. [35] Contending that a causal connection between his failure to divulge and the plaintiff's damage is required, the defendant seems to assert that the plaintiff has offered no evidence that the defendant's failure to disclose his relevant experience or his statistical risk harmed the plaintiff. Even had the surgery been performed by a "master," the defendant argues, a bad result may have occurred. [36]

> 35   The dissenting opinion in the court of appeals determined the error to be harmless.
> 36   For discussion of this aspect of causation, see Twerski & Cohen, supra.

Page 21

199 Wis. 2d 615, *; 545 N.W.2d 495, **;
1996 Wisc. LEXIS 23, ***

The defendant appears to attack the basic concept of causation applied in claims based on informed consent. As reflected in the informed consent jury instruction (Wis JI-Civil 1023.3 (1992)), which the defendant himself proposed and [***47] which was given at trial, the question confronting a jury in an informed consent case is whether a reasonable person in the patient's position would have arrived at a different decision about the treatment or surgery had he or she been fully informed. As reflected in the special verdict question in this case, that question asked whether "a reasonable person in Donna Johnson's position [would] have refused to [**510] consent to the surgery by Dr. Richard Kokemoor had she been fully informed of the risks and [*652] advantages of surgery." If the defendant is arguing here that the standard causation instruction is not applicable in a case in which provider-specific evidence is admitted, this contention has not been fully presented and developed.

Finally, the defendant argues that if his duty to procure the plaintiff's informed consent includes an obligation to disclose that she consider seeking treatment elsewhere, then there will be no logical stopping point to what the doctrine of informed consent might encompass. We disagree with the defendant. As the plaintiff noted in her brief to this court, "it is a rare exception when the vast body of medical literature and expert opinion agree that the difference [***48] in experience of the surgeon performing the operation will impact the risk of morbidity/mortality as was the case here," thereby requiring referral. Brief for Petitioner at 40. At oral argument before this court, counsel for the plaintiff stated that under "many circumstances" and indeed "probably most circumstances," whether or not a physician referred a patient elsewhere would be "utterly irrelevant" in an informed consent case. In the vast majority of significantly less complicated cases, such a referral would be irrelevant and unnecessary.

Moreover, we have already concluded that comparative risk data distinguishing the defendant's morbidity and mortality rate from the rate of more experienced physicians was properly before the jury. A close link exists between such data and the propriety of referring a patient elsewhere. A physician who discloses that other physicians might have lower morbidity and mortality rates when performing the same procedure will presumably have access to information regarding who some of those physicians are. When the duty to share comparative risk data is material [*653] to a patient's exercise of informed consent, an ensuing referral elsewhere will often represent [***49] no more than a modest and logical next step.[37]

> 37 The Canterbury court included a duty to refer among its examples of information which, under the facts and circumstances of a particular case, a physician might be required to disclose in order to procure a patient's informed consent. The court stated: "The typical situation is where a general practitioner discovers that the patient's malady calls for specialized treatment, whereupon the duty generally arises to advise the patient to consult a specialist." Canterbury, 464 F.2d at 781 n.22.

Given the difficulties involved in performing the surgery at issue in this case, coupled with evidence that the defendant exaggerated his own prior experience while downplaying the risks confronting the plaintiff, the circuit court properly exercised its discretion in admitting

Page 22

199 Wis. 2d 615, *; 545 N.W.2d 495, **;
1996 Wisc. LEXIS 23, ***

evidence that a physician of good standing would have made the plaintiff aware of the alternative of lower risk surgery with a different, more experienced surgeon in a better-equipped facility.

[***50]   For the reasons set forth, we conclude that the circuit court did not erroneously exercise its discretion in admitting the evidence at issue, and accordingly, we reverse the decision of the court of appeals and remand the cause to the circuit court for further proceedings consistent with this opinion.

*By the Court.--The* decision of the court of appeals is reversed and the cause is remanded to the circuit court with directions.

Justice Ann Walsh Bradley did not participate.



LENOX DINGLE, M.D. v. DEBORAH M. BELIN

No. 98, Sept. Term, 1999

COURT OF APPEALS OF MARYLAND

358 Md. 354; 749 A.2d 157; 2000 Md. LEXIS 174

April 11, 2000, Filed

**PRIOR HISTORY:** [***1] Certiorari to the Court of Special Appeals (Circuit Court for Baltimore City). Case No. 96309014/CL219531.

**DISPOSITION:** JUDGMENT OF COURT OF SPECIAL APPEALS VACATING JUDGMENT OF CIRCUIT COURT ON BREACH OF CONTRACT CLAIM REVERSED; CASE REMANDED TO COURT OF SPECIAL APPEALS WITH INSTRUCTIONS TO AFFIRM JUDGMENT OF CIRCUIT COURT; COSTS IN THIS COURT AND IN COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.

**HEADNOTES**

Failure of surgeon to perform surgery in manner allegedly agreed to with patient: action for breach of contract may lie.

**COUNSEL:** ARGUED BY: Catherine W. Steiner (Whiteford, Taylor & Preston, L.L.P., on brief) of Baltimore, MD, FOR PETITIONER.

ARGUED BY: Leslie L. Gladstone of Baltimore, MD, FOR RESPONDENT.

**JUDGES:** ARGUED BEFORE: Bell, C.J.; Eldridge, Rodowsky, Raker, Wilner, Cathell, and Bloom, Theodore G. (retired, specially assigned), JJ. Opinion by Wilner, J.

**OPINION BY:** WILNER

**OPINION**

[*357] [**158] Opinion by Wilner, J.

The issue before us was characterized by the Court of Special Appeals in this case as one of "ghost surgery." The more precise question is whether a surgeon who is employed by a patient to perform certain surgery and who agrees, as part of that employment, to do the actual cutting, leaving to assisting residents a subordinate role, may be held liable for breach of contract, distinct from negligence in the performance of the surgery or negligence associated with the failure to obtain informed consent from the patient, if the surgeon attends and participates in the surgery but permits a resident to do that cutting.

The Circuit Court for Baltimore City concluded **[***2]** that the claim for breach of contract made by respondent Deborah Belin was, in effect, subsumed in her alternative claims of negligence and, for that reason, entered judgment as a matter of law on the breach of contract action at the conclusion of the evidence. The Court of Special Appeals reversed that part of the judgment. *Belin v. Dingle*, 127 Md. App. 68, 732 A.2d 301 (1999). Although we do not consider what allegedly occurred here to be "ghost surgery," on the facts of this case we agree that a claim for breach of contract was sufficiently pled and proved to warrant submission of that claim to the jury. We shall reverse the judgment of the Court of Special Appeals dealing with that claim, however, because we conclude that the essential underpinning of the claim was, in fact, submitted to the jury, which determined the issue in the doctor's favor.

**[**159]** BACKGROUND

On June 29, 1993, Ms. Belin, employed petitioner, Lenox Dingle, a general surgeon with operating privileges at Mercy Hospital in Baltimore, to perform a laparoscopic cholecystectomy -- the removal of her gall bladder through a small incision in her abdomen. In brief, the surgery involves making the incision **[***3]** and inserting at least three ports into the abdomen. Carbon dioxide is introduced into the abdomen to expand the area and make it more visible. A camera, inserted through **[*358]** one of the ports, displays the interior on two high-definition television monitors. Observing the monitor, one physician, through another port, retracts the organs and tissues in order to isolate the gall bladder and the structures that connect it to other organs and tissues, and a second physician, also observing the monitor, cuts and clips those connecting structures and removes the gall bladder through a port.

The surgery occurred at Mercy on July 2. Dr. Dingle was assisted by a medical student and by a resident, Dr. Magnuson, who was just beginning her fourth year of residency training. The student was responsible for operating the camera, which was done properly. Dr. Dingle did the retractions, exposing the field. Dr. Magnuson dissected the gall bladder and removed it. She and Dr. Dingle regarded the surgery as routine, without incident. There was, however, a problem. One of the connecting structures that needed to be dissected was the cystic duct, which runs from the gall bladder to the common bile duct. The **[***4]** common bile duct runs from the liver to the intestines. Instead of dissecting the cystic duct, Dr. Magnuson dissected and clipped the common bile duct, which resulted in the drainage of bile into Ms. Belin's abdomen. That, in turn, led to a great deal of pain and discomfort and to the need for extensive corrective surgery at Johns Hopkins Hospital.

In November, 1996, after having waived arbitration pursuant to Maryland Code, § 3-2A-06(b) of the Courts and Judicial Proceedings Article, respondent filed suit against Dr. Dingle, Dr. Magnuson, and Mercy Hospital in the Circuit Court for Baltimore City. The amended complaint now before us contained four counts -- negligence based on the lack of informed consent, battery, negligence in the performance of the surgery, and breach of contract. Aside from the negligence alleged as part of the lack of informed consent, Dr. Dingle was not charged with any separate negligence in delegating duties or responsibilities to Dr. Magnuson. The claim of general negligence focused solely on the actual conduct of the surgery.

 [*359]   The battery count was dismissed by the court at the end of respondent's case and is no longer an issue. The claim for breach of [***5]   contract by Dr. Dingle was dismissed by the court at the end of the entire case. The correctness of that ruling is the heart of this appeal. The counts for negligence arising from the lack of informed consent and negligence in the performance of the surgery were submitted to the jury, which returned verdicts for the defendants.

The claims for breach of contract and lack of informed consent were both based on the assertion that, when Ms. Belin employed Dr. Dingle, she insisted, and he agreed, that, although he would be assisted in the surgery by one or more residents, he would do the actual cutting and removal of the gall bladder. In Count One -- lack of informed consent -- she alleged that "because Belin was aware that Mercy was a university affiliated hospital and often used for teaching inexperienced residents in various surgical techniques, Belin requested and received assurances from Dingle that he would perform the surgical procedure in the cholecystectomy and only use a resident to assist him as was absolutely necessary." The thrust of Count One was the assertion that, without Belin's knowledge or consent, the resident Magnuson "played a very active role in the surgery" and [***6]   "did the cutting, clamping and stapling that should have been performed by [Dingle]"   [**160]   and that, by failing to inform Belin of the scope of responsibilities that would be performed by Magnuson, Dingle and Magnuson "breached their duty to secure the fully informed consent of Belin prior to commencing operating upon her." Had she been aware of the active role to be played by Magnuson, Belin asserted, she would not have consented to having the surgery performed at Mercy or by Drs. Dingle and Magnuson. For that breach of duty, Ms. Belin sought compensation for all injuries and losses, past, present, and future, sustained by her, all of which, she claimed, were caused by the defendants' negligence in failing to obtain her informed consent.

Count Four, alleging the breach of contract, incorporated all of the allegations stated in the other counts. It added that   [*360]   Dingle had entered into an oral contract with Belin under which he had agreed "that he would do the identification of the anatomy and the cutting and clipping required during the [surgery] and not a resident or other assistant," and that, in consideration of that agreement, she agreed to allow Dingle to perform the surgery. Dingle [***7] breached that contract, she averred, by permitting Dr. Magnuson to perform the cutting and clipping of the gall bladder and related structures. The same measure of damages was asserted -- "compensation for all injuries, damages and losses, past, present and future, which she has

sustained, is sustaining and will sustain in the future, all of which were caused by the breach of contract."

It was undisputed that Drs. Dingle and Magnuson both participated in the surgery, that Dr. Dingle did the necessary retractions, and that Dr. Magnuson performed the dissections and removed the gall bladder. It was also undisputed that Ms. Belin had no contact whatever with Dr. Magnuson before the surgery, although she was aware that one or more residents would be assisting Dr. Dingle.

The evidence regarding the alleged contract and what Dr. Dingle said and agreed to do was in sharp dispute. Ms. Belin testified that she told Dingle "that I wanted him to be the one that was going to cut me and identify the gall bladder and take it out," that he advised her that he could not do the surgery by himself, and that she said she understood "but if you have a resident in there, I just want that person to maybe **[***8]** suture me up." She added, "I want you to be the one to do my surgery. And he agreed." Ms. Belin informed the jury that, as a surgical technician who worked at Mercy, she was aware that it was a teaching hospital and that surgeons often allowed residents to play a major role in surgery, and she did not want her surgery to be used for training purposes.

The written consent that Ms. Belin signed authorized Dr. Dingle "and/or such assistants as may be selected and supervised by him" to perform the laparoscopic cholecystectomy. The form has a place for "Special remarks or comments by patient," which was left blank. There was no indication on the **[*361]** written consent form, in other words, of any allocation between Dr. Dingle and the assistants selected and supervised by him as to what, precisely, each was to do during the surgery. Dr. Dingle denied that he ever had the conversation testified to by Ms. Belin and stated that he never would have agreed to the conditions she alleged. Although at one point he said that, to satisfy those conditions, the surgery would have to have been performed at another hospital, Dr. Dingle indicated that, if faced with that demand, he would have offered Ms. Belin **[***9]** only two options -- "allow me to do what I thought was best unrestricted, or to get another surgeon."

The evidence was essentially undisputed that the particular surgery requires three medical participants -- one to operate the camera, one to do the necessary retractions, and one to do the dissection and removal. It would thus not have been possible for Dr. Dingle to do *both* the retraction and the dissection and removal, as Ms. Belin said he agreed to do. Dr. Dingle and the defense experts opined that **[**161]** the retraction and exposure of the field was often the more difficult and demanding aspect of this kind of laparoscopic surgery. One of Dr. Dingle's expert witnesses, Dr. Bailey, testified that in most instances the attending surgeon does the retracting and the resident does the dissecting and clipping. The reason, he said, was that the retraction requires a high hand-to-eye skill level, to be able to manipulate and maneuver the gall bladder and keep it properly exposed. Ms. Belin's expert witness, Dr. Goldstone, agreed that it would not breach the standard of care for the resident to do the cutting and clipping and the attending surgeon to do the retracting, "provided there isn't **[***10]** some previous agreement that this would not occur."

All of the experts agreed that, when one surgeon does the retraction and another does the clipping and cutting, both consult and agree on where the clips are to be put and where the cuts are to be made. They both have the benefit of the television monitors. Dr. Goldstone testified that "not one clip is applied until you both agree where it is to be put" and "not one cut is made with the scissors until you both agree that the cut is being made in the proper place." The evidence indicated **[*362]** that that procedure was followed in Ms. Belin's case -- that Drs. Dingle and Magnuson consulted and agreed on where the cuts were to be made and the clips applied.

At the end of the plaintiff's case, the defendants moved for judgment on all counts. Dingle submitted on the negligence claim but argued that the breach of contract claim was essentially a restatement of the negligence action, for, in order to recover for breach of contract, Belin would have to prove negligence arising out of the contractual relationship. He urged that a lack of informed consent claim does not "go to the mechanism by which the operation is to be conducted" or to "resident **[***11]** involvement" and that there was no battery because the cutting of the common bile duct was not intentional. Ms. Belin responded that the breach of contract action arose from Dr. Dingle's commitment to do the cutting and not from any negligence arising from the contract. Although expressing the belief that the breach of contract action was "duplicitous," the court reserved judgment on that count. It granted the motion only as to the battery claim.

Following the defense case, the motion for judgment was renewed. Dr. Dingle once again argued that, to recover for breach of contract, Ms. Belin would have to prove negligence, for "she does not have any special damages because of the alleged breach of contract." Moreover, he contended that there was no indication of a higher risk for the particular injury that occurred because a resident did the clipping and cutting and no indication that anything that occurred to her that would not have occurred had Dr. Dingle done the clipping and cutting. Ms. Belin's response to that argument and to the motion itself, as it pertained to the breach of contract claim, is unclear from the record. This is another instance in which the proceedings were recorded **[***12]** by audio-visual means, rather than by a court reporter, and there are apparent gaps in the record. The transcript made from the audio tape shows counsel stating that "as long as it's made clear to the jury that this contractual issue is part of the cause -- and or the negligence -- then fine, I have no problem with you granting the motion for dismissal. . . . So, as long as that can be considered **[*363]** by the jury as part of negligence by -- then, that's fine with me." The court then granted the motion to dismiss the breach of contract claim, stating, according to the transcript, "I think the damages from a breach of contract would be much more liberal -- than -- and therefore --. So I will grant the motion for judgment." The remaining negligence counts -- one based on negligence in the performance of the surgery and the other based on lack of informed consent -- were submitted the jury.

**[**162]** In its instructions to the jury, the court essentially merged the two claims of negligence on the part of Dr. Dingle -- negligence in the performance of the surgery and negligence in failing to obtain an informed consent. It informed the jury that a health care provider is negligent if the provider "does **[***13]** not use that degree of care and skill which

a reasonably competent health care provider engaged in a similar practice and acting in similar circumstances would use" or, "put another way, a health care provider is negligent if he or she breached or deviated from the applicable standard of care." The court immediately followed that instruction with the statements that "[a] surgeon must obtain consent from the patient to perform a surgery" and "to obtain the required consent, the surgeon must explain the surgery to the patient and warn of all material risks or dangers in the surgery." A material risk, the court continued, "is one which a physician knows or ought to know would be significant to a reasonable person in the patient's position in deciding whether or not to submit to a particular medical treatment or procedure." The surgeon is negligent, it added, "if the surgeon fails to disclose to the patient all the material information, risks, and warnings."

In a prepared verdict sheet, four questions were submitted to the jury. The first asked simply whether Dr. Dingle was "negligent causing Plaintiff, Deborah Belin, injuries." It did not distinguish between negligence in the performance **[***14]** of the surgery and negligence in failing to obtain an informed consent. The second asked the same question as to Mercy Hospital, based on the conduct of Dr. Magnuson. The jury was instructed that, if the answer to those questions was "no," **[*364]** it was to stop and return a verdict for the defendants. A third question, to be addressed only if there was an affirmative answer to question (1) or (2), related to damages. The parties agreed that Ms. Belin sustained hospital bills of $ 50,024 and doctor bills of $ 30,345 for the corrective measures necessitated by what had occurred and that Dr. Dingle was paid $ 2,800 for performing the surgery. Ms. Belin was also, of course, seeking substantial damages for pain and suffering.

In accordance with the court's ruling on the breach of contract claim, that claim was not mentioned in any of the closing arguments. The question of whether Dr. Dingle ever agreed to the conditions asserted by Ms. Belin *was* argued, however. Plaintiff's counsel told the jury that, in order to find for the defendants, the jury, among other things, would "have to find that my client, Deborah Belin, is lying regarding her request made to Dr. Dingle." Defense counsel reminded **[***15]** the jury of Dr. Dingle's denial that the conversation testified to by Ms. Belin ever occurred and suggested that, at most, she may have asked whether Dr. Dingle was going to be "her surgeon." Because of its negative answers to the first two questions, finding no negligence on the part of either doctor, the jury, following the court's instructions, did not address the issue of damages.

On appeal to the Court of Special Appeals, Ms. Belin complained, among other things, that the trial court erred in dismissing the breach of contract action on the theory that it was subsumed under the negligence count, and, as noted, the intermediate appellate court, in a split decision, found merit in that complaint. One member of the panel, based on the recorded response by plaintiff's counsel to Dr. Dingle's motion and the fact that counsel was not inhibited from arguing the alleged agreement to the jury in the context of the lack of informed consent claim, concluded that Ms. Belin had effectively consented to the dismissal and thus failed to preserve her complaint for appellate review. The panel majority found otherwise. After listening to the audiotape recording, it concluded that the transcript **[***16]** of the argument on the motion was incomplete and did not record everything said at the bench

[*365]   conference, and, in the absence of any argument of non-preservation by Dr. Dingle, it [**163]   accepted counsel's assertion that he did object to the dismissal.

Relying principally on a New Jersey case, *Perna v. Pirozzi*, 92 N.J. 446, 457 A.2d 431 (1983), the appellate court concluded that, if Dr. Dingle agreed to the conditions asserted by Ms. Belin and then failed to observe that agreement, his "contractual obligation was separate from and existed independent of his duty to make sure that no deviation from the applicable standard of care occurred during the operation." *Belin v. Dingle*, 127 Md. App. at 81, 732 A.2d at 307. The court went on to hold that, even if the patient proves a breach of the contract, the doctor is not liable for injuries that the patient would have suffered had there been no breach. In that regard, it declared that, once the jury finds that the contract was breached and the operation was unsuccessful, "the patient has the burden of persuasion on the issue of what damages resulted from the unintended consequences of the operation, i.e. those injuries [***17]   that would not have followed from a successful operation" and "the physician has the burden of persuasion on the issue of what injuries would have followed the unsuccessful operation even if the physician had not breached the agreement." *Id*. at 82, 732 A.2d at 308.

We granted *certiorari* principally to consider whether a physician who, as part of his or her contractual undertaking with a patient, agrees to an allocation of tasks between the physician and other physicians, may be liable for breach of contract if that agreement is violated.

DISCUSSION

**Preservation**

As noted, the Court of Special Appeals panel was split on whether Ms. Belin effectively consented to the dismissal of her breach of contract claim, with the understanding that she could argue the alleged agreement with Dr. Dingle in the context of her action for lack of informed consent. The panel majority gave plaintiff's counsel the benefit of the doubt, and [*366]   so shall we. There *are* apparent gaps in the record as to what was said in response to the defense motion, both by plaintiff's counsel and by the court, and it is significant that Ms. Belin clearly objected to the same motion when [***18]   made at the end of her case. Even if she failed to articulate a proper objection at the conclusion of the evidence, however, the Court of Special Appeals had discretion to consider the issue, which it chose to do. As we indicated, non-preservation was not raised as an issue by Dr. Dingle in the Court of Special Appeals. Although it was raised by him, for the first time, in his petition for *certiorari*, we did not grant the petition to review an issue of preservation. We granted the petition to consider the substantive issue noted above.

**Sorting Out Causes of Action**

Ms. Belin urges that there is a proper cause of action for breach of contract when a physician promises to fulfill a particular surgical function but fails to do so, resulting in harm, and that that action is independent of any negligence on anyone's part. Her point is that Dr. Magnuson made a mistake in cutting and clipping the common bile duct which, even if not

negligent, might not have been made had the cutting and clipping been done by Dr. Dingle, a more experienced surgeon. Dr. Dingle contends that Maryland should not recognize, under any theory, "a claim for 'ghost surgery' against a physician arising **[***19]** out of an alleged agreement regarding the role a resident is to play during a surgical procedure." At the very least, he contends, such a claim should not be permitted as part of an action for lack of informed consent or breach of contract. Creating a duty to disclose a resident's precise role, he warns, "would permit patients to choreograph how an operation is to be performed negating all possibility of informed medical judgment occurring during the operation."

The courts, in proper cases, have recognized a number of different causes of action **[**164]** that might lie against a health care provider when a medical procedure or course of therapy produces unintended and harmful results or fails to produce **[*367]** the positive results reasonably anticipated by the patient. These actions, often bearing the common appellation of "malpractice," differ in their underlying theory, in some of the elements that must be proved, and in the kind of damages that may be recovered. Most are tort-based, sounding either in battery or in negligence of one kind or another, and, occasionally, in misrepresentation or fraud; some are contract-based. When they are pursued either alternatively or in combination, care must **[***20]** be taken to keep the actions separate and not to allow the theories, elements, and recoverable damages to become improperly intertwined.

We have long recognized, as have most courts, that, except in those unusual circumstances when a doctor acts gratuitously or in an emergency situation, recovery for malpractice "is allowed only where there is a relationship of doctor and patient as a result of a contract, express or implied, that the doctor will treat the patient with proper professional skill and the patient will pay for such treatment, and there has been a breach of professional duty to the patient." *Hoover v. Williamson*, 236 Md. 250, 253, 203 A.2d 861, 862 (1964). The relationship that spawns the malpractice claim is thus ordinarily a contractual one. Largely because of the greater facility offered by tort-based actions for recovering damages for non-economic loss -- predominantly pain, suffering, and disfigurement -- malpractice actions have traditionally been tort-based, the tort arising from the underlying contractual relationship. *See Schaefer v. Miller*, 322 Md. 297, 587 A.2d 491 (1991). [1]

> 1   The issue in *Schaefer v. Miller* was whether punitive damages were recoverable in a medical malpractice action in the absence of actual malice on the part of the doctor. That issue was premised on the undisputed assumption that the malpractice action arose from a contractual relationship. The opinion cited was the opinion of three judges and was accompanied by a concurring opinion of three other judges. The disagreement among the judges, resolved later in *Owens-Illinois v. Zenobia*, 325 Md. 420, 601 A.2d 633, *reconsideration denied*, 325 Md. 665, 602 A.2d 1182 (1992), concerned only the circumstances under which punitive damages may be awarded and not the existence of a contractual relationship between the patient and doctor.

**[*368]**   **[***21]**

The traditional action has been for negligence in the performance (or non-performance) of a course of therapy or a medical procedure. [2] The negligence consists of the breach of the duty that a physician has "to use that degree of care and skill which is expected of a reasonably competent practitioner in the same class to which [the physician] belongs, acting in the same or similar circumstances." *Shilkret v. Annapolis Emergency Hosp.*, 276 Md. 187, 200, 349 A.2d 245, 252 (1975). To recover in such an action, the plaintiff must show that the doctor's conduct -- the care given or withheld by the doctor -- was not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the act (or omission) giving rise to the cause of action. *See* Maryland Code, § 3-2A-02(c) of the Courts and Judicial Proceedings Article. That action necessarily focuses on the manner in which the physician diagnosed and treated the patient's medical problem and, except as it may bear on other issues, such as contributory negligence, causation, or damages, not so **[\*\*\*22]** much on what was told to the patient or what the patient's expectations may have been.

> 2     We shall use the terms procedure, treatment, and therapy interchangeably. The case before us involves a surgical procedure, but the concepts discussed are not necessarily limited to that context.

In *Sard v. Hardy*, 281 Md. 432, 379 A.2d 1014 (1977), we recognized, as a separate negligence-based (rather than battery-based) cause of action, the performance of **[\*\*165]** a medical procedure by a physician without the informed consent of the patient.

In the course of her third pregnancy, the plaintiff, Ms. Sard, informed her gynecologist, Dr. Hardy, that, in light of her two previous pregnancies, which resulted in Caesarean section deliveries, she did not wish to become pregnant again and requested that she be sterilized. In an attempt to achieve that result, the doctor performed a bilateral tubal ligation in the course of delivering the third child by means of a Caesarean section. That procedure proved ineffective, however, **[\*\*\*23]** and **[\*369]** Ms. Sard became pregnant for the fourth time. She sued Dr. Hardy for failing to inform her that (1) the tubal ligation might not succeed in preventing future pregnancies, (2) other sterilization procedures were available, (3) there were methods of performing a tubal ligation other than the one Dr. Hardy used, that had a lesser risk of failure, and (4) the procedure he used had a lesser risk of failure if not performed contemporaneously with a Caesarean section. The case raised, for the first time in Maryland, the nature of an action based on a lack of informed consent.

The underlying premises of an action for conducting a medical procedure without obtaining the patient's informed consent are that (1) the decision to undergo an elective medical procedure rests with the patient, who, if competent, retains the right to exercise control over his or her body, (2) a physician therefore has no right to subject a competent patient to a medical procedure without the patient's consent, (3) the patient will ordinarily be unable to make an intelligent decision whether to proceed without a clear and adequate explanation by the physician of the nature, benefits, and risks of, and alternatives **[\*\*\*24]** to, the contem-

plated procedure, and (4) the physician therefore has a duty, before proceeding, to provide that explanation and obtain the patient's *informed* consent. We stated in *Sard*:

"Simply stated, the doctrine of informed consent imposes on a physician, before he subjects his patient to medical treatment, the duty to explain the procedure to the patient and to warn him of any material risks or dangers inherent in or collateral to the therapy, so as to enable the patient to make an intelligent and informed choice about whether or not to undergo such treatment."

*Id*. at 439, 379 A.2d at 1020. *See also Wright v. Johns Hopkins Health*, 353 Md. 568, 728 A.2d 166 (1999); *Faya v. Almaraz*, 329 Md. 435, 450 n.6, 620 A.2d 327, 334 n.6 (1993).

Unlike the traditional action of negligence, a claim for lack of informed consent focuses not on the level of skill exercised in the performance of the procedure itself but on the **[*370]** adequacy of the explanation given by the physician in obtaining the patient's consent. In *Sard*, we adopted a "general," rather than a "professional" standard in that regard and, quoting from *Cobbs v. Grant*, 8 Cal. 3d 229, 502 P.2d 1, 10, 104 Cal. Rptr. 505 (Cal. 1972), **[***25]** we determined that the explanation "must be measured by the patient's need, and that need is whatever is material to the decision." Thus, we continued, "the test for determining whether a potential peril must be divulged is its materiality to the patient's decision." *Sard,* at 443-44, 379 A.2d at 1022.

Although, as in *Sard v. Hardy*, claims based on lack of informed consent usually involve allegations that the physician failed to make adequate disclosure of a material risk or collateral effect of the contemplated procedure or of an available alternative not carrying that risk or effect, the duty is not so limited. Risks, benefits, collateral effects, and alternatives normally must be disclosed routinely, but other considerations, at least if raised by the patient, may also need to be discussed and resolved. *See* Aaron D. Twerski & Neil B. Cohen, *The Second Revolution in Informed Consent: Comparing Physicians to Each Other*, 94 NW. U. L. REV. 1 (1999); **Johnson v. Kokemoor, 199 Wis. 2d 615, 545 N.W.2d 495 (Wis. 1996)**. One of those considerations, **[**166]** in an expanding era of more complex medical procedures, group practices, and collaborative **[***26]** efforts among health care providers, may be who, precisely, will be conducting or superintending the procedure or therapy. This may be especially important with respect to surgical procedures, which usually involve collaboration between the chosen surgeon and other medical professionals who may be unknown to the patient. The physician, as Dr. Dingle indicated was the case here, may be unwilling to accept limitations on the actual performance of the surgery, but, if the identity of the persons who will be performing aspects of the surgery is important to the patient, the matter must be discussed and resolved.

Despite Dr. Dingle's protestation to the contrary, a physician who agrees to a specific allocation of responsibility or a specific limitation on his or her discretion in order to **[*371]** obtain the consent of the patient to the procedure and then, absent some emergency or other good cause, proceeds in contravention of that allocation or limitation has not obtained the informed consent of the patient. We do not see this result as having the pernicious effects

suggested by Dr. Dingle, of permitting patients to "choreograph" surgery and unduly restrict the flexibility that the surgeon must **[***27]** retain. Precisely as Dr. Dingle stated was the case here, the surgeon does not have to agree to any such limitations, and, presumably, few, if any, of them will so agree. The issue is raised only when there is a claim that such an agreement was made and, without good cause, violated.

Notwithstanding the existence of these tort-based actions, courts have universally recognized that, except in emergency or gratuitous situations, the relationship between doctor and patient is a contractual one, either expressly or by implication, and, from that premise, many have held that, as an alternative to tort-based actions, a separate action for breach of the contract may lie when the doctor acts in contravention of a contractual undertaking, at least in some settings. Those actions are often founded either on a breach of warranty theory, alleging a warranty by the physician of a particular result, or on a promise independent of a medical procedure. For an example of the latter, *see Chew v. Meyer*, 72 Md. App. 132, 527 A.2d 828 (1987) (failure of doctor to perform agreement to complete and submit patient's medical insurance forms). In *Sard v. Hardy*, *supra*, 281 Md. 432, 451-52, 379 A.2d 1014, 1026-27, **[***28]** a breach of warranty claim was made, based on an alleged assurance by Dr. Hardy, *following* the surgery, that Ms. Sard was absolutely sterile and could not again become pregnant. We concluded that a patient *may* recover for breach of an express warranty or assurance of that kind under two circumstances: if the assurance was made before the medical procedure or, if made after the procedure, it was supported by separate consideration. *Id*. Ms. Sard was unable to recover because the assurance was made after the surgery and was not supported by any separate consideration.

**[*372]** Other States have allowed such actions. *See*, *for example*, *Robins v. Finestone*, 308 N.Y. 543, 127 N.E.2d 330 (N.Y. 1955), where an action *ex contractu* to recover the costs of remedial therapy and loss of income was allowed on a complaint that the defendant physician, employed to remove a growth by means of fulguration, expressly promised that he would perform the procedure in a good and workmanlike manner, that the plaintiff would be cured in one or two days, and that the plaintiff could resume work immediately thereafter. The New York court noted that, although it may be unusual **[***29]** for a physician to enter into an agreement to cure, rather than merely undertake to render his or her best skill, "a doctor and his patient are at liberty to contract for a particular result and, if that result be not attained, a cause of action for breach of contract results which is entirely separate from one for malpractice although both may arise from the same **[**167]** transaction." 127 N.E.2d at 331-32. Quoting from *Colvin v. Smith*, 276 A.D. 9, 92 N.Y.S.2d 794, 795 (App. Div. 1949), the court carefully distinguished between the two kinds of actions:

"The two causes of action are dissimilar as to theory, proof and damages recoverable. Malpractice is predicated upon the failure to exercise requisite medical skill and is tortious in nature. The action in contract is based upon a failure to perform a special agreement. Negligence, the basis of the one, is foreign to the other. The damages recoverable in malpractice are for personal injuries, including the pain and suffering which naturally flow from the tortious

act. In the contract action they are restricted to the payments made and to the expenditures for nurses and medicines or other damages that flow from the breach thereof.  **[\*\*\*30]**  "

*Robins, supra*, 127 N.E.2d at 332. *See also Stewart v. Rudner*, 349 Mich. 459, 84 N.W.2d 816, 822-23 (Mich. 1957); *Zostautas v. St. Anthony De Padua Hospital*, 23 Ill. 2d 326, 178 N.E.2d 303 (Ill. 1961); *Scarzella v. Saxon*, 436 A.2d 358 (D.C. App. 1981) and cases cited at 361; Jack W. Shaw, Jr., Annotation, *Recovery Against Physician on Basis of Breach of Contract to Achieve Particular Result or Cure*, 43 A.L.R. 3d 1221 (1972). **[\*373]**

Actions for breach of contract have been founded on a variety of alleged promises and commitments. Most have alleged a promise to cure, or to cure within a certain period of time, or of some other particular result. *See Robins v. Finestone, supra*, 127 N.E.2d 330; *Giambozi v. Peters*, 127 Conn. 380, 16 A.2d 833 (Conn. 1940); *Guilmet v. Campbell*, 385 Mich. 57, 188 N.W.2d 601 (Mich. 1971); *Hawkins v. McGee*, 84 N.H. 114, 146 A. 641 (N.H. 1929); *Noel v. Proud*, 189 Kan. 6, 367 P.2d 61 (Kan. 1961); *Bailey v. Harmon*, 74 Colo. 390, 222 P. 393 (Colo. 1924); *Sullivan v. O'Connor*, 363 Mass. 579, 296 N.E.2d 183 (Mass. 1973). **[\*\*\*31]** Others, such as *Stewart v. Rudner, supra*, 84 N.W.2d 816, have been based on a commitment to do a certain procedure, to deliver a child by means of a Caesarean section. *See*, in general, 4 FRED LANE, MEDICAL LITIGATION GUIDE, § 40.07.

We are unaware of any case precisely like this one, where the dispute is over an alleged allocation of specific functions between or among surgeons, all of whom were expressly authorized to participate and perform some role in the procedure. There have, however, been a number of cases in which a patient was informed that Dr. A would do the procedure, consented to Dr. A's performing the procedure, and later learned that the procedure was performed entirely or predominantly by Dr. B, with little or no participation by Dr. A. Liability has been found in those situations, but on different theories. In *Perna v. Pirozzi*, *supra,* 457 A.2d 431 -- the case relied upon by the Court of Special Appeals -- the plaintiff gave a proper, informed consent for Dr. Pirozzi to operate upon him in order to remove kidney stones. Dr. Pirozzi was in a group practice with two other urologists. The surgery was performed entirely by **[\*\*\*32]** the other two doctors; Dr. Pirozzi was not even present. All three doctors were sued, and, among other claims of negligence and battery, the plaintiff asserted the lack of informed consent -- that the consent given was conditioned on Dr. Pirozzi performing the surgery. The claims against the two other doctors were treated as batteries -- a non-consensual touching.

**[\*374]**  With respect to the claim against Dr. Pirozzi, the court noted that a patient "has the right to choose the surgeon who will operate and to refuse to accept a substitute," and that, "correlative to that right is the duty of the doctor to provide his or her personal services in accordance with the agreement with the patient." *Id.* at 440. The failure to perform that duty, the court held, constitutes a deviation from standard medical care, for which the patient has an action for malpractice. It then addressed the proper form of action:

[**168]   "Although an alternative cause of action could be framed as a breach of the contract between the surgeon and the patient, generally the more appropriate characterization of the cause will be for breach of the duty of care owed by the doctor to the patient. The absence of damages may render [***33]   any action deficient, but the doctor who, without the consent of the patient, permits another surgeon to operate violates not only a fundamental tenet of the medical profession, but also a legal obligation." [3]

[*375]    [***34]   *Id.* at 441. *Perna v. Pirozzi*, in other words, while recognizing a cause of action in that circumstance, treated the action against the doctor actually engaged to perform the surgery as preferably one of negligence, rather than as a breach of contract. Indeed, as Dr. Dingle points out, Dr. Pirozzi was not sued on a breach of contract theory.

3    The court's conclusion regarding the violation of a medical tenet sprang from a number of formal statements or declarations of the American Medical Association and the American College of Surgeons. The court quoted at length American Medical Association Judicial Council Opinion 8.12 (1982) that "to have another physician operate on one's patient without the patient's knowledge and consent is a deceit," that "the patient is entitled to choose his own physician and he should be permitted to acquiesce in or refuse to accept the substitution," that "the surgeon's obligation to the patient requires him to perform the surgical operation: (1) within the scope of authority granted by the consent to the operation; (2) in accordance with the terms of the contractual relationship; (3) with complete disclosure of all facts relevant to the need and the performance of the operation; and (4) to utilize his best skill in performing the operation," that "the surgeon, in accepting the patient is obligated to utilize his personal talents in the performance of the operation to the extent required by the agreement creating the physician-patient relationship," that the surgeon so chosen "cannot properly delegate to another the duties which he is required to perform personally," that the surgeon may use the services of assisting residents or other assisting surgeons to the extent necessary but that "if a resident or other physician is to perform the operation under the guidance of the surgeon, it is necessary to make a full disclosure of this fact to the patient, and this should be evidenced by an appropriate statement contained in the consent," that, if the surgeon employed "merely assists the resident or other physician in performing the operation, it is the resident or other physician who becomes the operating surgeon," and that "if the patient is not informed as to the identity of the operating surgeon, the situation is 'ghost surgery.'"

As Dr. Dingle points out, that 1982 opinion was updated in 1994. *See* American Medical Association Council on Ethical and Judicial Affairs CODE OF MEDICAL ETHICS (1998-99 ed.) Opinion 8.16. The new opinion drops the reference to "ghost surgery" and modifies somewhat the duty on the part of the surgeon to disclose the role that residents may play. The current version states, in relevant part, that "*with the consent of the patient*, it is not unethical for the operating surgeon to delegate the performance of certain aspects of the operation to the assistant provided this is done under the surgeon's participatory supervision, i.e., the surgeon must scrub. If a resident or other

physician is to perform the operation under non-participatory supervision, it is necessary to make a full disclosure of this fact to the patient, and this should be evidenced by an appropriate statement contained in the consent." (Emphasis added).

In *Grabowski v. Quigley*, 454 Pa. Super. 27, 684 A.2d 610 (Pa. Super. 1996), *appeal granted,* 548 Pa. 670, 698 A.2d 594, *appeal dismissed*, 553 Pa. 75, 717 A.2d 1024 (1998), the patient, in need of back surgery, consented to the operation being performed by Dr. Quigley and reported to the hospital at the appointed time, prepared to be operated on by Dr. Quigley. He later learned that Quigley was not present at 8:15 a.m., when the anesthesia was administered and the operation was due to commence, that another surgeon, Dr. Bailes, was eventually summoned, that Dr. Bailes began the surgery at 10:20, and that Dr. Quigley showed up at 11:25 and participated to some extent thereafter until the operation ended at 12:30. The patient sued Dr. Bailes for battery and for negligence in the performance of the surgery, and **[***35]** he sued Dr. Quigley for negligence in the surgery, negligence in not being present, and breach of contract to perform the surgery in its **[*376]** entirety. Reversing summary judgments entered for the doctors, the **[**169]** court concluded that there was sufficient evidence presented to show that the alleged contract existed and that it was breached. The court rejected the argument that a breach of contract action would lie only on a special or express contract that Quigley alone would perform the surgery. Quoting from *Perna v. Pirozzi, supra*, the court held that a "basic tenet" of the contract between doctor and patient is "that the physician with whom the patient has contracted is obligated to perform the services." *Grabowski*, at 617. *See also Taylor v. Albert Einstein Medical Center*, 723 A.2d 1027 (Pa. Super. 1998).

A breach of contract action was allowed in *Alexandridis v. Jewett*, 388 F.2d 829 (1st Cir. 1968). The plaintiff engaged Drs. Jewett and Driscoll, who were partners, to treat her during her pregnancy and deliver the child. The doctors were aware that the plaintiff had a very soft cervix, which indicated a rapid delivery after the onset **[***36]** of labor. The evidence showed that, at 2:45 a.m., the plaintiff's husband called Dr. Jewett and informed him that the plaintiff was in labor. Jewett allegedly advised him to take the plaintiff immediately to the hospital and said that Dr. Driscoll, who was on duty that night, would meet them there. Jewett apparently informed the hospital, however, not to summon Dr. Driscoll until medication was necessary. The plaintiff arrived at 3:45 and was met by a first-year resident. Dr. Driscoll did not appear until after 5:00. In the meanwhile, the resident diagnosed fetal distress and delivered the baby. As part of the procedure, he performed an episiotomy and, in doing so, cut into the anal sphincter, leading ultimately to the patient suffering from chronic rectal incontinence. Reversing defendants' judgments, the appellate court, applying Massachusetts law, concluded that there was sufficient evidence of both negligence on the part of Jewett and Driscoll in not assuring Driscoll's presence earlier and of breach of contract.

The trial court had instructed the jury that, if Jewett and Driscoll, through a lack of diligence, abandoned the plaintiff by failing to meet the standard of their contract, **[***37]** they would be **[*377]** responsible for any negligence on the part of the resident. The jury found no negligence on the part of the resident, however. On appeal, the plaintiff urged that

liability for breach of contract did not depend on any third party's negligence, and the appellate court agreed, pointing out that, to condition contract liability on the negligence of the resident would deprive her of what she bargained for. She contracted for the delivery of her baby "by one of two highly skilled and experienced doctors, i.e., for specialized care," but what she received was "nothing more than an undertaking that the care provided would meet the ordinary standards of the community." The court continued:

"If either Dr. Jewett or Dr. Driscoll had performed the operation, the standard of care would have been 'the care and skill commonly possessed and exercised by similar specialists in like circumstances.' [citations omitted] We cannot understand why a specialist should be subjected to a less onerous burden when he abandons an undertaking than when he attempts to fulfill it. We think the jury should have been instructed, as appellant requested, that if it found that the added skill possessed **[\*\*\*38]** by Dr. Jewett and Dr. Driscoll would have avoided the injury, contract liability would result."

*Id*. at 833; *see also Forlano v. Hughes*, 393 Mass. 502, 471 N.E.2d 1315 (Mass. 1984).

We draw a number of conclusions from this judicial landscape. Because the doctor-patient relationship is normally a contractual one, it is permissible for the parties, if they choose to do so, to define with some precision the role that the doctor is to play. The parties may well have conflicting interests in that regard -- the doctor wanting as much flexibility and discretion as possible and the patient, if choosing the physician because of some **[\*\*170]** special confidence in that physician's particular abilities, desiring that the selected physician oversee and personally perform the most difficult part of the procedure. As noted in footnote 3 above, the medical community itself recognizes the interest that the patient has in the matter and the need for disclosure and agreement if there is **[\*378]** likely to be a significant participation by other persons. The lack of a clear understanding prior to the procedure may well engender a later finding that informed consent was not obtained. **[\*\*\*39]** A violation of an understanding so reached may constitute the lack of informed consent, negligent delegation, and a breach of the contract, not to mention the risk of a claim of misrepresentation or fraud. It would be prudent, of course, for the written consent form presented to the patient either to set forth any special understanding in this regard or note affirmatively that there is no such understanding.

The scenarios in which these claims can arise are too varied to attempt any complete analysis of how they all may relate, one to another. In the context of this case, it will suffice to say that a doctor who partially abandons his or her patient by improperly delegating to others professional tasks that the doctor was engaged personally to do and agreed personally to do may be liable for traditional professional negligence, lack of informed consent, and breach of contract, depending in part on the nature of the consequences that flow from that abandonment.

The problem for Ms. Belin in this case is that the one issue, common and central to both her claim of lack of informed consent and her claim for breach of contract was, in fact, submitted to the jury, which necessarily found **[\*\*\*40]** against her. There was no question as

to how the surgery proceeded -- what Dr. Dingle did and what Dr. Magnuson did; nor was there any claim by Ms. Belin that Dr. Dingle failed to advise her of material risks, of collateral consequences, or of alternative therapies. [4] The only issue, as to both the informed consent and breach of contract claims, was whether Dr. Dingle ever agreed to the allocation of functions claimed by Ms. **[*379]** Belin. As noted, plaintiff's counsel made clear to the jury, in the context of the informed consent claim, that, to render a defendants' verdict, the jury would have to disbelieve Ms. Belin's version of her conversation with Dr. Dingle. It obviously did so. The breach of contract claim asserted by Ms. Belin could not survive in the face of that finding.

4    There was some dispute over whether Dr. Dingle informed Ms. Belin about the prospect of having to switch from a laparoscopic procedure to a larger abdominal incision, but that did not occur, at least with respect to the cholecystectomy. Part of the claim of negligence in the performance of the surgery was the failure of Drs. Dingle and Magnuson to terminate the laparoscopic approach and proceed by making a larger incision. The jury, as noted, found against her on that claim.

**[***41]** JUDGMENT OF COURT OF SPECIAL APPEALS VACATING JUDGMENT OF CIRCUIT COURT ON BREACH OF CONTRACT CLAIM REVERSED; CASE REMANDED TO COURT OF SPECIAL APPEALS WITH INSTRUCTIONS TO AFFIRM JUDGMENT OF CIRCUIT COURT; COSTS IN THIS COURT AND IN COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.



**JOSEPH HOWARD AND MARIE HOWARD, PLAIN-
TIFFS-RESPONDENTS, v. UNIVERSITY OF MEDICINE AND
DENTISTRY OF NEW JERSEY, DR. C. RUEBENACKER, DR.
C. VAICYS, DR. GRIGORIAN, M. FELIX, KRISTIN
SCHWERZER, J. ESPOSITO, E. WHEELER, JONATHAN
DALMER, JOHN DOES 1-25 (FICTITIOUS NAMES), JANE
DOES 1-25 (FICTITIOUS NAMES), JIM DOES 1-25 (FICTI-
TIOUS NAMES), BETTY DOES 1-25 (FICTITIOUS NAMES),
AND ABC CORPS., 1-20 (FICTITIOUS NAMES), DEFEND-
ANTS, AND DR. ROBERT HEARY AND KAREN ROMANO,
DEFENDANTS-APPELLANTS.**

**A-100 September Term 2000**

**SUPREME COURT OF NEW JERSEY**

**172 N.J. 537; 800 A.2d 73; 2002 N.J. LEXIS 752**

**January 2, 2002, Argued
June 18, 2002, Decided**

**SUBSEQUENT HISTORY:**     **[***1]**  As Corrected June 19, 2002.

**PRIOR HISTORY:**     On appeal from the Superior Court, Appellate Division, whose opinion is reported at: 338 N.J. Super. 33, 768 A.2d 195 (2001).

**SYLLABUS**

   (This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interests of brevity, portions of any opinion may not have been summarized).

   Joseph Howard v. University of Medicine and Dentistry of New Jersey, et. Als. (A-100-00)

   Argued January 2, 2002 -- Decided June 18, 2002

   **LaVECCHIA, J., writing for a unanimous Court.**

The Court addresses the possible causes of action available to an injured party who claims that a physician misrepresented his credentials and experience at the time he obtained the claimant's consent to surgery.

Joseph Howard came under the care of Dr. Robert Heary **[\*\*\*2]** in February 1997 for neck pain and related claims. Howard had a history of cervical spine disease. Following a 1991 car accident, Howard was examined by doctors who determined that he had severe spinal stenosis and recommended that he undergo surgery, which Howard declined to do, even though the condition was worsening progressively.

In January of 1997, Howard was involved in another car accident causing, among other things, a cervical and low back injuries. Howard sought the care of Dr. Boston Martin, who had treated him after the 1991 accident. Dr. Martin concluded that Howard's spinal condition had worsened significantly and recommended that he be seen at the University of Medicine and Dentistry of New Jersey (UMDNJ) by Dr. Heary, a Professor of Neurology and the Director of UMDNJ's Spine Center of New Jersey.

Dr. Heary had two pre-operative consultations with Howard. In the first consultation, Dr. Heary determined that Mr. Howard needed surgery to correct a cervical myelopathy secondary to cervical stenosis and a significantly large C3-C4 disc herniation. Because of the serious nature of the surgery, Dr. Heary recommended that Mrs. Howard attend a second consultation. **[\*\*\*3]** What transpired during that meeting is in dispute. Dr. Heary claims that he informed the Howards of the significant risks of the surgery, including paralysis. The Howards deny that they were informed of such risks. In addition, the Howards contend that Dr. Heary told them that he was Board Certified and that he had performed approximately sixty corpectomies each year in the past eleven years. Mrs. Howard claims that she was opposed to the surgery but that she and her husband decided to go through with it based on Dr. Heary's specific claims of skill and experience. Dr. Heary denies that he represented that he was Board Certified in Neurosurgery and that he claimed to have performed sixty corpectomies per year for eleven years.

Dr. Heary performed the surgical procedure on March 5, 1997, but it was unsuccessful. The Howard's filed a malpractice action alleging that Mr. Howard was rendered a quadriplegic as a result of Dr. Heary's negligence. The Howard's moved to amend their complaint to add a count of fraud based on Dr. Heary's alleged misrepresentation of his experience and credentials. The trial court denied the motion, finding that a fraud count would cloud the issues presented.

 **[\*\*\*4]** The Appellate Division granted leave to appeal and reversed and remanded with the direction to the trial court to allow amendment of the complaint to allege a deceit-based claim. The Appellate Division held that the denial of the motion to amend the complaint violated the interests-of-justice standard. Further, the panel disagreed that the Howard's would be required to prove negligent performance of the surgery in order to recover damages under the deceit-based claim. The Appellate Division likened the claim for fraudulent misrepresentation to a claim for battery, when a doctor, other than the one authorized under principles

of informed consent, performs the surgery. In such circumstances, proof of negligent performance by the doctor would not be required.

The Supreme Court granted Dr. Heary's motion for leave to appeal.

**HELD:** A fraud or deceit-based claim is unavailable to address the claim that the physician misrepresented his skill and credentials during the pre-surgery consultation. However, The Howards may attempt to prove that Dr. Heary's alleged misrepresentations about his credentials and experience presents a claim based on lack of informed consent to **[***5]** the surgical procedure.

1. A plaintiff has several avenues of relief against a doctor: 1) deviation from the standard of care (medical malpractice); 2) lack of informed consent; and 3) battery. The Howards' motion to amend the complaint raises the question whether a patient's consent to surgery obtained through alleged misrepresentations about the doctor's professional experience and credentials is properly addressed in a claim of lack of conformed consent, battery, or whether it should constitute a separate and distinct claim based on fraud. (Pp. 7)

2. A plaintiff seeking to recover under a theory of lack of informed consent must prove that a reasonably prudent patient in his or her position, if apprised of the material risks, would have elected a different course of treatment or care. In addition, the claimant must meet a two-pronged test of causation: 1) that the undisclosed risk actually materialized; and 2) that it was medically caused by the treatment. (Pp. 8-13)

3. A medical battery cause of action exists where a doctor performs surgery without consent, rendering the surgery an unauthorized touching. A battery exists where the patient consents to one type of operation **[***6]** but the physician performs a substantially different one from the one for which consent was obtained or where no consent is obtained. "Ghost surgery" has also been considered a battery where one surgeon obtains the informed consent from the patient and another surgeon performs the operation without the knowledge of the patient. (Pp. 13-17)

4. Common law should not be extended to allow a novel fraud or deceit-based cause of action in this doctor-patient context that would allow for the possibility of punitive damages and would circumvent the requirements for proof of both causation and damages imposed in a traditional informed consent setting. This is especially so when the damages from this alleged fraud arise exclusively from the doctor-patient relationship involving the corpectomy procedure. (Pp. 17-20)

5. In certain circumstances, a serious misrepresentation concerning the quality or extent of a physician's professional experience, viewed from the perspective of the reasonably prudent patient assessing the risks associated with a medical procedure, can be material to the grant of intelligent and informed consent to the procedure. Howard claims that Dr. Heary's misrepresentations **[***7]** induced him to consent to the procedure, and its risk of paralysis, that he would not have undergone had he known the truth about Dr. Heary's qualifications. This claim is founded on a lack of informed consent. However, the Howards must prove that the

additional undisclosed risk posed by Dr. Heary's level of qualifications and experience increased the risk of paralysis from the corpectomy procedure. (Pp. 20-26)

6. Misrepresented or exaggerated physician experience would have to significantly increase the risk of a procedure in order for it to affect the judgment of a reasonably prudent patient in an informed consent case. The proximate cause analysis will involve a two step inquiry. First, whether the more limited experience or credentials possessed by Dr. Heary could have substantially increased Mr. Howard's risk of paralysis from undergoing the corpectomy procedure. Expert testimony would be required for such a showing. The second inquiry would be whether that substantially increased risk would cause a reasonably prudent patient not to consent to the procedure. To satisfy the damages element, the plaintiff would have to show a causal connection between the inadequately undisclosed **[\*\*\*8]** risk of the procedure and the injury sustained. (Pp. 26-29)

Judgment of the Appellate Division is **REVERSED IN PART and AFFIRMED IN PART.** The matter is **REMANDED** to the trial court to allow the Howards the opportunity to amend the complaint to allege lack of informed consent.

**CHIEF JUSTICE PORITZ and JUSTICES STEIN, COLEMAN, LONG, VERNIERO, and ZAZZALI join in JUSTICE LaVECCHIA'S opinion.**

**COUNSEL:** *R. Scott Eichhorn* argued the cause for appellants (*McDonough, Korn & Eichhorn,* attorneys; *Matthew S. Schorr,* of counsel; *Mr. Schorr* and *William S. Mezzomo,* on the briefs).

*Bruce H. Nagel* argued the cause for respondents (*Nagel Rice Dreifuss & Mazie,* attorneys; *Mr. Nagel, Robert H. Solomon* and *Adam M. Slater,* of counsel; *Mr. Nagel, Mr. Solomon* and *Mr. Slater,* on the briefs).

*Joel M. Silverstein* submitted **[\*\*\*9]** a brief on behalf of amicus curiae *Medical Society of New Jersey (Stern, Greenberg & Kilcullen,* attorneys).

*Kevin McNulty* submitted a brief on behalf of amicus curiae *University Physician Associates of New Jersey, Inc. (Gibbons, Del Deo, Dolan, Griffinger & Vecchione,* attorneys).

**JUDGES:** The opinion of the Court was delivered by LaVECCHIA, J. Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA, and ZAZZALI.

**OPINION BY:** LaVECCHIA

**OPINION**

**[\*542]** **[\*\*75]** The opinion of the Court was delivered by

LaVECCHIA, J.

In this appeal we consider what causes of action will lie when a plaintiff contends that a physician misrepresented his credentials and experience at the time he obtained the plaintiff's consent to surgery.

## I.

Plaintiff, Joseph Howard, came under the care of defendant, Dr. Robert Heary, in February 1997 for neck pain and related complaints. He had a history of cervical spine disease. Following a car accident in 1991, he was diagnosed with spondyliosis, with spinal cord compression extending from the C3 to C7 cervical discs. According to various doctors who examined him at that time he had severe cervical spinal stenosis, and he was advised to undergo a **[**76]** "decompressive cervical laminectomy because of the **[*543]** extent of his cervical pathology." Although the condition was "worsening progressively," plaintiff decided to forego surgery.

In January 1997, another automobile accident caused plaintiff injuries that included a cerebral concussion, cervical syndrome **[***10]** with bilateral radiculopathies, and low back syndrome with bilateral radiculopathies. Plaintiff sought the care of Dr. Boston Martin, who had treated him after the 1991 accident. Dr. Martin concluded that plaintiff's spinal condition had worsened significantly and recommended that plaintiff be seen at the University of Medicine and Dentistry of New Jersey (UMDNJ) by Dr. Heary, a Professor of Neurosurgery and the Director of UMDNJ's Spine Center of New Jersey.

Dr. Heary had two pre-operative consultations with plaintiff. In the first consultation, Dr. Heary determined that plaintiff needed surgery to correct a cervical myelopathy secondary to cervical stenosis and a significantly large C3 C4 disc herniation. Because of the serious nature of the surgery, Dr. Heary recommended that plaintiff's wife attend a second consultation. The doctor wanted to explain again the risks, benefits, and alternatives to surgery, and to answer any questions concerning the procedure.

Plaintiff returned with his wife for a second consultation, but what transpired is disputed. An "Office Note" written by Dr. Heary detailing the contents of the consultation states that "[a]ll alternatives have been discussed **[***11]** and patient elects at this time to undergo the surgical procedure, which has been scheduled for March 5, 1997." Dr. Heary asserts that he informed plaintiff and his wife that the surgery entailed significant risks, including the possibility of paralysis. Plaintiffs dispute that they were informed of such risks. Further, they contend that during the consultation plaintiff's wife asked Dr. Heary whether he was Board Certified and that he said he was. Plaintiffs also claim that Dr. Heary told them that he had performed approximately sixty corpectomies in each of the eleven years he had been performing such surgical procedures. According to Mrs. Howard, she was opposed to the surgery and it was only after Dr. Heary's specific claims of skill **[*544]** and experience that she and her husband decided to go ahead with the procedure.

Dr. Heary denies that he represented that he was Board Certified in Neurosurgery. [1] He also denies that he ever claimed to have performed sixty corpectomies per year for the eleven years he had practiced neurosurgery.

> 1      Although he was Board Eligible at the time of Mr. Howard's surgery, Dr. Heary did not become Board Certified in Neurosurgery until November 1999. "A physician is considered to be a surgical specialist if the physician: (1) Is certified by an American surgical specialty board approved by the American Board of Medical Specialties; or (2) Has been judged eligible by such a board for its examination by reason of education, training and experience." *American College of Surgeons Statements on Principles,* Section II.A.

 [***12]   Dr. Heary performed the surgical procedure on March 5, 1997, but it was unsuccessful. A malpractice action was filed alleging that Mr. Howard was rendered quadriplegic as a result of Dr. Heary's negligence.

During pretrial discovery, Dr. Heary and Mr. and Mrs. Howard were deposed. Plaintiffs claim that they learned from Dr. Heary's deposition that he had misrepresented his credentials and experience during the pre-surgery consultation. In his deposition Dr. Heary stated that he was not Board Certified at the time of the surgery, and that he had performed approximately **[**77]**   "a couple dozen" corpectomies during his career. Based on that allegedly new information, plaintiffs moved unsuccessfully to amend their original complaint to add a fraud count.

In denying the motion, the trial court reasoned that "the plaintiff can get before the jury everything that is necessary without clouding the issue [with] is there a fraud here against the doctor. . . . I have to agree with counsel for defendant that that, in essence, is not the nexus of malpractice." The court added that the fraud count would be duplicative, because if it were true that the doctor had misrepresented his credentials and experience **[***13]**   plaintiffs still would be required to prove that Dr. Heary deviated from the acceptable standard of care to be entitled to recovery.

 [*545]   On leave to appeal the interlocutory order, the Appellate Division reversed and remanded with direction to the trial court to permit amendment of the complaint to include a "deceit based claim." *Howard v. University of Medicine and Dentistry*, 338 N.J. Super. 33, 39, 768 A.2d 195 (2001). Rejecting the contention that the amended complaint caused undue prejudice to defendant, the Appellate Division held that the denial of the motion for leave to amend did not comport with the interests-of-justice standard. *Id.* at 38, 768 A.2d 195. In respect of the merits of the newly pled claim based on deceit, the panel disagreed that plaintiff would be required to prove negligent performance of the surgery in order to recover damages. *Ibid.* The Appellate Division likened the claim for fraudulent misrepresentation to a claim for battery, when a doctor, other than the one authorized under principles of informed consent, performs the surgery. *Id.* at 39, 768 A.2d 1095. In such circumstances, proof of negligent performance by the doctor would **[***14]**   not be required. *Ibid.*

We granted defendant's motion for leave to appeal *Howard v. Univ. of Med. & Dentistry of N.J.*, 168 N.J. 287, 773 A.2d 1152 (2001).

## II.

Presently, a patient has several avenues of relief against a doctor: (1) deviation from the standard of care (medical malpractice); (2) lack of informed consent; and (3) battery. *Colucci v. Oppenheim*, 326 N.J. Super. 166, 180, 740 A.2d 1101 (App.Div.1999), *certif. denied,* 163 N.J. 395, 749 A.2d 369 (2000) (citations omitted). Although each cause of action is based on different theoretical underpinnings, "it is now clear that deviation from the standard of care and failure to obtain informed consent are simply sub-groups of a broad claim of medical negligence." *Teilhaber v. Greene*, 320 N.J. Super. 453, 463, 727 A.2d 518 (App.Div.1999) (citations omitted). The original complaint in this case alleged a standard medical malpractice claim of deviation from the standard of care. Plaintiffs' motion to amend the complaint to add a fraud claim raises the question whether a patient's consent to surgery **[*546]** obtained through alleged misrepresentations about the physician's **[***15]** professional experience and credentials is properly addressed in a claim of lack of informed consent, or battery, or whether it should constitute a separate and distinct claim based on fraud.

### A.

We focus first on the distinction between lack of informed consent and battery as they are recognized in New Jersey. The doctrine of informed consent was tied initially to the tort of battery, but its evolution has firmly established it as a negligence concept. See *Largey v. Rothman*, 110 N.J. 204, 207-08, 540 A.2d 504 (1988) (tracing history of theory of informed consent). Early cases recognized a cause of **[**78]** action for an "unauthorized touching" or "battery" if a physician did not obtain consent to perform a medical procedure. See, e.g., *Mohr v. Williams*, 95 Minn. 261, 104 N.W. 12, 14-15 (1905) (finding physician liable for operating on left ear when permission given only for surgery on right ear); *Schloendorff v. Society of New York Hosp.*, 211 N.Y. 125, 105 N.E. 92, 93 (1914) (citations omitted) (declaring importance of personal autonomy in medical setting: "Every human being of adult years and sound mind has a right to **[***16]** determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault for which he is liable in damages."). Because doctors ordinarily lacked the "intent" to harm normally associated with the tort of battery, however, courts examining the nuances of the doctor-patient relationship realized that conceptually a cause of action based on lack of patient consent fit better into the framework of a negligence cause of action. See Marjorie Maguire Shultz, *From Informed Consent to Patient Choice: A New Protected Interest,* 95 Yale L.J. 219, 225 (1985) ("Given the absolute nature of battery, the narrowness of its defenses, and the breadth of its remedies, doctors could end up paying significant damages after providing faultless medical treatment, simply because some minor informational aspect of the consent process was questioned.").

**[*547]** By the mid-twentieth century, as courts began to use a negligence theory to analyze consent causes of action, the case law evolved from the notion of consent to *informed*

consent, balancing the patient's need for sufficient information with the doctor's perception of the appropriate **[\*\*\*17]** amount of information to impart for an informed decision. See *Largey*, *supra*, 110 N.J. at 208, 540 A.2d 504 (quoting *Salgo v. Leland Stanford Jr. Univ. Bd. of Trustees*, 154 Cal. App. 2d 560, 317 P.2d 170, 181 (Cal.App.1957) ("[a] physician violates his duty to the patient and subjects himself to liability if he withholds any facts which are necessary to form the basis of an intelligent consent by the patient to the proposed treatment.")).

The doctrine of informed consent continued to be refined. See *Natanson v. Kline*, 186 Kan. 393, 350 P.2d 1093, 1106, *modified on other grounds,* 187 Kan. 186, 354 P.2d 670 (1960) (holding that doctor's required disclosure was "limited to those disclosures which a reasonable medical practitioner would make under the same or similar circumstances," known as the "professional standard"). Eventually, the "prudent patient," or "materiality of risk" standard was introduced. *Canterbury v. Spence*, 150 U.S. App. D.C. 263, 464 F.2d 772, 786-88 (D.C.Cir.1972), *cert. denied,* 409 U.S. 1064, 93 S. Ct. 560, 34 L. Ed. 2d 518 (1972). That patient-centered view of **[\*\*\*18]** informed consent stresses the patient's right to self-determination, and the fiduciary relationship between a doctor and his or her patients. *Id.* at 781-82. The standard balances the patient's need for material information with the discretion to be exercised by the doctor, and requires a physician to disclose material information to the patient even if the patient does not ask questions. *Ibid.* "A risk would be deemed 'material' when a reasonable patient, in what the physician knows or should know to be the patient's position, would be 'likely to attach significance to the risk or cluster of risks' in deciding whether to forgo the proposed therapy or to submit to it." *Largey*, *supra*, 110 N.J. at 211-212, 540 A.2d 504 (quoting *Canterbury*, *supra*, 464 F.2d at 787).

**[\*548]** In New Jersey, as in most jurisdictions, informed consent is "a negligence concept predicated on the duty of a physician to disclose to a patient information that will enable him to 'evaluate knowledgeably **[\*\*79]** the options available and the risks attendant upon each' before subjecting that patient to a course of treatment." *Perna v. Pirozzi*, 92 N.J. 446, 459, 457 A.2d 431 (1983) **[\*\*\*19]** (quoting *Canterbury*, *supra*, 464 F.2d at 780). Although we originally followed the "professional" standard for assessing claims of informed consent, *Kaplan v. Haines*, 96 N.J. Super. 242, 257, 232 A.2d 840 (App.Div.1967), *aff' d.o.b.,* 51 N.J. 404, 241 A.2d 235 (1968), that standard was replaced by the "prudent patient" standard set forth in Canterbury. *Largey*, *supra*, 110 N.J. at 216, 540 A.2d 504.

Thus, to sustain a claim based on lack of informed consent, the patient must prove that the doctor withheld pertinent medical information concerning the risks of the procedure or treatment, the alternatives, or the potential results if the procedure or treatment were not undertaken. *Perna*, *supra*, 92 N.J. at 460, 457 A.2d 431 (citation omitted). See also *Matthies v. Mastromonaco*, 160 N.J. 26, 34-35, 733 A.2d 456 (1999) (noting requirement of exploring medically reasonable invasive and noninvasive alternatives, including risks and likely outcomes of both). The information a doctor must disclose depends on what a reasonably prudent patient would deem significant in determining whether to proceed with the proposed procedure. **[\*\*\*20]** *Largey*, *supra*, 110 N.J. at 211-212, 540 A.2d 504.

A plaintiff seeking to recover under a theory of lack of informed consent also must prove causation, *Id.* at 215, 540 A.2d 504, thereby requiring a plaintiff to prove that a reasonably prudent patient in the plaintiff's position would have declined to undergo the treatment if informed of the risks that the defendant failed to disclose. *Canesi v. Wilson*, 158 N.J. 490, 504-05, 730 A.2d 805 (1999) (citation omitted). If the plaintiff would have consented to the proposed treatment even with full disclosure, the **[*549]** burden of proving causation is not met. *Largey*, *supra*, 110 N.J. at 215-16, 540 A.2d 504. Accordingly,

> [t]o establish a *prima facie* case for medical negligence premised on a theory of liability for lack of informed consent, a plaintiff must show "(1) the physician failed to comply with the [reasonably-prudent-patient] standard for disclosure; (2) *the undisclosed risk occurred and harmed the plaintiff;* (3) a reasonable person under the circumstances would not have consented and submitted to the operation or surgical procedure had he or she been so informed; and (4) *the operation or surgical procedure was a* **[***21]** *proximate cause of plaintiff's injuries."*
>
> [*Teilhaber*, *supra*, 320 N.J. Super. at 465, 727 A.2d 518 (citations omitted) (emphasis added).]

The damages analysis in an informed consent case involves a comparison between the condition a plaintiff would have been in had he or she been properly informed and not consented to the risk, with the plaintiff's impaired condition as a result of the risk's occurrence. *Canesi*, *supra*, 158 N.J. at 505, 730 A.2d 805 (citations omitted) (noting that "there must be medical causation [from the procedure], that is, a causal connection between the undisclosed risk [of the procedure performed] and the injury ultimately sustained"). Our case law does not require a plaintiff to prove that the physician deviated from the standard of care in performing the operation or procedure; the physician's negligence is in the inadequate disclosure and the damages claimed derive from the harm to the patient caused by a procedure that would not have occurred if the disclosure had been adequate. *Id.* at 506, 730 A.2d 805 (analyzing causation requirements of informed consent and **[**80]** wrongful birth actions; although both require disclosure of risks that reasonably prudent **[***22]** patient would consider material, informed consent action requires plaintiff to demonstrate that undisclosed risk materialized and injury to patient resulted from treatment provided). In summary, in an action based on lack of informed consent,

the plaintiff must prove not only that a reasonably prudent patient in [his or] her position, if apprised of all material risks, would have elected a different course of treatment or care. In an informed consent case, the plaintiff must additionally meet a two-pronged test of proximate causation: [he or] she must prove that the undisclosed risk actually materialized and that it was medically caused by the treatment.

[*Ibid.*]

[*550]   B.

Our common law also authorizes a medical battery cause of action where a doctor performs a surgery without consent, rendering the surgery an unauthorized touching. *Perna*, *supra*, 92 N.J. at 460-61, 457 A.2d 431. Because battery is an intentional tort, it is reserved for those instances where either the patient consents to one type of operation but the physician performs a substantially different one from that for which authorization was obtained, or where no consent is obtained. *Matthies*, *supra* **[***23]**   , 160 N.J. at 35, 733 A.2d 456 (citing 3 David W. Louisell & Harold Williams, *Medical Malpractice* §§ 22.02, 22.03 (1999)); *Samoilov v. Raz*, 222 N.J. Super. 108, 119, 536 A.2d 275 (App.Div.1987).

In circumstances where the surgery that was performed was authorized with arguably inadequate information, however, an action for negligence is more appropriate. *Tonelli v. Khanna*, 238 N.J. Super. 121, 126-27, 569 A.2d 282 (App.Div.), *certif. denied,* 121 N.J. 657, 583 A.2d 344 (1990). Battery actions are less readily available in part because of the severity of their consequences. In an action for battery, a patient need not prove that the physician deviated from either the applicable standard for disclosure or the standard for performance of the operation. *Perna*, *supra*, 92 N.J. at 460-61, 457 A.2d 431. Accordingly, "[a]n operation undertaken without [any] consent (battery) even if perfectly performed with good medical results may entitle a plaintiff to at least nominal and even punitive damages." *Whitley-Woodford v. Jones*, 253 N.J. Super. 7, 11, 600 A.2d 946 (App.Div.1992) (citations omitted).

The decision in *Perna* represents the unusual circumstance **[***24]**   where the consent granted was vitiated, rendering the circumstances the equivalent of an unauthorized touching-in other words, a battery. In that matter, the defendant urologists were part of a medical group that operated as a self-described "team." *Perna*, *supra*, 92 N.J. at 451, 457 A.2d 431. Their method of operation included a decision made immediately prior to a surgical procedure **[*551]**   designating the specific member of the group who was to perform the surgery. Unaware of that practice, the plaintiff entered the hospital on the advice of his family physician for tests and a urological consultation. In the hospital, the plaintiff was examined by one physician member of the practice group who previously had treated the plaintiff for a bladder infection. *Ibid.* The doctor recommended the removal of kidney stones and the plaintiff signed a consent form naming that physician as the surgeon. The operation ultimately was performed

by two other physicians from the practice group, both of whom were unaware that only the original doctor's name appeared on the consent form. *Id.* at 452, 457 A.2d 431. Post-surgical **[\*\*81]** complications developed and the plaintiff became aware of the substitution of doctors. **[\*\*\*25]** *Ibid.*

Plaintiff sued based on lack of informed consent. *Perna*, *supra*, 92 N.J. at 452, 457 A.2d 431. The court instructed the jury that the plaintiff could recover only if the substitution of surgeons caused his damages. *Id.* at 453, 457 A.2d 431. The jury found for the defendants, and on appeal the Appellate Division affirmed. *Id.* at 450, 457 A.2d 431. On certification to this Court, the matter was reversed and remanded. *Id.* at 465-66, 457 A.2d 431. The Court referred to the substitution of surgeons as "ghost surgery" because the doctor to whom informed consent was given was not the surgeon who performed the surgery. In that circumstance, the Court concluded that that surgeon did not have the plaintiff's informed consent. *Id.* at 463 n.3, 464-465, 457 A.2d 431 (citing *Judicial Council of the American Medical Ass'n,* Op. 8.12 (1982)). Denominating the matter a battery, the Court held that the plaintiff was entitled to "recover for all injuries proximately caused by the mere performance of the operation, whether the result of negligence or not." *Perna*, *supra*, 92 N.J. at 460-61, 457 A.2d 431. The Court held that if the patient suffers no injuries except those that may be foreseen **[\*\*\*26]** from the operation, he then is entitled at least to nominal damages and, in an appropriate case, may be entitled to damages for mental anguish resulting from the **[\*552]** belated knowledge that the operation was performed by a doctor to whom he had not given consent. *Id.* at 461, 457 A.2d 431.

Thus, although a claim for battery will lie where there has been "ghost surgery" or where no consent has been given for the procedure undertaken, if consent has been given for the procedure only a claim based on lack of informed consent will lie. A claim based on lack of informed consent properly will focus then on the adequacy of the disclosure, its impact on the reasonable patient's assessment of the risks, alternatives, and consequences of the surgery, and the damages caused by the occurrence of the undisclosed risk. See W. Page Keeton, et al., *Prosser and Keeton on Torts* § 32 at 190 (5th ed.1984).

III.

A.

In finding that a deceit-based claim was appropriate in this matter, the Appellate Division analogized the allegations concerning Dr. Heary's misrepresentations about his credentials and experience to the "ghost surgery" situation discussed in Perna. *Howard*, *supra*, 338 N.J. Super. at 38-39, 768 A.2d 195. **[\*\*\*27]** At the outset, we note that this case is not factually analogous to *Perna* where a different person from the one to whom consent was given actually performed the procedure. 92 N.J. at 451-52, 457 A.2d 431. Nor is this a case where someone impersonating a doctor actually touched a patient. See *Taylor v. Johnston*, 985 P.2d 460, 465 (Alaska 1999) (noting that "battery claim may lie if a person falsely claiming to be a physician touches a patient, even for the purpose of providing medical assistance"). Here, defendant explained the procedure, its risks and benefits, and the alternatives to the surgery.

He then performed the procedure; another person did not operate in his stead as in the "ghost surgery" scenario. See Thomas Lundmark, *Surgery by an Unauthorized Surgeon as a Battery,* 10 J.L. & Health 287 (1995-1996) (defining **[*553]** ghost surgery as "surgery by a surgeon [to whom] the patient has not consented"). The facts in *Perna* simply are not helpful here.

Few jurisdictions have confronted the question of what cause of action should lie when a doctor allegedly misrepresents his **[**82]** credentials or experience. Research has revealed only one jurisdiction that **[***28]** has allowed a claim based on lack of informed consent under similar circumstances. See ***Johnson v. Kokemoor*, 199 Wis. 2d 615, 545 N.W.2d 495, 498 (Wis.1996)** (analyzing doctor's affirmative misrepresentation as claim for lack of informed consent and finding that reasonable person would have considered information regarding doctor's relative lack of experience in performing surgery to have been material in making intelligent and informed decision). Although some suggest that a claim based in fraud may be appropriate if a doctor actively misrepresents his or her background or credentials, we are aware of no court that has so held. See, e.g., *Bethea v. Coralli*, 248 Ga. App. 853, 546 S.E.2d 542, 544 (Ga.Ct.App.2001) (holding that patient may not bring claim for fraud independent of claim of medical malpractice); *Ditto v. McCurdy*, 86 Haw. 84, 947 P.2d 952, 958 (Hawaii 1997) (holding that failure to disclose lack of board certification as plastic surgeon, as opposed to other board certifications possessed, did not violate requirements for informed consent or render doctor liable for fraud); *Paulos v. Johnson*, 597 N.W.2d 316, 320 (Minn.Ct.App.1999) **[***29]** (allegation of misrepresentation is not actionable as independent fraud claim); *Spinosa v. Weinstein*, 168 A.D.2d 32, 571 N.Y.S.2d 747, 751-54 (N.Y.App.Div.1991) (holding that fraudulent representations made to plaintiff did not render her consent to foot surgery equivalent to absence of consent; rather, claim had to do with whether there was failure to obtain informed consent); cf. *Duttry v. Patterson*, 565 Pa. 130, 771 A.2d 1255, 1259 (Pa. 2001) (holding that alleged affirmative misstatement of credentials does not support claim for lack of informed consent, but suggesting that claim for misrepresentation may be appropriate).

The thoughtful decision of the Appellate Division notwithstanding, we are not convinced that our common law should be **[*554]** extended to allow a novel fraud or deceit-based cause of action in this doctor-patient context that regularly would admit of the possibility of punitive damages, and that would circumvent the requirements for proof of both causation and damages imposed in a traditional informed consent setting. We are especially reluctant to do so when plaintiff's damages from this alleged "fraud" arise exclusively from the doctor-patient **[***30]** relationship involving plaintiff's corpectomy procedure. See *Spinosa*, *supra*, 571 N.Y.S.2d at 753 (citations omitted) (holding that concealment or failure to disclose doctor's own malpractice does not give rise to claim of fraud or deceit independent of medical malpractice, and noting that intentional tort of fraud actionable "'only when the alleged fraud occurs separately from and subsequent to the malpractice . . . and then only where the fraud claim gives rise to damages separate and distinct from those flowing from the malpractice'"). Accordingly, we hold that a fraud or deceit-based claim is unavailable to address the wrong alleged by plaintiff. We next consider whether a claim based on lack of informed consent is

the more appropriate analytical basis for the amendment to the complaint permitted by the Appellate Division.

B.

Our case law never has held that a doctor has a duty to detail his background and experience as part of the required informed consent disclosure; nor are we called on to decide that question here. See *In re Conroy*, 98 N.J. 321, 346, 486 A.2d 1209 (1985) (stating that informed consent doctrine anticipates "a patient's **[\*\*\*31]** consent, obtained after explanation of the nature of the treatment, substantial risks, and alternative therapies.") (quoting Norman **[\*\*83]** L. Cantor, *A Patient' s Decision to Decline Life Saving Medical Treatment: Bodily Integrity Versus the Preservation of Life,* 26 Rutgers L. Rev. 228, 346 (1973)); *Matthies*, *supra*, 160 N.J. at 36-41, 733 A. 2d 456. *See generally* 3 David W. Louisell & Harold Williams, *Medical Malpractice* § 22.04(3)(a) (1998) (noting that ordinary scope of disclosure involves "information concerning (1) **[\*555]** the diagnosis; (2) the general nature of the contemplated procedure; (3) the risks involved; (4) the prospects of success; (5) the prognosis if the procedure is not performed; and (6) alternative medical treatments"). Courts generally have held that claims of lack of informed consent based on a failure to disclose professional-background information are without merit. See, e.g., *Ditto*, *supra*, 947 P.2d at 958 (holding that informed consent does not require doctor to "affirmatively disclose his or her [professional] qualifications or lack thereof to a patient"); *Foard v. Jarman*, 326 N.C. 24, 387 S.E.2d 162, 167 (N.C.1990) (finding **[\*\*\*32]** that because informed consent statute imposed no affirmative duty to discuss experience, facts presented "no genuine issue regarding defendant's experience which [bore] on the issue of informed consent").

Although personal credentials and experience may not be a required part of an informed consent disclosure under the current standard of care required of doctors, the question raised in this appeal is whether significant misrepresentations concerning a physician's qualifications can affect the validity of consent obtained. The answer obviously is that they can.

In certain circumstances, a serious misrepresentation concerning the quality or extent of a physician's professional experience, viewed from the perspective of the reasonably prudent patient assessing the risks attendant to a medical procedure, can be material to the grant of intelligent and informed consent to the procedure. See 1 Dan B. Dobbs, *The Law of Torts,* § 251 at 660-61 (2001) (citing **Kokemoor, supra**, and discussing that some authority has begun to suggest that patient is entitled to information concerning doctor's experience in performing specific surgery). In **Kokemoor, supra**, **[\*\*\*33]** the Supreme Court of Wisconsin reviewed a case in which the plaintiff alleged that her surgeon did not obtain her informed consent to perform a surgical procedure because he had misrepresented his experience in response to a direct question during a pre-operative consultation. **545 N.W.2d at 505**. At trial, evidence was introduced suggesting that the type of surgery performed--basilar bifurcation aneurysm--was "among **[\*556]** the most difficult in all of neurosurgery." *Ibid.* The court found that evidence of the defendant's lack of experience was relevant to an informed consent claim because "[a] reasonable person in the plaintiff's position would have considered such information material in making an intelligent and informed decision about the surgery." Ibid. See

also *Bethea*, *supra*, 546 S.E.2d at 544 (recognizing that fraudulent misrepresentation of facts material to consent may support claim based on lack of informed consent); *Paulos*, *supra*, 597 N.W.2d at 320 (suggesting misrepresentation by doctor that he was board certified in plastic surgery may present issue of informed consent).

The allegation here is that defendant's misrepresentations concerning his **[\*\*\*34]** credentials and experience were instrumental in overcoming plaintiff's reluctance to proceed with the surgery. The theory of the claim is not that the misrepresentation induced plaintiff to proceed with unnecessary surgery. See *Tonelli*, *supra*, 238 N.J. Super. at 128, 569 A.2d 282 (noting that plaintiff alleged that doctor performed unnecessary surgery for personal gain). Rather, plaintiff essentially contends that he was misled about material **[\*\*84]** information that he required in order to grant an intelligent and informed consent to the performance of the procedure because he did not receive accurate responses to questions concerning defendant's experience in performing corpectomies and whether he was "Board Certified." Plaintiff allegedly was warned of the risk of paralysis from the corpectomy procedure; however, he asserts that if he had known the truth about defendant's qualifications and experience, it would have affected his assessment of the risks of the procedure. Stated differently, defendant's misrepresentations induced plaintiff to consent to a surgical procedure, and its risk of paralysis, that he would not have undergone had he known the truth about defendant's qualifications. **[\*\*\*35]** Stripped to its essentials, plaintiff's claim is founded on lack of informed consent.

As noted earlier, a patient-specific standard of what is material to a full disclosure does not apply in a claim based on lack of **[\*557]** informed consent. Thus, plaintiff's subjective preference for a Board Certified physician, or one who had performed more corpectomies than defendant had performed, is not the actionable standard. Nonetheless, assuming the misrepresentations are proved, if an objectively reasonable person could find that physician experience was material in determining the medical risk of the corpectomy procedure to which plaintiff consented, and if a reasonably prudent person in plaintiff's position informed of the defendant's misrepresentations about his experience would not have consented, then a claim based on lack of informed consent may be maintained.

Modern advances in medicine coupled with the increased sophistication of medical consumers require an evolving notion of the reasonably prudent patient when assessing a claim based on lack of informed consent. See Schultz, *supra*, 95 Yale L.J. at 221-22. That said, most informed consent issues are unlikely to implicate **[\*\*\*36]** a setting in which a physician's experience or credentials have been demonstrated to be a material element affecting the risk of undertaking a specific procedure. The standard requires proof on which an objectively reasonable person would base a finding that physician experience could have a causal connection to a substantial risk of the procedure. *Largey*, *supra*, 110 N.J. at 213-15, 540 A.2d 504; 3 David W. Louisell & Harold Williams, *Medical Malpractice* § 22.05(3) (2001).

The alleged misrepresentations in this case about "physician experience" (credentials and surgical experience) provide a useful context for demonstrating the difficulty inherent in meeting the materiality standard required in order for physician experience to have a role in an

informed consent case. We recognize that a misrepresentation about a physician's experience is not a perfect fit with the familiar construct of a claim based on lack of informed consent. The difficulty arises because physician experience is not information that directly relates to the procedure itself or one of the other areas of required medical disclosure concerning the procedure, its substantial risks, and alternatives that must **[*558]** be disclosed **[***37]** to avoid a claim based on lack of informed consent. But the possibility of materiality is present. If defendant's true level of experience had the capacity to enhance substantially the risk of paralysis from undergoing a corpectomy, a jury could find that a reasonably prudent patient would not have consented to that procedure had the misrepresentation been revealed. That presumes that plaintiff can prove that the actual level of experience possessed by defendant had a direct and demonstrable relationship to the harm of paralysis, a substantial risk of the procedure that was disclosed to plaintiff. Put differently, plaintiff must prove that the additional undisclosed risk posed by defendant's true **[**85]** level of qualifications and experience increased plaintiff's risk of paralysis from the corpectomy procedure.

The standard for causation that we envision in such an action will impose a significant gatekeeper function on the trial court to prevent insubstantial claims concerning alleged misrepresentations about a physician's experience from proceeding to a jury. We contemplate that misrepresented or exaggerated physician experience would have to significantly increase a risk of a procedure **[***38]** in order for it to affect the judgment of a reasonably prudent patient in an informed consent case. As this case demonstrates, the proximate cause analysis will involve a two-step inquiry.

The first inquiry should be, assuming a misrepresentation about experience, whether the more limited experience or credentials possessed by defendant could have substantially increased plaintiff's risk of paralysis from undergoing the corpectomy procedure. We envision that expert testimony would be required for such a showing. The second inquiry would be whether that substantially increased risk would cause a reasonably prudent person not to consent to undergo the procedure. If the true extent of defendant's experience could not affect materially the risk of paralysis from a corpectomy procedure, then the alleged misrepresentation could not cause a reasonably prudent patient in plaintiff's position to decline consent to the procedure. The court's gatekeeper function in respect of the first question will **[*559]** require a determination that a genuine issue of material fact exists requiring resolution by the factfinder in order to proceed to the second question involving an assessment by the reasonably prudent **[***39]** patient. Further, the trial court must conclude that there is a genuine issue of material fact concerning both questions in order to allow the claim to proceed to trial.

Finally, to satisfy the damages element in a claim based on lack of informed consent, a plaintiff typically has to show a causal connection between the inadequately disclosed risk of the procedure and the injury sustained. *Canesi*, *supra*, 158 N.J. at 505, 730 A.2d 805. If that risk materialized and harmed plaintiff, damages for those injuries are awarded. *Ibid.* Here, if successful in his claim based on lack of informed consent, plaintiff may receive damages for injuries caused by an inadequately disclosed risk of the corpectomy procedure. However, as

noted, to be successful plaintiff must prove that defendant's allegedly misrepresented qualifications and experience can satisfy the stringent test for proximate causation that is required for physician experience to be material to the substantial risk of the procedure that occurred (paralysis) and injured plaintiff. If he can, then plaintiff may be compensated for that injury caused by the corpectomy irrespective of whether defendant deviated from the standard of care in **[\*\*\*40]** performing the surgical procedure.

In conclusion, plaintiff's medical malpractice action will address any negligence in defendant's performance of the corpectomy procedure. We hold that in addition plaintiff may attempt to prove that defendant's alleged misrepresentation about his credentials and experience presents a claim based on lack of informed consent to the surgical procedure, consistent with the requirements and limitations that we have imposed on such a claim.

## IV.

We reverse that portion of the decision below that would permit a separate action for fraud in view of our conclusion that misrepresentations concerning a physician's credentials and experience **[\*560]** ordinarily are to be cognizable in a claim based on lack of informed consent. All aspects of plaintiff's complaint against **[\*\*86]** defendant arise out of plaintiff's consent to a medical procedure and defendant's performance of that procedure. Permitting a cause of action based on lack of informed consent, in addition to the malpractice action, is all that is required and appropriate to address plaintiff's allegations.

The judgment of the Appellate Division is affirmed in part, and reversed in part. The matter is remanded to **[\*\*\*41]** the trial court to allow plaintiff the opportunity to amend his complaint to allege lack of informed consent, consistent with the requirements for prevailing on that claim as set forth in this opinion.

CHIEF JUSTICE PORITZ and JUSTICES STEIN, COLEMAN, LONG, VERNIERO, and ZAZZALI join in JUSTICE LaVECCHIA's opinion.



**JOSE ALBERTO BARRIOCANAL, Individually and as the Executor of the Estate of EMILIANA F. BARRIOCANAL, JOSE L. BARRIOCANAL, NELSON RAMON BARRIOCANAL, and MARIA VERONICA BARRIOCANAL, Plaintiffs Below, Appellants, v. MARTIN GIBBS, M.D., Defendant Below, Appellee.**

**No. 334, 1996**

**SUPREME COURT OF DELAWARE**

**697 A.2d 1169; 1997 Del. LEXIS 240**

**April 22, 1997, Submitted**
**July 9, 1997, Decided**

**SUBSEQUENT HISTORY:** **[**1]** Released for Publication September 11, 1997. As Corrected July 21, 1997.

**PRIOR HISTORY:** Court Below: Superior Court of the State of Delaware in and for New Castle County, C.A. No. 94C-04-044. Upon appeal from the Superior Court.

**DISPOSITION:** REVERSED and REMANDED.

**COUNSEL:** Ben T. Castle, Esquire, and Melanie K. Sharp, Esquire, of Young, Conaway, Stargatt & Taylor, Wilmington, Delaware, and Christopher C. Fallon, Jr., Esquire (argued), of Cozen and O'Connor, Philadelphia, Pennsylvania, of Counsel, for Appellants.

Richard Galperin, Esquire (argued), and Mary L. Sutherland, Esquire, of Morris, James, Hitchens & Williams, Wilmington, Delaware, for Appellee.

**JUDGES:** Before VEASEY, Chief Justice, WALSH, HOLLAND, HARTNETT, and BERGER, Justices, constituting the Court en Banc.

**OPINION BY:** VEASEY

**OPINION**

[*1170]   VEASEY, Chief Justice:

In this appeal of a judgment for the defendant doctor in a medical malpractice case, we consider the requirements for the admissibility of testimony under Delaware's informed consent statute, 18 *Del. C.* § 6852. The statute defines the conditions under which an injured party may recover damages from a health care provider based [**2]   upon lack of informed consent. We conclude that the Superior Court improperly excluded plaintiffs' proffered testimony that the defendant failed to meet the standard of care for informed consent. Accordingly, we reverse in part the judgment below and remand for a new trial of plaintiffs' informed consent claim. We need not decide the second issue raised by plaintiffs on appeal concerning plaintiffs' contention that certain remarks made by defense counsel in closing were prejudicial and that the trial court committed reversible error in permitting them. Nevertheless, such remarks and their implications were improper and should not be repeated at the new trial.

## *Facts and Procedural History*

Plaintiffs below-appellants, the husband and children of Emiliana F. Barriocanal, filed this wrongful death and survival action against defendant below-appellee, Martin Gibbs, M.D., under Delaware's Health Care Malpractice Insurance and Litigation Act, 18 *Del. C.* § 6801 *et seq.* Dr. Gibbs performed brain aneurysm surgery on Mrs. Barriocanal on April 19, 1992. During the surgery, Dr. Gibbs clipped Mrs. Barriocanal's right distal internal carotid artery instead of the aneurysm. She suffered massive cerebral injury and died several [**3]   days later.

The Barriocanals brought suit, alleging that Dr. Gibbs had failed to obtain informed consent for the surgery and that he had performed the surgery in a negligent manner. At trial, the Barriocanals sought to introduce evidence that Dr. Gibbs had failed to disclose that he had not performed aneurysm surgery recently, that Christiana Hospital would be thinly staffed the day of surgery since it was Easter Sunday, and that there were other hospitals in nearby cities that specialized in this type of surgery.

Prior to trial, defense counsel filed a motion in limine to exclude this evidence because plaintiffs' expert, Jeffrey S. Yablon, M.D., had not unequivocally stated that this type of information is customarily given to patients in order to secure their informed consent. The Superior Court granted the motion on the ground that the plaintiffs could not point to a portion of the pretrial record that complied with the standards in 18 *Del. C.* § 6852(a)(2), which provides:

> (a) No recovery of damages based upon lack of informed consent shall be allowed in any action for malpractice unless: .

> (2) The injured party proved by a preponderance of evidence that the health [**4]   care provider did not supply information regarding such treatment, procedure or surgery to the extent customarily given to patients, or other persons authorized to give consent for patients, by other licensed health care providers

with similar training and/or experience in the same or similar health care communities as that of the defendant at the time of the treatment, procedure or surgery.

Prior to trial, the plaintiffs filed a Petition for Reconsideration of the Superior Court's decision, and included a supplemental letter report dated April 18, 1996, in which Dr. Yablon elaborated on his opinion that Dr. Gibbs had failed to secure informed consent prior to performing the aneurysm surgery. In that letter, Dr. Yablon opined, in pertinent part, as follows:

The information which I believe should have been conveyed to Dr. Barriocanal by Dr. Gibbs so that he could render his "informed consent["] was as follows: . . .

vi) Dr. Gibbs should have conveyed the paucity of his recent aneurysm surgery including no such operations in the prior year.

vii) The difference in hospital staffing with regard to surgery being performed on a holiday (Easter) as compared with a **[\*\*5]** normal business day should have been **[\*1171]** discussed so that Dr. Barriocanal could have made an informed judgment on whether to proceed with surgery at Christiana on Sunday or wait until Monday when additional staffing was available.

viii) Dr. Gibbs should have offered Dr. Barriocanal all of the options available including . . . transfer to a teaching institution.

The record does not reflect whether or not the motion was reconsidered. [1] In any event, the evidence was excluded. At trial, the Superior Court permitted plaintiffs' counsel to make a record of the excluded evidence. Dr. Yablon indicated that he would have testified in accordance with his opinions set forth in his letter of April 18, 1996.

1 *Jose Alberto Barriocanal, et al. v. Martin Gibbs, M.D.,* Super. Ct., C.A. No. 94 C-O4-044, 1996 Del. Super. LEXIS 283 (July 3, 1996) (ORDER) at 7.

Following a jury verdict in favor of Dr. Gibbs, the Barriocanals moved for a new trial on two grounds: (1) that defense counsel made unduly prejudicial statements during closing arguments, **[\*\*6]** and (2) that certain evidence central to the Barriocanals' informed consent claim was improperly excluded. The Superior Court denied the motion, holding, as to the excluded evidence, that Dr. Yablon failed to "bridge the gap regarding the elements of informed consent, i.e., that neurosurgeons in this community would reveal to a patient the nature and recency of similar surgery, the composition of the surgical team, and the availability of alternate treatment centers." [2]

2 *Id.*

The remarks of defense counsel that plaintiffs claimed to be prejudicial were as follows:

[Plaintiffs' counsel] talked to you in his opening about the American dream, how the [plaintiff] Doctor Barriocanal came to America, was an immigrant and came to America from Paraguay. He's an example of the American dream. He came here to seek his fortune. He certainly has done well. We saw income tax returns of 190 thousand dollars gross in 1992. I guess that is the American dream come true.

But I'm afraid you're being asked here **[**7]** today to support a new and different view of the American dream, the medical malpractice lottery wheel. We have a bad outcome, we have a tragedy, and we turn it into cash. That is the new American dream. [3]

The trial court also denied the motion for a new trial as it relates to these remarks, stating that, while defense counsel's remarks were improper, they did not prejudicially affect the substantial rights of the plaintiffs. From this decision, the plaintiffs appeal.

3  The Barriocanals also objected to other remarks at the end of defense counsel's closing argument. Those remarks related to defense counsel's arguably presumptuous suggestions to the jury about how to check off the special interrogatory form to answer the questions presented to them on informed consent and the standard of care. This appears to have been cured by the trial judge *sua sponte* and need not concern us here.

### *Standard and Scope of Review*

An appeal from a trial court's denial of a motion for new trial is governed **[**8]** by an abuse of discretion standard of review. [4] Where, as here, the appeal is grounded on allegations that the trial court erred as a matter of law or abused its discretion in certain evidentiary rulings, this Court will first consider whether the specific rulings at issue were correct. [5] "If the court finds error or abuse of discretion in the rulings, it must then determine whether the mistakes constituted 'significant prejudice so as to have denied the appellant a fair trial.'" [6]

4  *Strauss v. Biggs,* Del. Supr., 525 A.2d 992, 996-97 (1987).
5  *Id.* at 997.
6  *Id.* (citation omitted).

### *The Law of Informed Consent*

In Delaware, informed consent in the context of medical malpractice is defined by statute. The patient must demonstrate that the health care provider failed to supply information "customarily given" by other "licensed health care providers with similar training and/or experience in the same or **[*1172]** similar health care communities as that of the defendant

at the time **[\*\*9]** of the treatment, procedure or surgery." [7] In defining "informed consent," 18 *Del C.* § 6801(6) provides:

(6) "Informed consent" means the consent of a patient to the performance of health care services by a health care provider given after the health care provider has informed the patient, to an extent reasonably comprehensible to general lay understanding, of the nature of the proposed procedure or treatment and *of the risks and alternatives to treatment or diagnosis which a reasonable patient would consider material to the decision whether or not to undergo the treatment or diagnosis.* [8]

[7]   1 8 *Del. C.* § 6852(a)(2).
[8]   1 8 *Del. C.* § 6801 (emphasis supplied).

The plain language of section 6852 requires a plaintiff to produce both evidence of the standard of care (i.e., "information regarding [the relevant] treatment, procedure or surgery to the extent customarily given to patients, or other persons authorized to give consent for patients, by other licensed health **[\*\*10]** care providers with similar training and/or experience in the same or similar health care communities as that of the defendant at the time of the treatment, procedure or surgery") and evidence of whether the health care provider met that standard (i.e., the information that the health care provider actually supplied at the time of the treatment, procedure or surgery). [9]

[9]   1 8 *Del. C.* § 6852.

## *Application to this Case*

The record indicates that Dr. Yablon was prepared to testify in accordance with his opinions set forth in a letter of April 18, 1996. As noted above, Dr. Yablon specifically opined:

The information which I believe should have been conveyed to Dr. Barriocanal by Dr. Gibbs so that he could render his "informed consent["] was as follows:

* * *

vi) Dr. Gibbs should have conveyed the paucity of his recent aneurysm surgery including no such operations in the prior year.

vii) The difference in hospital staffing with regard to surgery being performed on a holiday **[\*\*11]** (Easter) as compared with a normal business day should

have been discussed so that Dr. Barriocanal could have made an informed judgment on whether to proceed with surgery at Christiana on Sunday or wait until Monday when additional staffing was available.

viii) Dr. Gibbs should have offered Dr. Barriocanal all of the options available including . . . transfer to a teaching institution.

At trial, Dr. Yablon testified on voir dire, outside of the presence of the jury, that it was the "standard of care" to provide these three types of information. The following exchange took place when Dr. Yablon testified on voir dire:

Q. Doctor, if permitted in this case, would you have testified in accordance with the opinions that are set forth in this letter of April 18, 1996?

A. Yes, sir.

Q. And in your opinion, was the information that was contained in this letter of April 18, 1996, information that was required within the standard of care to have been conveyed by Dr. Gibbs to Dr. Barriocanal?

A. Yes.

Thus the plaintiffs proffered testimony that tended to show that Dr. Gibbs' failure to inform his patient of his lack of recent aneurysm surgery, of the difference **[\*\*12]** in hospital staffing on a holiday, and of the option of transfer to a teaching institution, fell below the applicable standard of care required to obtain informed consent. To exclude this evidence was reversible error.

We conclude that the Superior Court's interpretation of section 6852 erroneously required an expert to articulate certain "magic words." This interpretation would exalt form over substance. Rather, the trial court **[\*1173]** should have evaluated the substance of the proffered testimony as a whole to determine if it was sufficiently reliable to present to the jury. The jury's role then would be to evaluate the weight of the testimony.

The expert witness, Dr. Yablon, is a physician, not a lawyer. The fact that he did not express his medical opinions in perfect "legalese" should not preclude him from being able to present expert testimony regarding Delaware's standard of care, the information necessary to obtain informed consent and whether the defendant met those standards prior to performing brain aneurysm surgery on Mrs. Barriocanal on April 19, 1992. The thrust of Dr. Yablon's proffered testimony plainly addresses the substance of the statutory standard. This common sense interpretation **[\*\*13]** is in keeping with this Court's decision in *Loftus v. Hayden,* construing 18 *Del. C. § 6854,* the portion of the Delaware Health Care Malpractice Insurance and Litigation Act that addresses expert witnesses. [10] Therefore, we conclude that the Superior Court abused its discretion by excluding Dr. Yablon's testimony.

10   *See Loftus v. Hayden,* Del. Supr., 391 A.2d 749, 752 (1978).

Our interpretation of Section 6852 comports with the capabilities of the jury system and of the adversary system generally. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." [11] Additionally, in the event that the trial court concludes that the evidence presented in support of a position on inforrred consent is legally insufficient for a reasonable jury to find for that party on that issue, the trial court may grant a motion for judgment as a matter of law against that party **[**14]** with respect to the informed consent claim. [12] The court may also grant summary judgment. [13] These conventional devices, rather than wholesale exclusion, are the appropriate safeguards where the proffered testimony addresses the substance of the statutory standard for informed consent.

11   *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S. Ct. 2786, 2798, 125 L. Ed. 2d 469 (1993). *See also State v. Cephas,* Del. Supr., 637 A.2d 20, 28 (1994); *Beattie v. Beattie,* Del. Supr., 630 A.2d 1096, 1099 (1993).
12   Super. Ct. Civ. R. 50(a).
13   Super. Ct. Civ. R. 56.

Next, we must determine whether the exclusion of the proffered testimony constituted "significant prejudice so as to have denied the appellant a fair trial." [14] By statute in Delaware, a health care provider is required to disclose "the risks and alternatives to treatment or diagnosis which a reasonable patient would consider material to the decision whether or not to undergo the treatment or diagnosis." [15] We **[**15]** find that the type of "qualification" information at issue in this case was relevant to the issue of informed consent. Because the excluded evidence went to "the very heart" of plaintiffs' case and "might well have affected the outcome" of the trial, the exclusion of this evidence warrants a new trial. [16] In view of the fact that the plaintiffs did not appeal the jury verdict on their negligence claim, we reverse in part the judgment below and remand for a new trial on the issues of informed consent and damages.

14   *Strauss,* 525 A.2d at 997.
15   18 *Del. C.* § 6801(6).
16   *See Watts v. Delaware Coach Co.,* Del. Super., 44 Del. 283, 58 A.2d 689, 696 (1948).

### *Propriety of Defense Counsel's Remarks*

We need not address the plaintiffs' second claim that defense counsel's closing remarks quoted above were improper and constituted reversible error. They were certainly improper. This Court has held that, "any effort to mislead the jury or appeal to its bias or prejudice is inappropriate and, where objection is made, the trial court is obliged to act firmly with curative instructions even where no objection is forthcoming **[**16]** until after summations." [17] Although the remarks were improper, we need not decide whether the trial court committed

reversible error because **[*1174]** this case must be retried. We assume that this conduct will not be repeated at the next trial.

> 17    *DeAngelis v. Harrison,* Del. Supr., 628 A.2d 77, 80 (1993) (citing *Massey-Ferguson, Inc. v. Wells,* Del. Supr., 421 A.2d 1320, 1324 (1980)).

## *Conclusion*

We conclude that the law of informed consent, as articulated in the statute, requires a common sense application as noted herein. The trial court committed reversible error in excluding the proffered expert testimony. Accordingly, we reverse and remand for a new trial of plaintiffs' informed consent claim.



**HUNTER S. TASHMAN, M.D. v. MARGARET GIBBS**

**Record No. 010028**

**SUPREME COURT OF VIRGINIA**

**263 Va. 65; 556 S.E.2d 772; 2002 Va. LEXIS 20**


**January 11, 2002, Decided**

**PRIOR HISTORY:**      [***1]   FROM THE CIRCUIT COURT OF FAIRFAX COUNTY. Dennis J. Smith, Judge.

**DISPOSITION:**     Reversed and remanded.


**COUNSEL:** *Anne G. Scher* (*John M. Fitzgerald*; *Ronald P. Herbert*; *LeClair, Ryan*, on briefs), for appellant.

*P. Clark Kattenburg*; *Laura J. Johnston* (*J. Charles Curran*; *Kidwell, Kent & Curran*, on brief), for appellee.

**JUDGES:** OPINION BY JUSTICE BARBARA MILANO KEENAN.

**OPINION BY:** BARBARA MILANO KEENAN

**OPINION**

 [*68]   [**774]   PRESENT: All the Justices

OPINION BY JUSTICE BARBARA MILANO KEENAN

In this appeal of a judgment in favor of a plaintiff in a medical malpractice action, we consider whether the trial court erred in permitting the plaintiff's "informed consent" claim to be considered by the jury.

We state the evidence in the light most favorable to the plaintiff, Margaret L. Gibbs, the prevailing party in the trial court.  *City of Bedford v. Zimmerman*, 262 Va. 81, 83, 547 S.E.2d 211, 212 (2001). The evidence showed that Gibbs had received obstetrical and gynecological

care from the defendant, Hunter S. Tashman, M.D., over a period of several years. Dr. Tashman had delivered both of Gibbs' children and had successfully performed bladder suspension surgery on her. After the delivery of her second child, Gibbs developed a **[***2]** severe uterine and vaginal prolapse, a condition in which the uterus collapses and protrudes through the vagina.

In August 1996, Dr. Tashman examined Gibbs and advised her that she needed a total hysterectomy and a sacrospinous ligament suspension procedure (sacrospinous procedure) to correct the prolapse. In a sacrospinous procedure, the prolapsed vagina is pulled back into position and secured with sutures fixed to the sacrospinous ligament.

In October 1996, Dr. Tashman performed a total hysterectomy and a sacrospinous procedure on Gibbs. When Gibbs awoke from surgery, she experienced severe pain that radiated from her right hip, through her right leg, and into her foot. Gibbs could not straighten her right leg or place any weight on it, and she experienced numbness in her vaginal area.

The next day, Dr. Tashman examined Gibbs and informed her that her pain might have "something to do with the sciatic nerve." After consulting with a neurologist, Dr. Tashman concluded that the sutures made during the sacrospinous procedure needed to be removed. Three days after the initial operation, Dr. Tashman performed a second surgery to remove the sutures.

After the second surgery, Gibbs **[***3]** was able to straighten her right leg and to stand upright. Although her level of pain was reduced, Gibbs still experienced "a great deal of pain." She ultimately was diagnosed with permanent injury to her sciatic and pudendal nerves. As a result of these nerve injuries, Gibbs has experienced recurring medical problems, including permanent pain and a burning sensation in her right leg and hip, numbness and loss of sensation in her right **[*69]** foot, and a loss of sexual function due to permanent genital numbness.

 **[**775]** Gibbs filed a motion for judgment against Dr. Tashman, alleging that he was negligent in the manner in which he performed the sacrospinous procedure and in failing to obtain her "informed consent" to that procedure. Gibbs alleged that Dr. Tashman failed to obtain her "informed consent" because he did not tell her that he lacked experience in performing the sacrospinous procedure, and did not advise her of the nature and risks of the operation, including the risk of nerve damage.

During trial of the case, Gibbs presented the expert testimony of Hilary J. Cholhan, M.D., a gynecologist and obstetrician who is an associate professor at the University of Rochester. When asked to define **[***4]** the term "informed consent," Dr. Cholhan stated:

Informed consent is not just a piece of paper, it's a process, and it's a process of educating the patient so that the patient understands what conditions she has been diagnosed with and what treatment options are available to her, be they non-surgical or surgical. So it's not a piece of paper, it's essentially helping the patient understand his or her own condition so that she can make an informed consent based on the ability to determine what the advantages and disad-

vantages are of each treatment, and then the patient decides what he or she feels is appropriate as treatment.

Immediately thereafter, counsel for Gibbs asked Dr. Cholhan whether he had "an opinion to a reasonable degree of medical certainty as to what [the] standard of care [in] Virginia required in 1996 regarding informed consent." Dr. Cholhan replied, "That, I answered."

Dr. Cholhan stated that there were different surgical alternatives available to correct Gibbs' condition. He referred to the sacrospinous procedure performed on Gibbs as the "transvaginal approach." In an alternative procedure, a sacral colpopexy, which is often referred to as the "abdominal [***5] approach," the surgeon makes an incision through the abdomen and uses the lower part of the spine in the back of the abdominal cavity as an anchoring point to support the vagina.

Dr. Cholhan testified that Dr. Tashman deviated from the standard of care when he failed to inform Gibbs of the "abdominal approach" as an alternative to the sacrospinous procedure. Dr. Cholhan stated:

 [*70] The standard of care requires that all alternatives be discussed, and the abdominal approach was not discussed. Now, if Dr. Tashman - if it's not within his surgical armamentarium to do that, then you need to explain that to the patient, that is not within my armamentarium, other people favor doing it this way, however, I do not do it this way for these reasons. That was not discussed.

Dr. Cholhan defined "armamentarium" as "nothing more than repertoire, within the operator's skill and experience and knowledge."

When asked whether he had an opinion within a reasonable degree of medical certainty whether Dr. Tashman breached the standard of care with respect to obtaining Gibbs' "informed consent," Dr. Cholhan replied:

With all the information that I have reviewed and that's been provided me, [***6] including Dr. Tashman's notes, I saw no evidence that any patient counseling occurred with respect to alternatives of treatment, advantages of one treatment over another, disadvantages, risk factors, or the like.

However, during cross-examination, Dr. Cholhan agreed that Dr. Tashman's only "shortcoming" concerning obtaining Gibbs' "informed consent" was his failure to explain to her the alternatives to the sacrospinous procedure. When asked whether the "abdominal approach" involved less potential risk than the "transvaginal approach," Dr. Cholhan responded that "every procedure has inherent risks."

Gibbs testified that Dr. Tashman failed to inform her before the surgery that he had never performed a sacrospinous procedure as a "lead surgeon," and that she would not have consented to having him perform the surgery if she had been aware of his limited experience. Gibbs further testified that Dr. Tashman did not inform her of the possible risk of nerve damage from the sacrospinous procedure. According to Gibbs, Dr. Tashman [**776] only told her that the procedure could result in some blood loss and in vaginal dryness. With regard

to blood loss, Gibbs also stated that Dr. Tashman assured **[\*\*\*7]** her that "we won't need" the two pints of blood that he instructed her to "bank."

At the conclusion of Gibbs' evidence, Dr. Tashman moved to strike the "informed consent" claim from the negligence action, **[\*71]** arguing that the claim was not supported by sufficient evidence. The trial court denied the motion.

Dr. Tashman testified concerning his experience with the sacrospinous procedure. He stated that he had performed two sacrospinous procedures under the guidance of more experienced surgeons. He explained that on one of these occasions, he served as the "lead surgeon" and performed about 90 percent of the surgery. Dr. Tashman further stated that although the operation on Gibbs was the first time he performed the sacrospinous procedure by himself, he had the proper training and skills to perform the procedure.

Dr. Tashman testified that he informed Gibbs of his experience with the sacrospinous procedure and presented her with three options concerning who would perform her surgery. He told her that he could refer her to a more experienced surgeon to perform the surgery, that he could perform the operation himself with the assistance of a more experienced surgeon, or that he could perform **[\*\*\*8]** the procedure "solo for the first time." Dr. Tashman stated that Gibbs said that she preferred that he perform the surgery by himself because she was uncomfortable having "another surgeon in the room that she hasn't met yet."

Dr. Tashman also testified that he thought that "it crossed [his] mind to mention" to Gibbs the "abdominal approach" as an alternative surgical procedure, but he was unable to recall with certainty whether he had discussed this option with Gibbs. However, he stated that the "abdominal approach" would not have been appropriate for Gibbs because of a greater long-term risk of complications presented by that procedure.

Dr. Tashman also stated that he had informed Gibbs of the potential risks and complications of the sacrospinous procedure, including the risk of nerve damage. He testified that when he advised Gibbs and her husband of these facts, Gibbs acknowledged that she understood that the procedure would involve an additional level of risk.

Gibbs' husband, Raymond Dennis Gibbs, was called as a witness by Dr. Tashman, and testified that when he and his wife met with Dr. Tashman to discuss the surgery, "Dr. Tashman did not say anything at all about risk of **[\*\*\*9]** injury to nerves in this procedure." Mr. Gibbs also testified that when he asked Dr. Tashman about the risks involved in the surgery, Dr. Tashman replied that the sacrospinous procedure was more complicated than the hysterectomy because, among other things, the surgical area contains "a lot of nerves." Mr. **[\*72]** Gibbs stated that it was his understanding that Dr. Tashman "was just explaining the procedure" when he made mention of this fact.

Dr. Tashman presented the expert testimony of Fred Mecklenburg, M.D., an obstetrician and gynecologist who is a clinical professor at George Washington University. Dr. Mecklenburg testified that Dr. Tashman's overall evaluation, care, and treatment of Gibbs complied with the applicable standard of care. Dr. Mecklenburg also concluded, based on his review of

Dr. Tashman's office notes, that Dr. Tashman had conducted an "informed consent session" with Gibbs in which the surgery and its risks and complications were discussed.

Dr. Mecklenburg testified that the applicable standard of care did not require Dr. Tashman to discuss the "abdominal approach" with Gibbs. Dr. Mecklenburg stated that "the most appropriate approach to [Gibbs'] particular set of **[***10]** circumstances is vaginal. Not only is the abdominal approach more difficult and more complicated, but [it] is less likely to result in correction of all of [Gibbs'] problems."

Dr. Mecklenburg testified that Dr. Tashman was "adequately prepared" to perform the sacrospinous procedure. Dr. Mecklenburg also stated that for someone with Dr. Tashman's experience in performing pelvic surgery, training for this particular procedure is merely a matter of familiarizing the **[**777]** surgeon with the proper location and manner of suture placement, and that "it comes down to the equation of see one, do one."

At the conclusion of this evidence, the trial court denied Dr. Tashman's renewed motion to strike Gibbs' "informed consent" claim. The jury returned a general verdict in favor of Gibbs in the amount of $ 4,000,000. Pursuant to Code § 8.01-581.15, the trial court reduced the jury's award to $ 1,000,000, and the court entered judgment on the verdict. Dr. Tashman appeals from this judgment, challenging the trial court's decision to allow the jury to consider Gibbs' "informed consent" claim. However, Dr. Tashman does not assign error regarding the sufficiency of the **[***11]** evidence of Gibbs' other claim that he was negligent in his performance of the sacrospinous procedure.

Dr. Tashman argues that the evidence was insufficient as a matter of law to support Gibbs' "informed consent" claim, including the nature and extent of his duty of disclosure, and whether any alleged breach of this duty was a proximate cause of Gibbs' injuries. He emphasizes that Gibbs' expert, Dr. Cholhan, did not identify the risks related to the sacrospinous procedure that a reasonably prudent obstetrician and gynecologist was required by the standard of care to disclose. **[*73]** Dr. Tashman further contends that Dr. Cholhan did not testify that the duty to obtain a patient's "informed consent" requires a physician to disclose to the patient the extent of his experience in performing a particular procedure. Finally, Dr. Tashman argues that while Dr. Cholhan's testimony may have established a breach of the standard of care in Dr. Tashman's failure to inform Gibbs of the "abdominal approach," there was no evidence that this omission proximately caused Gibbs' injuries.

In response, Gibbs asserts that the evidence was sufficient to establish that Dr. Tashman failed to obtain her "informed **[***12]** consent" because he did not disclose the risks of the sacrospinous procedure or advise her of any appropriate alternative procedures. Gibbs also argues that the evidence was sufficient to establish that in obtaining a patient's "informed consent," a physician is required to disclose to his patient the extent of his experience in performing a proposed procedure. She contends that Dr. Cholhan's testimony supports this conclusion because he stated that a physician must disclose to his patient whether a certain procedure or skill is within his armamentarium. We disagree with Gibbs' arguments.

A physician has a duty in the exercise of ordinary care to inform a patient of the dangers of, possible negative consequences of, and alternatives to a proposed medical treatment or procedure. *See   Rizzo v. Schiller*, 248 Va. 155, 158, 445 S.E.2d 153, 155 (1994). To recover against a physician for failure to provide such information, the patient generally is required to establish by expert testimony whether and to what extent any information should have been disclosed.   *Moates v. Hyslop*, 253 Va. 45, 48, 480 S.E.2d 109, 111 (1997); *Rizzo*, 248 Va. at 159, 445 S.E.2d at 155; **[\*\*\*13]**   *Bly v. Rhoads*, 216 Va. 645, 650-51, 222 S.E.2d 783, 787 (1976).

A physician's duty of disclosure is defined with reference to the appropriate standard of care. *See   Dickerson v. Fatehi*, 253 Va. 324, 327, 484 S.E.2d 880, 881 (1997); *Rogers v. Marrow*, 243 Va. 162, 167, 413 S.E.2d 344, 346 (1992); *Raines v. Lutz*, 231 Va. 110, 113, 341 S.E.2d 194, 196 (1986). We have defined the standard of care in a medical malpractice action as that degree of skill and diligence exercised by a reasonably prudent practitioner in the same field of practice or specialty in Virginia.   *Bryan v. Burt*, 254 Va. 28, 34, 486 S.E.2d 536, 539 (1997); *Pierce v. Caday*, 244 Va. 285, 291, 422 S.E.2d 371, 374 (1992); *Raines*, 231 Va. at 113, 341 S.E.2d at 196.

**[\*74]**   A physician's deviation from the applicable standard of care must generally be established by expert testimony. *Dickerson*, 253 Va. at 327, 484 S.E.2d at 881; *Rogers*, 243 Va. at 167, 413 S.E.2d at 346; *Raines*, 231 Va. at 113, 341 S.E.2d at 196. Once a plaintiff has met the burden of establishing **[\*\*\*14]**   the standard of care and a deviation from that standard, she may establish by lay testimony that her physician did not disclose certain information regarding risks, and that she had no knowledge of those risks.   *Bly*, 216 Va. at 649-50, 222 S.E.2d at 787. As in **[\*\*778]**   other negligence actions, the plaintiff also must prove that the physician's negligent omissions were a proximate cause of the injury sustained. *Bryan*, 254 Va. at 34, 486 S.E.2d at 539-40; *King v. Sowers*, 252 Va. 71, 76, 471 S.E.2d 481, 484 (1996); *Brown v. Koulizakis*, 229 Va. 524, 532, 331 S.E.2d 440, 446 (1985).

In the present case, Gibbs' "informed consent" claim was based on three subjects that Dr. Tashman allegedly failed to disclose to her prior to the surgery. Those subjects were: 1) the risks of the sacrospinous procedure, including the risk of nerve damage; 2) Dr. Tashman's limited experience in performing the procedure; and 3) the available alternatives to the sacrospinous procedure.

On the issue of risks, we conclude that Gibbs failed to establish by expert testimony that the standard of care in 1996 for an obstetrician and gynecologist in Virginia **[\*\*\*15]**   required disclosure of any particular risks of the sacrospinous procedure, including the risk of nerve damage. Dr. Cholhan failed to identify any risks of the procedure that a reasonably prudent obstetrician and gynecologist was required to disclose to a patient contemplating such surgery. Instead, he merely stated that nerve damage is a risk of the procedure, and that he saw no evidence in the medical records that Dr. Tashman provided any patient counseling regarding risk factors.

Gibbs' contends, nevertheless, that Dr. Tashman's own testimony established the appropriate standard of care when he stated that he had advised Gibbs of certain risk factors, including the risk of nerve damage, that might result from the sacrospinous procedure. We disagree. This evidence from Dr. Tashman did not address the standard of care for disclosure of risks, but merely addressed the factual issue whether he made any disclosures to Gibbs.

Gibbs next contends, in the alternative, that she was not required to present expert testimony regarding the standard of care and Dr. Tashman's deviation from that standard because he did not advise her of any risks of the sacrospinous procedure. We do not reach **[\*\*\*16]** the merits of this argument, however, because Gibbs' factual **[\*75]** premise is incorrect. Gibbs testified that Dr. Tashman advised her that the surgery could result in blood loss, although it was unlikely, and in vaginal dryness. Thus, because Dr. Tashman advised Gibbs of certain risks of the sacrospinous procedure and Gibbs failed to present expert testimony establishing what the standard of care required regarding disclosure of risks, Gibbs' proof on this issue was insufficient as a matter of law.

On the issue of Dr. Tashman's experience, we conclude that Gibbs failed to establish by expert testimony that the appropriate standard of care in 1996 for an obstetrician and gynecologist in Virginia required Dr. Tashman to disclose to Gibbs the extent of his experience in performing sacrospinous procedures. Dr. Cholhan did not state that the standard of care required a reasonably prudent obstetrician and gynecologist to disclose the extent of his prior experience in performing a particular surgery. Instead, in his discussion of the "abdominal approach," Dr. Cholhan stated that if Dr. Tashman did not have the skill and experience to perform that procedure, he was required to disclose this fact **[\*\*\*17]** to his patient.

This testimony did not establish a standard of care requiring a physician to disclose his prior experience in performing a particular procedure, but addressed only the disclosure required by a physician who lacks the skill and experience to perform a particular procedure. Here, however, there was no testimony that Dr. Tashman lacked the skill or experience to perform a sacrospinous procedure. Dr. Mecklenberg testified that Dr. Tashman was "adequately prepared" to perform the procedure, based on his experience in performing pelvic surgery and his prior knowledge of the procedure. In addition, Dr. Tashman stated that he had the proper skill and experience to perform the sacrospinous procedure. Thus, we conclude that the evidence was insufficient as a matter of law to support this component of Gibbs' "informed consent" claim.

We next consider the third subject of Gibbs' "informed consent" claim, that Dr. Tashman failed to disclose the available alternatives to the sacrospinous procedure. **[\*\*779]** Dr. Cholhan testified that the standard of care required Dr. Tashman to discuss the "abdominal approach" surgical alternative with Gibbs, and that Dr. Tashman failed to do so. In addition, **[\*\*\*18]** Dr. Tashman was unable to recall whether he discussed this surgical option with Gibbs. This testimony, viewed in the light most favorable to Gibbs, established a standard of care requiring such disclosure and Dr. Tashman's deviation from that standard of care.

[*76] There is no evidence in the record, however, that this deviation from the standard of care was a proximate cause of Gibbs' injuries. In a medical malpractice action, a plaintiff must establish not only that a defendant violated the applicable standard of care, and therefore was negligent, but must also prove that the negligent act was a proximate cause of her injury. *Bryan*, 254 Va. at 34, 486 S.E.2d at 539-40; *King*, 252 Va. at 76, 471 S.E.2d at 484. A proximate cause of an event is an act or omission that, in a natural and continuing sequence, produces the event, and without which the event would not have occurred. *Sugarland Run Homeowners Ass'n v. Halfmann*, 260 Va. 366, 372, 535 S.E.2d 469, 472 (2000); *Atkinson v. Scheer*, 256 Va. 448, 454, 508 S.E.2d 68, 71 (1998); *Beale v. Jones*, 210 Va. 519, 522, 171 S.E.2d 851, 853 (1970).

Here, Gibbs did [***19] not state that she would have decided against having the sacrospinous procedure if Dr. Tashman had informed her of the "abdominal approach" alternative. Instead, she stated that she would not have allowed Dr. Tashman to perform the sacrospinous procedure if she had known of his limited experience in performing that procedure. Thus, we conclude that Gibbs' evidence on this component of her "informed consent" claim was insufficient as a matter of law, because this evidence did not establish that Dr. Tashman's failure to inform her of the "abdominal approach" affected her decision to have him perform the sacrospinous procedure.

Because Gibbs' evidence regarding all three components of her "informed consent" claim was insufficient as a matter of law to raise a jury issue, we conclude that the trial court erred in submitting that part of her malpractice action to the jury. Based on the trial court's error, Dr. Tashman argues that the entire negligence action must be remanded for a new trial. We agree.

We cannot determine from the record whether the jury based its verdict on the issue of "informed consent" or on the issue of Dr. Tashman's alleged negligent performance of the sacrospinous [***20] procedure. Therefore, we cannot say that the evidence and instructions erroneously submitted to the jury on the issue of "informed consent" did not affect its determination, and we must presume that the jury relied on such evidence and instructions in reaching its verdict. *See Ponirakis v. Choi*, 262 Va. 119, 126, 546 S.E.2d 707, 711-12 (2001); *Rosen v. Greifenberger*, 257 Va. 373, 381, 513 S.E.2d 861, 865 (1999).

[*77] For these reasons, we will reverse the trial court's judgment and remand the case for a new trial on both counts of Gibbs' motion for judgment.

*Reversed and remanded.*

Page 1

149 Conn. App. 596, *; 90 A.3d 256, **;
2014 Conn. App. LEXIS 167, ***



5 of 49 DOCUMENTS

## ERIKA TORRES v. ALEXANDER, A. CARRESE ET AL.

## AC 34350

## APPELLATE COURT OF CONNECTICUT

## 149 Conn. App. 596; 90 A.3d 256; 2014 Conn. App. LEXIS 167

**October 18, 2013, Argued
April 22, 2014, Officially Released**

**SUBSEQUENT HISTORY:** Appeal denied by Torres v. Carrese, 312 Conn. 912, 93 A.3d 595, 2014 Conn. LEXIS 225 (Conn., June 11, 2014)

**PRIOR HISTORY:**  **[***1]**
    Action to recover damages for the defendants' alleged **medical malpractice,** and for other relief, brought to the Superior Court in the judicial district of New Haven, where the court, Jones, J., denied the defendants' motions to dismiss; thereafter, the matter was transferred to the judicial district of Fairfield, where the court, Levin, J., granted the defendants' motions to dismiss; subsequently, the court, Levin, J., granted in part the plaintiff's motion to reargue and vacated in part the orders of dismissal; thereafter, the court, Levin, J., granted the defendants' motions for summary judgment and rendered judgment thereon, from which the plaintiff appealed to this court and the defendants filed separate cross appeals.
Torres v. Carrese, 2012 Conn. Super. LEXIS 52 (Conn. Super. Ct., Jan. 3, 2012)

**DISPOSITION:**     Affirmed.

**SYLLABUS**

    The plaintiff sought to recover damages from the defendants, C and Y, board certified obstetrician-gynecologists, for **medical malpractice,** claiming that the defendants were negligent in their obstetric care of the plaintiff. She claimed that after undergoing a cesarean section to deliver her third child, she was diagnosed with placenta percreta, which required that she undergo a hysterectomy. The plaintiff claimed that as a result of C's negligent con- duct,   **[***2]** she sustained damage to her bladder and uterus that rendered her permanently incontinent, caused her pain and suffering, and prevented her from obtaining gainful em-

Page 2

149 Conn. App. 596, *; 90 A.3d 256, **;
2014 Conn. App. LEXIS 167, ***

ployment. With respect to Y, the plaintiff alleged that he was negligent in performing the cesarean section, which caused damage to her bladder and forced her to undergo a hysterectomy. The plaintiff submitted with her complaint an opinion letter of a medical expert, M, a board certified urologist, who opined that C and Y had breached the standard of care owed to the plaintiff. The defendants filed motions to dismiss, claiming that the written opinion letter was not obtained from a similar health care provider as required by statute (§ 52-190a). After the trial court granted the defendants' motions to dismiss, it granted in part the plaintiff's motion to reargue and vacated in part the orders of dismissal only as to the plaintiff's purported claims of lack of **informed consent.** Thereafter, the trial court granted the defendants' motions for summary judgment as to the plaintiff's claims of lack of **informed consent** and rendered judgment thereon, from which the plaintiff appealed and the defendants cross appealed to this court. **[\*\*\*3]** *Held*:

1. The plaintiff could not prevail on her claim that the trial court improperly dismissed her professional negligence claims, which was based on her claim that the opinion letter authored by M rather than an obstetrician-gynecologist was sufficient to meet the requirements of § 52-190a and the statute (§ 52-184c) that defines "similar health care provider": although the plaintiff alleged that the defendants had acted outside their specialty and claimed that this case fell within the statutory exception to the requirement that only board certified cognates of the defendant physicians may author the written opinion required by § 52-190a, M's opinion letter did not suggest that the defendants were diagnosing or treating the plaintiff for a condition not within their specialty, and the plaintiff's injuries were sustained when Y was performing an obstetric-gynecological procedure due to the plaintiff's obstetric condition; accordingly, the plaintiff's case did not fall within the statutory exception and, therefore, the written opinion letter she submitted had to satisfy the requirements of §§ 52-190a and 52-184c (c), which it failed to do, as M was not trained and experienced in obstetrics-gynecology, **[\*\*\*4]** and was not board certified in obstetrics-gynecology.

2. The plaintiff could not prevail on her claim that even if the original opinion letter was insufficient, § 52-190a does not implicate subject matter jurisdiction and, therefore, because the defendants' subsequent motions to dismiss were filed in 2011, which was outside the time period set forth in the applicable rule of practice ([2006] § 10-30), the court erred in considering and granting the motions to dismiss: that court properly concluded that the defendants' 2011 motions to dismiss were functionally motions to reargue their timely filed 2006 motions to dismiss, in which they sought to dismiss the complaint on the ground that the plaintiff's failure to attach a written opinion letter from a similar health care provider as required by § 52-190a deprived the court of jurisdiction; furthermore, the defendants' noncompliance with the filing deadline in the applicable rule of practice (§ 11-12) pertaining to a motion to reargue did not deprive the court of subject matter jurisdiction to consider the pleading, and in light of the fact that the defendants, in filing their 2011 motions to dismiss, sought reconsideration because of **[\*\*\*5]** a newly articulated controlling principle of law set forth in a recent Supreme Court case, the trial court did not abuse its discretion in considering the defendants' untimely 2011 motions to dismiss.

Page 3

149 Conn. App. 596, *; 90 A.3d 256, **;
2014 Conn. App. LEXIS 167, ***

3. The plaintiff's claim that the trial court improperly concluded that C had no duty to obtain the plaintiff's **informed consent** was unavailing; with respect to C, there was no dispute that he neither performed nor participated in the plaintiff's cesarean hysterectomy, the operation was not imminent and there was no immediate reason for specific **informed consent,** as C's providing of prenatal care was not a procedure, operation or surgery for which **informed consent** was required, and C did not have an obligation to provide the plaintiff, or any subsequent substitute treating physician, with information regarding the increased risks the plaintiff might face when undergoing a cesarean section due to her condition of placenta previa, as the obligation to obtain **informed consent** turns on the performance of a procedure, not the intent to perform a procedure.

4. The trial court properly granted Y's motion for summary judgment and concluded that Y had no obligation to disclose to the plaintiff, **[***6]** in order to ensure that **consent** was **informed,** that the procedure could be better performed in another health care facility by more experienced or specialized physicians; there was no genuine issue of material fact that the plaintiff would have had a cesarean hysterectomy regardless of whether Y otherwise obtained her **informed consent,** as it was necessary to save the plaintiff's life, the plaintiff did not allege or present evidence showing that Y was not competent to perform the cesarean hysterectomy, and Y had no obligation to inform the plaintiff that the procedure could be better performed at another health care facility, as **informed consent** involves a discussion of the material risks of the procedure itself, which does not necessarily extend to the place where the procedure is to be performed.

**COUNSEL:** Jonathan Perkins, with whom were Wendi Kowarik and, on the brief, Karen L. Dowd and Brendon P. Levesque, for the appellant-cross appellee (plaintiff).

James F. Biondo, with whom, on the brief, was Audrey D. Medd, for the appellee-cross appellant (named defendant).

David J. Robertson, with whom, on the brief, were Madonna A. Sacco and Jeremy P. Chen, for the appellee-cross appellant (defendant **[***7]** Abraham J. Yaari).

**JUDGES:** Beach, Bear and Peters, Js. BEACH, J. In this opinion the other judges concurred.

**OPINION BY:** BEACH

**OPINION**

**[**260]** **[*599]** BEACH, J. This appeal arises from a **medical malpractice** action brought by the plaintiff, Erika Torres, against the defendants, Alexander A. Carrese and Abraham J. Yaari, board certified obstetrician-gynecologists. The plaintiff claims: (1) the trial court erred in dismissing her professional negligence claims against both defendants on the ground that the written opinion letter that she attached to her complaint did not satisfy the requirements of General Statutes § 52-190a; and (2) the trial court erred in granting the de-

Page 4

149 Conn. App. 596, *; 90 A.3d 256, **;
2014 Conn. App. LEXIS 167, ***

fendants' motions for summary judgment as to her claims against both defendants alleging lack of **informed consent**. We affirm the judgment of the trial court.

[*600] The following facts, which were undisputed for the purpose of summary judgment, and procedural history are relevant to our disposition of the plaintiff's claims. Carrese was the plaintiff's obstetrician-gynecologist from the time the plaintiff was sixteen years old. Carrese successfully performed two cesarean sections on the plaintiff for her two prior pregnancies. In 2004, the plaintiff became pregnant with [***8] her third child. The plaintiff was scheduled to deliver her third child in September, 2004. During her 2004 pregnancy, Carrese and the plaintiff understood that her third child would be delivered by cesarean section. In the fourth or fifth month of her pregnancy, the plaintiff began to **experience** pain, bleeding, and cramping. Carrese diagnosed the plaintiff to have the condition of placenta previa.[1] Carrese described the condition as "placenta before baby" and explained to the plaintiff that the placenta was blocking the path out of the womb.

> 1 As the trial court explained: "Placenta previa is a condition in which the placenta is implanted in the lower segment of the uterus, thereby partially or completely obstructing the internal bone of the cervix. . . . Placenta accreta is a condition where the placenta has grown through the placental membrane and into the uterine wall, so that it cannot be detached without removing the uterus. . . . As this case and the literature indicates, placenta percreta is a condition in which the placenta can grow through the uterus and into the bladder." (Citations omitted.)

On May 28, 2004, the plaintiff presented at Bridgeport Hospital with signs of vaginal [***9] bleeding and was seen by Yaari for the first time. While the plaintiff was dressed and sitting in bed, she informed a nurse that she wanted to leave. The plaintiff signed herself out of the hospital against medical advice.

In August, 2004, prior to leaving Connecticut for a vacation, Carrese arranged for Yaari to cover his patients. On August 5, 2004, while Carrese was on vacation, the plaintiff went into labor. The plaintiff presented at St. Vincent's Medical Center in Bridgeport, thirty-five weeks pregnant with vaginal bleeding and uterine [*601] contractions. The plaintiff was seen by Yaari. Sometime after the plaintiff was admitted, Yaari diagnosed the plaintiff to have the condition of placenta previa. Yaari delivered the plaintiff's third child by cesarean section.

As the court related, "After performing the cesarean section, Yaari discovered that the plaintiff in fact had placenta percreta and that the placenta had invaded the wall of the bladder causing substantial bleeding, [and] requiring a hysterectomy. The contemporaneous hospital record signed by Yaari further state[d] that the plaintiff [**261] `was taken to the operating room and a cesarean section was performed. A live baby girl was [***10] delivered. . . . Because of the severe bleeding that we could not prevent even though the incision on the uterus was in the fundal area, we had to pursue a . . . hysterectomy. Because of the location of the placenta at the lower level of the uterus, it penetrated the posterior wall of the bladder and thus was removed with the uterus and we called for intraoperative urology evaluation. The urology team arrived . . . and the patient had later on a reconstruction of the bladder' . . . ."

Page 5

149 Conn. App. 596, *; 90 A.3d 256, **;
2014 Conn. App. LEXIS 167, ***

In September, 2006, the plaintiff served this **medical malpractice** action on the defendants, Carrese and Yaari.[2] The complaint alleged that each defendant was "a duly licensed physician engaged in the practice of medicine in the State of Connecticut and a specialist in the field of obstetrics and/or gynecology."[3] The complaint alleged that the defendants were negligent in their obstetric care of the plaintiff. Specifically, count **[*602]** one alleged that Carrese, who had been the plaintiff's obstetrician since she was sixteen and had provided her with prenatal care for several months prior to August 5, 2004, was negligent in providing prenatal care to the plaintiff because he (1) "failed to maintain adequate medical **[***11]** records pertaining to the plaintiff's condition of placenta previa," (2) failed to detect the plaintiff's condition of placenta previa and/or placenta accreta, (3) "failed to convey to other treating doctors the fact that the plaintiff suffered from [placenta previa and/or placenta accreta]," (4) "failed to undertake necessary diagnostic testing such as ultrasounds," (5) "failed to advise the plaintiff of the risk that her bladder would be injured during the cesarean section and/or related procedures," and (6) failed to recognize that the plaintiff's condition required the intervention of a urologist and, in failing-refusing to procure the services of a urologist during the prenatal period, undertook to provide medical services which were within the specialty of a urologist. The plaintiff claimed that as a result of Carrese's negligent conduct she sustained damage to her bladder and uterus that has rendered her permanently incontinent, caused her pain and suffering, and prevented her from obtaining gainful employment, and incurred medical expenses.

> 2 According to the court, "On June 30, 2006, the court had granted the plaintiff's petition to extend the statute of limitations ninety days **[***12]** pursuant to General Statutes § 52-190a (b). The statute of limitations would otherwise have expired on August 5, 2006. The extended statute of limitations, therefore, was November 4, 2006."
>
> 3 The court noted that "[a]lthough the complaint does not indicate whether the defendants are board certified, it is undisputed that both [defendants] are board certified obstetricians-gynecologists."

Count two alleged that Yaari, the obstetrician who performed the plaintiff's cesarean section, was negligent in his obstetric care of the plaintiff because he (1) "failed to take the proper precautions during the plaintiff's cesarean section and/or related procedures as to avoid injuring her bladder (including arranging for the delivery to occur in the appropriate facility and arranging for a urologist to deal with the potential placenta accreta condition)," (2) "failed to undertake the appropriate investigations to determine whether the plaintiff suffered from placenta previa and/or placenta accreta," (3) "caused injury to the plaintiff's bladder," **[*603]** and (4) "undertook to perform medical services which were within the specialty of a urologist." Count two also alleged that Yaari "failed to advise the plaintiff **[***13]** of the risk that her bladder would be injured during the cesarean **[**262]** section and/or related procedures . . . ." The plaintiff claimed that as a result of Yaari's negligent conduct, she was "forced to undergo a hysterectomy and can no longer bear children," her "bladder is damaged and she is incontinent," she has "undergone anguish, pain and suffering" and incurred medical expenses, she has been unable to obtain gainful employment and to participate in many of life's activi-

Page 6

149 Conn. App. 596, *; 90 A.3d 256, **;
2014 Conn. App. LEXIS 167, ***

ties, and she will "in the future undergo further debilitating and painful treatments and undergo further anguish, pain and suffering and medical expenses."

With her complaint, the plaintiff filed a good faith certificate signed by her attorney, who represented therein that he had made a reasonable inquiry into the circumstances of the plaintiff's claims and that, on the basis of that inquiry, he believed in good faith that the defendants had been negligent in their treatment of the plaintiff. Additionally, pursuant to § 52-190a (a), the plaintiff submitted a written opinion letter of a medical expert, dated September 5, 2006, who had reviewed the defendants' care of the plaintiff and rendered his opinion as to that care **[\*\*\*14]** as well as to the care of the plaintiff's treating urologists.[4] Jay Motola, a board certified urologist, concluded that the plaintiff's urologists had provided her good care. With respect to the defendants, Motola opined in relevant part: "On the other hand, the obstetricians involved in the care of this case need to be further scrutinized. Clearly the root cause **[\*604]** of the subsequent urinary fistula does not lie with the urologic care that was provided, but rather the original injury to the urinary tract that the obstetricians created. It is my opinion to a reasonable degree of medical certainty, that the obstetricians, Drs. Carrese and Yaar[i] breached the standard of care due to the [plaintiff] by causing the original injury to her urinary tract. It is this injury that has rendered the [plaintiff] in the state that she is presently in and therefore the liability lies on the part of the treating obstetricians. . . . It is also my opinion that . . . Carrese breached the prevailing standard of care by failing to maintain adequate medical records [while] taking care of [the plaintiff]."

> 4   On January 3, 2007, the plaintiff filed a request to amend and an amended complaint, the only material **[\*\*\*15]** changes being (1) the original written opinion letter's author was revealed to be Jay Motola, a board certified urologist, and (2) the attachment of a second written opinion letter authored by Daniel Miller, an obstetrician-gynecologist. Neither defendant objected.

On November 13, 2006, Yaari filed a motion to dismiss the plaintiff's complaint on the ground that the written opinion letter submitted by the plaintiff was not written by a "similar health care provider," as defined by General Statutes § 52-184c and as mandated by § 52-190a, and therefore, dismissal was proper pursuant to § 52-190a (c).[5] On November 15, 2006, counsel for Carrese filed a motion to dismiss on similar grounds.[6] According to the court, "Oral argument was heard on January 2, 2007, at which time the court, *Jones, J.*, granted Yaari's motion because it was unopposed . . . [and] Carrese's motion was marked off because the plaintiff's counsel was absent. On the same day, the plaintiff filed an objection to . . . Yaari's motion. The plaintiff then, on January 3, **[\*\*263]** 2007, filed a motion to set aside the dismissal as to . . . Yaari and for reargument, which was granted by the court, *Jones, J.*, on January 22, 2006. On February **[\*\*\*16]** 26, 2007 . . . Carrese filed another motion to dismiss . . . **[\*605]** which was in all respects identical to his prior motion . . . .

> 5   On October 17, 2006, counsel for Yaari filed an appearance. His motion to dismiss was filed within thirty days of filing an appearance, as is required by Practice Book § 10-30.

Page 7

149 Conn. App. 596, *; 90 A.3d 256, **;
2014 Conn. App. LEXIS 167, ***

6    On October 18, 2006, counsel for Carrese filed an appearance. His motion to dismiss was filed within thirty days of filing an appearance, as is required by Practice Book § 10-30.

"Oral argument was heard a second time on February 26, 2007. . . . The defendants move[d] to dismiss the [plaintiff's] first amended complaint on the ground that the first written opinion [letter] submitted by the plaintiff was not obtained from a 'similar health care provider' as mandated by § 52-190a. They argue[d] that the plain language of § 52-190a (c) indicate[d] that [failure to attach a sufficient written opinion letter was] ground for dismissal of the action. They also contend[ed] that the failure to attach an adequate medical opinion [was] not a curable defect, and, therefore, the plaintiff's amended complaint, attaching the opinion of an [obstetrician-gynecologist was] not properly before the court. **[\*\*\*17]** Furthermore, even if the amendment [was] effective, the defendants argue[d] that the second opinion provided [was] sparse and [was] insufficient to meet the statutory requirement that the opinion 'include a detailed basis for the formation of such opinion.'" (Citations omitted; footnotes omitted.) On April 4, 2007, the court, *Jones, J.*, denied the defendants' motions to dismiss on the ground that an insufficient opinion letter, as opposed to the absence of an opinion letter, was not a sufficient ground for dismissal.[7]

7    On May 4, 2007, the defendants each filed motions to reargue claiming, inter alia, that in denying their motions to dismiss the court improperly had considered a subsequent complaint and opinion letter filed by the plaintiff. The court, *Jones, J.*, denied the defendants' motions to reargue, noting that it did not rely on the plaintiff's amended complaint or subsequent opinion letters in doing so.

On January 19, 2011, the case was called for trial. On January 31, 2011, and February 10, 2011, after our Supreme Court released its opinion in *Bennett v. New Milford Hospital, Inc.*, 300 Conn. 1, 21, 12 A.3d 865 (2011) (holding in cases against specialists, author of written opinion **[\*\*\*18]** letter pursuant to § 52-190a [a] must be **[\*606]** "similar health care provider" as defined in § 52-184c [c], regardless of author's potential qualifications to testify at trial, and insufficient written opinion letter, while not impairing subject matter jurisdiction, requires dismissal of action under § 52-190a [c]), the defendants each filed new motions to dismiss the plaintiff's complaint.[8] On March 7, 2011, the court granted the defendants' motions to dismiss the plaintiff's complaint because the plaintiff failed to attach an opinion letter from a similar health care provider to the complaint as required by § 52-190a.[9] The court subsequently reconsidered and vacated its decision only as to the plaintiff's purported claims of lack of **informed consent**, **[\*\*264]** combined within allegations of negligence, reasoning that the requirements of a good faith certificate and a written opinion letter from a similar health care provider do not apply to a claim of lack of **informed consent**.

8    The plaintiff objected to the defendants' motions to dismiss, arguing that (1) the defendants' motions to dismiss were the functional equivalent of motions to reargue the prior rulings on the motions and were untimely under **[\*\*\*19]** Practice Book § 11-12; (2) *Bennett v. New Milford Hospital, Inc.*, supra, 300 Conn. 1, should not be applied

Page 8

149 Conn. App. 596, *; 90 A.3d 256, **;
2014 Conn. App. LEXIS 167, ***

retroactively to this case; (3) the opinion letter attached to the plaintiff's good faith certificate was authored by a similar health care provider as defined by § 52-184c (c); (4) § 52-190a violates article second of the Connecticut constitution; and (5) judicial economy requires denial of the defendants' motions.

9    The court filed its memorandum of decision on March 14, 2011, after having issued written orders granting the motions to dismiss on March 7, 2011. The plaintiff subsequently filed a motion to reargue on March 7, 2011, which the court denied in part. The plaintiff then filed an amended complaint on April 21, 2011.

On July 28, 2011, Carrese moved for summary judgment as to the plaintiff's claims of lack of **informed consent** on the ground that the plaintiff did not plead lack of **informed consent**, and, alternatively, to the extent that a lack of **informed consent** claim was pleaded, no triable issue existed. On August 1, 2011, Yaari also moved for summary judgment. The plaintiff filed separate objections to the defendants' motions on **[*607]** September 23, 2011. On December 30, 2011, **[***20]** the court granted the defendants' motions for summary judgment as to the plaintiff's alleged claims of lack of **informed consent**, and, on January 3, 2012, issued a supporting memorandum of decision.[10] This appeal and the defendants' cross appeal followed. See footnote 22 of this opinion. Additional facts will be set forth as necessary.

10    On January 11, 2012, the plaintiff filed a motion to reargue, which the court denied on January 30, 2012. On February 16, 2012, the plaintiff filed this appeal.

I

On appeal, the plaintiff first claims that the court improperly dismissed her professional negligence claims because the written opinion letter, authored by a urologist, not an obstetrician-gynecologist, was sufficient to meet the requirements of §§ 52-190a (a) and 52-184c. The plaintiff argues alternatively that even if the original opinion letter was insufficient, § 52-190a does not implicate subject matter jurisdiction, and therefore, because the defendants' motions to dismiss were filed outside the time period set forth by Practice Book (2006) § 10-30, the court erred in considering and granting their motions to dismiss.[11] We address these arguments separately.

11    Practice Book (2006) § 10-30 **[***21]** provides in relevant part: "Any defendant, wishing to contest the court's jurisdiction, may do so even after having entered a general appearance, but must do so by filing a motion to dismiss within thirty days of the filing of an appearance. . . ."

A

The plaintiff first claims that the court improperly dismissed her professional negligence claims because the opinion letter, authored by a urologist rather than an obstetrician-gynecologist, was sufficient to meet the requirements of §§ 52-190a (a) and 52-184c. The defendants argue that because they are board certified obstetrician-gynecologists only

Page 9

149 Conn. App. 596, *; 90 A.3d 256, **;
2014 Conn. App. LEXIS 167, ***

another board certified **[*608]** obstetrician-gynecologist qualifies as a "similar health care provider" as defined by §§ 52-190a and 52-184c and *Bennett v. New Milford Hospital, Inc.*, supra, 300 Conn. 1. We agree with the defendants.

Our review of a trial court's ruling on a motion to dismiss pursuant to § 52-190a is plenary. See *Morgan v. Hartford Hospital*, 301 Conn. 388, 395, 21 A.3d 451 (2011) ("[t]he interpretation of § 52-190a is a question of law over which this court exercises plenary review").

We begin our analysis by setting forth the relevant statutory provisions. Section 52-190a (a) provides **[***22]** that before filing a personal injury action against a health care provider, the attorney or party filing the action must make "a reasonable inquiry as permitted by the circumstances to determine that there are grounds for a good faith belief that there has been negligence in the care or treatment of the claimant. . . ." **[**265]** [12] To show a good faith belief, the complaint must be accompanied by a written and signed opinion of a "similar health care provider," as defined in § 52-184c, stating that there appears to be evidence of medical negligence and including a detailed basis for the formation of that opinion. General Statutes § 52-190a. To determine if an opinion letter meets the requirements of § 52-190a (a), the letter must be read in conjunction with § 52-184c (c), **[*609]** which defines the term "similar health care provider." *Wilkins v. Connecticut Childbirth & Women's Center*, 135 Conn. App. 679, 686, 42 A.3d 521, cert. granted on other grounds, 305 Conn. 921, 47 A.3d 881 (2012). For health care providers who are board certified or who hold themselves out as specialists, such as the obstetrician-gynecologists who treated the plaintiff in this case, § 52-184c (c) defines "similar health care **[***23]** provider" as one who: (1) "[i]s trained and experienced in the same specialty"; and (2) "is certified by the appropriate American board in the same specialty . . . ."[13]

12    General Statutes § 52-190a (a) provides in relevant part: "No civil action or apportionment complaint shall be filed to recover damages resulting from personal injury or wrongful death occurring on or after October 1, 1987, whether in tort or in contract, in which it is alleged that such injury or death resulted from the negligence of a health care provider, unless the attorney or party filing the action or apportionment complaint has made a reasonable inquiry as permitted by the circumstances to determine that there are grounds for a good faith belief that there has been negligence in the care or treatment of the claimant. . . . [T]he claimant or the claimant's attorney . . . shall obtain a written and signed opinion of a similar health care provider, as defined in section 52-184c, which similar health care provider shall be selected pursuant to the provisions of said section, that there appears to be evidence of medical negligence and includes a detailed basis for the formation of such opinion. . . ."

13    General Statutes § 52-184c (c) **[***24]** provides: "If the defendant health care provider is certified by the appropriate American board as a specialist, is trained and experienced in a medical specialty, or holds himself out as a specialist, a 'similar health care provider' is one who: (1) Is trained and experienced in the same specialty; and (2) is certified by the appropriate American board in the same specialty; provided if the defendant health care provider is providing treatment or diagnosis for a condition which is

Page 10

149 Conn. App. 596, *; 90 A.3d 256, **;
2014 Conn. App. LEXIS 167, ***

not within his specialty, a specialist trained in the treatment or diagnosis for that condition shall be considered a 'similar health care provider'."

The plaintiff argues that the opinion letter, authored by a urologist, is sufficient to meet the requirements of § 52-190a because this case falls within the statutory exception to the requirement that only board certified cognates of the defendant physician may author the written opinion required by § 52-190a. In defining "similar health care provider," § 52-184c (c) provides that where "the defendant health care provider is providing treatment or diagnosis for a condition which is not within his specialty, a specialist trained in the treatment or diagnosis **[\*\*\*25]** for that condition shall be considered a 'similar health care provider'." The plaintiff further argues that this case falls within the statutory exception because her complaint alleged that "the defendants had left the area of obstetrics and were diagnosing and treating the plaintiff's urological system, something outside their specialty."

This argument fails for two reasons. First, in the written opinion letter dated September 5, 2006, Motola, **[\*610]** the board certified urologist, never suggested that the defendants were diagnosing or treating the plaintiff for a condition not within their specialty. Second, the plaintiff's bladder and ureter were damaged when Yaari was performing a hysterectomy, an obstetric-gynecological procedure, because of the plaintiff's condition of placenta percreta, **[\*\*266]** an obstetric condition. Because this case does not fall within the statutory exception, the original written opinion letter submitted by the plaintiff must satisfy the requirements of §§ 52-190a and 52-184c (c) in order to be effective.

In this regard, the plaintiff's claim is governed by *Bennett v. New Milford Hospital, Inc.*, supra, 300 Conn. 1. In *Bennett*, our Supreme Court concluded that "in cases of **[\*\*\*26]** specialists, the author of an opinion letter pursuant to § 52-190a (a) must be a similar health care provider as that term is defined by § 52-184c (c), regardless of his or her potential qualifications to testify at trial pursuant to § 52-184c (d)." Id., 21. Put another way, "one's familiarity with or knowledge of the relevant standard of care, for purposes of authoring a prelitigation opinion letter, is not a proper consideration in determining the adequacy of that letter if the author does not meet the statutory definition of a 'similar health care provider.'" *Wilkins v. Connecticut Childbirth & Women's Center*, supra, 135 Conn. App. 687. In *Bennett*, the court held that, because the plaintiff alleged in his complaint that the defendant was a specialist in emergency medicine, the court was correct in concluding that the opinion letter authored by a general surgeon, with added qualifications in surgical critical care, who engaged in the practice of trauma surgery, was not authored by a similar health care provider as defined by § 52-184c (c) and therefore did not satisfy § 52-190a. *Bennett v. New Milford Hospital, Inc.*, supra, 24. Therefore, pursuant to *Bennett*, the language of §§ 52-190a (a) **[\*\*\*27]** and 52-184c (c) dictates that a "similar **[\*611]** health care provider" with respect to the plaintiff's health care providers in this case is one who is trained and experienced in obstetrics-gynecology and is board certified in obstetrics-gynecology. Because the author of the opinion letter submitted by the plaintiff is neither, the letter does not comply with § 52-190a (a), and accordingly, the court properly dismissed the plaintiff's professional negligence claims.[14] See *Bennett v. New Milford Hospital, Inc.*, supra, 28 ("dismissal is the man-

Page 11

149 Conn. App. 596, *; 90 A.3d 256, **;
2014 Conn. App. LEXIS 167, ***

datory remedy when a plaintiff fails to file an opinion letter that complies with § 52-190a [a]"); see also *Morgan v. Hartford Hospital*, supra, 301 Conn. 398 ("the legislature envisioned the dismissal as being without prejudice . . . and even if the statute of limitations has run, relief may well be available under the accidental failure of suit statute" [internal quotation marks omitted]).

14    Although the plaintiff may have obtained opinion letters from board certified obstetrician-gynecologists after the action commenced, after the defendants had filed their motions to dismiss, and after the statute of limitations had expired, the court may not consider **[***28]** those documents. See, e.g., *Votre v. County Obstetrics & Gynecology Group, P.C.*, 113 Conn. App. 569, 585, 966 A.2d 813, cert. denied, 292 Conn. 911, 973 A.2d 661 (2009).

B

The plaintiff also claims that, even if the original opinion letter was insufficient, § 52-190a does not implicate subject matter jurisdiction, and therefore, because the defendants' motions to dismiss were filed outside the time period set forth by Practice Book (2006) § 10-30,[15] the court erred **[**267]** in considering, and granting, the motions to dismiss. The defendants argue that the court **[*612]** properly determined that their 2011 motions to dismiss were functionally motions to reargue their timely filed 2006 motions to dismiss the plaintiff's complaint. In the unusual circumstances of this case, we agree with the defendants.

15    Practice Book (2006) § 10-30 (b) provides in relevant part: "Any defendant, wishing to contest the court's jurisdiction, may do so even after having entered a general appearance, but *must* do so by filing a motion to dismiss within thirty days of the filing of an appearance. . . ." (Emphasis added.)

Practice Book (2006) § 10-31 (a) provides in relevant part that "[t]he motion to dismiss shall be used to assert **[***29]** (1) lack of jurisdiction over the subject matter, (2) lack of jurisdiction over the person, (3) improper venue, (4) insufficiency of process, and (5) insufficiency of service of process. . . ."

The following additional facts are relevant. At the hearing on the defendants' 2011 motions to dismiss,[16] the plaintiff argued that the defendants' motions to dismiss were, in essence, motions to reargue their 2006 motions to dismiss[17] that did not comply with the mandatory time requirements set forth in Practice Book § 11-12. The plaintiff further argued that no statute or rule of practice authorized filing a motion to dismiss, not claiming lack of subject matter jurisdiction, five and one-half years after filing an appearance.[18] In its memorandum of decision, the court agreed with the plaintiff that the 2011 motions to dismiss were really motions to reargue the 2006 motions to dismiss.[19] The court also agreed that the defendants' motions were untimely because § 11-12 mandates that motions to **[*613]** reargue be filed within twenty days of the decision. The court concluded, however, that it properly could entertain the defendants' 2011 motions to dismiss because the defendants' failure to meet the

Page 12

149 Conn. App. 596, *; 90 A.3d 256, **;
2014 Conn. App. LEXIS 167, ***

timeliness **[\*\*\*30]** requirements did not deprive the court of jurisdiction, and it otherwise was within the court's discretion to entertain the motions.

16 On January 31, 2011, Yaari moved to dismiss the plaintiff's September 15, 2006 complaint pursuant to § 52-190a (c), on the ground that the plaintiff's complaint did not comply with the requirements of § 52-190a because the written good faith opinion letter was not authored by a health care provider similar to Yaari. On February 10, 2011, Carrese filed a motion to dismiss on similar grounds.

17 The defendants' 2006 motions to dismiss--filed on November 13, 2006, and November 15, 2006, respectively--raised the issue of the adequacy of the plaintiff's § 52-190a opinion letter and were denied by the court, *Jones, J.*, on April 16, 2007.

18 Practice Book § 11-12 (a) provides: "A party who wishes to reargue a decision or order rendered by the court shall, within twenty days from the issuance of notice of the rendition of the decision or order, file a motion to reargue setting forth the decision or order which is the subject of the motion, the name of the judge who rendered it, and the specific grounds for reargument upon which the party relies."

19 On March 7, 2011, **[\*\*\*31]** the court granted the defendants' motions to dismiss the entire complaint. The court subsequently vacated its decision as to the plaintiff's claims of lack of **informed consent**, the result of which was that only the professional negligence claims remained dismissed.

1

We first consider whether the trial court properly concluded that the defendants' 2011 motions to dismiss were functionally motions to reargue their 2006 motions to dismiss. "[T]he interpretation of pleadings is always a question of law for the court and . . . our interpretation of the pleadings therefore is plenary." (Internal quotation marks omitted.) *Dimmock v. Lawrence & Memorial Hospital, Inc.*, 286 Conn. 789, 799-800, 945 A.2d 955 (2008); see also *Sherman v. Ronco*, 294 Conn. 548, 554 n.10, 985 A.2d 1042 (2010). "[P]leadings must be construed broadly and realistically, rather than narrowly and technically." (Internal quotation marks omitted.) *Connecticut Coalition for Justice in Education Funding, Inc. v. Rell*, 295 Conn. 240, 253, 990 A.2d 206 (2010). Courts **[\*\*268]** analyze pleadings for what they are, rather than for what their titles state they are. See, e.g., *State v. Smith*, 19 Conn. App. 646, 648, 563 A.2d 1034 ("[a party] **[\*\*\*32]** cannot change the nature of his motion by changing its title any more than one can make a bull a cow by giving it a female name"), cert. denied, 213 Conn. 806, 567 A.2d 836 (1989).

In this case, the defendants' original 2006 motions to dismiss sought to dismiss the plaintiff's complaint on the ground that the plaintiff's failure to attach a written opinion letter from a similar health care provider, as mandated by § 52-190a, deprived the court of jurisdiction. The defendants' 2011 motions to dismiss sought to dismiss the plaintiff's complaint on the ground that **[\*614]** the plaintiff's failure to attach a written opinion letter from a similar health care provider required dismissal of the action pursuant to § 52-190a (c) and *Bennett v. New Milford Hospital, Inc.*, supra, 300 Conn. 1. The defendants' 2011 motions to dismiss

Page 13

149 Conn. App. 596, *; 90 A.3d 256, **;
2014 Conn. App. LEXIS 167, ***

essentially sought to reverse or to modify the denials of their earlier 2006 motions to dismiss[20] by Judge Jones. We conclude that the court was correct in concluding that the defendants' 2011 motions to dismiss, despite their titles, were in reality motions to reargue their 2006 motions to dismiss.

> 20   We note that the defendants' 2006 motions to dismiss were timely filed in **[\*\*\*33]** accordance with Practice Book (2006) § 10-30 because they were filed within thirty days of the defendants' counsel filing their appearances in this case.

2

The plaintiff contends that the twenty day filing deadline in Practice Book § 11-12 (a) is a mandatory limitation, and therefore, because the defendants' 2011 motions were untimely, Judge Levin improperly considered the motions.[21] The defendants argue that Judge Levin properly considered their 2011 motions to dismiss.[22] We agree with the defendants.

> 21   On appeal, the plaintiff also now claims that the court, *Levin, J.*, improperly considered the defendants' 2011 motions to dismiss because the 2011 motions to dismiss were motions to reargue Judge Jones' earlier denial of their 2006 motions to dismiss. The motions were not decided by the same judge who denied their earlier motions to dismiss, as is required by Practice Book § 11-12 (c). Practice Book § 11-12 (c) provides in relevant part that "[a] motion to reargue shall be considered by the judge who rendered the decision or order. . . ." The plaintiff did not raise this argument in her written objection to the defendants' 2011 motions to dismiss or at the hearing on the defendants' 2011 **[\*\*\*34]** motions to dismiss. Because the plaintiff raises this argument for the first time on appeal, we find it was not preserved, and we decline to address it.
> 22   On cross appeal, the defendants argue that if this court finds that Judge Levin properly could not reconsider Judge Jones' denial of the defendants' original 2006 motions to dismiss, then this court should find, nonetheless, that Judge Jones' denials of the 2006 motions to dismiss were improper under *Bennett v. New Milford Hospital, Inc.*, supra, 300 Conn. 1. Because we find that the court, *Levin, J.*, properly considered the defendants' 2011 motions to dismiss, we find it unnecessary to address the defendants' argument on cross appeal.

**[\*615]**   We review the plaintiff's claim under the abuse of discretion standard; see, e.g., *Chartouni v. DeJesus*, 107 Conn. App. 127, 127, 129, 944 A.2d 393 (we review denial of motion to reargue for abuse of discretion), cert. denied, 288 Conn. 902, 952 A.2d 809 (2008); and conclude that the court did not abuse its discretion in considering the defendants' untimely 2011 functional motions to reargue.

Practice Book § 11-12 (a) provides: "A party who wishes to reargue a **[\*\*269]** decision or order rendered by the court *shall*, **[\*\*\*35]** within twenty days from the issuance of notice of the rendition of the decision or order, file a motion to reargue setting forth the decision or order which is the subject of the motion, the name of the judge who rendered it, and the spe-

Page 14

149 Conn. App. 596, *; 90 A.3d 256, **;
2014 Conn. App. LEXIS 167, ***

cific grounds for reargument upon which the party relies." (Emphasis added.) "We construe words used in the Practice Book according to their commonly approved meaning." *Lo Sacco v. Young*, 210 Conn. 503, 507, 555 A.2d 986 (1989). The word "shall" typically implies a mandatory connotation. "Our Supreme Court previously has recognized the significance of the [drafter's] choice in electing to choose shall or may in formulating a . . . directive. . . . Absent an indication to the contrary, the [drafter's] choice of the mandatory term shall rather than the permissive term may indicates that the . . . directive is mandatory." (Citation omitted; internal quotation marks omitted.) *Vargas v. Doe*, 96 Conn. App. 399, 412, 900 A.2d 525, cert. denied, 280 Conn. 923, 908 A.2d 546 (2006). Ordinarily, then, a motion to reconsider must be timely filed, and a court may and usually should decline to consider an untimely motion.

Our determination that the filing deadline **[***36]** in Practice Book § 11-12 is mandatory, however, does not end the inquiry. "Rules of practice are not statutory or constitutional mandates, but they reflect the courts' authority to prescribe rules to regulate their proceedings and **[*616]** facilitate the administration of justice . . . . Even if a . . . Practice Book rule must be strictly construed and is mandatory, compliance with its requirements does not necessarily become a prerequisite to a court's subject matter jurisdiction." (Citations omitted; internal quotation marks omitted.) *State v. Falcon*, 84 Conn. App. 429, 433, 853 A.2d 607 (2004), overruled in part on other grounds by *State v. Das*, 291 Conn. 356, 368, 968 A.2d 367 (2009); see also *Lo Sacco v. Young*, supra, 210 Conn. 508 (failure to comply with mandatory time requirement in our rules of practice does not affect subject matter jurisdiction); Practice Book § 1-8 ("[t]he design of these rules being to facilitate business and advance justice, they will be interpreted liberally in any case where it shall be manifest that a strict adherence to them will work surprise or injustice"). For example, our Supreme Court has held that a failure to meet the twenty day deadline to appeal from **[***37]** a final judgment, as required by our rules of practice, does not deprive an appellate court of jurisdiction, even where the opposing party files a motion to dismiss the untimely appeal. See *Kelley v. Bonney*, 221 Conn. 549, 559, 606 A.2d 693 (1992) ("pursuant to Practice Book § 4056 [now § 66-8], the Appellate Court had broad discretion to hear the appeal, whether timely filed or not"). The issue, then, is whether the court abused its discretion in granting the defendants' motions to reargue, which were untimely according to the terms of our rules of practice.

After a thorough review of the record, we conclude that the court did not abuse its discretion in considering the defendants' untimely 2011 motions to dismiss. First, as noted previously, noncompliance with mandatory filing deadlines in our rules of practice does not deprive the court of subject matter jurisdiction to consider the pleading. Second, the defendants, in filing their 2011 motions to dismiss, sought reconsideration because of a newly articulated controlling principle of law set forth **[*617]** by our Supreme Court in *Bennett v. New Milford Hospital, Inc.*, supra, 300 Conn. 1. See *Opoku v. Grant*, 63 Conn. App. 686, 692-93, 778 A.2d 981 (2001) **[***38]** ("[T]he purpose of a reargument **[**270]** is . . . to demonstrate to the court that there is some decision or some principle of law which would have a controlling effect, and which has been overlooked, or that there has been a misapprehension of facts. . . . [A] motion to reargue . . . is not to be used as an opportunity to have a

Page 15

149 Conn. App. 596, *; 90 A.3d 256, **;
2014 Conn. App. LEXIS 167, ***

second bite of the apple or to present additional cases or briefs which could have been presented at the time of the original argument." [Citations omitted; internal quotation marks omitted.]). Thus, it was reasonable for the defendants to file what amounts to a late motion to reargue before a second judge in light of the Supreme Court's decision in *Bennett*, issued almost four years after Judge Jones issued his ruling on the defendants' 2006 motions to dismiss.[23]

> 23   Unusual practical considerations were presented here. The trial court correctly determined that *Bennett* was to have retroactive effect. See, e.g., *Marone v. Waterbury*, 244 Conn. 1, 10, 707 A.2d 725 (1998) ("judgments that are not by their terms limited to prospective application are presumed to apply retroactively"). In light of *Bennett*, the court was faced with a situation in which any judgment rendered   **[\*\*\*39]** on the professional negligence issues in favor of the plaintiff would likely be reversed in any event. By dealing with the issue, the court avoided the time and expense, to the state and to the parties, of a perhaps pointless trial.

For the aforementioned reasons we conclude that the court properly considered and granted the defendants' 2011 motions to dismiss.

II

The plaintiff also claims that the court erred in rendering summary judgment as to her claims of lack of **informed consent** against Carrese and Yaari. Specifically, the plaintiff argues that the court (1) erred in concluding that Carrese had no duty to obtain the plaintiff's **informed consent**, and (2) erred in concluding that   **[\*618]**   Yaari had no obligation to disclose to the plaintiff that the cesarean hysterectomy[24] could perhaps be more safely performed at another health care facility. We address these claims separately.

> 24   Where appropriate, the operative procedures involving the cesarean section and the hysterectomy will be referred to collectively as "the cesarean hysterectomy."

"Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there   **[\*\*\*40]** is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law.[25] . . . Our review of the trial court's decision to grant [the defendant's] motion for summary judgment is plenary." (Internal   **[\*\*271]** quotation marks omitted.) *Milton v. Robinson*, 131 Conn. App. 760, 779, 27 A.3d 480 (2011), cert. denied, 304 Conn. 906, 39 A.3d 1118 (2012).

> 25   "The party opposing a motion for summary judgment must present evidence that demonstrates the existence of some disputed factual issue. . . . The movant has the

Page 16

149 Conn. App. 596, *; 90 A.3d 256, **;
2014 Conn. App. LEXIS 167, ***

burden of showing the nonexistence of such issues but the evidence thus presented, if otherwise sufficient, is not rebutted by the bald statement that an issue of fact does exist. . . . To oppose a motion for summary judgment successfully, the nonmovant must recite specific facts . . . which contradict those stated in the movant's **[\*\*\*41]** affidavits and documents. . . . The opposing party to a motion for summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue." (Internal quotation marks omitted.) *Milton v. Robinson*, 131 Conn. App. 760, 779, 27 A.3d 480 (2011), cert. denied, 304 Conn. 906, 39 A.3d 1118 (2012).

"[T]he lack of **informed consent** claim is a different cause of action from [a] claim of [medical] negligence . . . ."[26] **[\*619]** *Goral v. Kenney*, 26 Conn. App. 231, 237 n.7, 600 A.2d 1031 (1991). "In order to prevail on a cause of action for lack of **informed consent**, a plaintiff must prove *both* [1] that there was a **failure** to **disclose** a known material risk of a proposed procedure and [2] that such failure was a proximate cause of his injury."[27] (Emphasis added.) *Shortell v. Cavanagh*, 300 Conn. 383, 388, 15 A.3d 1042 (2011). In order to obtain valid **informed consent**, the physician's disclosure to the patient must include four factors: (1) the nature of the *procedure*; (2) the risks and hazards of the *procedure*; (3) the alternatives to the *procedure*; and (4) the anticipated benefits of the *procedure. Logan v. Greenwich Hospital Assn.*, 191 Conn. 282, 292, 465 A.2d 294 (1983).

26  "[T]he **[\*\*\*42]** focus of a **medical malpractice** case is often a dispute involving the correct medical standard of care and whether there has been a deviation therefrom. Conversely, the focus in an action for lack of **informed consent** is often a credibility issue between the physician and the patient regarding whether the patient had been, or should have been, apprised of certain risks prior to the medical procedure." *Shortell v. Cavanagh*, 300 Conn. 383, 389, 15 A.3d 1042 (2011); see also *Caron v. Adams*, 33 Conn. App. 673, 687, 638 A.2d 1073 (1994) ("the basis for claiming a lack of **informed consent** is a failure to make a sufficient disclosure of the risks of or alternatives to a certain medical procedure or treatment").

27  "Our standard of disclosure for **informed consent** in this state is an objective standard that does not vary from patient to patient based on what the patient asks or what the patient would do with the information if it were disclosed. As this court stated in [*Logan v. Greenwich Hospital Assn.*, 191 Conn. 282, 292-93, 465 A.2d 294 (1983)], the lay standard of **informed consent** requires a physician to provide the patient with that information which a reasonable patient would have found material **[\*\*\*43]** for making a decision whether to embark upon a contemplated course of therapy. . . . In adopting the objective lay standard, this court recognized that rather than impose on the physician an obligation to disclose at his peril whatever the particular patient might deem material to his choice, most courts have attempted to frame a less subjective measure of the physician's duty." (Emphasis omitted; internal quotation marks omitted.) *Duffy v. Flagg*, 279 Conn. 682, 692, 905 A.2d 15 (2006).

Page 17

149 Conn. App. 596, *; 90 A.3d 256, **;
2014 Conn. App. LEXIS 167, ***

Our Supreme Court has adopted an objective lay standard for determining the materiality of risk. See, e.g., *Shortell v. Cavanagh*, supra, 300 Conn. 388 ("[u]nlike a **[\*620]** **medical malpractice** claim, a claim for lack of **informed consent** is determined by a lay standard of materiality, rather than an expert medical standard of care which guides the trier of fact in its determination"); see also *Logan v. Greenwich Hospital Assn.*, supra, 191 Conn. 292 (adopting lay standard for lack of **informed consent** claims). "[T]he lay standard of **informed consent** requires a physician to provide the patient with that information which a *reasonable* patient would have found material for making a decision whether to embark upon a **[\*\*\*44]** contemplated course of therapy." (Emphasis in original; internal quotation marks omitted.) *Duffy v. Flagg*, 279 Conn. 682, 692, 905 A.2d 15 (2006). "Materiality may be said to be the significance a reasonable person, in what the physician knows or should know is his patient's position, would attach to the disclosed risk or risks in deciding whether to submit or not to submit to surgery or treatment." (Internal quotation marks omitted.) *Logan v. Greenwich Hospital Assn.*, supra, 291. Our Supreme Court has also **[\*\*272]** noted, however, "that the cases on **informed consent** require something less than a full disclosure of all information which may have some bearing, however remote, upon the patient's decision." (Internal quotation marks omitted.) *Duffy v. Flagg*, supra, 692.

A

The plaintiff claims that the court erred in concluding that Carrese had no duty to obtain the plaintiff's **informed consent**. The plaintiff argues, essentially, that, because Carrese was providing her prenatal care and anticipated that he would be the physician to perform the eventual cesarean section, he had an obligation to provide the plaintiff, and any subsequent substitute treating physician, with information about the plaintiff's **[\*\*\*45]** condition and the nature of her pregnancy "such that **[\*621]** she could make knowing consent to treatment."[28] We disagree.

> 28   The plaintiff also argues that the court improperly relied on cases involving the duties of referring physicians because Carrese was not a referring physician. We agree with the plaintiff that Carrese was not a referring physician. We note that the trial court, however, in discussing cases involving the duties of referring physicians, stated that "[h]ere, Carrese was not even a referring physician."

The following additional facts and procedural history are relevant. In count one of her April 21, 2011 revised complaint, the plaintiff alleged that Carrese (1) "failed to advise the plaintiff in timely fashion of her options with respect to complete bed rest, early delivery or other means of dealing with potentially life threatening complication of placenta percreta in a timely and appropriate fashion"; (2) "failed to advise the plaintiff of the possibility of complications during delivery due to her condition(s) of placenta previa, placenta accreta and/or placenta percreta"; and (3) "failed to advise the plaintiff of the risk that her bladder would be injured during the cesarean **[\*\*\*46]** [hysterectomy] . . . ."

Page 18

149 Conn. App. 596, *; 90 A.3d 256, **;
2014 Conn. App. LEXIS 167, ***

On July 28, 2011, Carrese moved for summary judgment on the grounds that the plaintiff did not allege lack of **informed consent**[29] or alternatively, to the extent **[*622]** that a lack of **informed consent** claim was pleaded, no genuine issue of fact existed. In support of his motion, Carrese submitted his affidavit. In its January 3, 2012 memorandum of decision, the court granted the motion and explained its decision: "The plaintiff does not dispute that Carrese neither performed nor participated in the plaintiff's cesarean hysterectomy. **[**273]** Therefore, Carrese had no duty to obtain the plaintiff's **informed consent**. Carrese's motion for summary judgment is granted."

29    Carrese argues that the plaintiff did not properly allege lack of **informed consent** and notes that the first time the plaintiff argued that there was a pending lack of **informed consent** claim was in seeking to reargue the dismissal of her **medical malpractice** claims. Carrese argues that count one of the original complaint alleged medical negligence against Carrese and not lack of **informed consent**. Lack of **informed consent** is a cause of action separate from a claim of medical negligence and arises from a different set **[***47]** of facts. See, e.g., *Hammer v. Mount Sinai Hospital*, 25 Conn. App. 702, 706, 596 A.2d 1318, cert. denied, 220 Conn. 933, 599 A.2d 384 (1991). The plaintiff, therefore, had the burden, pursuant to Practice Book § 10-26, to plead the lack of **informed consent** claim in a separate count properly to put Carrese on notice of that claim. We note that regardless of whether the plaintiff properly alleged a cause of action that was based on lack of **informed consent** in the original complaint, the court ordered the defendants to address the plaintiff's claimed cause of action of lack of **informed consent**, the defendants had notice of such claim, and the defendants may have implicitly agreed to allow the plaintiff to amend her complaint to include this cause of action by not objecting. Even if the plaintiff did not plead lack of **informed consent** in her original complaint, in light of the defendants' actions and notice of the plaintiff's lack of **informed consent** claims, we decline to address the defendants' argument further.

The plaintiff argues that because Carrese provided her prenatal care and anticipated that he would be the physician to perform the eventual cesarean section, he had an obligation **[***48]** to provide the plaintiff, with information about the plaintiff's condition and the nature of her pregnancy "such that she could make knowing consent to treatment." The plaintiff also argues that Carrese had an obligation to provide any subsequent substitute treating physician with information about her condition such that she could give **informed consent** to treatment. We disagree.

Our case law regarding the issue of a physician's obligation to obtain a patient's **informed consent** focuses on the decision "to embark upon a contemplated course of therapy," such as a "procedure," "operation," or "surgery." (Internal quotation marks omitted.) *Logan v. Greenwich Hospital Assn.*, supra, 191 Conn. 290-94 (examining our **informed consent** case law). Carrese provided the plaintiff prenatal care. It is undisputed that Carrese did not perform the plaintiff's cesarean section and was on vacation with his family at the time of the plaintiff's surgery. Although he may have anticipated performing a cesarean section sometime in the

Page 19

149 Conn. App. 596, *; 90 A.3d 256, **;
2014 Conn. App. LEXIS 167, ***

future, the operation was not imminent and **[\*623]** there was no immediate reason for specific **informed consent**. Unlike performing a cesarean section, providing prenatal care is *not* a "procedure," **[\*\*\*49]** "operation," or "surgery."

Under the current state of the law of **informed consent**, Carrese did not have an obligation to provide the plaintiff, or any subsequent substitute treating physician, with information regarding the increased risks the plaintiff might face when undergoing a cesarean section due to her condition of placenta previa.[30]

> 30 Because the procedure was to be performed in the future and Carrese was never in the position to be the operating surgeon, we conclude that Carrese had no obligation to obtain **informed consent**. We do not address the broader issue of whether the applicable standard of care was deviated from in the course of the plaintiff's care.

The plaintiff makes much of the fact that Carrese *intended* at some point to perform the cesarean section. Under our law, however, a physician's obligation to obtain **informed consent** turns on the performance of a procedure and *not* the intent to perform a procedure. Consequently, we find that the plaintiff's arguments are unavailing. See, e.g., *Sherwood v. Danbury Hospital*, 278 Conn. 163, 171 n.8, 192, 194, 896 A.2d 777 (2006) (obligation to inform patient of risks of blood transfusion is owed by physician performing surgery **[\*\*\*50]** and him "alone" [emphasis omitted]).

B

The plaintiff's final claim is that the court erred in concluding that Yaari had no obligation to disclose to the plaintiff, in order to ensure that **consent** was **informed,** that the procedure could be better performed at another health care facility. The plaintiff argues that Yaari had an obligation to advise the plaintiff of the option of having a cesarean hysterectomy at another health care facility, more specifically, a "tertiary facility" with other specialists present, because Yaari reasonably anticipated that the procedure would require **[\*\*274] [\*624]** expertise beyond his specialty.[31] The defendant contends that the law of **informed consent** does not impose the obligation, at least in general, of advising a patient that a different facility might provide more sophisticated care.

> 31 The court stated: "At oral argument on the defendants' motions [for summary judgment], the plaintiff clarified that the crux of her claim was not that she would not have had a cesarean section or a hysterectomy if provided with additional information, but rather that she should have been told that the procedure should have been completed at a 'tertiary facility,' by a more skilled surgeon, **[\*\*\*51]** with a team of specialists present."

The following additional facts and procedural history, as recited by the trial court, are relevant. "Sometime after the plaintiff was admitted to the hospital on August 5, 1004, Yaari suspected and subsequently confirmed that she had placenta previa. . . . Yaari also suspected that the plaintiff had placenta accreta. Yaari tried to stop the contractions and, according to the

Page 20

149 Conn. App. 596, *; 90 A.3d 256, **;
2014 Conn. App. LEXIS 167, ***

contemporaneous hospital record, he 'explained to the [plaintiff] that there [was] a good chance that we might need to remove the uterus and there might be damage to the bladder during this kind of operation because of the location of the previous uterine incisions. The [plaintiff] consented. This was also explained to her husband.' . . .

"In her affidavit in opposition to the defendants' motions for summary judgment, however, the plaintiff state[d] that 'Yaari . . . did not advise me of the risks associated with undertaking a cesarean section in the presence of placenta accreta or placenta percreta nor did he tell me anything about my alternatives at that time (or in May 2004), including that of having my cesarean delivery take place at an appropriate tertiary facility and of **[\*\*\*52]** having it handled by a team of specialists experienced in dealing with very difficult, potentially life-threatening lower abdominal surgery. . . . Yaari did not tell me that he suspected that I had placenta accreta **[\*625]** or placenta percreta nor did he mention anything about my bladder or my ureters potentially being damaged should he go ahead with the surgery.' . . .

"The plaintiff signed a consent form giving Yaari permission to perform a 'repeat C-Section, Possible Hysterectomy, Possible [illegible].' Specifically, the form state[d]: 'My condition, the nature of the above procedure, risks and hazards of the procedure, the benefits of the procedure, any problems related to recuperation, the likelihood of success of the procedure, all viable alternatives to the procedure and the same type of information regarding such alternatives have been explained to my satisfaction by . . . Yaari.' Yaari also signed the consent form, affirming that he had provided the information to the plaintiff.

"After performing the cesarean section, Yaari discovered that the plaintiff in fact had placenta percreta and that the placenta had invaded the wall of the bladder causing substantial bleeding, requiring a hysterectomy. **[\*\*\*53]** The contemporaneous hospital record signed by Yaari further states that the plaintiff 'was taken to the operating room and a cesarean section was performed. A live baby girl was delivered. . . . Because of the severe bleeding that we could not prevent . . . we had to pursue a cesarean hysterectomy. Because of the location of the placenta at the lower level of the uterus, it penetrated the posterior wall of the bladder and thus was removed with the uterus and we called for intraoperative urology evaluation. The urology team arrived, headed by Dr. [Jeffrey] Small, and the patient had later on a reconstruction of the bladder and reimplantation of the one of the ureters.'"

On August 1, 2011, Yaari filed a motion for summary judgment, arguing that he was entitled to judgment as a matter of law because there was no genuine issue of **[\*\*275]** material fact that he disclosed all material risks to the **[\*626]** plaintiff.[32] The plaintiff opposed the motion, arguing that Yaari had a duty to advise her of the option of having a cesarean hysterectomy at a tertiary facility, with other physicians present, including a urologist and a gynecologist-oncologist. Yaari maintained that the law of **informed consent** did not **[\*\*\*54]** impose such an obligation. The court granted Yaari's motion for summary judgment on December 30, 2011. The court held that "[u]nder the circumstances of this case, where the plaintiff concedes that she would have had a cesarean hysterectomy regardless of whether Yaari otherwise obtained her **informed consent**, and where there is no allegation nor evidence that Yaari was not competent, prepared and experienced to perform a cesarean hys-

Page 21

149 Conn. App. 596, *; 90 A.3d 256, **;
2014 Conn. App. LEXIS 167, ***

terectomy, there is no genuine issue of material fact that . . . Yaari did not violate any duty to the plaintiff by not advising her that she might have the surgery performed by more experienced physicians or more specialized physicians."

32    The court held that there was no genuine issue of material fact that the plaintiff would have undergone a cesarean hysterectomy.

We note initially that the plaintiff's "**informed consent**" claim has little to do with any known material risk of a cesarean hysterectomy and thus falls outside the usual rubric of **informed consent**. The plaintiff conceded, and our review of the record confirms, that there is no genuine issue of material fact that the plaintiff would have undergone a cesarean hysterectomy in any event--the plaintiff's **[\*\*\*55]** counsel so indicated.[33] Further, **[\*628]** the record **[\*\*276]** indicates that the cesarean hysterectomy was necessary to save the plaintiff's life.[34] Additionally, the plaintiff did not allege, or present any evidence showing, that Yaari was not competent to perform the cesarean hysterectomy. The crux of the plaintiff's lack of **informed consent** claim as to Yaari is solely that Yaari "depriv[ed] her **[\*\*277]** of the choice to seek the intervention of physicians more experienced in and/or specializing in dealing with this type of condition." Yaari contends that the current state of the law of **informed consent** in Connecticut imposes no such affirmative obligation on physicians.

33    The plaintiff's attorney made the following remarks at the hearing on the defendants' motions for summary judgment:

"[The Plaintiff's Counsel]: Thank you, Your Honor. Your Honor, as to the--just addressing quickly the **informed . . . consent** form that the defendant, Dr. Yaari has provided a copy of . . . all it says is repeat [cesarean] section and possible hysterectomy. It says something else, possible greater, I can't read the words, but it says nothing, Your Honor, and the testimony is . . . at no time did Dr. Yaari tell [the plaintiff] that **[\*\*\*56]** because she'd had multiple prior [cesarean] sections and had a placenta previa, she was at a substantially increased risk of suffering from placenta percreta and/or placenta accreta. Placenta percreta is a more advanced or complicated version. And in fact, she did suffer from placenta percreta. And he never had a percreta or accreta discussion with her ever, Your Honor. . . .

"The Court: What would have changed if she had? . . .

"[The Plaintiff's Counsel]: What would have changed, Your Honor, firstly, in May of 2004, she was at Bridgeport Hospital. Dr. Yaari was again covering for Dr. Carrese and was the responsible physician. . . . And the hospital [record] says . . . suspected placenta previa, will tell Dr. Yaari when he calls in an hour, something to that effect.

"And so, that he knew so months before the delivery, it is our position, and it certainly is an issue of fact on this, at least that she had a placenta previa condition, and he knew about her prior [cesarean] sections. Under those circumstances . . . [w]hat . . .

Page 22

149 Conn. App. 596, *; 90 A.3d 256, **;
2014 Conn. App. LEXIS 167, ***

we're saying is that, well, certainly she should have been given the risks and the alternatives to that. . . .

"The Court: This is *alternatives to what*?

"[The Plaintiff's **[\*\*\*57]** Counsel]: . . . [*T*]*o having Dr. Carrese and/or Dr. Yaari perform this cesarean section, cesarean section hysterectomy*. A lot of them are saying, and most--certainly all the plaintiff's experts and a number of the defendant's experts, that it would have been preferable to have an experienced general pelvic surgeon. It's [a] very unusual occurrence, this placenta accreta, in the life of an . . . obstetrician-gynecologist. And it's--it's the plaintiff's position that she would have liked to have known that she was in an elevated risk of suffering lower urinary tract injury and that she could have gone and *she would like to have known the alternative of going to, and having present, an experienced, let's say, gynecological oncologist to this procedure on her. . . .*

"The Court: Gynecological oncologist, did you say?

"[The Plaintiff's Counsel]: Yes. Yes, Your Honor, in other words, a doctor who specializes in complicated lower urinary tract surgeries, for example. So, rather--and she could have, if she'd known, if this had been brought to her attention . . . you know, she could have had an alternative of having somebody who specializes in this kind of complicated condition deal with it. In fact, **[\*\*\*58]** she was told nothing about it. She only found [out] about placenta percreta, placenta accreta, after the delivery. They told her nothing about it.

"And, in fact, Dr. [Frank] Boehm, Dr. Yaari's expert, says that Dr. Yaari knew ahead of time or suspected strongly that she had an accreta. And . . . Dr. [Jeffrey] Richardson, one of the plaintiff's experts, testified that, in fact, he suspected that she--oh, testified that Dr. Yaari did anticipate on August 5, before the delivery was attempted, there was a placenta accreta and/or percreta present, and that urologic injury could occur during the procedure.

"And that because of knowing about it ahead of time, he, quote, he had the luxury of time. In other words, we don't accept that there is an emergency exception, Your Honor. I believe that all that the defendant has cited to on this issue is a state regulation, it's not a statute, that simply says that hospitals should make sure that doctors get **informed consent**. That's essentially what that regulation says. It doesn't say anything about doctors don't have to get **informed consent** if there's an emergency.

"But beyond that, it's our position, Your Honor, that there was not an emergency, that **[\*\*\*59]** . . . there was sufficient time for [the plaintiff] to give **informed consent**, to have a discussion about possible bladder injury, about possible urethral injury, about an option of having a urologist or a gynecological oncologist deal with the procedure. She wasn't given any of these options. She was not told the risks. She was not told the alternatives. And, Your Honor, it's the plaintiff's position that that's exactly what **in-**

**formed consent** is about. She should have been told of these risks and alternatives, and she was not . . .

"The Court: *What . . . other alternatives were there, again, other than you mentioned an experienced pelvic surgeon or gynecological oncologist*?

"[The Plaintiff's Counsel]: *She would have, Your Honor, have had to undergo an operation where her uterus was removed. She would have had to undergo a hysterectomy*. But, Your Honor, it is our view that had she been given this option of going with someone who knew what he was doing and did this as a specialist, she would not be permanently unable to use the bathroom today. She wasn't given that option because she wasn't told about it." (Emphasis added.)

34    In its memorandum of decision, the court stated: "In the deposition    **[\*\*\*60]** of Dr. Frederick Rau, an obstetrician-gynecologist, the following exchange occurred:

"Q. And in reviewing all the records, have you developed any opinions as to whether or not . . . Yaari conformed to the standard of care in his care and treatment of [the plaintiff] in this particular situation?

"A. I believe that . . . Yaari did conform to the standard of care in this very difficult situation. . . . I don't think he had any choice but to proceed with the operation, perform the cesarean hysterectomy, and then manage the bleeding and urologic issues after the hysterectomy.

"Yaari submitted a portion of an uncertified deposition transcript of Dr. Jeffrey Richardson, an obstetrician-gynecologist, who testified that the hysterectomy saved the plaintiff's life. The pertinent deposition testimony is as follows:

"Q. Okay. Did the hysterectomy that was done in this case save [the plaintiff's] [life]? . . .

"A. I would say the hysterectomy saved her [life]."

"Additionally, the plaintiff submitted a portion of a certified deposition transcript of Dr. Frank Boehm, an obstetrician-gynecologist, who testified that the circumstances of the plaintiff's case constituted a life-threatening situation. The    **[\*\*\*61]** pertinent deposition testimony is as follows:

"A. [T]his is a life-threatening situation, placenta percreta with a previa. The amount of blood loss was obviously enormous; the [plaintiff] received nine units of blood." (Emphasis omitted.)

None of our courts have addressed a claim closely analogous to the plaintiff's--that is, whether a physician has an obligation to inform his or her patient that a procedure may be better performed at another health    **[\*629]**    care facility.[35] We hold that on the facts presented in this case, Yaari had no such obligation. Our holding is informed primarily by binding precedent such as *Shortell v. Cavanagh*, supra, 300 Conn. 383, and *Logan v. Greenwich Hospital Assn.*, supra, 191 Conn. 282, which suggest that the gravamen of **informed consent**

Page 24

149 Conn. App. 596, *; 90 A.3d 256, **;
2014 Conn. App. LEXIS 167, ***

is a discussion of the material risks of the procedure itself. The procedure itself does not necessarily extend to the place where the procedure is to be performed; in the circumstances of this case, the alleged fact that the facility was not a tertiary facility was not, as a matter of law, a material risk.[36]

35    The Wisconsin Supreme Court addressed an analogous claim in *Adler v. Kokemoor*, 199 Wis. 2d 615, 545 N.W.2d 495 (1996) (where  **[\*\*\*62]** plaintiff produced evidence showing defendant misrepresented mortality rates and his **experience** performing surgery, with respect to lack of **informed consent** claim, court properly allowed plaintiff to introduce evidence showing decreased risk of complications had plaintiff undergone neurosurgery for aneurysm at a tertiary care facility). In *Adler*, the court considered whether a trial court was correct in allowing the plaintiff to present evidence that the defendant physician should have advised the plaintiff of the possibility of undergoing surgery at a tertiary care facility with a more experienced surgeon. While we are not bound by *Adler*, we note that the facts of *Adler*--which involved a physician who misrepresented mortality rates and did not disclose the fact that, although he had performed thirty operations to clip anterior circulation aneurysms, he had never performed operations to clip the significantly more complicated posterior circulation aneurysms like the one from which the plaintiff suffered--are wholly unlike the facts of this case.

36    We do not foreclose the possibility that, in other circumstances, analogous factors may appropriately be regarded to be material risks subject  **[\*\*\*63]** to consideration by a jury. For example, we do not necessarily rule out a surgeon's complete lack of **experience** or a grossly unsanitary operating facility as a material risk attendant to the procedure. In this matter, risks material *to the procedure* were disclosed, and there was never a suggestion that the surgeon was not competent to perform the procedure. The plaintiff now asserts that, had she known of all of the possible sequelae and places where the surgery perhaps could have been performed, she would have opted for a "tertiary facility." Although, as noted previously, we express no opinion as to whether the issue raises questions of professional negligence, we do not hold that advising as to "tertiary facilities" was required on the facts of this case. There was no evidence that this facility was substandard and, in any event, there is almost always a more prestigious facility somewhere.

The judgment is affirmed.

In this opinion the other judges concurred.

Page 1

279 Conn. 682, *; 905 A.2d 15, **;
2006 Conn. LEXIS 312, ***



KATHLEEN DUFFY, ADMINISTRATRIX (ESTATE OF SAGE
T. WARREN), ET AL. v. JULIE S. FLAGG ET AL.

SC 17455

SUPREME COURT OF CONNECTICUT

279 Conn. 682; 905 A.2d 15; 2006 Conn. LEXIS 312

April 18, 2005, Argued
August 29, 2006, Officially Released

**PRIOR HISTORY:** [***1] Action to recover damages for, inter alia, medical malpractice, brought to the Superior Court in the judicial district of Ansonia-Milford, where the action was withdrawn as to the defendant Middlesex Hospital; thereafter, the court, Lager, J., granted the motion in limine filed by the named defendant et al. to preclude certain evidence; subsequently, the case was tried to the jury; verdict and judgment for the named defendant et al., from which the plaintiffs appealed to the Appellate Court, Bishop, West and Hennessy, Js., which reversed in part the trial court's judgment and remanded the case for a new trial, and the named defendant et al., on the granting of certification, appealed to this court. Duffy v. Flagg, 88 Conn. App. 484, 869 A.2d 1270, 2005 Conn. App. LEXIS 141 (2005)

**DISPOSITION:** Reversed; judgment directed.

**COUNSEL:** Charles W. Fleischmann, with whom were Madonna A. Sacco and, on the brief, Paul E. Pollock and David J. Robertson, for the appellants (named defendant et al.).

Antonio Ponvert III, with whom was James D. Horwitz, for the appellees (plaintiffs).

**JUDGES:** Borden, Norcott, Palmer, Vertefeuille and Sullivan, Js. In this opinion the other justices concurred.

**OPINION BY:** VERTEFEUILLE

**OPINION**

Page 2

279 Conn. 682, *; 905 A.2d 15, **;
2006 Conn. LEXIS 312, ***

[**16] [*684] VERTEFEUILLE, J. The defendants Julie S. Flagg, a physician, and her medical practice, [***2] Crescent Street Ob-Gyn (Crescent Street), [1] appeal, following our grant of certification, from the judgment of the Appellate Court reversing the judgment of the trial court in favor of the defendants following a jury trial. *Duffy* v. *Flagg*, 88 Conn. App. 484, 869 A.2d 1270 (2005). The defendants claim that the Appellate Court improperly concluded that the trial court improperly excluded certain evidence relative to the issue of informed consent. We agree with the defendants, and accordingly, we reverse the judgment of the Appellate Court.

> 1    Prior to trial, the plaintiff withdrew the action against another defendant, Middlesex Hospital. For purposes of this opinion, we refer to Flagg and Crescent Street as the defendants.

The record reveals the following factual and procedural history. In August, 1997, the plaintiff Kathleen Duffy [2] became pregnant with her second child and sought medical treatment from Flagg and Crescent Street. The plaintiff had received medical care from the [*685] defendants [***3] approximately two years earlier when she was pregnant with her first child, who was delivered by cesarean section. During the course of her prenatal care for her second child, the plaintiff discussed with Flagg and other members of Crescent Street the possibility of having her second child born vaginally despite the fact that her first child had been delivered by cesarean section. During these discussions, the defendants informed the plaintiff of the risks of the procedure known as "vaginal birth after cesarean section," including the risk of uterine rupture and the possibility of a resulting risk of death to the plaintiff and her infant. On one occasion, while discussing the procedure with Flagg, the plaintiff asked Flagg whether she had encountered any difficulty in her prior vaginal birth after cesarean section deliveries. [3] Flagg responded that there had been "a bad outcome" because of a uterine rupture. The plaintiff did not inquire further about the result of the uterine rupture, and Flagg did not tell the plaintiff that the [**17] infant had died as a result of that uterine rupture. The plaintiff thereafter decided to attempt a vaginal birth after cesarean delivery and executed written [***4] consent forms therefor, which specifically detailed the nature, risks, alternatives and benefits of the procedure. [4]

> 2    The plaintiff Kathleen Duffy commenced this action individually and as administratrix of the estate of Sage T. Warren, her daughter. For purposes of this opinion, we refer to Duffy in both capacities as the plaintiff.
> 3    Flagg testified at trial that she had performed approximately 200 vaginal birth after cesarean section deliveries during her career.
> 4    The consent form that the plaintiff signed included the following specific statements regarding the risk of harm to the plaintiff's infant: "I understand that [vaginal birth after cesarean section] is associated with a higher risk of harm to my baby than to me"; and "I understand that if my uterus ruptures during my [vaginal birth after cesarean section], there may not be sufficient time to operate and to prevent the death of or permanent brain injury to my baby."

Page 3

279 Conn. 682, *; 905 A.2d 15, **;
2006 Conn. LEXIS 312, ***

On May 19, 1998, the plaintiff was admitted to Middlesex Hospital **[\*\*\*5]** for the delivery of her second child. The plaintiff attempted to deliver the infant vaginally, but after she displayed possible signs of a uterine rupture, **[\*686]** Flagg transferred her to the operating room and delivered Sage T. Warren, the plaintiff's decedent, by cesarean section. As a result of complications during the birth, the infant survived on life support for eight days, but ultimately died on May 28, 1998. Thereafter, the plaintiff instituted this negligence action, alleging both medical malpractice and lack of informed consent.

Prior to trial, the defendants filed a motion in limine seeking to exclude all evidence related to the fact that Flagg previously had encountered a uterine rupture during an attempted vaginal birth after cesarean section delivery, including the existence of a lawsuit against Flagg for the death of the infant that resulted from that attempt, and all testimony from or reference to the former patient involved in that delivery. The trial court thereafter granted the defendants' motion in limine. The plaintiff then withdrew her claim with regard to informed consent. [5] After the completion of the evidence, the jury returned a verdict in favor of the defendants. **[\*\*\*6]** The plaintiff then filed a motion to set aside the **[\*687]** verdict and for a new trial, which the court denied. Thereafter, the court rendered judgment in favor of the defendants in accordance with the verdict.

> 5    The Appellate Court concluded that the plaintiff had preserved her right to challenge the trial court's ruling on the motion in limine because she did not waive her informed consent claim, but only voluntarily withdrew it in response to the court's ruling on the motion in limine, which precluded her from offering evidence regarding that claim. See *Duffy* v. *Flagg*, supra, 88 Conn. App. 487-88 n.4. We agree with the Appellate Court that the plaintiff did not waive her informed consent claim, on the basis of the following colloquy:
>
> "The Court: Alright, so the record will reflect that the claim of informed consent has been withdrawn by counsel, and will not be charged to the jury, nor will they be asked to make a decision on that basis.
>
> "[Plaintiff's Counsel]: And just so the record is clear, the reason that we're doing it is in view of the court's ruling, and I don't want to by virtue of having withdrawn it, waive any rights as to the issue on appeal.
>
> "The Court: I understand that. I assume that this is being done in anticipation that the court would not charge it to the jury in any event. So your rights are preserved to appeal the court's ruling in the event of an adverse outcome, on this specific issue.
>
> "[Plaintiff's Counsel]: That's right. Thank you, Your Honor."
>
> Accordingly, the issue properly was preserved for appeal.

**[\*\*\*7]** The plaintiff appealed from the judgment of the trial court to the Appellate Court, claiming that the trial court improperly had granted the defendants' motion in limine to preclude evidence regarding Flagg's prior experience with vaginal birth after cesarean section, which the plaintiff claimed was relevant to informed consent. [6] **[\*\*18]** The Appellate

Page 4

279 Conn. 682, *; 905 A.2d 15, **;
2006 Conn. LEXIS 312, ***

Court reversed the judgment of the trial court with regard to the informed consent claim, concluding that the evidence related to Flagg's prior experience with vaginal birth after cesarean section was admissible to determine whether Flagg had obtained the plaintiff's informed consent. *Duffy* v. *Flagg*, supra, 88 Conn. App. 493. Concluding that the trial court's error affected only the plaintiff's claim based on failure to obtain informed consent and did not warrant a new trial on the medical malpractice claim, the Appellate Court reversed the judgment of the trial court on the informed consent claim and remanded the case for a new trial solely on that claim. Id., 495. Thereafter, we granted the defendants' petition for certification to appeal from the Appellate Court, limited to the following issue: "Did the **[\*\*\*8]** Appellate Court properly reverse the trial court's ruling excluding certain evidence regarding the issue of informed consent?" *Duffy* v. *Flagg*, 274 Conn. 909, 876 A.2d 1201 (2005).

> 6    In her appeal to the Appellate Court, the plaintiff originally raised other grounds for appeal in her brief, but withdrew those claims at oral argument. Those claims therefore were not decided by the Appellate Court. See *Duffy* v. *Flagg*, supra, 88 Conn. App. 485-86 n.3.

On appeal, the defendants claim that the Appellate Court improperly reversed the trial court's ruling excluding evidence of Flagg's prior experience with vaginal birth after cesarean section. Specifically, the defendants assert that the Appellate Court failed to   **[\*688]**   apply *Logan* v. *Greenwich Hospital Assn.*, 191 Conn. 282, 292, 465 A.2d 294 (1983), and subsequent decisions, in which this court recognized that "informed consent involves four specific factors: (1) the nature of the procedure; (2) the risks and **[\*\*\*9]**   hazards of the procedure; (3) the alternatives to the procedure; and (4) the anticipated benefits of the procedure." *Alswanger* v. *Smego*, 257 Conn. 58, 67-68, 776 A.2d 444 (2001), citing *Logan* v. *Greenwich Hospital Assn.*, supra, 292. Instead, the defendants argue, the Appellate Court added an additional element to informed consent, namely an obligation on the part of a physician to disclose details of his or her professional experience even if this experience did not increase the risk to the patient.

In response, the plaintiff contends that the Appellate Court properly reversed the trial court's ruling excluding evidence regarding Flagg's prior experience with vaginal birth after cesarean section. The plaintiff contends that information regarding Flagg's prior experience is relevant to informed consent because the plaintiff specifically asked Flagg about her experience with vaginal birth after cesarean section deliveries, Flagg withheld the fact that an infant previously had died during such a delivery and the plaintiff would not have attempted a vaginal birth had she known that Flagg previously had experienced an infant death during such a **[\*\*\*10]**   delivery. We agree with the defendants, and, accordingly, we reverse the judgment of the Appellate Court.

We begin with the applicable standard of review. "The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court." (Internal quotation marks omitted.) *Olson* v. *Accessory Controls & Equipment Corp.*, 254 Conn. 145, 156, 757 A.2d 14 (2000). Although ordinarily we review evidentiary claims pursuant to an

Page 5

279 Conn. 682, *; 905 A.2d 15, **;
2006 Conn. LEXIS 312, ***

abuse of discretion standard, the trial court's ruling on the motion in limine in the **[*689]** present case was based on its legal determination that Flagg's prior experience was not properly part of an informed **[**19]** consent claim. "When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Commissioner of Transportation* v. *Rocky Mountain, LLC*, 277 Conn. 696, 728, 894 A.2d 259 (2006). We must decide, therefore, whether the trial court was legally and logically correct when it decided, under the facts of the case, to exclude **[***11]** evidence regarding Flagg's prior experience with the procedure of vaginal birth after cesarean section.

The following additional facts and procedural history are necessary to our resolution of this question. The defendants' motion in limine sought to preclude the plaintiff from introducing the following evidence: that a patient of Flagg's had experienced a uterine rupture during a prior vaginal birth after cesarean section delivery; the existence of a lawsuit against Flagg arising from the death of the infant that resulted from the uterine rupture; and any testimony from or reference to the former patient involved in that delivery. The basis for the motion was that the evidence regarding Flagg's prior experience with vaginal birth after cesarean section was not relevant to the plaintiff's medical malpractice action and that its prejudicial effect outweighed any probative value. In response, the plaintiff argued that the evidence was relevant to the plaintiff's informed consent claim because the plaintiff and Flagg had discussed Flagg's prior experience with vaginal birth after cesarean section and Flagg's experience played a key role in the plaintiff's decision to attempt a vaginal **[***12]** birth for the birth of her second child. Accordingly, the plaintiff argued that Flagg's prior experience and her candor **[*690]** in relating that experience to the plaintiff was relevant and admissible.

During oral arguments on the motion in limine, the trial court asked the plaintiff's counsel for a proffer of the evidence that it planned to introduce. In response, the plaintiff's counsel indicated that he wanted to introduce evidence that, during a conversation between Flagg and the plaintiff regarding the risks of vaginal birth after cesarean section, the plaintiff had asked Flagg whether she had encountered any difficulty in her prior vaginal birth after cesarean section deliveries and Flagg stated that there had been a uterine rupture in one case, but did not say that the rupture had resulted in the death of the infant. The plaintiff's counsel further related that the plaintiff would testify that if she had been provided with information concerning the fact that Flagg had experienced a death of an infant during a vaginal birth after cesarean section delivery, rather than simply a uterine rupture, she would not have opted for that type of delivery. The plaintiff's counsel further proffered **[***13]** that the plaintiff would testify that, during this discussion with Flagg, she did not inquire further as to the consequences of the uterine rupture. The plaintiff's counsel also proffered that the plaintiff would testify that the risks of the vaginal birth after cesarean section were explained to her, including the risk of uterine rupture, and that she understood that one of the consequences of uterine rupture could be the death of the infant. The plaintiff would also testify that she discussed the consent forms with Flagg and other members of Crescent Street. In response to the

Page 6

279 Conn. 682, *; 905 A.2d 15, **;
2006 Conn. LEXIS 312, ***

trial court's inquiry, the plaintiff's counsel also acknowledged that there would be no evidence that Flagg's prior experience with vaginal birth after cesarean section increased the risk of harm to the plaintiff from such a procedure. After hearing the plaintiff's proffer and after argument from **[**20]** all parties, the trial court granted the motion in **[*691]** limine and excluded evidence related to Flagg's prior experience with vaginal birth after cesarean section on the basis that Flagg's personal experience in performing the procedure was not relevant to an informed consent claim because it did not increase the risk of **[***14]** harm to the plaintiff.

In reversing the judgment of the trial court, the Appellate Court found it critical that Flagg's alleged failure to provide information to the plaintiff was in response to a direct question from the plaintiff. The Appellate Court concluded that when a patient directly asks for information regarding a physician's prior experience and the physician fails to provide that information, the jury should be able to determine whether such failure supports a claim for lack of informed consent. See *Duffy* v. *Flagg*, supra, 88 Conn. App. 493. We disagree.

We begin our analysis with a brief review of the law of informed consent. "The informed consent doctrine derives from the principle that [e]very human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent, commits an assault, for which he is liable in damages." (Internal quotation marks omitted.) *Sherwood* v. *Danbury Hospital*, 278 Conn. 163, 180, 896 A.2d 777 (2006). "Traditionally, a physician's duty to disclose information was measured by a 'professional' standard **[***15]** which was set by the medical profession in terms of customary medical practice in the community. . . . [However, in] *Logan* v. *Greenwich Hospital Assn.*, supra, [191 Conn.] 292-93, we adopted a 'lay' standard and stated that under the doctrine of informed consent, a physician is obligated 'to provide the patient with that information which a reasonable patient would have found material for making a decision whether to embark upon a contemplated course of therapy.'" (Citation **[*692]** omitted.) *Lambert* v. *Stovell*, 205 Conn. 1, 5 n.3, 529 A.2d 710 (1987).

Our standard of disclosure for informed consent in this state is an *objective* standard that does not vary from patient to patient based on what the patient asks or what the patient would do with the information if it were disclosed. As this court stated in *Logan,* the lay standard of informed consent requires a physician "to provide the patient with that information which a *reasonable* patient would have found material for making a decision whether to embark upon a contemplated course of therapy." (Emphasis added.) *Logan* v. *Greenwich Hospital Assn.*, supra, 191 Conn. 292-93. **[***16]** In adopting the objective lay standard, this court recognized that "rather than impose on the physician an obligation to disclose at his peril whatever the *particular patient* might deem material to his choice, most courts have attempted to frame a less subjective measure of the physician's duty." (Emphasis added.) Id., 292, citing *Canterbury* v. *Spence*, 150 U.S. App. D.C. 263, 464 F.2d 772, 787 (D.C. Cir.), cert. denied, 409 U.S. 1064, 93 S. Ct. 560, 34 L. Ed. 2d 518 (1972).

We repeatedly have set forth the four elements that must be addressed in the physician's disclosure to the patient in order to obtain valid informed consent. "[I]nformed consent in-

Page 7

279 Conn. 682, *; 905 A.2d 15, **;
2006 Conn. LEXIS 312, ***

volves four specific factors: (1) the nature of the procedure; (2) the risks and hazards of the procedure; (3) the alternatives to the procedure; and (4) the anticipated benefits of the procedure." (Internal quotation marks omitted.) *Janusauskas* v. *Fichman*, 264 Conn. 796, 810 n.12, 826 A.2d 1066 (2003), quoting *Alswanger* v. *Smego*, supra, 257 Conn. **[**21]** 67-68; *Logan* v. *Greenwich Hospital Assn.*, supra, 191 Conn. 292. "We have noted **[***17]** that the cases on informed consent require something less than a full disclosure of all information which may have some bearing, however remote, upon the patient's decision." (Internal quotation marks **[*693]** omitted.) *Pedersen* v. *Vahidy*, 209 Conn. 510, 522, 552 A.2d 419 (1989). Indeed, "the doctrine of informed consent is a limited one." *Duttry* v. *Patterson*, 565 Pa. 130, 136, 771 A.2d 1255 (2001).

The plaintiff's contention, that Flagg's prior experience with vaginal birth after cesarean section became relevant to informed consent because the plaintiff asked about Flagg's experience, is at variance with two fundamental principles of our informed consent jurisprudence in this state. First, the claim runs afoul of our adoption and consistent application of an *objective* standard of disclosure. We do not require a physician to disclose information that a particular patient might deem material to his or her decision, but, rather, limit the information to be disclosed to that which a reasonable patient would find material. Second, the information that the plaintiff sought to admit into evidence did not relate to any of the four specific factors encompassed **[***18]** by informed consent as we have defined it. Before granting the defendants' motion in limine, the trial court in the present case carefully ascertained that the plaintiff did not claim, and was not offering any evidence that, Flagg's prior experience with vaginal birth after cesarean section increased the risks or hazards of that procedure for the plaintiff. The evidence therefore had no relevance to any of the four established elements of informed consent in this state. We therefore conclude that the Appellate Court improperly reversed the judgment of the trial court.

Our conclusion and reasoning are supported by the decisions of courts in several other states. The Supreme Court of Pennsylvania addressed this same issue in *Duttry* v. *Patterson*, supra, 565 Pa. 130. In *Duttry*, the plaintiff brought an action against her physician alleging medical malpractice and lack of informed consent. Id., 133. At trial, the plaintiff sought to introduce evidence demonstrating that the physician had misrepresented **[*694]** his experience with a certain medical procedure when he responded to the plaintiff's inquiry during a presurgery consultation. Id. The Pennsylvania **[***19]** Supreme Court upheld the trial court's ruling that the evidence concerning the physician's prior experience performing the procedure was inadmissible because "information personal to the physician, whether solicited by the patient or not, is irrelevant to the doctrine of informed consent." Id., 137. The court acknowledged that the doctrine of informed consent "clearly focuses on imparting information relative only to the surgery itself"; id., 136; and reaffirmed that "[t]his is an objective, rather than subjective analysis; its calculus does not shift depending on how inquisitive or passive the particular patient is." Id., 136-37. Indeed, the court cautioned that making evidence related to the physician's personal experience relevant whenever a particular patient requests such information is "highly problematic" and "divorced from the fundamental principle of the informed consent doctrine that information is material to the procedure at hand,

Page 8

279 Conn. 682, *; 905 A.2d 15, **;
2006 Conn. LEXIS 312, ***

and therefore must be divulged in order to obtain the patient's informed consent, if a reasonable person would wish to know it." Id., 136; see also *Wlosinski* v. *Cohn*, 269 Mich. App. 303, 308, 713 N.W.2d 16 (2005) **[\*\*\*20]** ("physician has no duty to disclose to a patient the physician's **[\*\*22]** success rates for a particular medical procedure, and [the physician's] failure to advise the decedent of his success rates could not, as a matter of law, taint the patient's consent"); *Whiteside* v. *Lukson*, 89 Wn. App. 109, 112, 947 P.2d 1263 (1997) (holding that physician does not have duty to disclose to patient information about physician's experience in performing proposed procedure in order to obtain patient's informed consent). [7] We agree with the reasoning of **[\*695]** these courts, and reaffirm the objective standard of informed consent that is well established in our case law.

> 7    The trial court distinguished the present case from two cases in which courts in other states have concluded that evidence regarding the physician's prior experience is relevant to an informed consent claim if it increased the risks or hazards of the procedure for the plaintiff. First, in *Howard* v. *University of Medicine & Dentistry of New Jersey*, 172 N.J. 537, 800 A.2d 73 (2002), the Supreme Court of New Jersey, although recognizing that "[c]ourts generally have held that claims of lack of informed consent based on a failure to disclose professional-background information are without merit"; id., 555; held that a physician's prior experience may be relevant *if it increased the risk to the patient from the procedure*. Id., 555-57. Second, in *Johnson* v. *Kokemoor*, 199 Wis. 2d 615, 640-41, 545 N.W.2d 495 (1996), the Wisconsin Supreme Court concluded that evidence regarding a physician's limited prior experience with a particular procedure was admissible for purposes of an informed consent claim *when the plaintiff also introduced statistical evidence demonstrating that the physician's limited experience with this procedure increased the risk to the plaintiff*. We agree that these cases are distinguishable from the present case.

**[\*\*\*21]** The present case is also distinguishable from the Appellate Court's decision in *DeGennaro* v. *Tandon*, 89 Conn. App. 183, 873 A.2d 191 (2005). In *DeGennaro*, the Appellate Court concluded that there was sufficient evidence for the jury to determine that there was a lack of informed consent when the defendant dentist failed to disclose certain provider specific information to the plaintiff. Id., 197. Specifically, the defendant failed to inform the plaintiff of her inexperience with certain equipment that was used in the procedure to be performed on the plaintiff, that the defendant usually had an assistant present during this type of procedure, but would not have one present during the plaintiff's procedure, and that the defendant's office was not officially open for business at the time the procedure was performed. See id., 185-87. In ruling as it did, the Appellate Court concluded that such information should not be excluded from the dentist's duty to inform "simply because that information was provider specific as opposed to procedure specific." Id., 191. The evidence in *DeGennaro*, however, is distinctly different **[\*\*\*22]** from the evidence at issue in the present case. In *DeGennaro*, the provider specific information was related to the "the risks posed by the circumstances under which the **[\*696]** defendant performed the procedure" and was therefore relevant to one of the four established elements of informed consent in this state. Id.,

Page 9

279 Conn. 682, *; 905 A.2d 15, **;
2006 Conn. LEXIS 312, ***

189. Conversely, in the present case, there was absolutely no evidence that Flagg's prior experience with vaginal birth after cesarean section had any bearing on the risks to the plaintiff from the procedure or that it was otherwise relevant to any of the four established elements of informed consent. Accordingly, the Appellate Court's conclusion in *DeGennaro* does not conflict with our conclusion in the present case.

The plaintiff asserts that in *Janusauskas* v. *Fichman*, supra, 264 Conn. 811, we previously determined that a physician's experience in performing a particular procedure is relevant to a **[**23]** claim of lack of informed consent. The plaintiff's reliance on *Janusauskas*, however, is misplaced. First, the evidence involved in *Janusauskas* is distinguishable from the evidence at issue here. The evidence at issue in *Janusauskas* **[***23]** consisted of comments by the plaintiff's physician that he had had success with the proposed procedure on patients with a medical condition similar to the plaintiff's and his specific predictions as to the ultimate improvement that the procedure could have on the plaintiff's eyesight. Id. Therefore, the physician's comments were not strictly about the physician's prior experience performing the procedure, but were predictions as to the success of the plaintiff's surgery based on the physician's prior experience. These representations related to the plaintiff's surgery itself and essentially were information about the risks and benefits of the procedure, not information about the physician's prior experience with the procedure; it is undisputed that information related to the risks and benefits of a procedure is relevant to a claim of informed consent. See *Logan* v. *Greenwich Hospital Assn.*, supra, 191 Conn. 292; see also *Duttry* v. *Patterson*, supra, 565 Pa. 136. Second, even if the **[*697]** evidence could be construed as prior experience evidence, we examined it in reference to the plaintiff's claim under the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a **[***24]** et seq. Therefore, we did not reach any conclusion as to whether a physician's experience in performing a particular procedure is relevant to a claim of lack of informed consent. To the contrary, we reaffirmed that "[i]nformed consent involves four specific factors . . . ." *Janusauskas* v. *Fichman*, supra, 810 n.12.

The plaintiff further claims that if evidence regarding a physician's prior experience and/or his or her candor in revealing that experience is not relevant to an informed consent claim, then a physician will have no obligation to answer truthfully specific questions about his or her skills, qualifications, or experience. We disagree. Nothing in our ruling today suggests that a physician who misleads or misinforms his or her patient about the physician's skills, qualifications, or experience may not be liable in damages for misrepresentation. Our conclusion today is simply that we decline to expand the doctrine of informed consent to encompass answers to questions from a patient that are not relevant to the well established four factors that must be addressed in a physician's disclosure.

When this court rules on the parameters of informed consent, **[***25]** we prescribe what each and every physician in this state must disclose to each of his or her patients. We therefore strive to establish a rule of general applicability based on the reasonable patient standard. Although physicians should answer each patient's questions accurately and candidly, we must be mindful not to expand unduly the contours of the informed consent doctrine such that

Page 10

279 Conn. 682, *; 905 A.2d 15, **;
2006 Conn. LEXIS 312, ***

physicians would lack a clear understanding of the scope of the disclosure that they must make, and patients thereby would be burdened with immaterial information that many might find confusing. **[\*698]** Our adherence to the four factors of informed consent enunciated in *Logan* avoids these undesirable results.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the trial court's judgment.

In this opinion the other justices concurred.

Page 1

269 Mich. App. 303, *; 713 N.W.2d 16, **;
2005 Mich. App. LEXIS 3147, ***



**BARBARA WLOSINSKI, Personal Representative of the Estate
of MICHAEL WROBEL, Deceased, Plaintiff-Appellee, and
BLUE CROSS BLUE SHIELD OF MICHIGAN and BLUE
CARE NETWORK OF MICHIGAN, Intervening Plaintiffs, v
Oakland Circuit Court STEVEN COHN, M.D., and WILLIAM
BEAUMONT HOSPITAL, Defendants-Appellants.**

**No. 253286**

**COURT OF APPEALS OF MICHIGAN**

**269 Mich. App. 303; 713 N.W.2d 16; 2005 Mich. App. LEXIS
3147**

**December 20, 2005, Decided**

**PRIOR HISTORY:**      **[***1]**   LC No. 01-033241-NH.
Wlosinski v. Cohn, 468 Mich. 918, 662 N.W.2d 757, 2003 Mich. LEXIS 1189 (2003)

**DISPOSITION:**      Denial of summary disposition reversed in part, judgment vacated, and
case remanded for new trial. We do not retain jurisdiction.

**COUNSEL:** *Mark Granzotto, P.C.* (by *Mark Granzotto*), and *The Thurswell Law Firm* (by
*Milton H. Greenman*), for the plaintiff.

*Plunkett & Cooney, P.C.* (by *Robert G. Kamenec*), for the defendants.

**JUDGES:** Before: O'Connell, P.J., and Schuette and Borrello, JJ. BORRELLO, J. (dissent-
ing). SCHUETTE, J. (concurring in part and dissenting in part).

**OPINION BY:** Peter D. O'Connell

**OPINION**

   **[**18]**   **[*305]**   O'CONNELL, P.J.

Page 2

269 Mich. App. 303, *; 713 N.W.2d 16, **;
2005 Mich. App. LEXIS 3147, ***

In this medical malpractice wrongful death case, defendants appeal as of right a judgment in favor of plaintiff. We reverse the trial court's denial of defendants' motion for summary disposition on plaintiff's claim of lack of informed consent, vacate the trial court's judgment, and remand for a new trial.

In May 1998, the decedent, Michael Wrobel, was diagnosed with kidney failure. At the time of diagnosis, he was a senior in high school. Medical testing confirmed that plaintiff, the decedent's mother, would be a suitable kidney donor. The decedent and his mother researched various hospitals and discovered that defendant William Beaumont Hospital had a high success rate for kidney transplants according to mandatory reports that were posted on the website of a national organization. They visited the hospital and were introduced to defendant Dr. Steven Cohn, who explained the procedure. On July 14, 1999, Dr. Cohn **[***2]** transplanted one of plaintiff's kidneys to the decedent. The decedent suffered severe postoperative complications, including a blood clot in the blood vessel feeding the transplanted kidney. Dr. Cohn removed the clot, but the transplanted kidney ultimately failed anyway. Doctors removed the failed kidney, and the decedent resumed kidney dialysis. The decedent's health continued to decline over the next year, and he ultimately elected to withdraw from kidney dialysis and entered a hospice program. He died on September 24, 2000.

**[*306]** On July 13, 2001, plaintiff filed a medical malpractice wrongful death action against defendants. Plaintiff's original complaint alleged that defendants committed several errors related to the blood clot that appeared **[**19]** after the operation. Plaintiff amended the complaint to include a count for defendants' failure to garner plaintiff's and the decedent's informed consent. Plaintiff based this count on an alleged discrepancy between the hospital's reported success rate for kidney transplants, which she apparently found while researching hospitals, and its actual success rate. She also alleged a discrepancy between the personal success rate Dr. Cohn reported to her and **[***3]** his actual success rate. Plaintiff did not support this amended complaint with an affidavit of merit. Nevertheless, plaintiff again moved to amend her complaint, and the proposed amendments alleged that the negligent use of drugs that suppressed the decedent's immune system led to an infection that caused the kidney to fail. The trial court allowed the amendment, but insisted that plaintiff include an affidavit of merit for the additional counts.

The version of the amended complaint that plaintiff filed differed from the version she attached to her motion to amend. It included additional allegations regarding the negligent use of mesh in the decedent's blood clot operation to hasten healing of the surgical wound. It alleged that the use of mesh led to an infection that compromised the kidney. Plaintiff presented an affidavit of merit from her expert, Raymond Pollak, M.D., who confirmed that defendants' management of the original surgery, their discovery of the blood clot, and its removal failed to conform to the standard of care. Dr. Pollak also ventured his opinion that defendants made the following nontechnical omissions:

> **[*307]** i. Failure to address deficiencies in the transplant department **[***4]**
> . . . and to correct whatever disagreements there were between the transplant team

Page 3

269 Mich. App. 303, *; 713 N.W.2d 16, **;
2005 Mich. App. LEXIS 3147, ***

. . . so as to insure proper communications between them and appropriate treat-
ment of the Plaintiff's decedent . . . [.]

    j. Failure to investigate/retrain/dismiss incompetent transplant physi-
cians/surgeons . . . which may have prevented the adverse outcomes that occurred
. . . [.]

    k. Failure to investigate Dr. Cohn's higher than average transplant surgical
failure rate in a timely manner and to inform the Plaintiffs of the same [.]

Defendants moved for summary disposition, claiming that plaintiff failed to substantiate
any of her claims. Defendants specifically argued that plaintiff's claim of lack of informed
consent lacked any factual support because plaintiff's deposition testimony indicated that she
was informed of the risks associated with the transplant procedure. The trial court denied the
motion, stating that defendants had failed to counter the statement in Dr. Pollak's affidavit that
the statistical information withheld from plaintiff and decedent failed to conform to the
standard of care. The case proceeded to trial.

At trial, the court allowed plaintiff to present the evidence of Dr. **[\*\*\*5]** Lawrence
Greenberg, who was not certified in Dr. Cohn's specialty, but who repeatedly denigrated Dr.
Cohn's surgical abilities primarily on the basis of a string of failed transplants. Dr. Green-
berg's testimony harped on Dr. Cohn's failure rate leading up to the decedent's surgery. Dr.
Greenberg testified that five out of seven of Dr. Cohn's kidney transplants had failed in the
months before the decedent's surgery. When the defense tried to shed some light on the cir-
cumstances surrounding the failed transplants, the trial court correctly ruled that privilege
precluded plaintiff from obtaining and presenting details of Dr. **[\*308]** Cohn's failures, so
it would not allow the evidence. Under these circumstances, the statistics remained raw
numbers without any factual development that might **[\*\*20]** suggest a correlation between
the other failed transplants and the decedent's transplant. Plaintiff's experts made further
comments about Dr. Cohn's failure rate, and plaintiff's counsel emphasized the sequence of
failed transplants in his closing arguments. The jury awarded plaintiff $ 1.475 million in
damages, and the trial court, after making relatively minor adjustments, entered judgment for
roughly $ 1.5 million.

Defendants contend **[\*\*\*6]** that the trial court erred in denying their motions for sum-
mary disposition and judgment notwithstanding the verdict on plaintiff's claim that Dr. Cohn
failed to obtain the decedent's informed consent before surgery. According to defendants, a
physician has no duty to disclose to a patient the physician's success rates for a particular
medical procedure, and Dr. Cohn's failure to advise the decedent of his success rates could
not, as a matter of law, taint the patient's consent. We agree. We review de novo a trial court's
decision to grant summary disposition. *Maiden v Rozwood*, 461 Mich. 109, 118; 597 N.W.2d
817 (1999).

Page 4

269 Mich. App. 303, *; 713 N.W.2d 16, **;
2005 Mich. App. LEXIS 3147, ***

The doctrine of informed consent requires a physician to warn a patient of the risks and consequences of a medical procedure. *Lincoln v Gupta*, 142 Mich. App. 615, 625; 370 N.W.2d 312 (1985). By itself, Dr. Cohn's success rate was not a risk related to the medical procedure. *Id*. In fact, none of the affidavits of merit accompanying plaintiff's complaints indicates that disclosure of Dr. Cohn's particular success rate was necessary to obtain informed consent according to the standard of care. As a matter of law, we hold that a **[*309]** physician's **[***7]** raw success rates do not constitute risk information reasonably related to a patient's medical procedure. [1]

1    Our holding is limited to the disclosure of statistical data regarding past treatment and other background information that has no concrete bearing on the actual risks of a given procedure. Certainly if a surgeon unfailingly faints at the sight of blood, a reasonable patient might want to know this and explore other treatment options. Between these poles, however, lies a world of scenarios that requires trial courts to remain vigilant in their roles as evidentiary gatekeepers. MRE 702. The trial court did not exercise that role in this case.

The other jurisdictions that have addressed similar issues agree. See *Howard v University of Medicine and Dentistry of New Jersey*, 172 NJ 537, 553-554; 800 A.2d 73 (2002), and the cases it cites. Although many jurisdictions recognize only deceit-based claims or no claim at all, see **[***8]** *Duttry v Patterson*, 565 Pa 130, 136-137; 771 A.2d 1255 (2001); *Ditto v McCurdy*, 86 Haw 84, 90-91; 947 P.2d 952 (1997), some jurisdictions have allowed evidence about a doctor's inexperience, but only in cases in which the doctor asserted his or her experience and competence; see *Howard, supra* at 558-559; **Johnson v Kokemoor, 199 Wis 2d 615, 624; 545 N.W.2d 495 (1996)**. Even those jurisdictions do not require wholesale statistical disclosure, but approach a doctor's qualifications as they relate to the procedure's particular risks, an ordinary patient's willingness to accept those risks in light of the alternatives, and the causal connection between the disclosure and the actual harm. *Howard, supra*; *Johnson, supra*. For example, although the Wisconsin court in *Johnson* allowed the statistical evidence to stand, it specifically warned against the adoption of a standard of care that universally required statistical disclosure. **Johnson, supra at 645-646**. Moreover, the New Jersey court in *Howard* did not automatically sanction a probe into the doctor's experience, but **[*310]** remanded the case so that the trial **[***9]** court could perform **[**21]** its "gatekeeper function," which it defined as a "significant" role assigned "to prevent insubstantial claims . . . from proceeding to a jury." *Howard, supra* at 558. Emphasizing the causation standard, the court stated, "We contemplate that misrepresented or exaggerated physician experience would have to significantly increase a risk of a procedure in order for it to affect the judgment of a reasonably prudent patient in an informed consent case." *Id*. The court specifically noted that New Jersey has never placed a duty on doctors "to detail [their] backgrounds and experience[s] as part of the required informed consent disclosure . . . ." *Id*. at 554.

In this case, plaintiff's deposition reflected that Dr. Cohn vaguely represented his transplant history as "good," [2] and that he otherwise informed plaintiff and the decedent of the

medical risks that were directly related to the surgery. Therefore, we do not even approach the type of misrepresentation that may urge a contrary result. Also, unlike the cases involving misrepresented experience, this case lacks any hint of a relationship between Dr. Cohn's previous failed transplants and **[\*\*\*10]** the failure of the decedent's new kidney. [3] Without a compelling case before us, we simply hold that defendants, as a matter of law, did not have a duty **[\*311]** to disclose Dr. Cohn's statistical history of transplant failures to obtain the decedent's informed consent.

2 In fact, the evidence reflects that at the time of these statements, Dr. Cohn's success rate was very good.

3 On this point, it should be noted that the clearest definition of a "failed" transplant, which underlay the controversial statistic, was the loss of the transplanted organ, for any reason, within a year. As defendants pointed out below, "any reason" might include a car accident or some other totally unrelated happenstance. Therefore, the bare statistics were totally unrelated to the risks of transplant surgery and could never satisfy the criterion of actually causing the injury here.

Regarding plaintiff's other uses of this statistical evidence, our courts have long recognized the distinction between a doctor's negligence and a treatment's **[\*\*\*11]** failure. *Roberts v Young*, 369 Mich. 133, 138; 119 N.W.2d 627 (1963). "[T]he bare fact that full recovery does not result, or that a surgical operation is not entirely successful, is not in itself evidence of negligence." *Id.*, quoting *Zoterell v Repp*, 187 Mich. 319, 330; 153 NW 692 (1915). Therefore, bare numerical success rates are not, in themselves, evidence that a doctor did anything wrong. For example, it is absolutely unknown, and unknowable, whether the preceding kidney transplants performed by Dr. Cohn failed because of health complications that rendered those patients "high risk" patients. [4] We will not permit an inference of negligence to flow from unsuccessful treatment alone. *Roberts, supra* at 138. Yet, by allowing the limited inclusion of the mere existence of these transplant failures, the court allowed the jury to conclude that Dr. Cohn had a proclivity to fail. Because the bald statistics are not valid evidence of negligence either by Dr. Cohn or by the hospital, and because they are not relevant to informed consent, [5] we fail to see what **[\*\*22]** purpose they serve other than as prohibited character evidence. **[\*\*\*12]** MRE 404(b)(1).

4 We note that one of the foreseeable consequences of requiring doctors, especially surgeons, to disclose their success rates as a condition to our deeming a patient's consent "informed" is that it would encourage doctors to treat only those patients who will likely boost their success rates, rather than the frail, "high risk" patients who truly and desperately need the specialized care that doctors offer.

5 Pennsylvania recognizes that facts failing to support a claim of lack of informed consent might support a claim of fraud, *Duttry, supra* at 137, but neither the pleadings nor the particulars of this case support a fraud claim here, so we do not examine this as an alternative.

Page 6

269 Mich. App. 303, *; 713 N.W.2d 16, **;
2005 Mich. App. LEXIS 3147, ***

[*312] There can be no doubt that plaintiff's counsel paraded the statistics before the jury to show that Dr. Cohn had a propensity to botch transplants. Propensity evidence is barred because it diverts a jury's attention from the facts of the case being tried and focuses it on the probability that the [***13] defendant, who has made so many mistakes before, made one again. Cf. *People v Matthews*, 17 Mich. App. 48, 51-52; 169 N.W.2d 138 (1969). In other words, it punishes a defendant for his misfortune rather than his fault. The ploy worked especially well in this case, because the details and circumstances of the previous surgeries were kept from the jury, and the jury was not instructed to limit its use of the invalid evidence. This evidence fatally tainted the jury's verdict, and a new trial is in order. MRE 103.

Defendants also raise several challenges to plaintiff's experts, but because we remand for a new trial, it is unnecessary to resolve all these issues here. Nevertheless, we agree with defendants that the trial court failed to perform its gatekeeping mission under *Craig v Oakwood Hosp*, 471 Mich. 67, 78-81; 684 N.W.2d 296 (2004), and MRE 702. On remand, the court should hold a hearing and evaluate the factual and medical underpinnings of Dr. Pollak's anticipated testimony. We also note that neither Dr. Greenberg nor Dr. Evan Morton was qualified to testify against Dr. Cohn regarding the standard of care because they were not [***14] board-certified in the same specialty as Dr. Cohn. MCL 600.2169. Their evidence should be limited accordingly. The trial court must also examine the relevance of Dr. Greenberg's testimony apart from the invalid statistical information he provided at trial and carefully review it for probative value and relevance to the decedent's surgery. It should go without saying, however, that we do not bar Dr. Greenberg from providing other, admissible testimony. Similarly, Dr. Morton's testimony did not exclusively [*313] relate to whether Dr. Cohn breached the standard of care; it also related to a Doppler ultrasound performed on the night of the transplant. Expert testimony is admissible under MRE 702 if (1) the expert is qualified, (2) the testimony assists the trier of fact to understand the evidence or determine a fact in issue, and (3) the testimony is derived from recognized scientific, technical, or other specialized knowledge. *Craig, supra* at 78-79. Without deciding the issue, it appears to us that Dr. Morton's testimony may be relevant to plaintiff's theory of the case.

Finally, defendants argue that the trial court erred in refusing to cap plaintiff's [***15] monetary award for wrongful death damages regarding the decedent's funeral and burial expenses and plaintiff's loss of society and companionship. Because we are remanding for a new trial, we merely note that "the medical malpractice noneconomic damages cap does apply to wrongful death actions where the underlying claim is medical malpractice . . . ." *Jenkins v Patel*, 471 Mich. 158, 161; 684 N.W.2d 346 (2004). The parties should approach the case accordingly.

Denial of summary disposition reversed in part, judgment vacated, and case remanded for new trial. We do not retain jurisdiction.

**CONCUR BY:** Bill Schuette (In Part)

**CONCUR**

Page 7

269 Mich. App. 303, *; 713 N.W.2d 16, **;
2005 Mich. App. LEXIS 3147, ***

SCHUETTE, J. (concurring in part and dissenting in part).

I concur in the conclusion reached by my colleague, Judge O'CONNELL, in reversing **[**23]** the trial court's denial of defendants' motion for summary disposition on plaintiff's claim of lack of informed consent as well as in his determination that evidence of Dr. Cohn's success/failure rate was not admissible on the issue of informed consent. MRE 404. In addition, as referenced by Judge O'CONNELL, the decision by our Supreme **[*314]** Court in *Jenkins v Patel*, 471 Mich. 158, 161; 684 N.W.2d 346 (2004), is dispositive of this case, has retroactive effect, and accurately stands for the proposition that the noneconomic damages cap applies to a wrongful death action with an underlying medical malpractice claim.

I differ, however, and therefore dissent on the admissibility of Dr. Cohn's success/failure rate with respect to plaintiff's claims of negligent supervision by defendant William Beaumont Hospital of Dr. Cohn. While evidence of Dr. Cohn's success/failure rate is inadmissible with respect to plaintiff's informed consent claim (MRE 404), Dr. Cohn's success failure rate is relevant (MRE 401), admissible (MRE 404[b]) evidence concerning plaintiff's cause of action for negligent supervision. [1] MRE 404(b)(1) specifically lists evidence demonstrating a party's knowledge of a fact among the types of evidence of past acts that are not excluded by MRE 404. In contrast to the opinion of my distinguished colleague Judge O'CONNELL, in accord with MRE 404(b)(1), Dr. Cohn's success/failure rate was *not* character evidence for the purposes of plaintiff's negligent supervision claim against Beaumont Hospital because it was used to establish the hospital's knowledge of Dr. Cohn's skill.

> 1   It is possible that evidence would be admissible for one purpose and not another because a determination of whether past acts evidence is excluded under MRE 404(b) hinges on the purpose for which it is offered. *People v Johnigan*, 265 Mich. App. 463, 465-466; 696 N.W.2d 724 (2005). That said, defendants would likely be entitled to a limiting instruction pursuant to MRE 105, which states that "[w]hen evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly," as well as consideration under MRE 403.

However, the trial court failed to issue an instruction limiting the jury's consideration of the success/failure **[*315]** rate evidence to the negligent supervision claim against Beaumont Hospital and cautioning against considering it for the purposes of the informed consent and negligence actions against Dr. Cohn. [2] The failure to issue a limiting instruction was error requiring reversal and grounds for a new trial.

> 2   Contrary to my distinguished colleague, Judge BORRELLO, I believe this issue was adequately preserved for review. While defendants' arguments opposing the consideration of Dr. Cohn's individual success rates were largely discounted by the trial court because of their noncompliance with page-limit requirements, the oral arguments, motion for reconsideration, motion for a directed verdict, and requested cautionary in-

Page 8

269 Mich. App. 303, \*; 713 N.W.2d 16, \*\*;
2005 Mich. App. LEXIS 3147, \*\*\*

struction (on which the trial court never ruled) sufficiently developed the parties' arguments for this Court's consideration.

/s/ Bill Schuette

**DISSENT BY:** BORRELLO, J. (dissenting).

**DISSENT**

[\*\*\*16]   I respectfully dissent because I   [\*\*\*17]   believe that the jury should have been permitted to determine whether Dr. Cohn failed to obtain the decedent's informed consent to a kidney transplant by failing to disclose to the decedent his statistical failure rate for kidney transplants. I disagree with the majority's creation of a bright-line rule that a physician never has a duty to disclose to a patient the physician's statistical success or failure rate for a particular medical procedure. I would affirm the trial court's denial of defendants' motion [\*\*24]   for summary disposition on plaintiff's claim of lack of informed consent, as well as the judgment in favor of plaintiff.

Dr. Cohn had a duty to warn the decedent about the risks and consequences of kidney transplant surgery. *Lincoln v Gupta*, 142 Mich. App. 615, 625; 370 N.W.2d 312 (1985). In a negligence action, whether a person has breached a duty of reasonable care is generally an issue for the finder of fact. *Case v Consumers Power Co*, 463 Mich. 1, 7;   [\*316]   615 N.W.2d 17 (2000). [1] Only when there is an "'overriding legislatively or judicially declared public policy'" should the court decide the standard [\*\*\*18]   of care as a matter of law. *Id.*, quoting *Moning v Alfono*, 400 Mich. 425, 438; 254 N.W.2d 759 (1977).

> 1    Furthermore, in medical malpractice cases, whether there is a breach of the standard of care generally requires expert testimony, and the credibility of the experts is primarily a "question for consideration by the jury." *Wilson v Stilwill*, 411 Mich. 587, 599; 309 N.W.2d 898 (1981).

I see no reason to depart from the general rule that it is for the finder of fact, and not the trial court, to decide whether a defendant in a negligence action has breached a duty of reasonable care. Furthermore, there are not sufficiently compelling public policy reasons that would justify removing this issue from the jury's consideration and allowing the trial court to decide the standard of care as a matter of law. The jury was in the best position to consider the particular facts of this case and determine whether Dr. Cohn breached the standard of care by [\*\*\*19]   failing to inform the decedent of his statistical failure rate for kidney transplants.

In their opinions, my brother jurists assert that Dr. Cohn's success rate was not a risk related to the medical procedure and that Dr. Cohn therefore had no duty to disclose such information under the doctrine of informed consent. This is true under the more traditional view of a physician's duty to inform, in which the duty to inform is "confined to the actual procedure" and does not include "provider specific information." See *DeGennaro v Tandon*, 89 Conn App 183, 189; 873 A.2d 191 (2005). However, I reject such a narrow and outdated

Page 9

269 Mich. App. 303, *; 713 N.W.2d 16, **;
2005 Mich. App. LEXIS 3147, ***

construction of the doctrine of informed consent and embrace a more expansive, patient-centered view of a physician's duty to inform a patient, as the Connecticut Court of Appeals did in *DeGennaro*. In holding that the **[\*317]** defendant dentist's duty to obtain the plaintiff patient's informed consent to a dental procedure required the defendant to disclose to the plaintiff "provider specific information," including the fact that the defendant was understaffed, that the defendant's office was not ready for business, **[\*\*\*20]** and that the defendant was using equipment with which she was unfamiliar, the *DeGennaro* court asserted:

> The duty to inform, however, requires a physician "to provide the patient with the information which a reasonable patient would have found material for making a decision whether to embark upon a contemplated course of therapy." (Internal quotation marks omitted.) *Godwin v. Danbury Eye Physicians & Surgeons, P.C.*, 254 Conn. 131, 143; 757 A.2d 516 (2000). We conclude that in addition to material information about the procedure to be performed, the duty to inform encompasses provider specific information where the facts and circumstances of the particular situation suggest that such information would be found material by a reasonable patient in making the decision to embark on a particular course of treatment, regardless of whether the patient has sought to elicit the information from the provider. **[\*\*25]** In reaching this conclusion, we join a number of other jurisdictions that have concluded that a patient centered duty to inform necessarily counsels against excluding from that duty to inform information that "a reasonable person in the patient's **[\*\*\*21]** position would need to know in order to make an intelligent and informed decision"; ***Johnson v Kokemoor*, 199 Wis.2d 615, 639; 545 N.W.2d 495 (1996)**; simply because that information was provider specific as opposed to procedure specific. These jurisdictions have recognized that provider specific information may add to the risks inherent in a particular procedure and may suggest to the patient that a viable and possibly, preferable alternative to the procedure may be having the procedure performed by another provider. [*DeGennaro, supra* at 190-191 .]

**[\*318]** I would adopt this patient-centered approach to a medical provider's duty to obtain informed consent. Under this approach, in addition to material information about the kidney transplant procedure itself, Dr. Cohn also had a duty to give the decedent "provider specific information" if such information would be found material by a reasonable person in making the decision to embark on a kidney transplant. See *id.* It is axiomatic that a reasonable patient would find information regarding a kidney transplant surgeon's statistical success and failure rates for kidney transplants **[\*\*\*22]** to be material in making the decision whether to proceed with a surgical procedure as serious as a kidney transplant. Moreover, Dr. Cohn had a

Page 10

269 Mich. App. 303, *; 713 N.W.2d 16, **;
2005 Mich. App. LEXIS 3147, ***

duty to supply such information regardless of whether the decedent sought to elicit such information. See *id*. at 190. In ***Johnson v Kokemoor*, 199 Wis 2d 615, 620, 641; 545 N.W.2d 495 (1996)**, the Supreme Court of Wisconsin held that evidence of a physician's statistical success rate is material to a patient's decision to consent to a medical procedure. In *Johnson*, the court held:

> When different physicians have substantially different success rates, *whether surgery is performed by one rather than another represents a choice between "alternate, viable medical modes of treatment"* . . . .
>
> * * *
>
> The doctrine of informed consent requires disclosure of "all of the viable alternatives and risks of the treatment proposed" which would be material to a patient's decision. We therefore conclude that when different physicians have substantially different success rates with the same procedure and a reasonable person in the patient's position would consider such information material, the circuit court **[***23]** may admit this statistical evidence. [*Id.* at 645 (emphasis added; citation omitted).]

**[*319]** Similarly, I believe that information about Dr. Cohn's success and failure rates would have aided the decedent's exercise of informed consent because it would have identified "a particular provider as an independent risk factor." *Id.* at 644-645. At the very least, whether "provider specific information" regarding Dr. Cohn's statistical failure rate for kidney transplants was warranted under the facts and circumstances of the case should have been determined by the jury, and not by the trial court. I reject the majority's bright-line rule that, as a matter of law, Dr. Cohn had no duty to provide information regarding his statistical failure rate for kidney transplants to the decedent under the informed consent doctrine. Rather, the jury should have had the opportunity to determine the scope and **[**26]** amount of information required and whether Dr. Cohn was required to disclose "provider specific information" regarding his failure rate for kidney transplant surgeries.

Like the court in *Johnson*, I do not believe that the doctrine of informed consent always requires physicians to **[***24]** give patients statistical information regarding their success or failure rates for a particular procedure. *Id.* at 646 ("We caution . . . that our decision will not always require physicians to give patients comparative risk evidence in statistical terms to obtain informed consent."). Rather, such questions are fact-driven and context-specific and must be decided on a case-by-case basis. See *id.* In my view, the majority's holding disregards the individual facts of this case and invades the province of the jury:

> "There is no fixed standard in the law by which a court is enabled to arbitrarily say in every case what conduct shall be considered reasonable and prudent, and what shall constitute ordinary care, under any and all circumstances. The terms

'ordinary care,' 'reasonable prudence,' and such like terms, as applied to the conduct and affairs of men, **[\*320]** have a relative significance, and cannot be arbitrarily defined. What may be deemed ordinary care in one case may, under different surroundings and circumstances, be gross negligence. The policy of the law has relegated the determination of such questions to the jury, under proper instructions from the court. It is their **[\*\*\*25]** province to note the special circumstances and surroundings of each particular case, and then say whether the conduct of the parties in that case was such as would be expected of reasonable, prudent men, under a similar state of affairs." [*Case, supra* at 10, quoting *Grand Trunk R Co v Ives*, 144 U.S. 408, 417; 12 S. Ct. 679; 36 L. Ed. 485 (1892).]

I believe that the jury, and not the trial court, should have been permitted to determine whether the standard of care required Dr. Cohn to disclose statistics regarding his success rate for kidney transplant surgeries, and I disagree with the majority's bright-line conclusion that Dr. Cohn, as a matter of law, had no duty to disclose his statistical history of transplant failures to obtain the decedent's informed consent. Such a determination was properly a matter for the jury to decide because in this case defendant hospital held itself out as a statistical leader in such operations. [2] Thus, I would conclude that the trial court did not err in denying **[\*321]** defendants' motion for summary disposition on plaintiff's claim that Dr. Cohn failed to obtain the decedent's informed consent.

> 2    A patient's physician, not the hospital where a procedure is performed, has the duty to impart information to a patient regarding the risks and consequences of a medical procedure. *Lincoln, supra* at 625. While I refrain from examining the issue in this case, I believe that the area of law involving a hospital's duty to inform patients when the hospital makes advertising claims to induce patients to use its facilities requires closer scrutiny with a special focus on whether the hospital, by way of advertising, should have imposed on it a heightened duty to patients in the area of informed consent than has previously been recognized by the courts in this state. I note that nothing in the law forbids this Court from holding hospitals to the same standard as other businesses who engage in deceptive or misleading trade practices.

**[\*\*\*26]** I would further hold that evidence regarding Dr. Cohn's failure rate for kidney transplantation was admissible under MRE 403 for all of plaintiff's claims. Under **[\*\*27]** MRE 403, the trial court has discretion to exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. MRE 403; *Lewis v LeGrow*, 258 Mich. App. 175, 199; 670 N.W.2d 675 (2003). Unfair prejudice does not mean "damaging." *Id.* MRE 403 only prohibits evidence that is unfairly prejudicial. Evidence is unfairly prejudicial if there is a danger that evidence that is only marginally probative will be given undue or preemptive weight by the jury. *Lewis, supra* at 199. I agree with the majority that evidence of Dr. Cohn's statistical

Page 12

269 Mich. App. 303, *; 713 N.W.2d 16, **;
2005 Mich. App. LEXIS 3147, ***

failure rate for kidney transplants is, at most, only marginally relevant to whether Dr. Cohn's care of the decedent was negligent in this particular case. However, given the fact that there was a substantial amount of testimony regarding Dr. Cohn's negligence specifically relating to the decedent in this case, there was little chance **[***27]** that the jury would give evidence regarding Dr. Cohn's overall success or failure rate undue or preemptive weight. Therefore, I believe that the evidence, while somewhat damaging, was not unfairly prejudicial. Furthermore, like my brother jurist Judge SCHUETTE, I would also conclude that evidence of Dr. Cohn's failure rate for kidney transplants was not precluded by MRE 404(b)(1) because such evidence was not character evidence. MRE 404(b)(1) prohibits the use of evidence to prove a person's character to show that the person acted in **[*322]** conformity with that character on a particular occasion, but does not preclude using such evidence for other relevant purposes. *People v Sabin (After Remand)*, 463 Mich. 43, 56; 614 N.W.2d 888 (2000). The rule limiting the admissibility of bad acts evidence applies in civil cases as well as criminal cases. *Lewis, supra* at 207. MRE 404(b)(1) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, **[***28]** plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

MRE 404(b)(1) "is a rule of inclusion" that "permits the admission of evidence on any ground that does not risk impermissible inferences of character to conduct." *People v Starr*, 457 Mich. 490, 496; 577 N.W.2d 673 (1998). To be admissible under MRE 404(b)(1), the evidence must be offered for something other than a character or propensity purpose, it must be relevant, and the probative value of the evidence must not be substantially outweighed by unfair prejudice under MRE 403. *People v Knox*, 469 Mich. 502, 509; 674 N.W.2d 366 (2004). "Character evidence" is "[e]vidence regarding someone's general personality traits or propensities" or "evidence of a person's moral standing in a community." Black's Law Dictionary (8th ed), p 595. Evidence that Dr. Cohn had a high statistical failure rate for kidney transplants is not suggestive of any type of general personality trait and reveals nothing **[***29]** about the moral or ethical composition of Dr. Cohn. Furthermore, in this case, the testimony was not offered to prove that Dr. Cohn acted in conformity with a character **[*323]** trait on a particular occasion. **[**28]** The testimony therefore "does not risk impermissible inferences of character to conduct." *Starr, supra* at 496. I therefore would hold that evidence regarding Dr. Cohn's success or failure rate for kidney transplant surgeries by definition did not constitute character evidence and falls outside the ambit of MRE 404(b)(1).

Unlike my esteemed colleagues Judges O'CONNELL and SCHUETTE, I do not believe that the trial court's admission of the evidence regarding Dr. Cohn's failure rate for kidney

Page 13

269 Mich. App. 303, *; 713 N.W.2d 16, **;
2005 Mich. App. LEXIS 3147, ***

transplant surgeries or failure to issue a limiting instruction on the use of such evidence requires a new trial in this case. Admittedly, evidence regarding Dr. Cohn's statistical failure rate for kidney transplant surgeries is only marginally, if at all, relevant to whether Dr. Cohn's care of the decedent was negligent in this particular case. However, the evidence was not improper character evidence under MRE 404(b)(1). Furthermore, in light of the substantial amount of testimony regarding **[\*\*\*30]** Dr. Cohn's negligence in this specific case, there was little chance that the jury would give evidence regarding Dr. Cohn's overall success or failure rate undue weight. Therefore, the failure to give a limiting instruction was harmless.

For all these reasons, I respectfully dissent.

/s/Stephen L. Borrello



**Matthew Curran and Emily Curran, husband and wife, appellants, v. Kerrey B. Buser, appellee.**

**No. S-04-1303.**

**SUPREME COURT OF NEBRASKA**

**271 Neb. 332; 711 N.W.2d 562; 2006 Neb. LEXIS 49**

**March 31, 2006, Filed**

**DISPOSITION:**     **[***1]**   Affirmed.

**HEADNOTES**

1. **Judgments: Appeal and Error.** When reviewing a question of law, an appellate court resolves the question independently of the conclusion reached by the trial court.

2. **Rules of Evidence: Appeal and Error.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility.

3. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, the admissibility of evidence is reviewed for an abuse of discretion.

4. **Rules of Evidence: Appeal and Error.** Because the exercise of judicial discretion is implicit in determinations of relevancy and admissibility under Neb. Rev. Stat. §§ 27-401 and 27-403 (Reissue 1995), the trial court's decision will not be reversed absent an abuse of discretion.

5. **Judges: Words and Phrases.** An abuse of discretion occurs when the trial judge's reasons or rulings are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

6. **Statutes.** Statutes relating to the same subject matter will be construed so as to maintain a sensible and consistent scheme, giving effect to every provision.

7. **Statutes: Appeal and Error.** An appellate court will, if possible, try to avoid a statutory construction which would lead to an absurd result.

8. **Health Care Providers: Negligence: Informed Consent: Proof: Proximate Cause.** Under Neb. Rev. Stat. §§ 44-2816 and 44-2820 (Reissue 2004), the professional theory governs the standard of care and the evidence required to prove the standard of care, but causation is determined through a two-prong test: The first prong uses an objective standard to evaluate the plaintiff's decision to forgo the surgery, while the second requires proof that the lack of informed consent proximately caused the injury and damages.

9. **Physician and Patient: Informed Consent.** Under Neb. Rev. Stat. §§ 44-2816 and 44-2820 (Reissue 2004), consent is informed when a doctor advises a patient of the risks in the same manner as doctors in similar localities and under similar circumstances ordinarily would.

10. **Health Care Providers: Negligence: Informed Consent: Proof: Proximate Cause.** In a medical negligence action, before a plaintiff may recover any damages sustained, the plaintiff must prove by a preponderance of the evidence that a reasonably prudent person in the plaintiff's position would not have undergone the treatment if he or she were "properly informed" under Neb. Rev. Stat. § 44-2816 (Reissue 2004) and that his or her injuries were proximately caused by the lack of informed consent.

11. **Physician and Patient: Informed Consent.** A doctor's personal standard regarding information for a patient's consent is irrelevant.

12. **Health Care Providers: Informed Consent: Statutes.** Neb. Rev. Stat. § 44-2816 (Reissue 2004) does not distinguish between treatment risks and doctor-related risks; it asks only whether similarly situated doctors would ordinarily provide the information.

13. **Statutes: Appeal and Error.** Appellate courts give statutory language its plain and ordinary meaning and will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.

14. **Health Care Providers: Negligence.** Under Neb. Rev. Stat. § 44-2816 (Reissue 2004), a doctor's disciplinary history, like other doctor-related risks, is required only when mandated by the standard of care.

15. **Rules of Evidence: Words and Phrases.** Under Neb. Rev. Stat. § 27-401 (Reissue 1995), relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

16. **Rules of Evidence.** Under Neb. Rev. Stat. § 27-402 (Reissue 1995), evidence which is not relevant is not admissible.

17. **Rules of Evidence.** Under Neb. Rev. Stat. § 27-403 (Reissue 1995), relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair

prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

18. **Witnesses: Impeachment.** Witnesses can only be impeached as to matters that are not collateral--matters that are independently provable.

19. **Witnesses: Impeachment.** Facts which would have been independently provable regardless of a contradiction are not collateral. It is only as to matters relevant to some issue involved in a case that a witness can be contradicted for the purpose of impeachment.

**COUNSEL:** E. Terry Sibbernsen and Andrew D. Sibbernsen, of Sibbernsen & Strigenz, P.C., for appellants.

Joseph S. Daly and Michael G. Monday, of Sodoro, Daly & Sodoro, P.C., for appellee.

**JUDGES:** Hendry, C.J., Connolly, Gerrard, Stephan, McCormack, and Miller-Lerman, JJ.

**OPINION BY:** Connolly

**OPINION**

[**565]    [*333]   Connolly, J.

Appellants, Matthew Curran and Emily Curran, sued Matthew's surgeon, appellee, [**566]   Kerrey B. Buser, for medical malpractice, because of complications arising after Buser removed Matthew's gallbladder. Before Matthew's surgery, the Department of Health and Human Services Regulation and Licensure disciplined Buser for "unprofessional con- duct" and restricted his surgical privileges for 1 year. Nine days after the year had passed, Buser operated on Matthew. The Currans sued Buser, alleging both negligence and lack of informed consent. The Currans wanted to introduce evidence of Buser's disciplinary history. Buser filed a   [*334]   motion in limine, prohibiting mention of his disciplinary issues, which the trial court granted. The jury found for Buser on the negligence issue, and the Currans appeal only the court's ruling on the motion in limine.

The Currans ask us to apply a different standard of [***2]   care to informed consent cases involving a doctor's disciplinary history. Because the Legislature adopted the professional theory as governing the standard of care in all informed consent cases, we affirm the trial court's decision.

BACKGROUND

In February 2001, after suffering abdominal pains, Matthew sought assistance from gen- eral practitioner Gregory Kloch. After an ultrasound revealed abnormalities in Matthew's gallbladder, Kloch referred Matthew to Buser. On February 13, Buser diagnosed Matthew as having an inflamed gallbladder. Buser told Matthew he needed to remove the gallbladder as soon as possible, using a procedure called laparoscopic cholecystectomy. Later on that date, Buser performed the surgery.

After the surgery, Matthew experienced complications, and Buser performed another surgery on him 6 days later. Buser discovered that a suture from the earlier surgery had come loose, so he inserted a "T-tube." When Matthew complained of bile drainage at the site of the "T-tube," Kloch recommended that Matthew go to a hospital in Omaha, Nebraska, for further treatment. While there, Matthew had numerous corrective surgeries and experienced prolonged pain, fatigue, nausea, and **[\*\*\*3]** depression, although these conditions have gradually improved.

After the surgery, the Currans sued Buser for negligence. During discovery, the Currans obtained photocopies of the Department of Health and Human Services Regulation and Licensure disciplinary order that restricted Buser's surgical privileges. The Currans alleged that Buser negligently performed the surgeries and failed to obtain informed consent.

Before trial, Buser moved in limine to prevent the Currans from mentioning the disciplinary action. Buser claimed that the disciplinary proceedings were irrelevant and that any probative value would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

**[\*335]** On the motion in limine, the court admitted the following evidence: The day of Matthew's first surgery, Buser sent a letter to Kloch, stating: "The patient is aware of the [State Board of Health] issue and declines referral to another surgeon." In Buser's deposition, he explained the disclosure as follows:

A. You know, I don't know if I went into the details of the exact restrictions of [the disciplinary order]. What I more than likely told him was that I was **[\*\*\*4]** the doctor that was accused of being a bad doctor in the newspapers and was sanctioned by the medical board.

The other thing that I said was that if any of that bothers you or anything that you've read or heard, if you want to talk about it or if you want to go to another **[\*\*567]** surgeon, that's fine, we'll be happy to arrange that.

Buser also testified in his deposition that he thought he told Matthew that the State Board of Health wanted to "pull" his license. Buser said that he believed his own standard of care required that he tell Matthew about the disciplinary action, but that he was not sure that the majority of surgeons feel obligated to do so. He said he explained to Matthew "the gist" of what he thought Matthew would want to know.

By contrast, the Currans, in their depositions, refute Buser's recollection, claiming that they learned of the disciplinary issues after the surgery and that Buser never indicated they could get a second opinion. The trial court sustained Buser's motion in limine.

At the beginning of the trial, the Currans made an offer of proof regarding Buser's disclosure of his disciplinary actions. In the offer of proof, the Currans sought to admit photocopies **[\*\*\*5]** of disciplinary actions against Buser from both Minnesota and Nebraska. The

Minnesota action restricted Buser's surgical practice, finding a "clustering of major laparoscopic complications," arising from "inappropriate" practices in the treatment of 13 different patients between 1992 and 1994. In the Nebraska disciplinary action, the chief medical officer recognized the Minnesota action and found clear and convincing evidence of "unprofessional," but not negligent, conduct in four new cases.

The court denied the offer of proof, citing *Hamilton v. Bares*, 267 Neb. 816, 678 N.W.2d 74 (2004), as requiring expert **[*336]** testimony about the standard of care in informed consent cases. The court stated that the Currans' evidence could still be admitted if an expert testified that the standard of care required disclosure of disciplinary proceedings. No such expert testified, and the jury never heard the disciplinary evidence. The jury returned a verdict for Buser on the negligence issue. The Currans appeal only the trial court's order sustaining Buser's motion in limine.

ASSIGNMENT OF ERROR

The Currans assign that the trial court erred by sustaining Buser's motion in limine, disallowing **[***6]** them to introduce evidence of Buser's disciplinary action and his failure to inform Matthew of that action.

STANDARD OF REVIEW

[1] When reviewing a question of law, an appellate court resolves the question independently of the conclusion reached by the trial court. *In re Grand Jury of Lancaster Cty.*, 269 Neb. 436, 693 N.W.2d 285 (2005).

[2,3] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, the admissibility of evidence is reviewed for an abuse of discretion. See *In re Interest of B.R. et al.*, 270 Neb. 685, 708 N.W.2d 586 (2005).

[4,5] Also, because the exercise of judicial discretion is implicit in determinations of relevancy and admissibility under Neb. Rev. Stat. §§ 27-401 and 27-403 (Reissue 1995), the trial court's decision will not be reversed absent an abuse of discretion. *Gerhold Concrete Co. v. St. Paul Fire & Marine Ins.*, 269 Neb. 692, 695 N.W.2d 665 (2005). **[***7]** An abuse of discretion occurs when the trial judge's reasons or rulings are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. **[**568]** *Holden v. Wal-Mart Stores*, 259 Neb. 78, 608 N.W.2d 187 (2000).

**[*337]** ANALYSIS

The Currans do not contend that Matthew was not made aware of all the risks of the procedure. The thrust of the Currans' argument is that Buser operated on Matthew without informed consent because Buser failed to inform him of his disciplinary history. The Currans urge this court to apply the material risk theory to informed consent cases when the omitted information relates to the doctor's disciplinary history. They (1) argue that the statute em-

braces material risk principles; (2) in the alternative, ask us to carve out a special exception; and (3) contend that the trial court improperly excluded their evidence because it was relevant, not unduly prejudicial, and admissible for impeachment purposes.

*Difference Between Professional Theory and Material Risk Theory.*

Informed consent concerns a doctor's duty to inform his or her patient of the risks involved in treatment or **[\*\*\*8]** surgery. See W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 32 (5th ed. 1984). Although initially treated as a battery action, modern courts recognize it as a negligence action hinging on the standard of professional conduct. See *id.* Regarding the sufficiency of the information, we have stated:

> "Surgeons and other doctors are . . . required to provide their patients with sufficient information to permit the patient himself to make an informed and intelligent decision on whether to submit to a proposed course of treatment or surgical procedure. Such a disclosure should include the nature of the pertinent ailment or condition, the risks of the proposed treatment or procedure, and the risks of any alternative methods of treatment, including the risks of failing to undergo any treatment at all. Thus, although the procedure be skillfully performed, the doctor may nevertheless be liable for an adverse consequence about which the patient was not adequately informed."

*Eccleston v. Chait*, 241 Neb. 961, 967, 492 N.W.2d 860, 864 (1992) (quoting Keeton et al., *supra*). When determining what information a patient needs to make an informed **[\*\*\*9]** decision, jurisdictions have generally split between two different theories: the **[\*338]** professional theory and the material risk theory. We have explained the difference between the theories as follows:

> The "professional" theory holds that the duty is measured by the standard of the reasonable medical practitioner under the same or similar circumstances, and must be determined by expert medical testimony establishing the prevailing standard and the defendant practitioner's departure therefrom. On the other hand, the "material risk" theory holds the duty to disclose is measured by the patient's need for information to balance the probable risks against the probable benefits in making the decision to either undergo or forgo the treatment proposed. Although under this theory expert medical testimony may be necessary to establish the undisclosed risk as a known danger of the procedure, expert testimony is not required to establish the physician's duty to disclose, and the fact finder can decide, without the aid of a medical expert, whether a reasonable person in the patient's position would have considered the risk significant in making his or her decision.

*Smith v. Weaver*, 225 Neb. 569, 573-74, 407 N.W.2d 174, 178 (1987). **[\*\*\*10]**

[**569] *Nebraska Legislature Codified Informed Consent Doctrine, Adopting Professional Theory to Govern Standard of Care.*

The professional theory is firmly entrenched in Nebraska law; we have both statutory provisions and case law adopting the doctrine. First, Neb. Rev. Stat. § 44-2816 (Reissue 2004) defines informed consent:

> Informed consent shall mean consent to a procedure based on information which would ordinarily be provided to the patient under like circumstances by health care providers engaged in a similar practice in the locality or in similar localities. Failure to obtain informed consent shall include failure to obtain any express or implied consent for any operation, treatment, or procedure in a case in which a reasonably prudent health care provider in the community or similar communities would have obtained an express or implied consent for such operation, treatment, or procedure under similar circumstances.

[*339] Moreover, Neb. Rev. Stat. § 44-2820 (Reissue 2004) provides the burden of proof in an action based on failure to obtain informed consent. It states:

> Before the plaintiff may recover any [***11] damages in any action based on failure to obtain informed consent, it shall be established by a preponderance of the evidence that a reasonably prudent person in the plaintiff's position would not have undergone the treatment had he or she been properly informed and that the lack of informed consent was the proximate cause of the injury and damages claimed.

This court has routinely determined that "notwithstanding voluminous criticism of the professional theory of informed consent, [we are] bound by § 44-2816 as a statutory standard and prescription for an informed consent." *Eccleston v. Chait*, 241 Neb. 961, 968, 492 N.W.2d 860, 864 (1992). See, also, *Robinson v. Bleicher*, 251 Neb. 752, 559 N.W.2d 473 (1997), *disapproved on other grounds, Hamilton v. Bares*, 267 Neb. 816, 678 N.W.2d 74 (2004); *Jones v. Malloy*, 226 Neb. 559, 412 N.W.2d 837 (1987); *Smith v. Weaver, supra*.

Nonetheless, the Currans point to the dissent in *Smith v. Weaver, supra*, which argued that § 44-2820 committed this state to the material risk theory. In doing so, the Currans argue that the statutory language [***12] does not support our adherence to the professional theory, but embraces material risk principles.

[6,7] But statutes relating to the same subject matter will be construed so as to maintain a sensible and consistent scheme, giving effect to every provision. See *In re Application of Metro. Utils. Dist.*, 270 Neb. 494, 704 N.W.2d 237 (2005). And an appellate court will, if possible, try to avoid a statutory construction which would lead to an absurd result. *Nicholson v. General Cas. Co. of Wis.*, 262 Neb. 879, 636 N.W.2d 372 (2001). The approach urged here

would lead to an absurd result insofar as the Currans argue that § 44-2816 adopts the professional theory, while § 44-2820 adopts the material risk theory. If this were the case, we would have two mutually exclusive standards governing a doctor's duty to inform his or her patient.

[8] Instead, we read §§ 44-2816 and 44-2820 together. Doing so demonstrates that the Nebraska Legislature adopted the professional theory for its standard of care and the evidence **[*340]** required to prove the standard of care and that it adopted a two-prong test for causation. The first prong uses an objective standard **[***13]** to evaluate the plaintiff's decision to forgo the surgery, while the second requires proof that the lack of informed consent proximately **[**570]** caused the injury and damages. Although our statutory framework is somewhat unique, we note that other professional theory jurisdictions also use objective standards for causation. See, e.g., *Funke v. Fieldman*, 212 Kan. 524, 512 P.2d 539 (1973).

[9,10] Under §§ 44-2816 and 44-2820, consent is informed when a doctor advises a patient of the risks in the same manner as doctors in similar localities and under similar circumstances ordinarily would. However, before a plaintiff may recover any damages sustained, the plaintiff must prove by a preponderance of the evidence that a reasonably prudent person in the plaintiff's position would not have undergone the treatment if he or she were "properly informed" and that his or her injuries were proximately caused by the lack of informed consent. Although § 44-2820 does not define proper information, when read in conjunction with § 44-2816, a patient must be properly informed under § 44-2816.

Under this framework, the Currans must first prove by expert testimony that doctors in similar **[***14]** locations and situations would ordinarily disclose their disciplinary history. After establishing the standard of care, the Currans must next prove that Buser deviated from that standard. To prove causation, the Currans must prove both that a reasonable person in their situation would have refused the surgery if Buser had properly informed them under the standard and that the lack of information proximately caused the injury sustained and damages alleged. The statute's requirements are cumulative; thus, in order to proceed to the next step, the plaintiff must prove the one before it.

Here, Buser was the only doctor to testify about the standard of care in the locality. He said that although it was his personal practice to inform his patients of the recent disciplinary action, "I don't know if the majority feel that they are obligated to do that." Although Buser's testimony does not decisively state that most doctors would not feel obligated to disclose their disciplinary **[*341]** history, it is the plaintiff's burden to prove the standard of care. Thus, the Currans failed to prove that the standard of care required Buser to disclose his disciplinary history.

*Under Professional Theory, Doctor's* **[***15]** *Personal Standard of Care Does Not Establish Standard of Care.*

[11] Nonetheless, the Currans point out that Buser said his personal standard of care required him to disclose his disciplinary history. They ask us to hold Buser to his own standard of care. But as we said in *Eccleston v. Chait*, 241 Neb. 961, 969, 492 N.W.2d 860, 865 (1992),

a doctor's "personal standard regarding information for a patient's consent is irrelevant." Under the professional theory, the standard of care in medical malpractice cases for informed consent is not determined by the doctor's personal or customary routine, but on the information doctors ordinarily supply to patients in similar circumstances and locations. Here, Buser was the only doctor to testify about the standard of care for informed consent. He explained that although it was his practice to inform his clients about the disciplinary action, he was not sure that most doctors would do so.

However, if a doctor chooses to provide more information than similarly situated practitioners ordinarily would--adopting a higher standard of care--the doctor should not be penalized for straying from that higher standard as long as **[\*\*\*16]** the doctor does not drop below the community's standard of care. Holding doctors to their personal standard of care when that personal standard exceeds the community standard would discourage doctors from exceeding **[\*\*571]** the community standard and encourage blind conformity.

Although the Legislature bound the state to the professional theory, we have frequently reiterated that the professional theory "'paternalistically leaves the right of choice to the medical community, in derogation of the patient's right to self-determination.'" *Eccleston v. Chait*, 241 Neb. at 968, 492 N.W.2d at 864 (quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 32 (5th ed. 1984)). Thus, we do not wish to discourage doctors from providing a patient more information than the community standard requires and we refuse to do so here.

**[\*342]** *We Decline to Carve Out Material Risk Exception for Cases When Omitted Information Relates to Doctor's Disciplinary History.*

Although the Currans acknowledge that in Nebraska, the professional theory governs informed consent, they argue that their case is distinguishable from the "typical claim for failure to obtain informed consent, **[\*\*\*17]** " brief for appellants at 16, and that thus, the material risk theory should govern. They contend their case warrants an exception because Matthew was insufficiently informed about the doctor's disciplinary history, not about the operation itself. And when the unwarned risk relates to a doctor's disciplinary history, we should apply the material risk theory--asking whether a reasonable person would consider that information material, not whether ordinary doctors would disclose that information. Although enticing, we decline the invitation.

Our research could not uncover precedent for defining the standard of care differently depending on the kind of risks involved. Although other jurisdictions have questioned what role a doctor's experience should play in the context of informed consent, they are unsurprisingly split on the issue. Some courts adopt a bright-line rule requiring disclosure of treatment risks, but not of a doctor's experience. See, *Duttry v. Patterson*, 565 Pa. 130, 771 A.2d 1255 (2001); *Whiteside v. Lukson*, 89 Wn. App. 109, 947 P.2d 1263 (1997). Others require doctor-related disclosures only when mandated by the standard of care. See, **[\*\*\*18]** *Duffy v. Flagg*, 88 Conn. App. 484, 869 A.2d 1270 (2005); *Tashman v. Gibbs*, 263 Va. 65,

556 S.E.2d 772 (2002); *Johnson v. Kokemoor*, **199 Wis. 2d 615, 545 N.W.2d 495 (1996)**; *Arato v. Avedon*, 5 Cal. 4th 1172, 858 P.2d 598, 23 Cal.Rptr.2d 131 (1993).

The evidence proffered here would not be required under either approach. The Currans plainly limit their claim to warnings about Buser's disciplinary history, not the operation. The Currans never established that the standard of care required such disclosures. Rather, they ask us to adopt a different standard of care for a narrow class of plaintiffs. Not only is their approach unprecedented, it contravenes the Legislature's adoption of the professional theory by supplanting, in a single narrow context, the Legislature's judgment.

**[*343]** [12] Instead, our statutes comport with an approach that requires doctor-related disclosures only when mandated by the standard of care. Under § 44-2816, informed consent means "consent to a procedure based on information which would ordinarily be provided to the patient under like circumstances by health care providers engaged in a similar practice **[***19]** in the locality or in similar localities." While the Currans ask us to distinguish treatment risks from doctor-related risks, § 44-2816 does not make this distinction. It asks only whether similarly situated doctors would ordinarily provide the information.

**[**572]** [13,14] We give statutory language its plain and ordinary meaning and will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous. See *McCray v. Neb. State Patrol*, 271 Neb. 1, 710 N.W.2d 300 (2006). The language of the statute is unambiguous, and we are bound by it. Under § 44-2816, a doctor's disciplinary history, like other doctor-related risks, is required only when mandated by the standard of care.

As in the past, we recognize that the professional theory "places a patient, who more than likely lacks a medical background or training, in the precarious position of exploring and inquiring about adverse consequences of a surgical procedure." *Eccleston v. Chait*, 241 Neb. 961, 969, 492 N.W.2d 860, 865 (1992). Nonetheless, we do not write on a blank slate; the Legislature adopted the professional theory in § 44-2816, and **[***20]** its language binds this court to that theory.

*The Currans' Evidence Was Properly Excluded Because Trial Court Did Not Abuse Its Discretion When Finding It Inadmissible.*

[15-17] The Currans next argue that the excluded evidence is admissible under the Nebraska Rules of Evidence because it is relevant, not unduly prejudicial, and admissible for impeachment purposes. Under § 27-401, relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Under Neb. Rev. Stat. § 27-402 (Reissue 1995), evidence which is not relevant is not admissible. *Holden v. Wal-Mart Stores*, 259 Neb. 78, **[*344]** 608 N.W.2d 187 (2000). Moreover, under § 27-403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Because we continue to adhere to the professional theory, the question is, What **[\*\*\*21]** is the standard of care--what information do doctors in similar localities ordinarily give patients under similar circumstances? Here, the Currans failed to prove that the standard of care required Buser to disclose his disciplinary history. Thus, any evidence about Buser's disciplinary history is irrelevant to their informed consent claim.

Although the Currans argue that the evidence excluded is relevant to whether Matthew "would have allowed Buser to perform the recommended surgical operation," brief for appellants at 22, this misreads the statute. The Currans argue that the information is relevant to the first prong of the causation analysis required by § 44-2820. But § 44-2820 asks whether "a reasonably prudent person in the plaintiff's position would . . . have undergone the treatment *had he or she been properly informed.*" (Emphasis supplied.) As discussed above, §§ 44-2816 and 44-2820, when read together, suggest that proper information means properly informed under the professional theory which asks, What information doctors in similar localities ordinarily give patients under similar circumstances? Because the record lacks expert testimony that the standard of care required **[\*\*\*22]** disciplinary disclosures, the proffered evidence is also irrelevant to causation.

[18] Finally, the Currans argue that the court should have admitted Buser's disciplinary history to impeach his credibility. But this court has said that witnesses can only be impeached as to matters that are not collateral--matters that are independently provable. *Jones v. Tranisi*, 212 Neb. 843, 326 N.W.2d 190 **[\*\*573]** (1982). In *Jones*, this court upheld a jury verdict in a medical malpractice case. The plaintiff sued her doctor, claiming he negligently performed her thyroidectomy, impairing her vocal cords and leaving her permanently hoarse. On cross-examination, the doctor testified that no patient upon whom he had performed **[\*345]** a thyroidectomy complained of losing his or her voice after the operation.

[19] The plaintiff tried to introduce evidence that a former patient of the defendant experienced similar adverse consequences after the defendant performed the same surgery on her. We refused to admit rebuttal evidence proffered by the plaintiff, stating that if the plaintiff was offering the evidence to prove the doctor's negligence in performing the operation on the plaintiff, it was **[\*\*\*23]** not relevant for that purpose because one cannot prove negligence by demonstrating merely that the defendant acted negligently in the past. We further stated that the evidence was inadmissible for impeachment because it related to a collateral matter. "'Facts which would have been independently provable regardless of the contradiction are not "collateral." . . . "It is only as to matters relevant to some issue involved in a case that a witness can be contradicted for the purpose of impeachment." . . .'" *Id.* at 846, 326 N.W.2d at 192.

Although Buser and the Currans dispute whether Buser warned them about his disciplinary record, the dispute involves evidence that is irrelevant under the professional theory. Moreover, the trial court recognized that the proffered evidence implicates both §§ 27-401 and 27-403. While the parties' dispute may be marginally relevant to credibility, its probative value is outweighed by the dangers described in § 27-403. We conclude that the trial court did not abuse its discretion when excluding the Currans' evidence.

CONCLUSION

To carry out the Legislature's intent, we decline to distinguish doctor-related risks from other treatment **[***24]** risks. Moreover, the Currans failed to demonstrate that the standard of care in similar communities required Buser to disclose his disciplinary history; thus, the trial court did not abuse its discretion by sustaining the motion in limine. The trial court's decision is affirmed.

Affirmed.

Wright, J., not participating.

Page 1

89 Wn. App. 109, *; 947 P.2d 1263, **;
1997 Wash. App. LEXIS 2027, ***



**ROSETTA WHITESIDE, ET AL.,** *Appellants***, v. ROBERT J. LUKSON, M.D., ET AL.,** *Respondents***.**

**No. 16140-4-III**

**COURT OF APPEALS OF WASHINGTON, DIVISION THREE**

**89 Wn. App. 109; 947 P.2d 1263; 1997 Wash. App. LEXIS 2027**

**December 9, 1997, Filed**

**SUBSEQUENT HISTORY:**     **[\*\*\*1]**   Petition for Review Denied June 3, 1998, Reported at: 135 Wn.2d 1007, 959 P.2d 126, 1998 Wash. LEXIS 458.

**SUMMARY:**

**Nature of Action:** A surgical patient sought damages for personal injuries from the operating surgeon.

**Superior Court:** After the jury returned a verdict finding that the defendant had not obtained the plaintiff's informed consent to perform the surgery, the Superior Court for Benton County, No. 94-2-00042-7, Dennis D. Yule, J., on September 13, 1996, entered a judgment in favor of the defendant notwithstanding the verdict.

**Court of Appeals:** Holding that the defendant's inexperience in performing the surgical procedure was not a material fact for purposes of the plaintiff's claim that the defendant breached his duty to secure the plaintiff's informed consent, the court *affirms* the judgment.

**HEADNOTES**

WASHINGTON OFFICIAL REPORTS HEADNOTES

**[1] Medical Treatment -- Malpractice -- Informed Consent -- Physician's Qualifications -- Experience.**  For purposes of RCW 7.70.050(1)(a), under which the failure of a health care provider to inform a patient of material facts relating to a proposed course of treatment is an element of an action against the provider for breach of the duty to

Page 2

89 Wn. App. 109, *; 947 P.2d 1263, **;
1997 Wash. App. LEXIS 2027, ***

secure the patient's informed consent, a provider's lack of experience in providing a proposed treatment is not a "material fact."

**COUNSEL:** *Thomas R. Golden* of *Sullivan & Golden,* for appellants.

*Dennis L. Fluegge* and *Donald A. Treat* of *Meyer, Fluegge & Tenney,* for respondents.

**JUDGES:** Authored by Stephen M. Brown. Concurring: Frank L. Kurtz, Kenneth H Kato.

**OPINION BY:** Stephen M. Brown

**OPINION**

   **[\*110]**    **[\*\*1264]**   Brown, J. -- The sole issue in this case is whether, in securing an informed consent, a physician has a duty to disclose to the patient information about the physician's experience in providing a proposed treatment. We decide under Washington law a physician does not have this duty and affirm the trial court's grant of judgment notwithstanding the verdict on this issue.

   FACTS

   In November 1990, Dr. Lukson participated in a two-day class on how to perform a laparoscopic cholecystectomy. The class included hands-on participation in performing the procedure on three pigs.

   On November 20, 1990, Dr. Lukson saw Rosetta Whiteside and determined she needed to have her gallbladder removed. On December 17 he met with Mrs. Whiteside and obtained her consent to have **[\*\*\*2]**   him perform the laparoscopic cholecystectomy procedure on her. At the time he obtained her consent, Dr. Lukson had never performed the procedure on a person, nor did he inform her of this fact.

   Mrs. Whiteside's surgery was delayed, and by the time he performed her surgery, Dr. Lukson had performed this **[\*111]**   procedure on two other patients. Unfortunately, during the surgery on Mrs. Whiteside, Dr. Lukson misidentified and consequently damaged her bile duct. As a result of this mistake, she suffered a number of complications.

   The jury found Dr. Lukson was not negligent but also found his failure to inform Mrs. Whiteside of his inexperience in performing the procedure resulted in failure to obtain her informed consent. The trial court determined a health care provider's experience is not a material fact of which the patient must be informed and granted Dr. Lukson's motion for judgment notwithstanding the verdict. Mrs. Whiteside appeals that ruling.

   ANALYSIS

   A physician is liable for injuries resulting from health care to which the patient did not consent. RCW 7.70.030(3). In securing the patient's informed consent, a physician must advise the patient of material facts relating **[\*\*\*3]**   to the proposed treatment. RCW

Page 3

89 Wn. App. 109, *; 947 P.2d 1263, **;
1997 Wash. App. LEXIS 2027, ***

7.70.050(1)(a). *Smith v. Shannon,* 100 Wn.2d 26, 666 P.2d 351 (1983). The standard for determining whether a fact is material is the objective "reasonable patient" standard: the physician must disclose those facts a reasonable person would consider in deciding whether to consent to the proposed treatment. *Id.* at 33. Those **[\*\*1265]** facts include the foreseeable risks of the proposed treatment and availability and risks of alternative treatment or no treatment at all. *Holt v. Nelson,* 11 Wn. App. 230, 523 P.2d 211, *review denied,* 84 Wn.2d 1008 (1974).

The traditional view is that material facts are those which relate to the proposed treatment. *See* William J. McNichols, *Informed Consent Liability in a "Material Information" Jurisdiction: What Does the Future Portend,* 48 Okla. L. Rev. 711 (1996). Some jurisdictions, however, have held that collateral facts relating to the physician's competence may be material. **[\*\*\*4]** 48 Okla. L. Rev. 711; *see* Judith F. Daar, *Informed Consent: Defining Limits Through Therapeutic Parameters,* 16 Whittier L. Rev. 187, 191-92 (1995).

**[\*112]** The broader construction of the term "material fact" has included the physician's conflicts of interest, *Moore v. Regents of Univ. of Cal.*, 51 Cal. 3d 120, 793 P.2d 479, 271 Cal. Rptr. 146 (1990); *Hidding v. Williams*, 578 So. 2d 1192 (La. App. 1991); HIV status, *Faya v. Almaraz*, 329 Md. 435, 620 A.2d 327 (1993); physical impairment, and lack of experience, *Johnson v. Kokemoor*, 199 Wis. 2d 615, 545 N.W.2d 495 (1996). Under this expansive approach, facts such as the physician's statistical success rate, or history of malpractice claims, could also be considered material. 48 Okla. L. Rev. at 751; Aaron D. Twerski & Neil B. Cohen, *Comparing Medical Providers: A First Look at the New Era of Medical Statistics,* 58 Brook. L. Rev. 5 (1992). In theory, the physician's own health, financial situation, even medical school grades, could be considered material facts a patient would want to consider in **[\*\*\*5]** consenting to treatment by that physician. 58 Brook. L. Rev. at 28-29.

**[1]** Washington courts have not yet adopted the more expansive construction of the physician's duty to disclose. Construing RCW 7.70.050(1), *Thomas v. Wilfac, Inc.*, 65 Wn. App. 255, 828 P.2d 597, *review denied,* 119 Wn.2d 1020, 838 P.2d 692 (1992) limited the statutory duty to disclosure of treatment-related facts, expressly excluding the physician's qualifications. Following this traditional approach, we conclude that a surgeon's lack of experience in performing a particular surgical procedure is not a material fact for purposes of finding liability predicated on failure to secure an informed consent.

Affirmed.

Kurtz and Kato, JJ., concur.

Review denied at 135 Wn.2d 1007, 959 P.2d 126 (1998).



**MARCY WILLIS, Plaintiff - Appellant, v. D. SCOTT BENDER, M.D., Defendant - Appellee.**

**No. 07-8057**

**UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT**

**596 F.3d 1244; 2010 U.S. App. LEXIS 4531**

**March 3, 2010, Filed**

**PRIOR HISTORY:** **[\*\*1]**
   Appeal from the United States District Court for the District of Wyoming. (D.C. No. 2:06-CV-00211-WFD).

**COUNSEL:** Donald J. Sullivan, Sullivan Law Offices, P.C., Cheyenne, Wyoming, for Plaintiff / Appellant.

James Kaste of Lathrop & Rutledge, P.C. (Corinne E. Rutledge with him on the briefs), Cheyenne, Wyoming, for Defendant / Appellee.

**JUDGES:** Before O'BRIEN, McKAY, and SEYMOUR, Circuit Judges.

**OPINION BY:** O'BRIEN

**OPINION**

   **[\*1246]** **O'BRIEN**, Circuit Judge.

   Dr. D. Scott Bender, a general surgeon, perforated Marcy Willis' small bowel while performing a laparoscopic cholecystectomy (laparoscopic surgery to remove her gallbladder). Relevant here, Willis sued Bender for lack of informed consent and medical malpractice. The district court granted summary judgment to Bender on the informed consent claim. The medical malpractice claim proceeded to a jury trial. Willis requested a "captain of the ship" jury instruction which would have allowed the jury to hold Bender liable for his surgical assistant's negligence. The jury found in favor of Bender. Willis appeals from the grant of

Bender's motion for summary judgment as well as the court's refusal to instruct the jury on the "captain of the ship" doctrine. We affirm as to the "captain of the ship" [**2] jury instruction but reverse the district court's grant of summary judgment to Bender on the informed consent claim.

## I. FACTUAL BACKGROUND

Because we are reviewing the grant of summary judgment to Bender, we must [*1247] view the facts in the light most favorable to the non-moving party, Willis. *See Sanders v. Sw. Bell Tele. L.P.*, 544 F.3d 1101, 1105 (10th Cir. 2008), *cert. denied*, 130 S. Ct. 69, 175 L. Ed. 2d 25 (2009). Bender conceded as much by proceeding on his motion for summary judgment as if Willis' allegations were true but not admitting so.

Prior to the surgery at issue in this case, Willis had undergone three abdominal surgeries: a 1979 appendectomy, a 1991 surgery to remove scar tissue and open her Fallopian tubes and a 2002 surgery to repair an abdominal hernia. As a result of these surgeries, Willis had a large abdominal scar running from her diaphragm to her pubic area and extensive abdominal adhesions. [1] Due to these adhesions, Dr. Roland Fleck, the surgeon who performed Willis' 1991 and 2002 surgeries, advised Willis any future abdominal surgeries should be performed using an "open" rather than "closed" or laparoscopic procedure

> 1   Adhesions are bands of scar tissue that form as a natural part of [**3] the body's healing process after surgery; sometimes they bind together internal organs and tissues that would normally be separate and distinct. They can be very dense or loose and stringy. At his deposition, Dr. Roland Fleck, the surgeon who performed Willis' 1991 and 2002 surgeries, stated that to visualize an adhesion, one should imagine placing a piece of chewing gum between one's index finger and thumb and pulling them apart. The resulting strands of gum extending from the index finger to the thumb resemble adhesions. Due to the extensive number of adhesions in Willis' abdomen, Dr. Fleck described her abdomen as a "glue belly": "[I]f you were to open up an abdomen and pour in some glue, you would then think that everything is going to stick to each other, and that's sort of a descriptive term when you have multiple adhesions between different organs in the abdomen." (R. Appellant's App. Vol. I at 142.)

In late 2002, Willis visited Dr. Fleck complaining of abdominal pain. Dr. Fleck prescribed medication. When Willis' pain began interfering with her sleep, she called Dr. Fleck's office. She was informed Dr. Fleck was unavailable for several weeks. Therefore, on March 13, 2003, Willis [**4] visited a medical clinic in Alpine, Wyoming. The clinic's physician assistant referred her to Dr. Bender in Afton, Wyoming.

Willis met with Bender five days later. Bender suspected Willis' gallbladder was the source of her stomach pain. He told her if his suspicions were correct, her gallbladder would need to be removed and he would prefer to remove it laparoscopically. Willis informed Bender of her surgical history and abdominal adhesions. She also told Bender about Dr. Fleck's warning against a laparoscopic procedure and recommendation for future abdominal

surgeries to be conducted by an open procedure due to her adhesions. But Bender said laparoscopic surgery is the best procedure for individuals with adhesions because it does not create additional scar tissue. Willis asked Bender about his experience and track record with the laparoscopic procedure, whether he had ever been sued and whether he had ever had any problems with his medical license. Bender told Willis he had never been sued, never had any problems with his medical license and his success rate with the laparoscopic procedure was "99.9% right on the mark." (R. Appellant's App. Vol. I at 202.) Willis also asked Bender to [**5] consult with Dr. Fleck. Bender agreed to do so. Willis underwent an ultrasound examination several days later.

Approximately three days after Willis had the ultrasound, Bender called her to inform her the ultrasound revealed she had three large gallstones. During that conversation, she asked Bender if he had [*1248] had the opportunity to talk with Dr. Fleck. Bender said yes and Dr. Fleck had agreed with the laparoscopic procedure. After Willis expressed hesitation with a laparoscopic procedure, Bender assured her if he could not perform the surgery laparoscopically, he would convert to an open procedure. Willis signed a consent form agreeing to the surgery.

On April 4, 2003, Willis, accompanied by her husband and sister, reported to Star Valley Medical Center (the hospital) for the surgery. Bender met with them prior to the surgery. Willis' sister asked Bender whether he was sure he could perform the surgery laparoscopically; Bender said yes. Willis' husband asked Bender if he had spoken to Dr. Fleck about the surgery and whether he had agreed with performing it laparoscopically. Bender again said he had spoken with Dr. Fleck and Dr. Fleck had agreed with the proposed surgery.

During the surgery, [**6] Bender twice attempted to enter Willis' abdomen on the right side where the gallbladder is located but encountered significant adhesions. He then moved to the left side of the abdomen where he was able to enter. Over the next two to three hours, Bender cut down adhesions to reach the gallbladder, which he proceeded to remove. During the procedure, Dr. Donald Kirk, a family medicine physician, held and positioned the laparoscope at Bender's direction.

Willis remained at the hospital overnight. The next morning, April 5, she had severe abdominal pain and greenish drainage from the umbilical port site. A doctor at the hospital gave Willis antibiotics and told her he would try to locate Bender. Later that evening, Bender checked on Willis and decided she likely had a small bowel perforation which needed to be fixed immediately. Bender opened Willis' abdomen along her midline scar (non-laparoscopically) and discovered a 5 cm small bowel perforation which he repaired. He closed the abdomen with staples.

Willis remained in the hospital until April 11. Three days later, she returned to Bender's office to have the staples removed. When the staples were removed, the wound spontaneously opened. [**7] Because the wound was infected, Bender did not re-staple it but cleaned and bandaged it. He sent Willis home with medication and arranged for a home healthcare nurse to assist her with wound care. The next day, Willis returned to the hospital because she could

not stop vomiting. Bender suspected a small bowel obstruction or an ileus (temporary non-functioning of the intestine); further testing revealed an ileus. Willis remained at the hospital until April 19, when she was transferred, at her and her husband's request, to another hospital in Idaho, where she stayed until the ileus resolved (April 24).

Willis later discovered Bender had lied to her when she asked him about his experience and track record with the laparoscopic procedure, whether he had ever been sued and whether he had ever had any problems with his medical license. Bender had in fact been sued several times, including by a family of a patient who had died after undergoing a laparoscopic cholecystectomy performed by Bender in 2001. [2] The parties settled that **[*1249]** case prior to trial pursuant to a confidential settlement agreement. That same family also filed a complaint against Bender with the Wyoming Board of Medicine. The **[**8]** complaint with the Board was eventually resolved, in September 2003, after Bender agreed to and successfully completed a comprehensive assessment of his competency as a surgeon. [3] However, at the time Willis first questioned Bender as to his medical competence, the complaint was under investigation. Bender also lied to Willis when he told her he had spoken with Dr. Fleck who had agreed with the proposed laparoscopic procedure. Bender never called Dr. Fleck prior to the surgery.

2    The other litigation against Bender included: (1) a pro se lawsuit by a patient, who had felony convictions for defrauding the State of California, four years after Bender performed surgery to remove a malignant tumor near her heart; the case was dismissed based on the statute of limitations; (2) a lawsuit by a patient complaining she suffered from nerve damage in her leg after undergoing a skin graft performed by Bender; the case was dismissed before trial as a result of Bender being able to refute that a skin graft could cause nerve damage; and (3) a lawsuit by the family of a sixty-year-old automobile accident victim who underwent several abdominal surgeries performed by Bender and eventually died of his **[**9]** injuries; the case was dismissed before trial based on expert testimony stating Bender's performance met the standard of care.

3    Bender's competency assessment involved an interview and a comprehensive examination of general surgery. The assessment revealed eight or nine areas in which Bender needed additional study; only two areas are revealed in the record: the treatment of rattlesnake bites and the treatment of tetanus prophylaxis. Bender prepared a report on those two areas, as well as the others. He then orally answered questions relating to those areas. The public disclosure by the Wyoming Board of Health regarding the resolution of the complaint said:

> Final order dated 4/11/02 wherein Dr. Bender agreed to an assessment by PLAS [Post Licensure Assessment System] and agreed to complete additional training and education if necessary. Assessment and additional education requirement completed by 8/1/03. All requirements met and file closed on 9/23/03. MEDICAL LICENSE IS FULLY RESTORED WITH NO CONDITIONS OR RESTRICTIONS.

(R. Appellant's App. Vol. I at 154.)

## II. PROCEDURAL BACKGROUND

### A. The Complaint and Designation of Experts

Willis sued Bender for medical malpractice, battery and fraud. **[\*\*10]** She designated Dr. Clarence Braddock, a Professor of Medicine and Medical Ethics at Stanford University School of Medicine, to provide expert testimony to support her battery and fraud claims. Dr. Braddock opined that if Bender had provided false information to Willis in response to her questions, he breached his ethical obligation to Willis and her consent to the surgery would not have been informed. In support of her medical malpractice claim, Willis designated Dr. James McGreevy, a general surgeon and professor of surgery at the University of Utah School of Medicine, as her expert. He opined the decision to remove Willis' gallbladder was valid and despite her surgical history, including Dr. Fleck's admonition to proceed with an open procedure, Bender acted reasonably in initially attempting a laparoscopic approach. He also said Bender's post-operative care of Willis, including performing the second surgery to repair the bowel perforation, met the standard of care. However, in his opinion, Bender was negligent in continuing with a laparoscopic approach after his first two attempts at gaining access to Willis' abdomen failed; Bender should have instead converted to an open procedure.

### B. **[\*\*11]** Bender's Motion for Partial Judgment on the Pleadings

Bender filed a motion for partial judgment on the pleadings on the battery and fraud claims pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Bender argued that to the extent those claims alleged he had failed to disclose facts concerning his professional background, "no physician in the country has a duty to disclose [such] facts." (R. Appellant's App. Vol. I at 24.) Willis opposed the motion. While agreeing a doctor has no affirmative duty to disclose such facts, she **[\*1250]** claimed a doctor cannot lie when directly asked for this information and then use that false information to secure a patient's consent.

At a hearing on the Rule 12 motion, Bender amended his motion seeking only dismissal of the fraud claim as the allegations of misrepresentation were appropriately considered, if at all, under the informed consent doctrine. Although the district court agreed with Bender, stating Willis' claim appeared to be a "'garden variety' medical malpractice claim with a component of a lack of informed consent," it nevertheless denied the motion due to the fact the lawsuit was in its early stages. (Vol. I at 416.) Several months later, **[\*\*12]** Willis successfully moved to amend her complaint to eliminate the fraud claim.

## C. Bender's Motion for Summary Judgment

Bender moved for summary judgment on the battery claim arguing Willis had failed to present expert testimony establishing causation. He claimed Willis had failed to show through expert testimony that his alleged misrepresentations concerning his experience and track

record, litigation history and licensure problems increased the risk of the contemplated procedure or significantly increased her risk of injury. As to his alleged lying about consulting with Dr. Fleck, Bender admitted during his deposition and at trial that he never talked to Dr. Fleck but claimed Willis never asked him to do so. He also claimed Willis never asked him whether he had been sued or whether he had any problems with his medical license. Nevertheless, Bender asserted that according to Dr. Fleck's deposition testimony, had Bender called him, he would have only told Bender to be aware Willis had extensive adhesions. Therefore, according to Bender, had he contacted Dr. Fleck and informed Willis of his opinion, a reasonable person in Willis' position would have still consented to the laparoscopic [**13] approach.

Bender also sought summary judgment on the medical malpractice claim, again arguing Willis had failed to present expert testimony establishing causation. He claimed Dr. McGreevy's opinion limited his breach to his decision to make a third attempt to enter Willis' abdomen laparoscopically. However, Willis had failed to provide expert testimony establishing that that breach caused her injury. Moreover, Bender pointed to Dr. McGreevy's deposition testimony that bowel perforation was a known and accepted complication of laparoscopic abdominal surgery. Consequently, Bender claimed there was no evidence that negligence on his part caused the bowel perforation.

D. Willis' Opposition to Bender's Motion for Summary Judgment

Willis opposed Bender's motion. With respect to her battery claim, she asserted if Bender had told her the truth, she would not have hired him. She also argued that performing surgery on a non-consenting person constitutes negligence per se. As to the malpractice claim, Willis argued expert testimony was not necessary because a lay person is capable of understanding that bowels are not to be gashed by surgeons, surgeons should notice and repair bowel perforations, [**14] serious harm will inevitably result from a perforated bowel if left uncorrected and corrective surgery to repair the perforation is mandatory. In any event, she pointed out Bender himself had admitted causation at his deposition--he admitted Willis' bowel perforation occurred sometime during the first surgery, the second surgery was necessary to fix the perforation and as a consequence of the second surgery, which required Bender to open her abdomen along her midline scar, she developed a wound infection and ileus. Moreover, Dr. Dennis Dove, her [*1251] current surgeon in Texas, testified to the complications she suffered as a result of the second surgery.

E. District Court's Grant of Summary Judgment to Bender on Willis' Battery/Informed Consent Claim

The district court granted summary judgment to Bender on the battery claim. It first concluded that claim was more appropriately analyzed under the law of negligence, specifically the informed consent doctrine. The court determined that while Wyoming's informed consent law imposes a duty upon a doctor to disclose the specific risks associated with a medical procedure or treatment, it did not impose a duty on the physician to disclose the details [**15] about his own background or experience, even if the patient asks for this information.

Therefore, it held an informed consent claim based on a physician lying to a patient in response to direct questions is only actionable where the information allegedly misrepresented would otherwise fall under the scope of required disclosure, *i.e.*, the specific risks associated with a medical treatment or procedure. It reasoned:

> In insisting that the duty of disclosure be tied to the intended purpose of the informed consent doctrine, this Court does not mean to suggest that lying to patients is without the potential for legal liability. Instead, this decision merely recognizes the limitations of the informed consent doctrine as a catch all cause of action. Because there are more appropriate causes of action for asserting [a] physician's ineptitude or deceit, this Court cannot allow an impermissible expansion of the doctrine of informed consent in order to provide what would often be a redundant cause of action. There is simply no support for doing so under Wyoming law.

(R. Appellant's App. Vol. I at 244 (citations omitted).) The court did not, however, suggest a more appropriate cause of action.

The **[**16]** court was also concerned that allowing an informed consent claim based on a physician lying to a patient in response to questions concerning his experience and track record, licensure problems and litigation history would have the "practical effect of bringing before the jury the type of 'prior bad act' evidence that would normally be excluded under Federal Rule of Evidence 404(b)":

> A claim framed in this manner would require mini-malpractice trials within the underlying action for the purposes of proving that the physician's lack of skill (as evidenced by prior *meritorious* lawsuits, claims, or prior acts [of] surgical negligence) increased the risk to the patient of undergoing the surgery such that it should have been disclosed as part of the process of securing the patient's informed consent.

(R. Appellant's App. Vol. I at 244-45.)

Even assuming an informed consent claim could be made under these circumstances, the court concluded the claim failed because there was no expert testimony demonstrating proximate cause. While Willis may have provided expert testimony establishing Bender's alleged misrepresentations in response to her direct questions breached the standard of care, she had **[**17]** failed to present expert testimony showing the withheld information increased the risks such that a reasonable person in the same or similar circumstances would not have consented to the procedure had disclosure been made.

F. District Court's Denial of Summary Judgment to Bender on Willis' Medical Malpractice Claim

The court denied Bender's motion for summary judgment on the medical malpractice claim but not without reservations. **[\*1252]** It determined the claim was centered entirely on Bender's decision to continue a laparoscopic approach rather than converting to an open procedure after his first and second attempts to gain access to Willis' abdomen were unsuccessful. While Willis provided expert testimony that such conduct fell below the standard of care, she failed to provide any expert testimony that such conduct actually caused the bowel perforation. Although Bender conceded the perforation must have occurred during the laparoscopic cholecystectomy, he did not concede it was the result of any negligence. Moreover, there was evidence that bowel perforation was a known and accepted complication of a laparoscopic cholecystectomy. Nonetheless, giving Willis the benefit of a generous interpretation **[\*\*18]** of her expert's opinions, the court found her submissions were sufficient to withstand summary judgment. It read those submissions as alleging Bender's negligent decision to continue to proceed laparoscopically after his initial attempts failed unreasonably increased Willis' risk of undetected bowel injury. It warned, however, that Willis' ability to survive a motion for a directed verdict was precariously tied to the presentation of expert testimony establishing her bowel perforation was in fact caused by Bender's negligence.

G. Jury Trial on Medical Malpractice Claim

The medical malpractice claim proceeded to trial. Based on the grant of summary judgment to Bender on the informed consent claim, Bender filed a motion in limine to exclude Dr. Braddock's testimony at trial. While not agreeing with the court's summary judgment ruling on the informed consent claim and expressly reserving her right to challenge it, Willis agreed Braddock's testimony was not admissible at trial. The court granted Bender's motion in limine.

Willis requested a "captain of the ship" jury instruction which would have allowed Bender to be held liable for Dr. Kirk's negligence:

> Regardless of who employs or pays a **[\*\*19]** nurse or an assisting surgeon or other member of the operating team who takes part in the performance of surgery or services incidental to such surgery, if, while engaged in any such service, the assisting surgeon, the nurse or other member of the operating team, is under the direction of the surgeon in charge, so as to be his temporary servant or agent, any negligence on the part of any such assisting person, occurring while the latter is under the surgeon's direction, is deemed in law to be the negligence of such surgeon.

(R. Appellant's App. Vol. I at 314.) The court rejected the instruction. It did not provide explicit reasons for doing so but, based on its comments at the jury instruction conference, it

appears the instruction was rejected because it lacked evidentiary support, *i.e.*, there was no evidence showing anyone other than Bender was negligent.

The jury returned a verdict in favor of Bender, finding "[his] care of Marcy Willis [did not] violate [] the accepted standard of medical care expected of him as a general surgeon[.]" (R. Appellee's Supp. App. at 1.)

## III. DISCUSSION

Willis complains the district court erroneously granted Bender's motion for summary judgment on her informed **[**20]** consent claim and improperly rejected her proposed "captain of the ship" jury instruction. 4

> 4    Willis also argued in her opening brief that the district court improperly granted Bender's motion in limine to preclude Dr. Braddock (Willis' medical ethics expert) from testifying at trial. She withdrew this claim at oral argument because she had conceded in the trial court that the motion should be granted given the district court's grant of summary judgment to Bender on the informed consent claim.

 **[*1253]**   A. Informed Consent

Willis admits she signed a consent form prior to the surgery. She also concedes a doctor has no affirmative duty to voluntarily disclose information to a patient about his background. However, she argues that when a patient directly asks a doctor questions germane to her decision whether to hire him, the doctor has a duty to give truthful answers. Bender did not do so and had he done so, she would have refused to hire him, waited for Dr. Fleck and undergone the less risky open procedure which Dr. Fleck knew to be necessary. Because Bender deliberately lied to her about his experience and track record, litigation history, licensure problems and consulting with Dr. Fleck in order **[**21]** to convince her to accept him as her surgeon and thereby run the risks of the laparoscopic procedure, Willis says her consent was not valid, much less informed.

Bender claims the district court correctly granted summary judgment in his favor on the informed consent claim. In Wyoming, the informed consent doctrine only imposes an affirmative duty upon physicians to fully disclose to the patient any serious risks involved in a contemplated procedure which a reasonable practitioner of like training would disclose in the same or similar circumstances. What risks a reasonable practitioner would disclose in the same or similar circumstances must be established by expert testimony. While Bender concedes other courts have required physicians to disclose information other than the risks, benefits and alternatives to a procedure, including a physician's conflict of interest, HIV status, substance abuse impairment and in one case inexperience with a particular procedure, he argues no court has required a doctor to disclose the information alleged here--track record, lawsuits, licensure problems and the failure to speak to the patient's doctor.

Bender further asserts Willis failed to show his alleged **[**22]** misrepresentations increased her risk of injury under the laparoscopic procedure or created any additional risk of

injury. There is absolutely no evidence establishing Bender's success rate with the procedure in this case was worse than any other general surgeon's. He also points to Dr. Fleck's deposition testimony. Dr. Fleck did not recall Bender calling him prior to the surgery. However, Dr. Fleck testified that had Bender called him, he would have told Bender to be aware of Willis' adhesions. Dr. Fleck also said the decision whether to proceed laparoscopically or with an open procedure in a patient with adhesions is a matter of medical judgment and his recommendation to Willis that any future abdominal surgeries be performed with an open procedure was an individual preference. Based on this testimony, Bender claims that had he contacted Dr. Fleck, Dr. Fleck would not have said anything that might, objectively, result in a decision against the proposed closed procedure--had the information been conveyed to Willis, a reasonable person in her position would still have consented to the closed procedure. In summary, Bender claims Willis failed to establish the alleged misrepresentations **[\*\*23]** caused her any injury.

1. Standard of Review

"We review summary judgment decisions de novo, applying the same legal standard as the district court." *Sanders*, 544 F.3d at 1104. Summary judgment is **[\*1254]** appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Sanders*, 544 F.3d at 1105 (quotations omitted).

Because we are sitting in diversity, [5] we apply Wyoming law, including its choice of law rules. *See Vitkus v. Beatrice Co.*, 127 F.3d 936, 941 (10th Cir. 1997). "In Wyoming, the law that governs substantive aspects of a negligence action is the law of the place where an alleged tort occurred." *V-1 Oil Co. v. Ranck*, 767 P.2d 612, 616 (Wyo. 1989). Because the alleged malpractice occurred in Wyoming, we apply Wyoming law. Neither party contends otherwise. When applying Wyoming law, we must apply the most recent pronouncement of the Wyoming Supreme Court. *Royal Maccabees Life Ins. Co. v. Choren*, 393 F.3d 1175, 1180 (10th Cir. 2005). **[\*\*24]** "[A] federal district court's state-law determinations are entitled to no deference and are reviewed de novo." *Blanke v. Alexander*, 152 F.3d 1224, 1228 (10th Cir. 1998). Because the Wyoming Supreme Court has yet to decide whether an informed consent claim can be made on facts similar to those raised here, we must attempt to predict how the Wyoming Supreme Court would resolve the issue. [6] *Royal Maccabees Life Ins. Co.*, 393 F.3d at 1180.

5    Although Willis lived in Wyoming at the time of the alleged incident and Bender is a resident of Wyoming, Willis resided in Texas at the time she filed this lawsuit.

6    We could *sua sponte* ask the Wyoming Supreme Court to resolve this "unsettled and dispositive" issue of state law. *Kan. Judicial Review v. Stout*, 519 F.3d 1107, 1119-20 (10th Cir. 2008) (quotations omitted); *see also* Wyoming Rules of Appellate

Procedure, Rule 11.01. But we typically take our cue from the parties and neither party has requested certification.

2. Analysis

This is, indeed, a difficult issue. In general, a physician must obtain a patient's informed consent prior to performing a medical procedure upon the patient. *See Govin v. Hunter*, 374 P.2d 421, 423 (Wyo. 1962). Originally, a **[\*\*25]** physician's performance of a medical procedure without the patient's informed consent constituted a battery. *Roybal v. Bell*, 778 P.2d 108, 111 (Wyo. 1989). While battery still "remains applicable where a treatment or procedure was completely unauthorized . . . negligence principles [now] apply to the more often encountered situation where the treatment or procedure was authorized but the consent was uninformed." *Id.* at 111 n.4. As the district court concluded, the laparoscopic cholecystectomy in this case was not completely unauthorized. Therefore, we must analyze Willis' claim under negligence principles rather than the law of battery. Under those principles, the plaintiff must prove the same elements applicable to a medical malpractice claim: (1) the physician owed a duty to the plaintiff; (2) the physician breached that duty; and (3) the breach proximately caused injury to the plaintiff. *Id.*

In Wyoming, a physician has a duty to disclose any serious risks which are involved in a contemplated procedure. *Govin*, 374 P.2d at 423. The extent of that disclosure is determined under the traditional or professional view, that is, "[a] physician is required to disclose only such risks that **[\*\*26]** a reasonable practitioner of like training would have disclosed in the same or similar circumstances." *Roybal*, **[\*1255]** 778 P.2d at 112. "[E]xpert testimony is required to establish what a reasonable practitioner would disclose in the same or similar circumstances." *Id.* The expert is required to state the standard of care with "specificity sufficient to enable the court to determine if [the doctor] properly disclosed the risks and alternatives in conformance with the standard." *Id.* at 114.

The Wyoming Supreme Court has addressed informed consent in the medical malpractice context in five cases. *See Weber v. McCoy*, 950 P.2d 548, 552 (Wyo. 1997); *Havens v. Hoffman*, 902 P.2d 219, 221-23 (Wyo. 1995); *Roybal*, 778 P.2d at 111-14; *Studon v. Stadnik*, 469 P.2d 16, 20 (Wyo. 1970); *Govin*, 374 P.2d at 423-24. All but *Govin* involved a physician's failure to voluntarily disclose to the patient the risks associated with a particular procedure prior to obtaining the patient's consent. *Govin* involved a physician lying to the patient concerning the risks associated with the particular procedure. Therefore, a claim under Wyoming's informed consent law requires either (1) a misrepresentation concerning the risks **[\*\*27]** of a proposed treatment or procedure or (2) a failure to voluntarily disclose the risks of a proposed treatment or procedure. Willis' informed consent claim fits neither scenario as she is not claiming Bender lied to her about the risks of the surgery. Rather, she says Bender lied to her as to his experience, litigation history, licensure problems and having consulted with and obtained the approval of Dr. Fleck. These lies are physician-specific in nature and, in this case, were made in direct response to Willis' questions concerning the same. Consequently, we must decide whether Wyoming would extend its informed consent law to misrepresentations that are physician-specific in nature and made in direct response to a patient's questions.

In deciding issues of first impression, the Wyoming Supreme Court often looks outside its borders for guidance. *See, e.g., Starkey v. Starkey*, 2007 WY 106, 161 P.3d 515, 517 (Wyo. 2007); *State ex. rel. Wyo. Workers' Safety & Comp. Div. v. Faulkner*, 2007 WY 31, 152 P.3d 394, 398 (Wyo. 2007); *Johnson v. State*, 2003 WY 9, 61 P.3d 1234, 1243 (Wyo. 2003). Thus, we do the same. We find a number of courts have concluded physician-specific information such as experience is relevant to the informed **[**28]** consent issue and physicians have a duty to voluntarily disclose such information prior to obtaining a patient's consent. *See, e.g., Moore v. Regents of the Univ. of Cal.*, 51 Cal. 3d 120, 271 Cal. Rptr. 146, 151-52, 793 P.2d 479 (Cal. 1990) (failure to inform patient of physician's research and economic interests in procedure prior to conducting it); *Barriocanal v. Gibbs*, 697 A.2d 1169, 1170, 1173 (Del. 1997) (failure to disclose that physician had not recently performed aneurism surgery and there were other nearby hospitals that specialized in aneurism surgery); *Hidding v. Williams*, 578 So.2d 1192, 1198 (La. Ct. App. 1991) (failure to inform patient that physician suffered from alcohol abuse at the time of the proposed surgery); *Goldberg v. Boone*, 396 Md. 94, 912 A.2d 698, 717 (Md. 2006) (failure to inform patient there were other more experienced surgeons in the region that could perform the proposed procedure); *Johnson ex rel. Adler v. Kokemoor*, 199 Wis. 2d 615, 545 N.W.2d 495, 504-08 (Wis. 1996) (failure to disclose to patient there are substantially different morbidity and mortality rates of the proposed procedure depending on the physician's experience). We do not believe, however, that Wyoming would follow these courts for several reasons.

First, **[**29]** as stated previously, Wyoming applies the traditional or professional standard in determining the scope of a physician's informed consent disclosure, asking what a reasonable practitioner of like training would have disclosed in the same or similar circumstances. *Roybal*, 778 **[*1256]** P.2d at 112. The above cases utilize a reasonable patient standard, looking to whether a reasonable person in the patient's position would consider the information material to his decision as to whether to agree to allow the physician to perform the surgery upon him. [7] *See Moore*, 271 Cal. Rptr. at 150; *Barriocanal*, 697 A.2d at 1172-73; *Hidding*, 578 So.2d at 1195; *Goldberg*, 912 A.2d at 716; *Howard v. Univ. of Med. & Dentistry of N.J.*, 172 N.J. 537, 800 A.2d 73, 83 (N.J. 2002); *Johnson*, 545 N.W.2d at 501-02. The difference is significant. Obviously, what a reasonable person in the patient's position would find relevant in deciding whether to proceed with a particular procedure by a specific doctor is not necessarily what a reasonable practitioner of like training and experience would have disclosed in the same circumstances. Second, we believe Wyoming would find such expansion of a physician's informed consent duties to be overly **[**30]** burdensome to physicians. As one court explained in rejecting an informed consent claim based on a surgeon's failure to disclose his inexperience with the proposed procedure: "In theory, the physician's own health, financial situation, even medical school grades, could be considered material facts a patient would want to consider in consenting to treatment by that physician." *See Whiteside v. Lukson*, 89 Wn. App. 109, 947 P.2d 1263, 1265 (Wash. Ct. App. 1997).

7    Prior to 1972, virtually all jurisdictions recognizing the informed consent doctrine used the traditional or professional rule. In 1972, two cases adopted the prudent patient

standard in measuring the physician's duty to disclose. *Canterbury v. Spence*, 464 F.2d 772, 786-87, 150 U.S. App. D.C. 263 (D.C. Cir. 1972) (applying District of Columbia law); *Cobbs v. Grant*, 8 Cal. 3d 229, 104 Cal. Rptr. 505, 502 P.2d 1, 10-11 (Cal. 1972). Under that standard, a physician must disclose all information which a reasonable person in the patient's position would consider material to her decision as to whether to allow the physician to perform the contemplated treatment or procedure upon her. Unlike the traditional or professional rule, expert testimony is not required under the prudent patient standard. Since 1972, **[\*\*31]** a number of jurisdictions have adopted the prudent patient standard but it remains the minority position. 4 DAVID W. LOUISELL & HAROLD WILLIAMS, MEDICAL MALPRACTICE § 22.05[3],[4][B] (2009).

But we need not decide the issue. The issue here is not whether Bender had a duty under Wyoming's informed consent law to voluntarily disclose physician-specific information but rather whether he had a duty to truthfully answer Willis' physician-specific questions. Only a few courts have addressed this question and again there is a split of authority.

In *Johnson*, the plaintiff sued the defendant neurosurgeon for lack of informed consent after being rendered an incomplete quadriplegic as a result of undergoing surgery to clip an aneurysm at the rear of her brain. She alleged that when she had questioned the defendant surgeon concerning his experience, he said he had performed the surgery "several" times; when she asked what he meant by "several," he said "dozens" and "lots of times." 545 N.W.2d at 499 (quotations omitted). In fact, the defendant had relatively limited experience with aneurysm surgery comparable to that performed on the plaintiff. The jury found in favor of the plaintiff. On appeal, **[\*\*32]** the defendant argued, *inter alia*, the trial court had erred in admitting evidence of his limited experience because informed consent only requires disclosure of the risks associated with a particular treatment, not the risks associated with a particular physician. The Wisconsin Supreme Court rejected this argument:

> In this case, the plaintiff introduced ample evidence that had a reasonable person in her position been aware of the defendant's relative lack of experience in performing basilar bifurcation aneurysm **[\*1257]** surgery, that person would not have undergone surgery with him. According to the record the plaintiff had made inquiry of the defendant's experience with surgery like hers. In response to her direct question about his experience he said that he had operated on aneurysms comparable to her aneurysm "dozens" of times . . . . We conclude that the circuit court did not erroneously exercise its discretion in admitting evidence regarding the defendant's lack of experience . . . . A reasonable person in the plaintiff's position would have considered such information material in making an intelligent and informed decision about the surgery.

*Id*. at 505.

Similarly, in *Howard v. Univ. of Med.* **[\*\*33]** *& Dentistry of N.J.*, Mr. and Mrs. Howard sued the defendant surgeon for medical malpractice after Mr. Howard was rendered a quadriplegic as result of undergoing surgery performed by the defendant. 172 N.J. 537, 800 A.2d 73 (N.J. 2002). According to the Howards, prior to the surgery, Mrs. Howard had asked the defendant whether he was board-certified; he responded in the affirmative. The defendant also told them he had substantial experience with the proposed surgery. According to Mrs. Howard, she was opposed to the surgery and it was only after the defendant's claim of skill and experience that she and Mr. Howard consented to the surgery. During the defendant's deposition, the Howards learned for the first time the defendant was not board-certified and he had significantly overrepresented his experience with the surgery. They sought to amend their complaint to add a fraud claim.

On appeal, the New Jersey Supreme Court declined to extend its common-law to allow a fraud or deceit-based claim based on a physician misrepresenting his credentials or experience to a patient. *Id.* at 82. However, it concluded the Howards stated a lack of informed consent claim. While a doctor does not have a duty to detail **[\*\*34]** his background and experience to obtain the patient's consent, a doctor's significant misrepresentations concerning his qualifications can affect the validity of the consent obtained. *Id.* at 83. It explained:

> [D]efendant's misrepresentations induced plaintiff to consent to a surgical procedure, and its risk of paralysis, that he would not have undergone had he known the truth about defendant's qualifications. Stripped to its essentials, plaintiff's claim is founded on lack of informed consent.

*Id.* at 84; *see also Paulos v. Johnson*, 597 N.W.2d 316, 320 (Minn. Ct. App. 1999) (stating physician's misrepresentation while obtaining patient's consent to surgery that he was board-certified in response to patient's question concerning the same presents "a pure informed consent issue").

However, in *Duffy v. Flagg*, the patient, who had delivered her first child via a cesarean section, discussed with her physician the possibility of having her second child born vaginally. 279 Conn. 682, 905 A.2d 15 (Conn. 2006). The physician informed her of the risks of the procedure, known as vaginal birth after cesarean section delivery, including uterine rupture resulting in the patient and baby's deaths. The patient asked **[\*\*35]** the physician whether she had encountered any difficulty with the procedure; the physician said there had been "a bad outcome" because of a uterine rupture. *Id.* at 16 (quotations omitted). The patient did not inquire further and the physician did not explain that the baby had died as a result of that uterine rupture. Thereafter, the patient decided to attempt a vaginal birth after cesarean section delivery; the baby died due to complications during the birth.

The Connecticut Supreme Court concluded the informed consent doctrine only **[\*1258]** required disclosure of the nature of the procedure, its risks, its anticipated benefits and the alternatives to the procedure. *Id.* at 20. It declined to extend the doctrine to the physician's

failure to disclose to the patient his experience with a procedure because that experience had no bearing on the patient's risks or otherwise pertained to any of the four factors required to be disclosed. *Id*. at 21-22. By limiting the informed consent doctrine to the four areas specified, the court sought to provide a rule of general applicability so physicians would have a clear understanding of the scope of the disclosures they must make and patients are not burdened **[**36]** with immaterial information that they may find confusing. *Id*. at 23. It rejected the patient's claim that if evidence regarding a physician's experience and/or his candor in revealing that experience is not relevant to an informed consent claim then a physician will have no duty to truthfully answer questions concerning his skills, qualifications or experience. *Id*. The court said nothing in its ruling prevented the physician from being held liable for misrepresentation. *Id*.

Similarly, in *Duttry v. Patterson*, the patient asked the physician about his experience in performing the type of operation he recommended. 565 Pa. 130, 771 A.2d 1255 (Pa. 2001). The physician stated he had performed this procedure sixty times in the preceding five years but, in fact, had only performed it nine times during that period. The court determined the informed consent doctrine required a physician to provide a patient with material information necessary for her to determine whether to proceed with the proposed procedure. *Id*. at 1258. In previous cases, this material information had been defined as the nature of the proposed procedure, its seriousness, the organs of the body involved, the disease sought to be cured and **[**37]** the possible results, in other words, those "material facts, risks, complications and alternatives to surgery that a reasonable person in the patient's situation would consider significant in deciding whether to have [a procedure]." *Id*. (quotations omitted). The court declined to extend the informed consent doctrine to require disclosure of a physician's personal characteristics and experience, whether or not this information was solicited by the patient. *Id*. at 1259. However, it did not foreclose other avenues for relief such as a misrepresentation claim. *Id*.

While the cases are conflicting, we believe the Wyoming Supreme Court would follow *Johnson*, *Howard* and *Paulos* as they are the better reasoned. Bender's alleged misrepresentations to Willis in response to her direct questions allegedly induced her to consent to the surgery and its risks. Under these circumstances, if proved, her consent can hardly be considered "informed." We recognize *Duffy* and *Duttry* did not entirely foreclose an action against a physician who lies to a patient in response to questions asked in the course of obtaining consent, stating the patient may have a misrepresentation claim. The district court intimated **[**38]** the same and Bender agrees. [8] However, when the misrepresentation **[*1259]** occurs during the physician-patient relationship and in the course of a physician obtaining the patient's consent to a proposed treatment or procedure, we see no reason why Wyoming would limit the patient's claim to the more generic negligent misrepresentation tort, especially since it is doubtful whether a negligent misrepresentation claim is an avenue of relief available to most patients in Wyoming.

8   Bender also said at oral argument that patients could file a complaint with the Wyoming Board of Medicine. But according to the Board's website, if a patient's complaint:

> proves true, the Board may take appropriate action including revocation of the physician's license to practice medicine, suspension or probation under monitoring, restriction of the scope of the practice, requiring additional training and/or testing, mental and/or physical competency examinations, the imposition of fines and any number of combinations of these sanctions appropriate under the circumstances of the case.

*See* http://wyomedboard.state.wy.us/complaintprocess.asp. Therefore, the Board provides no relief to patients but instead concentrates on disciplining   **[**39]** the physician.

Wyoming has adopted § 552 of the Restatement (Second) of Torts for the elements of negligent misrepresentation. *Verschoor v. Mountain W. Farm Bureau Mut. Ins. Co*., 907 P.2d 1293, 1299 (Wyo. 1995). Section 552 states in relevant part:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

RESTATEMENT (SECOND) OF TORTS § 552(1) (1965); *see also Verschoor*, 907 P.2d at 1299 ("The elements of a negligent misrepresentation claim are . . . [f]alse information supplied in the course of one's business for the guidance of others in their business, failure to exercise reasonable care in obtaining or relating the information, and pecuniary loss resulting from justifiable reliance thereon.") (quotations omitted). This rule applies when an individual suffers pecuniary loss as a result of his reasonable reliance on the   **[**40]** misrepresentation of another. A patient harmed by a physician's misrepresentations may not always suffer economic loss. 9 In any event, as the Wisconsin Supreme Court said in *Johnson*, the fact overlap exists between negligent misrepresentation and informed consent "does not preclude the plaintiff from making allegations and introducing evidence in an informed consent case which might also have been pled in a negligent misrepresentation case." 545 N.W. 2d at 504 n.29.

9   The Restatement (Second) of Torts recognizes a claim for negligent misrepresentation resulting in physical harm. Section 311 provides: "One who negligently gives

false information to another is subject to liability for physical harm caused by action taken by the other in reasonable reliance upon such information, where such harm results to the other . . . ." RESTATEMENT (SECOND) OF TORTS § 311(1) (1965). Comment (b) states:

> The rule stated in this Section finds particular application where it is a part of the actor's business or profession to give information upon which the safety of the recipient or a third person depends. Thus it is as much a part of the professional duty of a physician to give correct information as **[\*\*41]** to the character of the disease from which his patient is suffering, where such knowledge is necessary to the safety of the patient or others, as it is to make a correct diagnosis or to prescribe the appropriate medicine . . . .

*Id*. cmt. b. Wyoming has not adopted this definition for the generic tort of negligent misrepresentation.

We also find unpersuasive the reasons the Connecticut Supreme Court gave in *Duffy* for rejecting the expansion of its informed consent doctrine to include physician-specific misrepresentations in response to a patient's direct questions. We need not worry about confusing physicians as to the scope of their disclosures; requiring physicians to honestly answer a patient's questions is a bright-line rule not subject to conflicting interpretations. Nor would such requirement burden patients with immaterial information as they would only receive that information they found material enough to request from the physician. **[\*1260]** Moreover, the physician, if he thought the requested information was not pertinent, could simply say so and refuse to answer.

Wyoming's application of the traditional or professional standard to determine the scope of a physician's required disclosure **[\*\*42]** does not require a different conclusion. That standard has only been applied to determine what information a physician is required to voluntarily disclose to a patient prior to obtaining his consent. It would appear to have no applicability to determining whether a doctor may lie to a patient in direct response to the patient's questions in the course of obtaining the patient's consent. In any event, one would be hard pressed to argue a reasonable physician of like training would lie to a patient in obtaining consent.

We recognize difficult trial issues are likely to result from our conclusion. Patients will frequently allege (as Willis did here) both a negligent treatment claim and a lack of informed consent claim in a single lawsuit. In such cases, there is a real concern the jury will use evidence relevant to the informed consent claim, such as a physician's lack of experience and litigation history, to improperly infer negligent treatment. We also envision cases where a patient will seek to prove the falsity of a physician's statements with the use of "prior bad act" evidence normally excluded under Rule 404(b) of the Federal Rules of Evidence. For example, a patient may allege **[\*\*43]** his doctor lied to him about his competency to perform a

certain procedure and seek to prove it by showing the doctor was incompetent in other cases. Such concerns need not deter us long. Trial courts frequently confront these types of issues, especially in the criminal law context. They can be easily remedied or minimized at the summary judgment stage, with appropriate jury instructions, or by bifurcating the trial. They should not prevent us from recognizing a cause of action where one exists. And these problems would arise even if, as Bender argues, the patient's claim should be limited to negligent misrepresentation.

We emphasize we are not saying Wyoming would impose upon physicians an affirmative duty to voluntarily disclose physician-specific information or to obtain the approval of a patient's regular physician prior to obtaining consent. Our decision is quite narrow. We only predict the Wyoming Supreme Court would allow an informed consent claim where a physician lies to a patient as to physician-specific information in direct response to a patient's questions concerning the same in the course of obtaining the patient's consent and the questions seek concrete verifiable facts, **[**44]** not the doctor's subjective opinion or judgment as to the quality of his performance or abilities. [10]

> 10    For instance, Willis' questions in this case concerning Bender's experience and track record with the laparoscopic procedure, whether he had ever been sued or had any problems with his medical license, and whether he consulted with and obtained the approval of Dr. Fleck, are verifiable and fact-based. They do not call for Bender's subjective opinion or judgment. Questions such as "how good of a surgeon are you?" are not readily verifiable and call for the doctor's subjective opinion. Such questions are not within the scope of our narrow holding. Whether questions posed to a doctor are actionable are legal questions or at least, mixed questions of law and fact, for the judge to decide, perhaps after a hearing, before sending the issue to the jury.

Having concluded Wyoming would extend the informed consent doctrine to the circumstances of the case *sub judice*, Willis must also establish causation. In Wyoming, with respect to the proximate cause element, the plaintiff must offer "proof that proper disclosure would have resulted in a decision against the proposed **[*1261]** treatment or procedure." **[**45]** [11] *Roybal*, 778 P.2d at 112. Wyoming has adopted the objective test for measuring the causal connection in informed consent cases. *Id*. at 112-13. Unlike the subjective test, which "considers what the plaintiff would have done if the risks had been properly disclosed," the objective test "focuses on what a reasonable person in the plaintiff's position would have done if the risks had been adequately disclosed." [12] *Id*. at 112. Under the objective test, "the patient's hindsight testimony is relevant but not controlling." *Id*.

> 11    Bender relies on *Howard* for the proposition that Willis was required to show his alleged misrepresentations increased her risk of injury from the laparoscopic procedure or created an additional risk of injury in order to establish causation. The district court said the same. But this is not Wyoming law. Our conclusion, based in part on the reasoning of *Howard*, that Wyoming would recognize an informed consent claim under the

circumstances presented in this case does not require us to also expand the causation element of Wyoming's informed consent doctrine to that required in *Howard*.

12    The subjective test has been criticized because it turns on the credibility of the [**46] hindsight of the patient who is seeking redress after an undesirable result. It also precludes recovery to a patient who dies as a result of the physician's treatment. *Roybal*, 778 P.2d at 112.

In this case, there is evidence supporting Willis' claim that had Bender not lied to her, she would not have consented to the surgery. This evidence includes, among other things: (1) Willis' testimony that had Bender not lied to her, she would not have hired him or undergone the proposed procedure; (2) Willis had been advised by Dr. Fleck that any future abdominal surgeries should be performed using the open procedure due to her adhesions; and (3) Bender's litigation history included a lawsuit by the family of a patient who had died after undergoing a laparoscopic cholecystectomy performed by Bender in 2001. However, there is also evidence negating causation, including, *inter alia*, (1) Bender informing Willis he would convert to an open procedure if he could not proceed laparoscopically; (2) Bender telling Willis her condition was serious enough that she should not wait until after tax season to have it done (she worked in an accountant's office) because then it could turn into an emergency surgery;   [**47] (3) the previous lawsuits against Bender (except one) had been dismissed prior to trial; and (4) had Bender called Fleck he would have just warned Bender of Willis' adhesions, which she herself warned him of and which were obvious to him based on her previous surgical history. Given the conflicting evidence, the causation question is best left for the jury.

We reverse the district court's grant of summary judgment to Bender on the informed consent claim.

B. Medical Malpractice--Captain of the Ship Instruction

Willis complains the court erred in rejecting her proposed "captain of the ship" instruction which would have allowed the jury to hold Bender liable for Dr. Kirk's negligence. She claims Wyoming recognizes the "captain of the ship" doctrine; in fact, her proposed instruction is Instruction 14.09 of the Wyoming Civil Pattern Jury Instructions. Willis also asserts that during trial she proved the cause of her perforated bowel was the blind manipulation of the laparoscopic camera by Dr. Kirk who was working under Bender's direction. Therefore, by refusing the instruction, the court allowed the jury to find her injury was caused by the negligence of Dr. Kirk, for whom Bender was legally   [**48] responsible, yet allow Bender to escape liability.

 [*1262]   Bender claims Wyoming has not adopted the "captain of the ship" doctrine and because the underlying basis for the doctrine has ceased to exist, it would likely not adopt it, as have a majority of the jurisdictions to recently address the issue. Even assuming the "captain of the ship" doctrine was viable in Wyoming, there was no evidence, specifically expert testimony, that Dr. Kirk was negligent and therefore no basis to hold Bender liable for Dr. Kirk's negligence.

1. Standard of Review

In a diversity case, the substance of a jury instruction is a matter of state law, but the grant or denial of a tendered instruction is governed by federal law. Although we review the district court's refusal to give a particular instruction for abuse of discretion, the ultimate question of whether the jury was properly instructed is a question of law which we review *de novo*. Furthermore, we must examine the instructions as a whole to determine if they sufficiently cover the issues in the case and focus on the facts presented by the evidence.

*Blanke*, 152 F.3d at 1232 (quotations and citations omitted).

2. Analysis

Until the 1940's, hospitals enjoyed "charitable **[**49]** immunity," entitling them to total immunity against their patients' medical malpractice suits. *See* KENNETH S. ABRAHAM & PAUL C. WEILDER, *Enterprise Medical Liability and the Evolution of the American Health Care System*, 108 Harv. L. Rev. 381, 385 (1994). As a result, patients injured by a hospital employee's negligence were often left without a form of redress for their injuries. *Lewis v. Physicians Ins. Co. of Wis.*, 2001 WI 60, 243 Wis. 2d 648, 627 N.W.2d 484, 492 (Wis. 2001). In an attempt to fill this gap, courts began using the "borrowed servant" doctrine to impose liability on the surgeon for negligence occurring in the operating room. *Franklin v. Gupta*, 81 Md. App. 345, 567 A.2d 524, 535 (Md. Ct. Spec. App. 1990). "The notion was that the surgeon acted as a special employer who borrowed nurses and other attendants from their general employer--the hospital--and thus became liable for their negligence." *Id*. Liability, however, was conditioned on showing "the surgeon actually controlled or had a right to control the details of the servant's conduct." *Id*.

In *McConnell v. Williams*, the Pennsylvania Supreme Court applied the "borrowed servant" doctrine in a medical malpractice case in which the plaintiff sought to hold her obstetrician **[**50]** liable for a hospital intern's negligent administration of silver nitrate into the eyes of the plaintiff's newborn immediately after a caesarian section performed by the obstetrician. 361 Pa. 355, 65 A.2d 243 (Pa. 1949). The court concluded there was a jury question as to whether there was a master-servant relationship between the obstetrician and the intern at the time of the intern's negligence; if so, the obstetrician was liable for that negligence. *Id*. at 248. Whether such relationship existed depended on whether the obstetrician had supervisory control over and the right to give orders to the intern at the time of the negligence. *Id*. at 246. In applying these principles, the court analogized a surgeon to a captain of a ship:

[I]t can readily be understood that in the course of an operation in the operating room of a hospital, and until the surgeon leaves that room at the conclusion of the operation, . . . he is in the same complete charge of those who are present and assisting him as is the captain of a ship over all on board, and that such supreme

control is indeed essential in view of the high degree of protection **[*1263]** to which an anaesthetized, unconscious patient is entitled . . . .

*Id.*

While **[**51]** it is clear from the *McConnell* decision that the court was not applying any new agency theory [13] and its reference to a captain of the ship was a mere analogy, some jurisdictions began using the phrase "captain of the ship" to impose strict or absolute liability on a surgeon for the negligence of every person associated with a patient's surgery regardless of whether the surgeon actually exercised any control over the actor. In other words, the surgeon's liability was presumed based on his mere status as surgeon and his presence in the operating room rather than any showing of actual control over the negligent actor. *See Sparger v. Worley Hosp., Inc.*, 547 S.W.2d 582, 584-85 (Tex. 1977); *Thomas v. Raleigh Gen. Hosp.*, 178 W. Va. 138, 358 S.E.2d 222, 224 (W. Va. 1987).

13  *See McConnell*, 65 A.2d at 248 ("It is for the jury to determine whether the relationship between defendant and the intern [], at the time the child's eyes were injured, was that of master and servant. If such was the relationship, defendant is legally liable for the injury caused by the intern []'s alleged negligence."). Moreover, the Pennsylvania Supreme Court later said: "[T]he 'captain of the ship' concept is but the adaptation of the **[**52]** familiar 'borrowed servant' principle in the law of agency to the operating room of a hospital." *Thomas v. Hutchinson*, 442 Pa. 118, 275 A.2d 23, 27 (Pa. 1971).

As hospitals have lost their charitable immunity and become large-scale providers of medical services with significant control over the manner in which their employees, including staff physicians, provide treatment, more recent courts have rejected the "captain of the ship" doctrine in favor of general agency principles. *See, e.g., Franklin*, 567 A.2d at 539 (rejecting "captain of the ship" doctrine in favor of "borrowed servant" doctrine; "[g]iven the statutory curtailment of a hospital's eleemosynary and governmental immunity in Maryland . . . there is no socio-economic need to extend the vicarious liability of a surgeon for the negligence of hospital employees simply to create a fund for victims of malpractice"); *Harris v. Miller*, 335 N.C. 379, 438 S.E.2d 731, 738, 740 (N.C. 1994) (holding "surgeons should no longer be presumed to enjoy the authoritative control of a master over all who assist merely because they are 'in charge' of the operation" and instead looking to respondeat superior and borrowed servant principles); *Anglin v. Kleeman*, 140 N.H. 257, 665 A.2d 747, 751 (N.H. 1995) **[**53]** (rejecting "captain of the ship" theory of liability; "[i]n modern medicine, the surgeon is a member of a team of professionals, and we see no reason why the surgeon should be deemed responsible for the actions of other professionals neither employed nor controlled by him"); *Sparger*, 547 S.W.2d at 585 ("We disapprove the captain of the ship doctrine and hold that it is a false special rule of agency. Operating surgeons and hospitals are subject to the principles of agency law [(master-servant and borrowed servant doctrines)] which apply to others."); *Lewis*, 627 N.W.2d at 493-94 ("'[C]aptain of the ship' has lost its vitality across the country as plaintiffs have been able to sustain actions [] against full-care modern hospitals for

the negligence of their employees[;] [a]ccordingly, we decline to resurrect the anachronistic 'captain of the ship' doctrine . . . .").

There are few courts which still employ the "captain of the ship" doctrine. *See, e.g., Baumgardner v. Yusuf*, 144 Cal. App. 4th 1381, 51 Cal. Rptr. 3d 277, 288 (Cal. Ct. App. 2006); *Ochoa v. Vered*, 186 P.3d 107, 112 (Colo. Ct. App. 2008); *Szabo v. Bryn Mawr Hosp.*, 432 Pa. Super. 409, 638 A.2d 1004, 1006 (Pa. Super. Ct. 1994). However, even these courts do not apply it in **[**54]** its purest form (*i.e.*, strict liability) but **[*1264]** instead look to agency principles, in particular, requiring the surgeon to have controlled and supervised the negligent actor's work as well as the manner in which it was done at the time of the alleged negligence. *See Baumgardner*, 51 Cal. Rptr. 3d at 287 ("The 'captain of the ship' doctrine imposes liability on a surgeon under the doctrine of respondeat superior for the acts of those under the surgeon's special supervision and control during the operation."); *Ochoa*, 186 P.3d at 110-11 (same); *Szabo*, 638 A.2d at 1006 ("The 'Captain of the Ship' Doctrine has agency considerations at its base. The essential question . . . is whether one is subject to the control of another not only to the work to be done but also the manner of performing it.") (citation and quotations omitted). Even the instruction proposed by Willis does not impose liability on the surgeon for an assistant's negligence unless the negligence occurs while the assistant is under the surgeon's direction.

We have uncovered no Wyoming case specifically addressing the "captain of the ship" doctrine. [14] While normally we would attempt to determine what the Wyoming Supreme Court would do **[**55]** if confronted with the issue, we need not do so here. Willis was not entitled to her proposed instruction because, as the district court decided, the evidence did not support its tender. *See Woolard v. JLG Indus., Inc.*, 210 F.3d 1158, 1177 (10th Cir. 2000) (stating a party "is entitled to an instruction based on its theory of the case if it has produced appropriate evidence to support it"); *see also Short v. Spring Creek Ranch, Inc.*, 731 P.2d 1195, 1199 (Wyo. 1987) ("[A] party is entitled to have a jury instruction upon its theory of the case but only if such theory is supported by competent evidence and a proper request for the instruction is made.").

14 Relying on *Jackson v. Hansard*, Willis claims Wyoming recognizes the "captain of the ship" doctrine. 45 Wyo. 201, 17 P.2d 659 (Wyo. 1933). We disagree. In *Jackson*, the Wyoming Supreme Court did not hold the surgeon liable for his assistant's negligence but rather for his own negligence. *Id*. at 663. Moreover, the fact Willis' proposed instruction appears in Wyoming's Civil Pattern Jury Instructions does not mean the Wyoming Supreme Court has adopted it. Indeed, in the comment preceding the instruction, it says:

> No Wyoming Supreme Court case has directly **[**56]** addressed the responsibility of the surgeon for errors or omissions of the members of the surgical team. *But see Jackson v. Hansard*, 45 Wyo. 201, 17 P.2d 659, 662 (Wyo. 1933). Nevertheless, the following instruction has been a part of the

Wyoming Civil Pattern Jury Instructions for some time and appears to state the general rule elsewhere in the country.

And the citations provided in support of the instruction include two California sources.

The proposed instruction sought to hold Bender liable for the negligence of the surgical assistant acting under his direction (Dr. Kirk). The only alleged negligence supported by Willis with expert testimony was Bender's decision to continue with the laparoscopic approach after the first two attempts to enter Willis' abdomen were unsuccessful. While Willis' expert also testified he believed the perforated bowel was caused by manipulation of one of the laparoscopic instruments held outside the field of view (presumably held by Dr. Kirk), he did not testify such manipulation fell below the standard of care. Expert testimony was necessary. *See Siebert v. Fowler*, 637 P.2d 255, 257 (Wyo. 1981) (stating expert testimony is necessary to prove the standard of care, whether **[\*\*57]** the physician's conduct fell below the standard of care, and whether that conduct was the legal cause of the plaintiff's injuries). Absent expert testimony establishing Dr. Kirk was negligent, there was no basis for the proposed instruction.

**[\*1265]** Even Bender's evidence did not support the giving of the instruction. Bender himself conceded the bowel perforation occurred sometime during the laparoscopic cholecystectomy and he took full responsibility for it. While he did not admit his conduct was negligent, neither did he claim it was caused by Dr. Kirk's negligence. Bender's expert, Dr. Barry Gardiner, also did not blame Dr. Kirk for Willis' injury. He believed Willis' injury occurred as Bender was "taking down" a dense adhesion connecting the bowel to the abdominal wall. (R. Appellee's Supp. App. at 330.) Again, absent evidence suggesting anyone involved in the surgery other than Bender was negligent, the court properly rejected Willis' proposed instruction. *See Spoor v. Serota*, 852 P.2d 1292, 1296 (Colo. Ct. App. 1992) ("captain of the ship" instruction not warranted absent evidence to support negligence claim against any party involved in the surgery other than the surgeon).

## IV. CONCLUSION

We **[\*\*58] REVERSE** the district court's grant of summary judgment to Bender on the informed consent claim but **AFFIRM** its denial of Willis' request for a "captain of the ship" jury instruction. The case is **REMANDED** for further proceedings consistent with this opinion.